IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

RICHARD REID,

        Plaintiff,

vs.                                                                  No. CIV 13-0337 JB/KBM

SUSAN PAUTLER; GREGORY GARCIA;
WES HATLEY; KRISTY MULLER; and
FLYSHIA ROSS, all in their individual capacities,

        Defendants.

## MEMORANDUM OPINION AND ORDER[1]

**THIS MATTER** comes before the Court on: (i) the Defendants' Opposed Motion to
Dismiss First Amended Complaint for Violation of Civil Rights, filed August 16, 2013
(Doc. 26)("MTD"); and (ii) the Plaintiff's Opposed Motion to Amend Complaint and
Memorandum Brief in Support Thereof, filed May 30, 2014 (Doc. 48)("Motion to Amend").
The Court held a hearing on the MTD on January 17, 2014.  The primary issues are: (i) whether
Defendant Flyshia Ross, a New Mexico Corrections Department ("NMCD") employee in the
Probation and Parole Division, was functionally acting in a judicial capacity when she filled out
an Order of Probation, submitted it to the Honorable Ricky D. Purcell, District Judge for the
Tenth District Court for the State of New Mexico, and then presented the signed Order of
Probation to Plaintiff Richard Reid, and is thus entitled to absolute quasi-judicial immunity;
(ii) whether Defendants Susan Pautler, Gregory Garcia, and Wes Hatley, NMCD employees in

---

[1]The Court issued an Order, filed March 31, 2014 (Doc. 39), granting the Defendants'
Opposed Motion to Dismiss First Amended Complaint for Violation of Civil Rights, filed
August 16, 2013 (Doc. 26), stating that the Court would "at a later date issue a memorandum
opinion more fully detailing its rationale for this decision."  Order at 1 n.1.  This Memorandum
Opinion and Order is the promised opinion.

the Probation and Parole Division, were functionally acting in a judicial capacity when they enforced the Order of Probation, which included searching Reid's home, ordering him to submit to urine drug tests, and arresting him for violating the Order of Probation, and are thus entitled to absolute quasi-judicial immunity; (iii) whether Heck v. Humphrey, 512 U.S. 477 (1994), bars Reid from bringing any of his claims under 42 U.S.C. § 1983; (iv) whether the Defendants are entitled to qualified immunity for allegedly violating Reid's due-process rights under the Fourteenth Amendment to the Constitution of the United States of America, and rights to be free from unreasonable searches and seizures under the Fourth Amendment to the Constitution of the United States of America; (v) whether Reid sufficiently alleged that Defendant Kristy Muller, an NMCD employee in the Probation and Parole Division, was personally involved in any alleged constitutional violations; and (vi) whether the Court should permit Reid to amend the First Amended Complaint for Violation of Civil Rights, filed July 17, 2013 (Doc. 25)("FAC"), to add two new claims, including a claim that the Defendants subjected him to double jeopardy in violation of the Fifth Amendment to the Constitution of the United States of America, and a claim that the Defendants denied him the right to counsel in violation of the Sixth Amendment to the Constitution of the United States of America.  The Court will grant the MTD and will dismiss all of Reid's claims against the Defendants, and it will deny the Motion to Amend.  The Court concludes: (i) Ross was not acting in a judicial capacity when she secured the Order of Probation, and is thus not entitled to absolute immunity; (ii) Garcia, Hatley, and Pautler are entitled to absolute immunity for enforcing the Order of Probation, a facially valid court order, but they are not entitled to absolute immunity for falsely stating that Reid repeatedly violated his probation conditions and was a risk to himself; (iii) Heck v. Humphrey bars Reid from asserting

- 2 -

the procedural due-process claim related to the additional term of probation as well as the Fourth Amendment search claim, because these claims depend on Reid establishing that the Order of Probation was invalid, but the Order of Probation has not been invalidated through the methods listed in Heck v. Humphrey, and Reid was not diligent in seeking to invalidate the Order of Probation; (iv) Ross is entitled to qualified immunity for the Fourth Amendment search and seizure claims against her, and Garcia, Hatley, and Pautler are entitled to qualified immunity for the procedural due process, Fourth Amendment search, and Fourth Amendment seizure claims against them; (v) Reid has not sufficiently alleged that Muller was involved in any of the purported constitutional violations; and (vi) Heck v. Humphrey would bar Reid's proposed additional claims, and, thus, amending the FAC would be futile. The Court will dismiss all of the claims with prejudice, except it will dismiss without prejudice the procedural due-process claim against Ross based on Reid's additional term of probation. The Court will also deny the Motion to Amend.

## FACTUAL BACKGROUND

The Court primarily takes the facts from the FAC. Normally, the sufficiency of a complaint must rest on its contents alone. See Casanova v. Ulibarri, 595 F.3d 1120, 1125 (10th Cir. 2010). There are three limited exceptions to this general principle: (i) documents that the complaint incorporates by reference, see Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007); (ii) "documents referred to in the complaint if the documents are central to the plaintiff's claim and the parties do not dispute the documents' authenticity," Jacobsen v. Deseret Book Co., 287 F.3d 936, 941 (10th Cir. 2002); and (iii) "matters of which a court may take judicial notice," Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322. The Defendants

have requested that the Court consider a number of documents attached to the Memorandum in Support of Defendants' Opposed Motion to dismiss First Amended Complaint for Violation of Civil Rights, filed August 16, 2013 (Doc. 27)("MTD Memo."), which, they assert, are referenced in the Complaint and are central to Reid's allegations.  See MTD Memo. ¶¶ 17-19, at 7-8.  At the hearing, Reid initially stated that he did not think the Court should consider the documents, because he could not gain access to the probation department's file for discovery, see Transcript of Hearing at 27:24-28:12 (Frost), taken January 17, 2014 ("Tr."),[2] but he did not dispute the documents' authenticity, admitted that he referred to them in the FAC, and then said that he did not see any problem with the Court considering the documents for the MTD and argued that they supported his position, Tr. at 28:13-29:4 (Court, Frost).  Because Reid referred to the documents in the FAC, the documents are central to Reid's claims, and the parties do not dispute their authenticity, the Court will also consider the three documents that the Defendants attached to the MTD Memo., without converting the MTD into a motion for summary judgment.  Further, Reid submitted to the Court the Stipulated Order on Satisfactory Discharge from Supervised Probation, filed in state court October 17, 2011, filed in federal court June 12, 2014 (Doc. 50-4)("Stipulated Order").   Reid references this document in the FAC, and, additionally, the Defendants do not object to the Court considering it, see Defendants' Response to Minute Order of June 9, 2014 at 3 n.3, filed June 13, 2014 (Doc. 51)("Defendants' Second Supp."), and thus, the Court will also consider the Stipulated Order for the MTD.

On April 19, 2001, Reid pled guilty to criminal charges in three separate cases: (i) Quay County Cause No. D-1010-CR-2000-00137 ("CR-137"); (ii) Quay County Cause No. D-1010-

---

[2]The Court's citations to the transcript of the hearing refer to the court reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

CR-2000-00138 ("CR-138"); and (iii) Quay County Cause No. D-1010-CR-2000-00139 ("CR-139").  FAC ¶ 5, at 1-2.  The three cases cross-referenced each other, but only the Judgment and Sentence for CR-137 set out Reid's incarceration and probation terms.  See FAC ¶ 5, at 1-2.  The Judgment, Sentence, and Commitment, No. CR-00-00139, filed August 16, 2013 (Doc. 27-2)("CR-139 J&S"), states: "The aforesaid sentence shall be consecutive to the sentence imposed in Cause No. CR-00-00137 and CR-00-00138.  Defendant has also pled guilty to charges in Cause No. CR-00-00137 and CR-00-00138 and the terms and conditions shall apply to all three cases."  CR-139 J&S ¶ 4, at 2.  See MTD Memo. ¶ 18, at 7-8.  Reid was sentenced to three hundred sixty-four days incarceration at the Quay County Detention Center; upon release, "he was to be transported directly to a residential rehabilitation treatment facility as determined by the Adult Probation and Parole Service," and then placed on supervised probation for five years "with a standard Order of Probation of the Tenth Judicial District."  FAC ¶ 6, at 2.

In June, 2002, an Order of Probation was filed in CR-137 requiring Reid to be on supervised probation from May 2, 2002, until May 1, 2007.  See FAC ¶ 7, at 2.  On May 27, 2004, the court entered an Order of Early Discharge on the suspended sentence, relieving Reid of any further obligations in CR-137.  See FAC ¶ 7, at 2.  In February, 2006, an Amended Order of Probation was filed in CR-138 and CR-139, requiring Reid to serve probation from March 14, 2002, until March 13, 2007.  See FAC ¶ 8, at 2.  Reid alleges that, "[u]nder New Mexico law, the total period of probation a defendant can be sentenced in district courts may not exceed five (5) years."  FAC ¶ 7, at 2 (citing N.M. Stat. Ann. § 31-20-5(A); State v. Devigne, 1981-NMCA-088, 96 N.M. 56, 632 P.2d 1199).[3]

_____

[3]The Court is including Reid's argument regarding New Mexico law in the factual

- 5 -

In June, 2007, three months after Reid completed five years of probation in CR-139, Ross "questioned why Plaintiff was no longer on probation." FAC ¶ 10, at 3. "Even though the file and documentation contained therein clearly showed that the Plaintiff's probation had ended on March 13, 2007 and that he could not be placed on any additional probation," Ross filled out a new Order of Probation, which extended Reid's probation from March 14, 2007, until March 13, 2012, and "submitted it to the district court for its signature." FAC ¶¶ 10-11, at 3.

Judge Purcell signed the Order of Probation. See Order of Probation at 2, dated June 12, 2007, filed August 16, 2013 (Doc. 27-1); MTD Memo. ¶ 17, at 7. After the court signed the Order of Probation, Ross presented it to Reid and required him to sign it; although Reid "questioned the validity of extending his probation any further," Ross assured him that he had an additional five years of probation to serve for his April 19, 2001, convictions. FAC ¶¶ 11-12, at 3. Under the Order of Probation, Reid

> was required to report to his Probation Officer ("PO") once a month; get permission from his PO before leaving Quay County, changing jobs or changing residences; he was prohibited from associating with persons identified by his PO as being detrimental to his supervision; he was required to authorize his PO to visit his home and to allow them to conduct warrantless searches on his person, residence, automobiles or property; he was required to provide urine or breath tests at the PO's request; and was required to pay monthly probation costs as well as pay Crime Stoppers, DNA and other fees.

FAC ¶ 12, at 3. Reid adhered to the terms of the Order of Probation until September, 2011, including monthly reporting to his PO and allowing his PO on at least one occasion to search his home in Logan, New Mexico. See FAC ¶ 13, at 3.

---

background to explain part of the "framework of [the] complaint," but it notes that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." Aschroft v. Iqbal, 556 U.S. 662, 678, 679 (2009). The Court will address in the analysis whether Reid's reading of New Mexico law regarding the total probation a person may serve is correct and how that determination impacts the MTD.

At some point before September, 2011, Garcia directly supervised Reid, and Muller supervised Garcia.  See FAC ¶ 14, at 4.  On September 7, 2011, Reid went to the Tucumcari, New Mexico, probation office for his monthly visit, where Hatley and Pautler were representing the probation office instead of his normal PO.  See FAC ¶ 14, at 4.  Hatley and Pautler demanded that Reid take a urine test, and he complied.  See FAC ¶ 14, at 4.  Hatley and Pautler told Reid that his test was positive, and Reid admitted that he had consumed marijuana at some point in the past.  See FAC ¶ 14, at 4.  Hatley then contacted Garcia to discuss what to do; Hatley, Pautler, and Garcia agreed that Reid should be immediately arrested.  See FAC ¶ 15, at 4.  They filled out an Arrest Order, which stated that Reid was not to be given bond.  See FAC ¶ 15, at 4; Arrest Order, dated September 7, 2011, filed August 16, 2013 (Doc. 27-3).  "As a justification for the arrest, Defendants Pautler, Garcia and Hatley falsely stated that the Plaintiff was a [risk][4] to himself and that he was guilty of repeated violations of supervised conditions."  FAC ¶ 15, at 4. The Arrest Order required the Defendants[5] to identify the current convictions which formed the basis for Reid's probation; each of the convictions that the Defendants identified "show that they were over ten (10) years prior to the date of the Arrest Order."  FAC ¶ 16, at 4.  Pautler signed the Arrest Order on Garcia's behalf, and Hatley signed the Arrest Order on Muller's behalf.  See FAC ¶ 15, at 4.  Muller did not sign the Arrest Order.  See Arrest Order at 1; MTD Memo. ¶ 19,

_____

[4]Although Reid alleges that Pautler, Garcia, and Hatley "falsely stated" that Reid was a "danger to himself," FAC ¶ 15, at 4, the Arrest Order includes a box checked to say that Reid was a "risk to Self," and had "multiple or repeated violations of supervision conditions," Arrest Order at 1.

[5]Reid does not specifically identify the Defendants in this paragraph, but it is likely Pautler, Hatley, and Garcia.  Also, the MTD Memo. argues that the allegation that the "defendants were required to identify the current convictions" is conclusory.  MTD Memo. at 6 n.8.

at 8.  Reid was "immediately taken into custody at the Quay County Detention Center."  FAC ¶ 15, at 4.

Reid alleges that NMRA 5-805(B) requires that the Defendants file a notice of the arrest, and give a copy to the probationer and the district court, and that the court then has five days to review the conditions of release for the incarcerated probationer.  See FAC ¶ 17, at 4-5.[6]  The Defendants did not file a notice of arrest.  See FAC ¶ 17, at 5.

Reid retained counsel to represent him, and on September 14, 2011, an order modifying his conditions of release was filed, and he was released on a $5,000.00 Own Recognizance Bond. See FAC ¶ 18, at 5.  Reid's counsel and the Tenth Judicial District Attorney's Office then determined that Reid had completed his probation in March, 2007, and that "he was not legally on probation after that date."  FAC ¶ 19, at 5.  The parties stipulated to an order discharging Reid based on fulfilling his term of probation, see FAC ¶ 19, at 5; that order states, in relevant part:

> **THIS MATTER** having come before the Court this 17th day of October, 2011, upon the motion of the Defendant, by and through his attorney, Randal M. Harris, and the concurrence of the State of New Mexico, represented by Tim Rose, Deputy District Attorney, regarding the same, and the Court being fully appraised in the premises orders the following:
>
> 1.    This Court has jurisdiction over the parties and subject matter herein;
>
> 2.    That the Defendant received a suspended sentence on the 19th day of April, 2001. for the charge of Burglary of Vehicle/Crafts/Structure - Non Residential, Criminal Damage to Properly Under $1,000 and was to be on probation for a period of five (5) years, zero (0) months, zero (0) days, and it

---

[6]The Court is including Reid's argument regarding New Mexico law in the factual background to explain part of the "framework of [the] complaint," but it notes that "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  Aschroft v. Iqbal, 556 U.S. 662, 678, 679 (2009).  The Court will address in the analysis whether Reid's reading of New Mexico law regarding NMRA 5-805(B) is correct and how NMRA 5-805(B) impacts the MTD.

further appearing to the Court that the Defendant is, satisfactorily discharged from Supervised Probation.

Stipulated Order at 1.

## PROCEDURAL BACKGROUND

On July 17, 2013, Reid filed the FAC, alleging three counts: (i) Count I, due-process violation under the Fourteenth Amendment to the Constitution of the United States; (ii) Count II, a search in violation of the Fourth Amendment to the Constitution of the United States; and (iii) Count III, a seizure in violation of the Fourth Amendment to the Constitution. See FAC at 5-7. In Count I, Reid alleges that "[t]he Defendants, while acting under the color of state law, deprived the Plaintiff of his liberty interest without due process of law," in violation of the Fourteenth Amendment to the Constitution, by requiring him to submit to four and one-half years of supervised probation and seven days of incarceration. FAC ¶ 21, at 5. He alleges that "it was a clearly established law that an individual cannot be placed on probation and required to adhere to the terms of probation and arrested for allegedly violating those terms, without first being charged with a crime and being provided with due process prior to a conviction," FAC ¶ 19, at 5, and that "[t]he conduct of the Defendants was intentional, willful, wanton, and in reckless disregard of the rights of the Plaintiff and he is therefore entitled to an award of punitive damages to punish the Defendants for their conduct to deter similar conduct on their part in the future," FAC ¶ 23, at 6. In Count II, Reid alleges that "[t]he Defendants, while acting under the color of state law, forced the Plaintiff to submit to a urine test and searched his home, without a warrant, absent exigent circumstances," in violation of the Fourth Amendment. FAC ¶ 26, at 6. He contends that "it was a clearly established law that a law enforcement officer could not require an individual to submit to a urine test or search his home without a warrant, unless there

were exigent circumstances," FAC ¶ 25, at 6, and that "the conduct of the Defendants was intentional, willful, wanton, and in reckless disregard of the rights of the Plaintiff," entitling him to punitive damages, FAC ¶ 28, at 7.  In Count III, Reid alleges that the "individual Defendants, while acting under the color of state law, arrested the Plaintiff on September 7, 2011 without probable cause and without a warrant," in violation of the Fourth Amendment.  FAC ¶ 31, at 7. He contends that "it was a clearly established law that a law enforcement officer could not arrest an individual without probable cause and/or an arrest warrant," and that, "under New Mexico law a probation officer has no independent law enforcement authority, but may only enforce the terms of valid probation orders."  FAC ¶ 30, at 7.  He alleges that the "conduct of the Defendants was intentional, willful, wanton, and in reckless disregard of the rights of the Plaintiff," entitling him to punitive damages.  FAC ¶ 33, at 7.

The Defendants move the Court, pursuant to rule 12(b)(6) of the Federal Rules of Civil Procedure, for an order dismissing the FAC with prejudice as to all Defendants.  See MTD at 1. The Defendants argue that each Defendant is immune from suit and liability under absolute quasi-judicial immunity, or, alternatively, qualified immunity.  See MTD at 1-2.  The Defendants also alternatively contend that, if Muller is not entitled to immunity, the Court should dismiss the claims against them, because of "insufficient personal involvement."  MTD at 2.

The Defendants emphasize "two observations" from the United States Court of Appeals for the Tenth Circuit "concerning probation officers and their 'unique' relationship to the sentencing court":

> (1) "the probation officer serves as an investigative and supervisory arm of the court," United States v. Davis, 151 F.3d 1304, 1306 (10th Cir. 1998)(internal quotation marks omitted); and (2) "[a]s a practical matter, then, the probation officer serves as a liaison between the sentencing court, which has supervisory

- 10 -

power over the defendant's term of supervised release, and the defendant, who must comply with the conditions of his supervised release or run the risk of revocation." Id. at 1306-07.

MTD Memo. at 2.  The Defendants note that the Tenth Circuit addressed "whether a federal probation officer had certain powers," but argue that "there is no rational reason why the Davis court's comments about the special role probation officers play is any less applicable to state probation officers."  MTD Memo. at 2 n.2.

In the Defendants' view, they are all entitled to absolute quasi-judicial immunity, because their work was "intimately or intrinsically associated with a judicial proceeding."  MTD Memo. at 11.  The Defendants point to the Tenth Circuit's holding that "a probation officer is entitled to quasi-judicial immunity for activities that are 'intimately associated with the judicial phase of the criminal process' such as preparation of a pretrial sentence report," MTD Memo. at 11 (quoting Tripati v. U.S.I.N.S., 784 F.2d 345, 348 (10th Cir. 1986)(per curiam)), and that "an 'official charged with the duty of executing a facially valid court order enjoys absolute immunity from liability for damages in a suit challenging conduct prescribed by that order,'" because "'[e]nforcing a court order or judgment is intrinsically associated with a judicial proceeding,'" MTD at 11 (quoting Valdez v. City & Cnty. of Denver, 878 F.2d 1285, 1286 (10th Cir. 1989)).

The Defendants identify five allegations that Reid makes against Ross: (i) she questioned why Reid was no longer on probation; (ii) she filled out a new Order of Probation and submitted it to the district court for its signature; (iii) she presented Reid with the new Order of Probation; (iv) she assured Reid that he had an addition five years of probation to serve; and (v) she did not file a notice of arrest NMRA 5-805 allegedly required.  See MTD Memo. at 11-12.  Regarding the first allegation -- that Ross questioned why Reid was no longer on probation -- the

- 11 -

Defendants contend that the FAC does not allege any "constitutionally infirm motive" for Ross' actions; they argue that her actions were consistent with the language in the CR-139 J&S, which indicated that the sentence "shall be consecutive" to the sentence imposed in CR-137 and CR-138.   MTD Memo. at 12.   Further, although Reid alleges that "the file and documentation contained therein clearly showed that the Plaintiff's probation had ended on March 13, 2007 and that he could not be placed on any additional probation," FAC ¶ 10, at 3, the Defendants argue that "there is simply no allegation that Ross was aware of such documentation" when she questioned why Reid was no longer on probation or submitted a new probation order to Judge Purcell," MTD Memo. at 12.   In the Defendants' view, these allegations are insufficient to show that Reid is entitled to relief.   See MTD Memo. at 12-13.   Regarding the second and third allegations -- that Ross filled out a new Order of Probation, submitted it to the district court for its signature, and presented it to Reid to sign -- the Defendants contend that the Order of Probation is Judge Purcell's order, that "he alone is legally responsible for its contents,"   MTD Memo. at 13 (citing Kelly v. Cnty. of Montgomery, Civ. No. 08-01660, 2008 WL 3408123, at *7 (E.D. Pa. Aug. 8, 2008)), and that, "[b]y presenting the [Order of Probation] to plaintiff, Ross was merely acting as an arm of Judge Purcell," MTD Memo. at 13.   The Defendants contend that Judge Purcell would have absolute judicial immunity for signing the Order of Probation and causing it to be enforced, and, thus, "there is no rational reason why defendant Ross should not be similarly immune for 'presenting' that order to plaintiff -- an act which Judge Purcell could have done himself."   MTD Memo. at 14.   Regarding Reid's fourth allegation -- that Ross assured Reid that he had five remaining years of probation -- the Defendants assert that Reid did not allege that he "was entitled to rely on Ross for an explanation" of his legal rights or that Ross

prevented him from "exercising his due process rights" by appealing the Order of Probation. MTD Memo. at 15.  The Defendants argue that Reid's failure to appeal the Order of Probation, which he "admittedly thought was improper," does not "now justify imposition of the burdens of litigation or liability -- almost six years after the fact -- on Ross."  MTD Memo. at 15.  The Defendants also argue that Ross' alleged assurance was "'intimately associated with the judicial phase of the criminal process,'" because they were consistent with the CR 139 J&S and what Judge Purcell could have told Reid.  MTD Memo. at 15 (quoting Tripati v. U.S.I.N.S., 784 F.2d at 348).  In the Defendants' view, New Mexico law did not clearly prohibit the imposition of a consecutive sentence in CR-139 after his probation in CR-137 and CR-138 had ended.  See MTD Memo. at 15-16.  The Defendants assert that Reid has not alleged that Ross knew the Order of Probation "contained an unlawful sentence . . . or intentionally lied to plaintiff as to the meaning and effect of the court's probation order."  MTD Memo. at 16.  Although the FAC alleges that the "conduct of Defendants was intentional, willful, wanton, and in reckless disregard of the rights of the Plaintiff," FAC ¶¶ 23, 28, 33, at 6-7, the Defendants argue that this allegation is insufficient under the pleading standards of Ashcroft v. Iqbal, 556 U.S. 662 (2009), and that Brown v. Montoya, 662 F.3d 1152, 1170 (10th Cir. 2011) -- in which the Tenth Circuit held that "an allegation that conduct was 'intentional, malicious, sadistic, willful, wanton, obdurate, and in gross and reckless disregard of [Mr. Brown's] constitutional rights' satisfied the requirement for alleging a sufficiently culpable state of mind in a § 1983 action" -- is "flatly at odds with the clear import of the holding of Iqbal."  MTD Memo. at 16 n.16.  The Defendants offer an alternative rationale for Brown v. Montoya:

> [A] possible explanation for the Brown court's conclusion that the boilerplate allegation of 'intentional, malicious, sadistic, willful, wanton, obdurate and in

> gross and reckless disregard' conduct of the probation officer sufficiently alleged the requisite state of mind is that the probation officer's activities in <u>Brown</u> appear to have been performed in the absence of a probation order ordering the probation officer to direct the plaintiff to register as a sex offender or be placed in the sex offender probation unit.

MTD Memo. at 16 n.16.  The Defendants contend that, in this case, "the requisite mental state cannot be inferred in the absence of allegations of specific facts supporting the inference of intentional or reckless conduct," and that "there is simply no allegation that Ross was aware of the alleged documentation in the file."  MTD Memo. at 16 n.16.  According to the Defendants, "[e]ven if Ross' assurance was negligent, negligence does not support liability under § 1983."  MTD Memo. at 16 (citing <u>Daniels v. Williams</u>, 474 U.S. 327, 333-36 (1986)).

Regarding the alleged failure to file a notice pursuant to NMRA 5-805(B), the Defendants argue that this allegation "cannot be used to predicate liability on Ross or any of the other defendants."  MTD Memo. at 17.  NMRA 5-805(B) states:

> If the probationer is arrested by the probation office without a warrant the probation office shall provide the district with a written notice within one (1) day of the arrest.  The notice shall contain a brief description of each alleged probation violation.  A copy of the notice shall be given to the probationer and filed with the court.

NMRA 5-805(B).  <u>See</u> MTD Memo. at 17 (quoting NMRA 5-805(B)).  The Defendants point out that NMRA 5-805(B) imposes an obligation on the probation office, not on a probation officer, and that Reid has not alleged that any of the Defendants are responsible within the probation office to file the notice.  <u>See</u> MTD Memo. at 17.  The Defendants assert that Reid's FAC does not allege that Ross or Muller took any part in Reid's arrest on September 7, 2011, and, thus, the "blanket reference to 'Defendants' . . . that no notice of arrest was filed" cannot apply to Ross or Muller.  MTD Memo. at 17. & n.18.  The Defendants further contend that "no harm resulted

from the alleged failure to file the notice," because, based on the calculations from NMRA 5-104(A), the judge had until September 14, 2011, to "review the notice of arrest or warrant and consider conditions of release," and the order modifying Reid's conditions of released was filed on September 14, 2011.  MTD Memo at 17-18 (citing NMRA 5-104(A)).

The Defendants argue that Hatley, Garcia, Pautler, and Muller are also entitled to quasi-judicial immunity, because their "alleged involvement with the violation of plaintiff's civil rights occurred in the context of them 'executing a facially valid court order.'"  MTD Memo. at 19 (quoting Valdez v. City & Cnty. of Denver, 878 F.2d at 1286).  They note that Reid has not alleged that the Order of Probation was facially invalid and argue that "a review of such order reveals no facial invalidity."  MTD Memo. at 19 n.19.  They point to the Order of Probation, which, among other things, authorized them to have Reid arrested without a warrant if he violated a probation condition, and argue that their conduct was consistent with the Order of Probation's authorizations and that they were "assisting Judge Purcell exercise his supervisory power" over Reid.  MTD Memo. at 20-21.  The Defendants contend that the Order of Probation authorized them to arrest Reid on September 7, 2011, and that the arrest was based on probable cause:  "Pautler and Hatley administered a urine test as specifically authorized by the facially valid" Order of Probation, and when Reid then "admitted that he had used marijuana," they had probable cause to believe that Reid had violated one of the conditions in the Order of Probation.  MTD Memo. at 21.

The Defendants assert that Reid amended his complaint to "beef up" the allegations against them by adding that they "falsely stated that Plaintiff was a danger to himself and that he was guilty of repeated violations of supervised conditions," and that each of the convictions on

the Arrest Order was over ten years old.  MTD Memo. at 21-22.  In the Defendants' view, the "'falsely stated' allegation" in the FAC is a "wholly conclusory 'naked assertion devoid of further factual enhancement.'"  MTD Memo. at 22 (quoting Ashcroft v. Iqbal, 556 U.S. at 678 (secondary quotation marks omitted)).   They argue that the Arrest Order controverts the allegation, because it states that Reid's detention "was necessary because of risk (not 'danger') -- to himself."  MTD Memo. at 22.  The Defendants maintain that Reid admitted to consuming marijuana, in violation of Judge Purcell's specific order that he not consume marijuana, and that "it was not unreasonable for defendants Pautler, Garcia, and Hatley to believe that plaintiff would consume marijuana in the future and that such consumption posed a risk to plaintiff."  MTD Memo. at 22.  The Defendants also assert that the FAC "does not allege *how* the listing of ten-year-old convictions in the Arrest Order constitute a violation of plaintiff's constitutional rights, and is thus insufficient in that regard."  MTD Memo. at 23 (emphasis in original).  They maintain that, although the convictions were over ten years old, this reality "does not negate the fact that there existed probable cause to arrest plaintiff based on his admitted use of marijuana and Judge Purcell's order that plaintiff not consume marijuana during the term of his probation."  MTD Memo. at 23.  The Defendants cite a number of cases that they argue support their contention that Hatley, Garcia, Pautler, and Muller are immune under the doctrine of absolute quasi-judicial immunity: Tripati v. U.S.I.N.S., Valdez v. City and Cnty. of Denver, Engebretson v. Mahoney, 724 F.3d 1034, 1039-40 (9th Cir. June 28, 2013); Gibbs v. Day, No. 3:09-cv-613, 2011 WL 1225898, at *4-5 (E.D. Tenn. Mar. 30, 2011); Beasley v. Allen, No. 05-1116-T/AN, 2006 WL 686338, at *3 & n.3 (W.D. Tenn. Mar. 15, 2006); Huffer v. Bogen, No. 11-4289, 2012 WL 5359637, at *5 (6th Cir. Nov. 1, 2012); Loggins v. Franklin County, Ohio, 218 F. App'x

466, 476 (6th Cir. 2007); Kelly v. Cnty. of Montgomery, 2008 WL 3408123, at *6-7.  See MTD

Memo. at 23-24.  The Defendants point to Kelly v. Cnty. of Montgomery in particular, because it

involved, in their view, similar facts:

> (1) a probation officer incorrectly reporting to a re-sentencing court that plaintiff's
> sentence was consecutive, rather than concurrent (as Ross apparently did here);
> (2) other probation officers' approval of the recommendation that the sentence be
> consecutive when they knew or should have known that the law permitted only a
> concurrent probation sentence; (3) unlawful extension of plaintiff's release date
> by the sentencing court as a result of the actions of the probation officers in giving
> or approving the recommendation to the court for a consecutive sentence;
> (4) representation to the court that plaintiff was subject to probation when he was
> not; and (5) the arrest and incarceration of plaintiff for an alleged probation
> violation when, under the law, he should not have been on probation.  Kelly, 2008
> WL 3408123*1, *6.  The probation officers moved to dismiss on the ground that
> they were entitled to absolute immunity, and alternatively, qualified immunity.

MTD Memo. at 25.  The Honorable James T. Giles, former United States District Judge for the

Eastern District of Pennsylvania, held that the probation officers' conduct was adjudicatory in

nature, and thus, granted the motion to dismiss based on absolute immunity.  See MTD Memo. at

25-26.

The Defendants contend that, alternatively, they are entitled to qualified immunity.  See

MTD Memo. at 26.  The Defendants assert that they

> have been unable to find any authority for the proposition that a probation officer
> must independently determine the validity of a facially valid probation order prior
> to enforcing it, or that plaintiff had the right to be free from "presentation" by a
> probation officer of a facially valid probation order signed by a judge, or later
> "supervision" by probation officers pursuant to such facially valid probation
> order.

MTD Memo. at 27.  The Defendants maintain that the weight of authority is to the contrary, that

is, that the law is not clearly established that probation officers must independently research the

lawfulness of a probation order which the sentencing judge signed.  See MTD Memo. at 27-28.

Although Reid alleged in the FAC that the maximum term of probation he could serve under New Mexico law is five years, the Defendants contend that the rule and case on which Reid relies -- N.M. Stat. Ann. § 31-20-5(A) and State v. Devigne -- show that the maximum probation term for convictions that occurred at one trial is five years, but that Reid's situation involves crimes charged in three separate cases.  See MTD Memo. at 28-29.  They maintain that the law in New Mexico is not clearly established that a probationer may not serve more than five years' probation in the aggregate for three separate cases.  See MTD Memo. at 30.

Finally, the Defendants argue that the Court should dismiss the claims against Muller, because the FAC does not allege that she was personally involved in the alleged constitutional violations; in their view, the "sole non-conclusory allegations against Muller is that she supervised Garcia . . . and she did not file a notice of arrest as allegedly required by Rule 5-805 NMRA." MTD Memo. at 30-31.  The Defendants maintain that "[m]ere supervision of a person who violates another person's constitutional rights is insufficient to impose § 1983 liability on the supervisor, as personal liability may not be predicated on a theory of respondeat superior." MTD Memo. at 31.  The Defendants contend that, although the law recognizes supervisory liability, the FAC does not contain allegations that support supervisory liability, because the FAC does not allege that Muller "promulgated, created, implemented or possessed responsibility for the continued operation of a policy that caused the complained of constitutional harm," or that she did so "with the state of mind required to establish the alleged constitutional deprivation."  MTD Memo. at 31.

Reid responds that the Defendants are not entitled to absolute immunity or qualified immunity.  See Plaintiff's Response in Opposition to the Defendants' Motion to Dismiss First

Amended Complaint for Violation of Civil Rights [Doc 26], filed August 23, 2013 (Doc. 28)("Response").  Reid asserts that Ross did not simply enforce the Order of Probation; she "made the determination" that Reid should serve five additional years of probation, completed the new Order of Probation, and presented it to the district court, "even though she knew the Plaintiff had already completed his period of probation."  Response at 3.  He asserts that he "anticipates that testimony in this case will show that district judges in New Mexico routinely sign off on probation orders submitted by the Probation and Parole Division without independently verifying the contents of those orders."  Response at 3.  Reid points to several cases which he contends "have held that probation and parole officers in identical situations to those of the Defendants are not entitled to absolute immunity," including Swift v. California, 384 F.3d 1184 (9th Cir. 2004), Draine v. Leavy, 504 F. App'x 494 (6th Cir. 2012), Galvan v. Garmon, 710 F.2d 214 (5th Cir. 1983), and Brown v. Montoya.  Response at 4-5.  Reid maintains that Ross was "not performing a judicial function in June of 2007 when, knowing that the Plaintiff had already completed his five (5) years of probation, she decided to fill out a new Order of Probation for submission to the court."  Response at 5.  Further, he maintains that "Hatley, Pautler and Garcia were not performing a judicial function when, knowing that the Plaintiff had completed his probation, they decided to falsify the Arrest Order and have the Plaintiff incarcerated."  Response at 5.  Reid argues that Valdez v. City and County of Denver -- a case on which the Defendants "rely heavily" -- is "easily distinguishable," because, in that case, "a district court had independently held an individual in contempt and ordered that they be arrested."  Response at 5.  Reid argues that "[n]o such order exists in this case."  Response at 5. Further, Reid asserts that the Defendants' reliance on Tripati v. U.S.I.N.S. is misplaced, because,

- 19 -

in that case, "the plaintiff was suing the probation officers for allegedly false statements made in a pretrial bond report and in a presentence report," activities that the district court had ordered and which "were an integral part of the court's function in sentencing the defendant," but that "[n]one of the Defendants in this case can claim a similar role."  Response at 5.

Reid argues that the Defendants are also not entitled to qualified immunity, because the FAC "alleges that the Defendants intentionally and recklessly imposed an additional five (5) years of probation on the Plaintiff, knowing that his legitimate term of probation ended on March 17, 2007," and that "it was a clearly established law in the Tenth Circuit from June of 2007 through the date of the Plaintiff's arrest that a probationer who has completed his term of probation is entitled to the same constitutional rights as any other citizen."  Response at 6.  Reid points to Trask v. Franco, 446 F.3d 1036 (10th Cir. 2006), a case in which the probation officer mistakenly thought the plaintiff remained on probation, but in fact, the judge's order releasing the plaintiff had not made its way into the probation officer's file.  See Response at 6.  According to Reid, the Tenth Circuit denied qualified immunity, because a question of fact existed concerning the reasonableness of the officers' belief that the plaintiff was still on probation.  See Response at 6 (citing Trask v. Franco, 446 F.3d at 1044).  Reid maintains that, because he has alleged that the probation officers knew his period of probation had expired, and yet imposed an additional four and one-half years of probation and seven days in jail, "[t]here can be no question" that if the allegations are true, the Defendants are not entitled to qualified immunity.  Response at 7.

Regarding Muller, Reid explains that "the only involvement of which the Plaintiff is aware concerning Defendant Kristy Muller is the fact that she would have normally approved the

Arrest Order, which was approved by Defendant Hatley." Response at 7. He asserts that, "[a]t this early stage of the case," he "believes that the form executed for the Plaintiff's arrest, which identifies Kristy Muller as the supervisor, is enough to keep her in this lawsuit." Response at 7.

The Defendants reply that, in the Response, Reid attempts to defeat the MTD "by pretending that the Amended Complaint alleges things that it simply does not allege." Reply Memorandum in Support of Defendants' Opposed Motion to Dismiss First Amended Complaint for Violation of Civil Rights at 1-2, filed September 16, 2013 (Doc. 32)("Reply"). The Defendants point out that, although Reid contends that Ross knew Reid had already completed his five years of probation and proceeded to fill out a new Order of Probation anyway,

> there is simply no allegation in the Amended Complaint that Ross plausibly knew at the time she allegedly prepared and submitted the OOP [Order of Probation] to Judge Purcell that a consecutive 5-year term of probation in one case (Case No. 139) could not follow a 5-year term of probation in another case, when the sentencing document in 139 specifically stated "[t]he aforesaid sentence shall be consecutive to the sentence imposed in Cause No. CR-00-00137 and CR-00-00138."

Reply at 2. They argue that "preparation of a judicial order is a quintessential 'judicial function,'" and even if Reid establishes through testimony that district judges in New Mexico routinely sign off on probation orders without verifying them, "then plaintiff will merely have established that the district judges in New Mexico have delegated part of their judicial function to the probation officers who prepare the orders for the judges' signatures." Reply at 3. They maintain that it would be "patently unfair" for Judge Purcell to have immunity for an order that he prepared himself and not extend that immunity to those who prepare orders for him, even though state rules authorize others to prepare orders and judgments and such practice is routine. Reply at 3 & n.1 (citing NMRA 1-058; NMRA 5-121(A)).

- 21 -

The Defendants further contend that -- although Reid alleges in the Response that Hatley, Pautler, and Garcia were not performing a judicial function when they falsified the Arrest Order, knowing that Reid had completed his probation -- the FAC does not allege that they knew that Reid had completed his probation, that the Order of Probation was infirm, or that it was facially invalid.  See Reply at 3.  The Defendants maintain that Hatley, Pautler, and Garcia should enjoy quasi-judicial immunity for enforcing the terms of the Order of Probation.  See Reply at 3-4 (citing Valdez v. City & Cnty. of Denver, 878 F.2d at 1286).  Although Reid attempts to distinguish Valdez v. City & Cnty. of Denver by asserting that the Defendants in this case were not following a court's direct order, the Defendants contend that, "whatever questions there might be about Ross and the OOP's genesis," Judge Purcell signed the Order of Probation, and Hatley, Pautler, and Garcia "were duty-bound to enforce" it.  Reply at 4.  Further, they assert that Reid did not allege in the FAC that Hatley, Pautler, and Garcia knew that the Order of Probation contained an illegal sentence of probation, "nor is such an allegation reasonably inferable from the non-conclusory factual allegations" within the FAC.  Reply at 4.  The Defendants compare their case to Tripati v. U.S.I.N.S., and contend that Ross' "alleged submission of a new order of probation to Judge Purcell for his signature is functionally similar to the preparation of a pretrial release report," because "preparation of an order of probation in a case where the judgment and sentence specifically said it was to run *consecutively* with the sentences in two other cases, is an 'important part of the judicial process.'"  Reply at 4-5 (emphasis in original)(quoting Tripati v. U.S.I.N.S., 784 F.2d at 348).  Even if Ross was "wrong on the law -- a point far from clear given the language" in the CR-139 J&S "and the fact that Devigne simply did not address the circumstances present in the instant case" -- the Defendants contend that quasi-judicial immunity

- 22 -

should still protect Ross.  Reply at 5 (citing <u>Kelly v. Cnty. of Montgomery</u>, 2008 WL 3408123 at

*1).  The Defendants also rely on <u>Tripati v. U.S.I.N.S.</u>, asserting that there is nothing in that case

"that suggests that such immunity should not extend to a probation officer who prepares a

probation order at the express or implied direction of a judge," and on <u>Valdez v. City & Cnty. of

Denver</u>, contending that the case "counsels immunity of defendants for all claims arising from

their execution of the facially valid" Order of Probation.  Reply at 5.

Regarding the qualified immunity defense, the Defendants contend that the FAC "does

not allege that any of the defendants knew that plaintiff's 'legitimate term of probation ended on

March 17, 2007' or that plaintiff's probation under the OOP was illegitimate," other than the

"conclusory -- and therefore insufficient -- allegations that 'the conduct of the Defendants was

intentional, willful, wanton, and in reckless disregard of the rights of the Plaintiff.'"  Reply at 6.

In the Defendants' view, the FAC alleges "no more" than that Hatley, Pautler, and Garcia

"enforced a facially valid order signed by Judge Purcell."  Reply at 6.  The Defendants argue that

they are entitled to qualified immunity, because, under <u>Hill v. Bogans</u>, 735 F.2d 391, 393 (10th

Cir. 1984), an officer has no constitutional duty to independently determine a warrant's validity,

unless that warrant is facially invalid.  <u>See</u> Reply at 7.  The Defendants contend that the FAC's

allegation that their conduct was "intentional, willful, wanton, and in reckless disregard of the

rights of the Plaintiff" is conclusory under <u>Ashcroft v. Iqbal</u>, 556 U.S. at 678, and that <u>Brown v.

Montoya</u> "appears to be flatly at odds with the conclusion in <u>Iqbal</u>."  Reply at 7.  The Defendants

argue that the

> only explanation discernible to defendants (other than the <u>Brown</u> court simply got
> it wrong) is that the bad acts of the probation officer defendant in <u>Brown</u> --
> wrongly directing the plaintiff to register as a sex offender and placing the
> plaintiff in the sex offender probation unit -- were not apparently authorized by

- 23 -

the probation order, and that somehow convinced the court that <u>Iqbal</u>'s seemingly
contrary holding did not apply under the circumstances.

Reply at 7-8.  The Defendants maintain that <u>Trask v. Franco</u>, a case on which Reid relies, does

not dictate denial of qualified immunity, because "the 'fact' that plaintiff was *later* discharged

from probation on agreement by plaintiff's counsel and the Tenth Judicial District Attorney's

office . . . is irrelevant."  Reply at 8 (emphasis in original).  Further, they point out that <u>Trask v.</u>

<u>Franco</u> involved a motion for summary judgment and not a post-<u>Ashcroft v. Iqbal</u> motion to

dismiss.  <u>See</u> Reply at 8-9.  The Defendants assert that <u>Brown v. Montoya</u> is distinguishable,

because the order did not permit the probation officer to order the probationer to register as a sex

offender.  <u>See</u> Reply at 9.

    The Defendants maintain that the Court should dismiss the FAC against Muller, "because

it fails to allege sufficient personal involvement in the alleged deprivation of plaintiff's

constitutional rights."  Reply at 9.  They contend that Reid's argument for keeping Muller in the

case -- that a form identifies her as a supervisor -- is "insufficient and wholly unsupported by the

law."   Reply at 9-10.   The Defendants point out that Reid also did not respond to their

explanation of why a failure to file a notice pursuant to NMRA 5-805(B) "was of no

constitutional consequence" and why <u>State v. Devigne</u> "does not stand for the proposition urged

by plaintiff," and, thus, argue that "the Court may conclude that plaintiff agrees with these

arguments."  Reply at 10.

    The Defendants direct the Court to <u>McAllister v. District of Columbia</u>, 653 A.2d 849, 851

(D.C. Ct. App. 1995), to support their proposition that "the doctrine of absolute judicial or quasi-

judicial immunity should be applied to defendant Ross even if she erred in preparation of the"

Order of Probation, "submitting it to Judge Purcell for signature, or presenting it to plaintiff."

Defendants' Notice of Supplemental Authority at 1, filed September 30, 2013 (Doc. 34)("Supp.").  They contend that McAllister v. District of Columbia also supports their argument that "Pautler, Hatley, Garcia, and Muller had no duty to discover any error in the OOP signed by Judge Purcell."  Supp. at 2 (citing McAllister v. District of Columbia, 653 A.2d at 852 & n.6).

At the hearing on January 17, 2014, the Defendants described the counts against them in Reid's FAC, see Tr. at 5:23-6:23 (James), and urged the Court to dismiss all the counts against them based on absolute quasi-judicial immunity or qualified immunity, or to dismiss the counts against Muller based on insufficient personal involvement, see Tr. at 6:24-7:7 (James).  The Defendants directed the Court to Tripati v. U.S.I.N.S. and Valdez v. City & Cnty. of Denver, arguing that, as the federal probation officer in Tripati v. U.S.I.N.S. preparing the pretrial report was entitled to absolute quasi-judicial immunity for performing an activity intimately associated with the judicial phase of the criminal process, so too are the Defendants in this case entitled to absolute quasi-judicial immunity for their involvement.  See Tr. at 7:7-8:13 (James).  The Court asked how the state probation system works; the Defendants explained that state probation officers are "employees of the New Mexico Corrections Department," that they "are not law enforcement officers, they don't carry guns," but that they did not know whether they are housed in a building separate from the court in Tucumcari.  Tr. at 8:14-9:14 (Court, James).  The Defendants asserted that "there is no reason to treat state probation officers differently from federal probation officers."  Tr. at 10:9-11 (James).  The Court noted that, if a police officer executed a warrant, he or she may have qualified immunity, but "nobody would suggest that a police officer would have judicial immunity," and asked how a state probation officer executing

a court order would have judicial immunity.  Tr. at 10:14-24 (Court).  The Defendants said that the probation officer could receive quasi-judicial immunity and that, while the label may not be important, "what's important is that it's absolute."  Tr. at 10:25-11:3 (James).  The Defendants pointed to Valdez v. City and County of Denver, in which the Tenth Circuit "held that an officer charged with enforcing a facial[ly] valid Court order enjoys absolute immunity and is not required to act as a[n] . . . appellate Court and second-guess the judge that issued that order, and in this case there is no allegation that the probation order required was not facially valid."  Tr. at 11:4-10 (James).  The Defendants explained that the Tenth Circuit decided Tripati v. U.S.I.N.S. in 1986, Valdez v. City and County of Denver in 1989, and Brown v. Montoya in 2011, but that Valdez v. City and County of Denver is "still good law."  Tr. at 11:20-12:4 (James).  The Court said that, if it were to issue an arrest warrant, then the United States Marshals would arrest the person, not the probation officer, and thus it would make sense that the marshals would receive absolute immunity for carrying out the court's order, although the marshals would not be immune if they violated a person's constitutional rights during the arrest.  See Tr. at 12: 18-13:20 (Court).  The Defendants agreed that, while the probation officers had a court order to supervise Reid, they could not supervise in an unconstitutional way, "for example, forcing [Reid] to provide a urine sample in public."  Tr. at 13:21-14:7 (James).  They argued that they are "entitled to absolute immunity for the arrest because again they were just enforcing and carrying out and implementing Judge Purcell's order."  Tr. at 14:13-21 (James).  The Court asked whether a probation officer who makes up a story and presents an application to a judge "filled with falsehoods" should be immune just because the judge signs off on the order.  Tr. at 14:22-15:8 (Court).  The Defendants asserted that, in Tripati v. U.S.I.N.S., "it was specifically alleged that

they made false statements in the reports that were presented to the Court," which could cover reckless or intentional false statements, and that the Tenth Circuit still found that the probation officers were entitled to absolute immunity.  Tr. at 15:9-20 (James, Court).

Regarding the pleading requirements, the Defendants asserted that Reid must make non-conclusory factual allegations to support that they acted maliciously, intentionally, or with bad faith, that he did not make non-conclusory factual allegations about scienter, and that, although Brown v. Montoya "is problematic," there were facts in Brown v. Montoya "that are absent in this case."  Tr. at 18:1-19:7 (James, Court).  The Court noted that, as a district court, it must "take the position of the Tenth Circuit" and that it may be "stuck" with Brown v. Montoya.  Tr. at 19:8-21 (Court).  The Defendants suggested that they could distinguish Brown v. Montoya, because, in that case, "the probation officer's actions were clearly outside the scope" of the probation order, including "placing or forcing the defendant to register as a sex offender" and placing him on "sex offender probation."  Tr. at 19:22-20:15 (James, Court).  The Court asked how "that is so qualitatively different than going to the judge and saying" that Reid had "five more years of supervised release or probation and making him serve time that he statutorily was not required to serve."  Tr. at 20:22-21:4 (Court).  The Defendants noted that Ross submitted the order to Judge Purcell, but she did not participate in the September 7, 2011, arrest, while Hatley, Pautler, Garcia, and Muller followed the terms of the facially valid order.  See Tr. at 21:5-17 (James).  In the Defendants' view, Judge Purcell made the order his own after Ross submitted it to him and he signed it, which "can be thought of as an intervening superseding cause of any harm that befell the plaintiff as a result of that order."  Tr. at 22:18-23:1 (James).  The Defendants noted that, had Reid challenged the Order of Probation "by appeal or just a hearing

with the judge at the time, we wouldn't be here today," and argued that it would be "unfair to allow Judge Purcell to be immune from liability for that order" and hold Ross liable for it, "[e]specially in light of the fact that it's four and a half years after the fact and Mr. Reid could have appealed or just simply talked to the judge." Tr. at 23:10-22 (James). The Defendants said the claim against Ross is a procedural due-process claim, and the Court noted that, when a plaintiff has not pursued an available procedural remedy, the plaintiff cannot maintain a procedural due-process claim. See Tr. at 24:1-25:17 (James, Court).

Reid contended that the Order of Probation was not facially valid, because it recites that Reid pled guilty on April 19, 2001, but the supervised probation was to run from March 14, 2007, until March 13, 2012; he argued: "[U]nder what possible set of circumstances would a Court in 2001 place someone on probation to begin in 2007 for five years? They wouldn't." Tr. at 29:11-19 (Frost). Reid explained that, while the parties dispute how long he was incarcerated, he was at most incarcerated for six months. See Tr. at 29:22-30:3 (Frost). The Court noted that the Order of Probation seemed "a little bit unusual," that it could not remember imposing a sentence "in 2001 saying in 2007 you're going to start serving your supervised release," but that, "effectively I do that all the time in the sense that I say I sentence you to 72 months and following that you're going to serve five years of supervised release." Tr. at 30:4-11 (Court). Reid responded that the three judgments show that no one intended Reid to be incarcerated and argued that the Order of Probation was not facially valid. See Tr. at 30:23-31:7 (Frost). The Court asked why the Order of Probation had to be facially valid; Reid contended that whether it was facially valid is a factor in the qualified immunity or absolute immunity analysis. See Tr. at 31:8-17 (Court, Frost). He explained that "there is a continuum of not what you're calling a

probation officer, but actually what they're doing on a day-to-day basis," so that at one end of the continuum, when a probation officer acts like a police officer, he or she is not entitled to absolute immunity, but at the other end of the spectrum, when a court asks a probation officer to complete a presentence report, he or she is part of the judicial decision making process and is entitled to absolute immunity. Tr. at 32:5-33:3 (Frost). Reid argued that, unlike a probation officer preparing a presentence report, the officers in this case made "their own determinations of whether the order should be granted or should not be granted or what should be done. This is not something that's directed by the Court." Tr. at 33:3-9(Frost). The Court asked "how do these individual defendants fair with your spectrum analysis" and "when would a probation officer ever, then be entitled judicial immunity." Tr. at 33:13-17 (Court). Reid responded that a probation officer would be immune in a situation like Valdez v. City and County of Denver, where the probation officer was not involved in any aspect of the court's decision to have the person arrested, but that "none of the defendants in this case meet that requirement." Tr. at 33:17-34:2 (Frost). Reid asserted that negligence can serve as the basis for liability in a § 1983 claim based on the Fourth Amendment, although not for a procedural due-process claim. See Tr. at 34:3-21 (Frost)(citing Berg v. Cnty. of Allegany, 219 F.3d 261 (3rd Cir. 2000); Pitchford v. Borough of Munhal, 631 F. Supp. 2d 636 (W.D. Pa. 2007)). He explained that those cases involved qualified immunity, not absolute immunity, because "I've never thought this case was absolute immunity, had anything to do with it. It's qualified immunity." Tr. at 35:12-36:2 (Frost). The Court asked if Reid had anything further to say about judicial immunity, and he said that he did not. See Tr. at 36:3-6 (Court, Frost).

The Defendants pointed out that the CR-139 J&S "specifically said that the sentence was to run consecutively" to CR-137 and CR-138, and, thus, Ross was "acting like a scribe of the Court, preparing an order." Tr. at 36:12-16 (James). They contended that the portion of the Order of Probation that Reid emphasized was "a recital," and that the "meat of the order still says, You're on probation till this date, and you probation officers need to enforce[] this order." Tr. at 36:17-20 (James). In the Defendants' view, "the responsible parties" for any incorrect probation order were the district attorney, Reid's then-attorney, and the judge who signed the orders, but that it would not be fair to "mak[e] Ross stand for a suit for damages for these past acts when Reid failed to do anything about it at the time." Tr. at 36:21-37:4 (James).

Reid contended that none of the Defendants are entitled to absolute immunity, "because first we don't have a facially valid order, and we have additional evidence as we go through the file over the period of time that there were problems with this probation." Tr. at 37:19-35 (Frost). He explained that, in 2007, the court issued orders of discharge in CR-137 and CR-138, showing that Reid "had committed no violations" and that "he'd been a model citizen." Tr. at 38:2-6 (Frost). He asserted that "somebody looking through the file could have clearly determined that there is something not right here," because CR-137, CR-138, and CR-139 were "intertwined at every stage of the proceeding." Tr. at 38:6-11 (Frost). He asked "why wouldn't somebody ask that if he's discharged from probation in two other cases why would he continue to be on probation in this one and why would that probation start five years later?" Tr. at 38:11-15 (Frost). He pointed out that "Ross had all the documentation in front of her," that "Garcia, as he supervised him over a period of three or four years, had available all the information," and Muller, as Garcia's supervisor, "participated as a supervisor" when Reid checked in each month

- 30 -

and when the probation officer searched his house.  Tr. at 39:16-6 (Frost).  Reid further argued that it should have "r[u]ng a bell to somebody that something [wa]s not right" when Reid's conviction was from 2001, "and yet in 2011 he's going to go to jail."  Tr. at 39:12-16 (Frost).  In Reid's view, the officers had "malicious intent" by arresting Reid, because they could have "easily filed an application with the Court to revoke his probation" and then determined whether he needed to be arrested.  Tr. at 39:18-24 (Frost).  He contended that they "misrepresented his status and said the reason we're going to hold him without a bond is because he's a risk to himself," "he's a multiple repeat violat[or] of supervised conditions," but "[t]hat is simply untrue."  Tr. at 40:2-5 (Frost).  In Reid's view, "not only did they have to ignore the fact that he's being thrown into jail for something he did 10 years earlier but they falsified and said that he's subject to hurting himself or others and he's a multiple violator."  Tr. at 40:5-10 (Frost).

The Defendants asserted that they had probable cause to arrest Reid, because the Order of Probation "authorized and directed the probation officers to test [Reid] for drugs, they tested him for drugs, he came up positive[, and] the order allowed him to be arrested."  Tr. at 40:18-24 (James).  They explained that the Arrest Order says that Reid was "a risk to himself," not that he was a "danger"; they emphasized that "marijuana is illegal," and one of the reasons it is illegal under federal law and in most states is "because many people thin[k] that the consumption of it poses a risk to self and others."  Tr. at 40:24-41:7 (James).

Moving onto qualified immunity, the Defendants framed the issue in this case as

was it beyond debate in 2007 when Ross prepared and submitted the subject probation order to Judge Purcell that plaintiff had a . . . protected right to have Ross question the legality of the judgment and sent[ence] in [CR-]139 that stated the . . . sentence shall be consecutive to the sentence imposed in [CR-]137 and [CR-]138 prior to filling out that standard order of probation?  Or state[d] another [way,] would it have been clear to a reasonable probation officer at the time she

filled out that order in accordance with the applicable judgment and sentence that she must first independently verify the propriety of the sentence?

Tr. at 42:13-43:8 (James).  The Defendants contended that Reid did not provide any

> authority for that proposition that [Ross] owed a duty to independent[ly] investigate or that plaintiff as a probationer had the right to have his probation officers do an independent investigation, and for that reason, . . . I don't think he sustained his burden to show that the plaintiff's right in this regard was clearly established.

Tr. at 43:9-16 (James).  In their view, even if Ross should have checked to see if the Order of

Probation was consistent with the law, the next step involved looking to state law, including

N.M. Stat. Ann. § 31-20-5A and State v. Devigne; the Defendants contended that, although § 31-

20-5A indicates that the total period of probation shall not exceed five years, State v. Devigne

interprets that statute to mean that the maximum probation for a defendant for convictions that

occurred at one trial was five years, while this situation involved three separate cases.  See Tr. at

43:16-44:25 (James).  The Court asked whether the federal issue is whether a probation officer

violates the Constitution of the United States by acting on an incorrect interpretation of state law.

See Tr. at 45:21-25 (Court).  The Defendants disagreed, reiterating that the federal question is

whether Reid has the right to have his probation officer independently verify the correctness of

his sentence.  See Tr. at 46:1-5 (James).  The Defendants contended that, even if Ross had

attempted to verify Reid's probation period, "it wasn't clear as to what was appropriate or not

under state law."  Tr. at 56:16-24 (James).

The Defendants framed the federal question against the Defendants, other than Ross, as

whether it was "beyond doubt during the period 2007 to 2011 that . . . probationers have . . . [the]

protected right to have their probation officers independently verify the validity of a facially

valid probation order."  Tr. at 47:2-8 (James).  The Defendants asserted that Reid could not cite

any case to that effect, failing to sustain his burden on the clearly established element, and that "Tenth Circuit law is to the contrary."  Tr. at 47:8-16 (James).  In the Defendants' view, Reid's Response made five state-of-mind allegations that were not in the FAC, including: (i) that the Defendants "intentionally and recklessly imposed an additional five years of probation on plaintiff knowing that his legitimate term of probation ended on March 17, 2007," Tr. at 48:24-49:5 (citing Response at 6); (ii) that Ross presented the Order of Probation to Judge Purcell "even though she knew the plaintiff had already completed his period of probation," Tr. at 49:6-10 (James)(citing Response at 3); (iii) that Ross, "knowing that the plaintiff had already completed his five years of probation," filled out a new Order of Probation and submitted it to the court, Tr. at 49:10-14 (James)(citing Response at 5); (iv) that Hatley, Pautler, and Garcia arrested Reid "knowing that the plaintiff had completed his probation," Tr. at 49:14-16 (James)(citing Response at 5); and (v) that the Defendants "knew that [Reid's] period of probation was over and yet proceeded to impose an additional four and a half years of probation and 7 days in jail," Tr. at 49:17-21 (James)(citing Response at 7).  The Defendants argued that Trask v. Franco does not support denying their qualified immunity defense, because the probation order in that case had been rescinded, whereas, in this case, the Defendants acted on what was to them a facially valid probation order that Judge Purcell had signed, and, although Reid was later discharged from the Order of Probation, Garcia's, Pautler's, and Hatley's acts were not improper.  See Tr. at 50:7-21 (James).

The Court asked Reid to explain the claims he was making against the Defendants; Reid alleged that every Defendant violated his procedural due-process rights and Fourth Amendment rights to be free from unreasonable searches and seizures.  Regarding the procedural due-process

- 33 -

claim, he explained that every Defendant had information available that should have shown them that he should not have had an additional five years of probation.  See Tr. at 51:11-23 (Frost, Court).  Regarding the Fourth Amendment search claim, Reid explained that, in his view, Ross proximately caused the subsequent searches and seizure, each month he had to go to the probation office for a drug test, he viewed it as a separate violation, and he based the Fourth Amendment seizure claim not only on the seven days he spent in jail, but on a "continuous seizure . . . affecting his liberty interest during the entire period of probation."  Tr. at 51:24-53:4 (Frost).

In response to the Court's question regarding whether Reid could have immediately appealed the Order of Probation, Reid said that there was no hearing in his case, and so neither the district attorney nor Reid's attorney was involved.  Tr. at 54:14-55:14 (Court, Reid).  Reid explained that he did not get an attorney to appeal the Order of Probation, because "he's destitute," was previously represented through a public defender, and thought that Ross was "shooting him straight."  Tr. at 56:5-11 (Frost).  Reid said that he signed the Order of Probation, but that "I think we can demonstrate that he signed that prior to the judge signing it, so . . . by him signing it I think [the Defendants were] representing to the Court that he agrees with that, but they didn't actually have a hearing where he could express his disagreement with the Court."  Tr. at 56:23-57:5 (Frost).  In his view, "[t]his was a circumstance where because of their shoddy procedures[,] there was no procedure available for him to do anything without going out and affirmatively hiring his own lawyer and challenging that."  Tr. at 57:10-14 (Frost).  The Court asked Reid how a ruling that there was not a procedural due-process violation based on Reid's failure to appeal the Order of Probation would affect his Fourth Amendment claims; Reid

responded that the order was not valid and that the other probation officers should have seen that the order was not valid, meaning that they conducted the searches and seizure without probable cause.   See Tr. at 59:19-61:22 (Court, Frost); id. at 63:8-13 (Frost).   Reid argued that the Defendants violated the Fourth Amendment, and state law impacts whether the Defendants were acting reasonably; he agreed with the Court that it is federal law, not state law, that governs whether the law is clearly established for the qualified immunity analysis, and he compared his case to Marshall v. Columbia Lea Regional Hospital, 474 F.3d 733 (10th Cir. 2007), and Brown v. Montoya.   See Tr. at 63:8-66:1 (Frost, Court).

        The Defendants argued that, if the Court finds that there is not a procedural due-process violation, then Valdez v. City and County of Denver and Gose v. Board of County Commissioners, 778 F. Supp. 2d 1191 (D.N.M. 2011)(Browning, J.), dictates that there are no Fourth Amendment violations.   See Tr. at 66:8-18 (James).   The Defendants also contended that the FAC, in some places, refers generally to the Defendants rather than to individual Defendants, and that Reid needed to identify with specificity what each Defendant did.   See Tr. at 67:18-68:2 (James).   The Court asked Reid what he was alleging against Ross; Reid explained that Ross presented the Order of Probation to Reid and then to the court, and that "it's the presentment to the Court that is the problem from my perspective."   Tr. at 70:14-71:9 (Court, Frost).   Reid maintained that, although police officers may ask for consent, this situation was more coercive, because the state court had already directed Reid to follow his probation officer's orders.   See Tr. at 71:15-72:16 (Court, Frost).   In Reid's view, probation officers have "immense power" over probationers, because "they've got so much authority over you[r] day-to-day" activities.   Tr. at 73:5-74:3 (Frost).

Regarding Muller, the Defendants reiterated their arguments that Reid did not sufficiently allege that she was personally involved in any alleged constitutional violations, or that she promulgated, created, implemented, or possessed responsibility for any policy that caused the alleged constitutional harm.  See Tr. at 74:13-75:8 (James).  Reid argued that he named Muller in the FAC, because she supervised Garcia and because the Arrest Order includes a line for her signature as a supervisor, although she did not sign the Arrest Order.  See Tr. at 76:18-78:3 (Frost); id. at 79:10-14 (Frost).  The Court noted that, for purposes of the MTD, it may have to consider the typed name as sufficient to require Muller to stop any constitutional violations that she sees.  See Tr. at 79:22-80:24 (Court, James).  The Defendants emphasized that, although Muller's typed name appears on the Arrest Order, she did not sign it and that Reid might have a case against her if she had signed it.  See Tr. at 81:9-82:5 (James, Court).  Reid maintained that he is alleging direct involvement, not supervisory liability, against Muller.  See Tr. at 82:22-24 (Frost).

The Court said that it agreed with the parties that the analysis for quasi-judicial immunity considers whether the probation officer is performing a judicial function, but it would need to look at the interplay between Judge Purcell's order and whether the people enforcing the order have immunity.  See Tr. at 84:9-85:14 (Court).  The Court said that it thought that Reid could have appealed the Order of Probation, which would eliminate liability against Ross, and that it did not think the other probation officers would have any duty to look beyond the Order of Probation.  See Tr. at 86:1-87:4 (Court).

In a Minute Order, filed May 24, 2014 (Doc. 45), the Court asked the parties to analyze the following issues related to Reid's procedural due-process claim against Ross: (i) "[W]hat

process did Reid have available before and after the June, 2007, Order of Probation was entered in CR-139, and what authority shows that he had that process available?"; (ii) "What process does the due process clause require Reid to have been given before or after the new Order of Probation was entered?"; and (iii) "How would Ross, an individual, violate Reid's procedural due process rights?"  Minute Order at 1.

In the Plaintiff's Supplemental Brief, filed May 29, 2014 (Doc. 46)("Reid Supp."), Reid argues that he "had the right to be present at the hearing extending his probation."  Reid Supp. at 1 (bold and title case omitted).  He points to United States v. Santiago, 977 F.2d 517 (10th Cir. 1992), and, quoting from the case, asserts that a criminal defendant has a right to confront witnesses and evidence offered against him pursuant to the Sixth Amendment to the Constitution of the United States' confrontation clause, and that, for any other criminal proceeding, he has a right under the Fifth Amendment to the Constitution of the United States of America's due process clause "'to be present whenever his presence has a relation, reasonably substantial, to the fullness of his opportunity to defend against the charge,'" and that this right to be present "'exists to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only.'"  Reid Supp. at 1-2 (quoting United States v. Santiago, 977 F.2d at 522)(internal quotation marks omitted).  He asserts that he had "the right to be present at whatever type of 'hearing' was conducted concerning" the Order of Probation, especially because the Order of Probation increased the severity of the sentence.  Reid Supp. at 2 (citing, e.g., United States v. Moree, 928 F.2d 654, 656 (5th Cir. 1991)(explaining that a defendant has a right to be present at the imposition of the sentence and to speak on his own behalf, even if he has had the opportunity to speak earlier in the proceedings (quoting United States v. Behrens, 375 U.S, 162, 167 (Harlan, J.,

concurring in the result))); State v. Sommer, 1994-NMCA-070, 118 N.M. 58, 878 P.2d 1007 (holding that defendant did not have a right to be present at the hearing on his motion to reconsider his sentence under SCRA 1986, 5-801(B) (effective until August 1, 1992)(repealed 1992), and explaining that neither the New Mexico rules nor the Constitution of the United States of America requires a defendant to be present at post-conviction hearings where a sentence is not imposed); State v. Allen, 1971-NMSC-026, 82 N.M. 373, 482 P.2d 237 (stating that, when a defendant's sentence has been set aside, the defendant's presence is necessary at resentencing, and that increasing a sentence, after a defendant has started to serve the sentence, violates the constitutional guarantee against double jeopardy).

Reid acknowledges that "the constitutional right to be present at a hearing, like all constitutional rights, can be waived under the appropriate circumstances," but he asserts that there is no evidence that he waived his right to be present at a hearing for new Order of Probation.  Reid Supp. at 2.  In his view, "[h]ad there actually been a hearing before the court" regarding the Order of Probation, he could have informed the Court what he asserts he told Ross -- that he believed he had finished his term of probation -- and "a judge would likely have looked at the history of the case, known that there was a five (5) [year] limit on probation and been able to refuse to enter the 2007 Order of Probation."  Reid Supp. at 3.

Reid argues that "there is not basis under the New Mexico Statutes for a new or amended Order of Probation that has the effect of increasing the penalty or adding additional conditions of probation."  Reid Supp. at 3 (citing State v. Castillo, 1980-NMCA-020, 94 N.M. 352, 610 P.2d 756; State v. Crespin, 1981-NMCA-095, 96 N.M. 640, 633 P.2d 1238).

In response to the Court's question what process Reid had available before Judge Purcell

entered the Order of Probation in CR-139, the Defendants assert that Reid had the right to counsel and right to be present at his sentencing for CR-139.  See Defendants' Response to Court's Minute Order at 1-2, filed May 29, 2014 (Doc. 47)("Defendants' Supp.")(citing State v. Garcia, 1980-NMSC-132, ¶ 15, 95 N.M. 246, 620 P.2d 1271 (stating that a "defendant's right to be present at every stage of the trial is grounded in the Sixth Amendment to the United States Constitution and made applicable to the states through the Fourteenth Amendment"); Rule 5-612(A) ("Except as otherwise provided by these rules, the defendant shall be present at all proceedings, including the arraignment, all hearings and conferences, argument, the jury trial and during all communications between the court and the trial jury.")).  The Defendants assert that, after Judge Purcell entered the Order of Probation, Reid could: (i) move to correct or modify the sentence pursuant to rule 5-801 NMRA, see Defendants' Supp. at 2; (ii) appeal to the Court of Appeals of New Mexico pursuant to N.M. Stat. Ann. § 39-3-3, see Defendants' Supp. at 3 (citing State v. Williams, 2006-NMCA-092, ¶ 3, 140 N.M. 194, 141 P.3d 538 (stating that "[t]he grant of probation is a discretionary act of the sentencing court" and setting forth the standard of review for terms and conditions of probation); State v. Diaz, No. 31,288, 2011 WL 5041541, at *1 (N.M. Ct. App. Sept. 28, 2011)(unpublished)(stating that the defendant appealed from her order of probation); (iii) petition for a writ of habeas corpus pursuant to N.M. Stat. Ann. § 44-1-1, see Defendants' Supp. at 3; or (iv) petition for writ of habeas relief under 28 U.S.C. § 2241, see Defendants' Supp. at 4.  The Defendants argue that Reid "clearly had several avenues of relief at least theoretically available to him" in 2007 when Judge Purcell signed the Order of Probation, but that Reid "completely failed to pursue" those avenues of relief "even though he admittedly questioned the validity of the probation order at the time."  Defendants' Supp. at 4.

Next, the Defendants respond to the Court's question regarding the amount of process that the due process clause requires Reid to have been given before Judge Purcell entered the Order of Probation.  See Defendants' Supp. at 5.  They assert that they have "searched in vain for authority explaining what, if any, additional process is due a person already convicted of a crime, and judgment and sentence entered, before the judge signs the order of probation."  Defendants' Supp. at 5.  They explain that,

> [b]ecause probation limits one's liberty less than imprisonment, as a matter of logic, it seems that so long as the probationer had been duly convicted, and judgment and sentence entered, no additional process would be due before the sentencing judge signs the order of probation.  In any event, the inability of defendants' counsel to find authority on this issue suggests that whatever procedural due process right claimed by plaintiff to have been violated by Ross by scribing, or Judge Purcell by signing, the order or probation without a hearing, was not "clearly established" in June 2007.

Defendants' Supp. at 5.  The Defendants analogize to the process that is due before extending a probationer's term of probation; they assert that the Third, Fifth, Sixth, Eighth, and Ninth Circuits "have held that a hearing is *not* constitutionally required prior to the extension of probation."  Defendants' Supp. at 5 (emphasis in original)(citing Skipworth v. United States, 508 F.2d 598 (3d Cir. 1975); United States v. Cornwell, 625 F.2d 686 (5th Cir. 1980); Forgues v. United States, 636 F.2d 1125 (6th Cir. 1980); United States v. Carey, 565 F.2d 545 (8th Cir. 1977); United States v. Silver, 83 F.3d 289 (9th Cir. 1996)).  The Defendants quote at length from United States v. Silver, in which the Ninth Circuit explained that, "'[w]hile the probationer who has found his period of probation extended does have some restrictions placed upon him, a "grievous loss" has not occurred and a liberty interest has not been so infringed as to require this court to call for additional protections as per the Due Process Clause.'"  Defendants' Supp. at 6 (quoting United States v. Silver, 83 F.3d at 292).  The Defendants note that there is "[n]o

- 40 -

Supreme Court or Tenth Circuit authority [that] appears to be controlling on this issue," but that

the Tenth Circuit cited <u>Skipworth v. United States</u>, 508 F.2d 598 (3rd Cir. 1975), with "apparent

approval" in <u>United States v. Ortiz</u>, 733 F.2d 1416, 1417 (10th Cir. 1984).  Defendants' Supp. at

6-7 n.3.  In the Defendants' view,

> to the extent entry of the probation order by Judge Purcell in June 2007 can be
> conceptualized as an extension of Reid's probation (and, in a sense, it can because
> the sentence in CR139 was to run consecutively to the sentences in CR137 and
> 138), no established law required that Ross (or anyone else) give Reid a hearing
> before Judge Purcell signed the subject order of probation.

Defendants' Supp. at 7.

Regarding the amount of process that the Due Process clause required Reid to have been

given after Judge Purcell entered the Order of Probation, the Defendants contend that "[o]ne

element of process due a probationer after he or she is placed on probation is that the probationer

be given a hearing within a reasonable time after he or she is taken into custody for a probation

violation."  Defendants' Supp. at 7.  According to the Defendants, a two-month delay is not

unreasonable.  <u>See</u> Defendants' Supp. at 7 (citing, <u>e.g.</u>, <u>Morrissey v. Brewer</u>, 408 U.S. 471, 485-

89 (1972); <u>Gagnon v. Scarpelli</u>, 411 U.S. 778 (1973)).  They point out that Reid received a

hearing within seven days of his arrest for violating his probation.  <u>See</u> Defendants' Supp. at 8.

In response to the Court's question how an individual violates a probationer's procedural

due-process rights, the Defendants assert that "there exists legal authority for the proposition that

an individual may be held personally liable in damages under § 1983 for depriving an individual

of his or her constitutional rights under the due process clause of the Fourteenth Amendment."

Defendants' Supp. at 8 (citing <u>Hafer v. Melo</u>, 502 U.S. 21, 31 (1991)(explaining that state

officials sued in their individual capacities are "persons" within the meaning of § 1983); <u>Brown</u>

v. Montoya, 662 F.3d at 1160-61 (recognizing that an individual sued in his individual capacity may be held liable under § 1983 for denying a plaintiff of his right to procedural due process)). According to the Defendants, "the ever-important element of causation in a § 1983 claim . . . is missing in plaintiff's due-process-based claim against Ross." Defendants' Supp. at 8. They assert that "Judge Purcell's signing of the subject order of probation scribed by Ross constituted an intervening cause of any harm suffered by plaintiff." Defendants' Supp. at 8 (citing Trask v. Franco, 446 F.3d at 1046 (holding that the probation officers' conduct was not the proximate cause of a plaintiff's injuries "if another act intervened and superseded the officer's liability for subsequent events")).

In the Minute Order, the Court also asked the parties to address whether there is "any authority to show that Reid's consent to the Order of Probation was not voluntary[.]" Minute Order at 1.

Reid asserts that "[a] criminal defendant cannot voluntarily consent to an illegal order which extends his probation." Reid Supp. at 3. He asserts that the Supreme Court of New Mexico addressed this "precise issue" in State v. Crespin, "where the defendant requested the judge allow him to go to a rehab that extended past the period of his probation, instead of being incarcerated for the remaining two (2) months of probation. The Court of Appeals upheld the judge's refusal to allow the plaintiff to agree to an extension of his probation, because there is no statutory basis for such an extension." Reid Supp. at 3-4.

The Defendants respond that Reid "may argue that State v. Baldon, 829 N.W.2d 785 (Iowa 2013), supports the proposition that Reid's consent to the order of probation was not voluntary," but they contend that "[i]t does not." Defendants' Supp. at 9. The Defendants

explain that, in <u>State v. Baldon</u>, the Supreme Court of Iowa "concluded that 'a parole agreement containing a prospective search provision is insufficient evidence to establish consent' and held that 'the search provision contained in Baldon's parole agreement does not represent a voluntary grant of consent within our constitutional meaning.'"  Defendants' Supp. at 9 (quoting <u>State v. Baldon</u>, 829 N.W.2d at 802-03).  The Defendants point out that, in reaching that conclusion, the Supreme Court of Iowa distinguished parole agreements from probation agreements, because the latter are often obtained through plea bargaining.  <u>See</u> Defendants' Supp. at 9.   In the Defendants' view, "Reid was a probationer, not a parolee, and, represented by counsel, reached a plea deal with the state of New Mexico (according to the judgment and sentence in CR-139) that provided for probation 'under the standard order of probation of this judicial district . . . .'" Defendants' Supp. at 10.  Further, they contend that "Reid's consent to the probation order and its conditions was purely voluntary," and, thus, his claims for Fourth Amendment searches and seizures "must fail."  Defendants' Supp. at 10.

The Court entered a second minute order on June 9, 2014, requesting the parties to brief the following issues:

> (i) Regarding the Fourth Amendment seizure claim against Defendant Flyshia Ross, was Plaintiff Richard Reid's conduct in violating a term of the Order of Probation foreseeable, or was it a superseding intervening cause cutting off Ross' liability for causing a Fourth Amendment seizure?  (ii) Regarding the procedural due process claim against Ross, and assuming that Ross violated Reid's procedural due process rights by not providing notice and a hearing before Judge Purcell signed the Order of Probation, did Reid have to exhaust his state remedies before bringing an action under 42 U.S.C. § 1983, such as moving to correct or amend the Order of Probation, appealing the Order of Probation, or filing a petition for a writ of habeas corpus?  In the Defendants' Response to Court's Minute Order[, filed May 29, 2014 (Doc. 47)], the Defendants offered to brief issues related to <u>Heck v. Humphrey</u>, 512 U.S. 477 (1994), and <u>Wilkinson v. Dotson</u>, 544 US. 74 (2005), and the Court invites the parties to address these cases.   (iii) Regarding the procedural due process claim against Defendants

> Gregory Garcia, Susan Pautler, and Wes Hatley, did they fail to provide the process described in <u>Morrissey v. Brewer</u>, 408 U.S. 471 (1972), and <u>Gagnon v. Scarpelli</u>, 411 U.S. 778 (1973), by failing to provide a preliminary hearing after completing the Arrest Order?

Minute Order, filed June 9, 2014 (Doc. 49).

Regarding the first question -- whether Reid's conduct in violating a probation term was foreseeable to Ross -- Reid asserts that "Ross could easily foresee that at some point during his probation the Plaintiff would test positive for marijuana use."  Plaintiff's Supplemental Brief in Opposition to the Defendants' Motion to Dismiss [Doc 26] at 1, filed June 12, 2014 (Doc. 50)("Reid's Second Supp.").  To demonstrate that his use of marijuana was foreseeable, he points to three facts: (i) he "pled guilty to the distribution of marijuana," Reid's Second Supp. at 2 (citing Judgment and Sentence in CR-01-00051, filed in state court October 1, 2001, filed in federal court June 12, 2014 (Doc. 50-1)("CR-01-051 J&S")); (ii) the NMCD policy "requires standardized drug screens and outlines the implications to the probationer should they fail a drug test," Reid's Second Supp. at 2 (citing New Mexico Corrections Department PPD Substance Abuse Testing for Offenders, dated August 20, 2013, filed June 12, 2014 (Doc. 50-2)("PPD Substance Abuse Testing")); and (iii) "it is widely known within the corrections industry that there is an overwhelming correlation between people placed on probation and the use of illegal drugs," Reid's Second Supp. at 3 (citing Beth M. Huebner & Jennifer Cobbina, <u>The Effect of Drug Use, Drug Treatment Participation, and Treatment Completion on Probationer Recidivism</u>, <u>available at</u>   http://www.icjia.state.il.us/public/pdf/ResearchReports/Drug%20Abuse%20 Treatment%20and%20Probationer%20Recidivism.pdf, first three pages filed June 12, 2014 (Doc. 50-3)("Huebner Article")).  Reid also contends that, "[l]ike the defendants in <u>Martinez v. Carson</u>, 697 F.3d 1252 (10th Cir. 2012), and <u>Trask v. Franco</u>, 446 F.3d 1036 (10th Cir. 2006), it

was easily foreseeable" that he would, at some point during his five years of probation, test positive for marijuana.  Reid's Second Supp. at 3.

The Defendants state that they were "unable to locate authority standing for the proposition that a probationer's violation of a term of his or her probation order is foreseeable (or unforeseeable) as a matter of law."   Defendants' Response to Minute Order of June 9, 2014 at 2, filed June 13, 2014 (Doc. 51)("Defendants' Second Supp.").  Responding to Reid's Second Supp. on the foreseeability issue, they argue that the Court should not consider the documents that Reid attached as exhibits, including CR-01-051 J&S, Substance Abuse Testing, and Huebner & Cobbina, supra, because Reid did not refer to these documents in the FAC and they "are not 'central'" to Reid's claims.  Defendants' Second Supp. at 11.

Regarding the Court's second question -- whether Reid had to exhaust his state remedies before bringing a § 1983 action -- Reid contends that the question "presupposes that the Plaintiff knew that under New Mexico law he could only be placed on probation for five (5) years and that he knew that the 2007 Order of Probation that he was being asked to sign was invalid under New Mexico law and unconstitutional," but that this presupposition "is not correct."   Reid's Second Supp. at 3.  Reid argues that

> [t]here is no question that had the Plaintiff been aware of his rights under the law, he could have done a lot of things to prevent being placed on an additional five (5) years of probation.  He could have refused to sign the Order of Probation. He could have demanded to see the judge or ask for a hearing in association with the Order of Probation.  If the judge rejected his argument, he could have appealed the additional Order of Probation to the New Mexico Court of Appeals and, ultimately, to the New Mexico Supreme Court.  But, he did not know.
>
> In fact, at the point that the Plaintiff hired an attorney in 2011 it was not because he was aware that he had been on probation for four (4) years longer than he was supposed to, but because he had been thrown in jail and he was trying to get out.  It was not until after the district court entered its order discharging him

- 45 -

> from probation that the Plaintiff was informed by his attorney that he should not
> have been on probation for the last four (4) years, drug tested or incarcerated for
> testing positive for marijuana.

Reid's Second Supp. at 3-4 (citing Stipulated Order at 1).   Reid explains that, by the time he

discovered that he should not have been on probation, "there was no administrative remedy

available to him," because he had been discharged from probation, an appeal would be moot, and

he could not file a declaratory judgment, "because the State agreed that he had been improperly

placed on an extra four (4) years of probation."   Reid's Second Supp. at 4 (citing Log from

October 17, 2011 Hearing in CR-139, filed in state court October 17, 2011, filed in federal court

June 12, 2014 (Doc. 50-5)("Oct. 17, 2011 Log")).   Finally, Reid contends that "the Supreme

Court and the Tenth Circuit have long held that it is unnecessary to exhaust administrative

remedies prior to pursuing a 1983 claim," and, while there are exceptions, such as the Prison

Litigation Reform Act of 1995, 42 U.S.C. § 1997e(a), no exceptions apply in this case.   Reid's

Second Supp. at 4-5 (citing Patsy v. Bd. of Regents, 457 U.S. 496 (1982); Hopkins v. Oklahoma

Pub. Employees Retirement Sys., 150 F.3d 1155 (10th Cir. 1998)).   He concludes that, "[d]ue to

the Plaintiff's ignorance of New Mexico law and his lack of legal training, he cannot be held to

have failed to exhaust administrative remedies concerning the violation of his rights, because he

did not know his rights were being violated."   Reid's Second Supp. at 5.   Reid further contends

that he has met the Heck v. Humphrey favorable termination requirement:

> On October 17, 2011 the district court entered a Stipulated Order of Satisfactory
> Discharge, which clearly demonstrated the Plaintiff was only to spend five (5)
> years on probation.   See [Stipulated Order].   The actual court log demonstrates
> that the district court actually stated there were no grounds to keep the Plaintiff on
> probation any longer.   See [Oct. 17, 2011 Log].   The determination by the court
> and the stipulation by both the Plaintiff and the State that there was no basis for
> him to be on probation any longer than five (5) years satisfies the Heck standard.

Reid's Second Supp. at 6-7.

The Defendants respond that Reid had to exhaust his state remedies before bringing his § 1983 action. See Defendants' Second Supp. at 2. Pointing to Heck v. Humphrey and Wilkinson v. Dotson, 544 U.S. 74 (2005), the Defendants assert that Reid cannot maintain his § 1983 action, because Judge Purcell's order of probation has not been invalidated; although the FAC states that the parties "stipulated to an order discharging the Plaintiff based on fulfilling the terms of probation," the Defendants argue that

> those allegations merely act as an admission that the June 2007 order of probation was never "reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus" as required by Heck.

Defendants' Second Supp. at 3 (quoting Heck v. Humphrey, 512 U.S. at 486-87).   The Defendants explain that the Stipulated Order that Reid references in the Complaint and is attached to Reid's Second Supp. does not find that Judge Purcell's order was illegal or invalid, but it "merely 'orders' that 'it further appearing to the Court that the Defendant is, satisfactorily discharged from Supervised Probation.'"  Defendants' Second Supp. at 3-4.  In the Defendants' view, the Stipulated Order releasing Reid from supervised release is "not a judicial declaration under Heck that Judge Purcell's June 2007 order of probation was illegal or invalid." Defendants' Second Supp. at 4.  The Defendants note that, although Reid is no longer on probation and, thus, does not have a habeas remedy, he cannot avoid Heck v. Humphrey's favorable termination requirement, because, in their view, he did not act diligently: "[T]here is no allegation that plaintiff, during his alleged five years of wrongful probation, ever sought to avail himself of relief through federal habeas or through other state remedies (although he had at

- 47 -

least four such mechanisms to do so)."   Defendants' Second Supp. at 5 (citing <u>Cohen v.</u>
<u>Longshore</u>, 621 F.3d 1311 (10th Cir. 2010)("[A] petitioner who has no available remedy in
habeas, <u>through no lack of diligence on his part</u>, is not barred by <u>Heck</u> from pursuing a § 1983
claim." (emphasis added)).   The Defendants argue that

> [r]equiring diligence in pursuing habeas or state-court remedies for an illegal
> sentence is consistent with the well-known rule requiring a plaintiff to mitigate his
> damages -- a probationer ought not be allowed to turn a blind eye to his allegedly
> illegal sentence for a multi-year period (especially when, as here, the probationer
> questions the validity of the probation at the time it is ordered), then tap the public
> till by collecting damages for those years he later asserts his liberty was limited
> and during which he made no effort to pursue habeas relief or relief through state
> courts.

Defendants' Second Supp. at 6.   Finally, the Defendants contend that Reid's "position that he can
avoid <u>Heck</u>'s exhaustion requirement because he was ignorant of his rights under New Mexico
law is flatly contradicted by his allegation that in 2007 'Plaintiff questioned the validity of
extending his probation any further.'"   Defendants' Second Supp. at 11-12 (quoting FAC ¶ 11, at
3).   The Defendants emphasize that Reid did not cite any authority supporting his argument that
the Stipulated Order "constitutes a declaration of invalidity of Judge Purcell's June 2007 order of
probation of the type required by <u>Heck</u>."   Defendants' Second Supp. at 12.   The Defendants ask
the Court not to consider the Oct. 17, 2011 Log, because Reid did not cite to it in the FAC, nor is
it central to his claims; further, they contend that it "includes hearsay (and hearsay within
hearsay) and is also not the best evidence."   Defendants' Second Supp. at 11.

Regarding the Court's third question -- whether Garcia, Pautler, and Hatley failed to
provide the process described in <u>Morrissey v. Brewer</u> and <u>Gagnon v. Scarpelli</u> by failing to
provide a preliminary hearing -- Reid notes that the failure to give Reid a hearing within twenty-
four hours of incarceration "does not in [and] of itself give rise to a due process claim," Reid's

- 48 -

Second Supp. at 5 (citing Petaway v. City of New Haven Police Dep't, 541 F. Supp. 2d 504, 512 (Conn. 2008)(stating that the failure to provide arraignment the day of arrest pursuant to statute did not violate due process), but explains that he must "demonstrate that the delay was both unreasonable and prejudicial," Reid's Second Supp. at 5.  He explains, because the Tenth Circuit has found that a three-month delay does not violate due process when the plaintiff cannot establish prejudice, see Reid's Second Supp. at 5 (citing Paul v. McFadin, 117 F.3d 1428, 1997 WL 407843 (10th Cir. 1997)(unpublished), "[i]t is clear that under no circumstances could the Plaintiff argue that a seven (7) day delay amounts to a due process violation unless he can also demonstrate prejudice," Reid's Second Supp. at 5-6.  He argues that

> [t]here can be no question that the Plaintiff was prejudiced as a result of the seven (7) day delay.  Had there been a court review of the Arrest Order leading to his arrest within a couple of days following the arrest, he could have avoided spending four (4) or five (5) days in jail.  As a result of the Defendants' conduct in not notifying the district attorney's office according to the statute or in some other way ensuring that the issue of his continued incarceration was brought before the court, the Plaintiff spent several additional days incarcerated.  Under the circumstances of this case he was not provided with a hearing "as promptly as convenient after arrest".  Morrissey v. Brewer, 408 U.S. 471 . . . (1972).  In this instance, seven (7) days was a violation of the due process rights.

Reid's Second Supp. at 6.

The Defendants respond that "neither Morrissey nor Gagnon specify a minimum period during which the 'preliminary hearing' must be provided," and state that they could not locate any controlling authority that indicates a seven day delay between arrest for a probation violation and the preliminary hearing violates a probationer's due-process rights.  Defendants' Second Supp. 7.  Although Reid alleges in the FAC that the Defendants failed to provide the proper procedure under SCRA 5-805(B), the Defendants reiterate that such a failure did not result in any harm, because Reid received a hearing within the time specified in the rule, and, further, a failure

to follow state law "does not amount to a constitutional violation."  See Defendants' Second Supp. at 8 n.5.  The Defendants next explain that the hearing which Reid received on September 14, 2011, seven days after he was arrested, "could be considered the 'preliminary hearing' or a combined preliminary/final hearing," because "[n]either Morrissey nor Gagnon foreclose the possibility of the preliminary hearing and the final hearing being consolidated."  Defendants' Second Supp. at 8 (citing, e.g., Pierre v. Washington State Bd. of Prison Terms & Paroles, 699 F.2d 471, 473 (9th Cir. 1983)).  Third, the Defendants argue that Reid "was, in effect, given an immediate 'preliminary hearing' when Pautler and Hatley, after administering the urine test that came back positive and after having been told by plaintiff that he had consumed marijuana, contacted Garcia on the telephone, and discussed the situation with him."  Defendants' Second Supp. at 10-11.  The Defendants contend that, because Garcia was not "present at the time of the urinalysis and admission," he "independently evaluated whether probable cause existed for the arrest pending a court hearing."  Defendants' Second Supp. at 11.

## LAW REGARDING RULE 12(b)(6)

Rule 12(b)(6) authorizes a court to dismiss a complaint for "failure to state a claim upon which relief can be granted."  Fed. R. Civ. P. 12(b)(6).  "The nature of a Rule 12(b)(6) motion tests the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true."  Mobley v. McCormick, 40 F.3d 337, 340 (10th Cir. 1994).  The sufficiency of a complaint is a question of law, and when considering a rule 12(b)(6) motion, a court must accept as true all well-pled factual allegations in the complaint, view those allegations in the light most favorable to the non-moving party, and draw all reasonable inferences in the plaintiff's favor.  See Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. at 322 ("[O]nly if a reasonable

person could not draw . . . an inference [of plausibility] from the alleged facts would the defendant prevail on a motion to dismiss."); Smith v. United States, 561 F.3d 1090, 1098 (10th Cir. 2009)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as true all well-pled factual allegations in a complaint and view these allegations in the light most favorable to the plaintiff." (citing Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006))).

A complaint need not set forth detailed factual allegations, yet a "pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action" is insufficient. Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. at 678. "Factual allegations must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Bell Atl. Corp v. Twombly, 550 U.S. at 555 (citation omitted).

To survive a motion to dismiss, a plaintiff's complaint must contain sufficient facts that, if assumed to be true, state a claim to relief that is plausible on its face. See Bell Atl. Corp. v. Twombly, 550 U.S. at 570; Mink v. Knox, 613 F.3d 995, 1000 (10th Cir. 2010). "A claim has facial plausibility when the pleaded factual content allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. at 678 (citing Bell Atl. Corp. v. Twombly, 550 U.S. at 556). "Thus, the mere metaphysical possibility that some plaintiff could prove some set of facts in support of the pleaded claims is insufficient; the complainant must give the court reason to believe that this plaintiff has a reasonable likelihood of mustering factual support for these claims." Ridge at Red Hawk, LLC

v. Schneider, 493 F.3d 1174, 1177 (10th Cir. 2007)(emphasis omitted).  The Tenth Circuit stated:

> "[P]lausibility" in this context must refer to the scope of the allegations in a
> complaint: if they are so general that they encompass a wide swath of conduct,
> much of it innocent, then the plaintiffs "have not nudged their claims across the
> line from conceivable to plausible."   The allegations must be enough that, if
> assumed to be true, the plaintiff plausibly (not just speculatively) has a claim for
> relief.

Robbins v. Oklahoma, 519 F.3d 1242, 1247 (10th Cir. 2008)(quoting Bell Atl. Corp. v. Twombly,

550 U.S. at 570)(internal citations omitted).

## LAW REGARDING THE USE OF DOCUMENTS OUTSIDE THE PLEADINGS IN A RULE 12(b)(6) MOTION

Generally, the sufficiency of a complaint must rest on its contents alone.  See Casanova v.

Ulibarri, 595 F.3d 1120, 1125 (10th Cir. 2010); Gossett v. Barnhart, 139 F. App'x 24, 24 (10th

Cir. 2005)(unpublished)[7]("In ruling on a motion to dismiss, the district court is limited to the

---

[7]Gossett v. Barnhart is an unpublished opinion, but the Court can rely on an unpublished opinion to the extent its reasoned analysis is persuasive in the case before it.  See 10th Cir. R. 32.1(A), 28 U.S.C. ("Unpublished decisions are not precedential, but may be cited for their persuasive value.").  The Tenth Circuit has stated:

> In this circuit, unpublished orders are not binding precedent, . . . and we have
> generally determined that citation to unpublished opinions is not favored.
> However, if an unpublished opinion or order and judgment has persuasive value
> with respect to a material issue in a case and would assist the court in its
> disposition, we allow a citation to that decision.

United States v. Austin, 426 F.3d 1266, 1274 (10th Cir. 2005).  The Court finds that Gossett v. Barnhart, Carter v. Daniels, 91 F. App'x 83 (10th Cir. 2004)(unpublished), Douglas v. Norton, 167 F. App'x 698 (10th Cir. 2006)(unpublished), Carbajal v. Hotsenpiller, 524 F. App'x 425 (10th Cir. 2013)(unpublished), Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707, 710 (10th Cir. 2011)(unpublished), United States v. Reed, 195 F. App'x 815, 821 (10th Cir. 2006)(unpublished), United States v. Ceballos, 355 F. App'x 226 (10th Cir. 2009)(unpublished), United States v. Gary, 24 F. App'x 862, 864-65 (10th Cir. 2001)(unpublished), United States v. Gary, 24 F. App'x 862, 864-65 (10th Cir. 2001)(unpublished), United States v. Burciaga-Burciaga, 147 F. App'x 725 (10th Cir. 2005)(unpublished), Jackson v. Loftis, 189 F. App'x 775, 779 (10th Cir. 2006)(unpublished), Garey v. Marshall, 361 F. App'x 91 (10th Cir.

facts pled in the complaint.").  Emphasizing this point, the Tenth Circuit, in <u>Carter v. Daniels</u>, 91

F. App'x 83 (10th Cir. 2004)(unpublished), stated: "When ruling on a Rule 12(b)(6) motion, the

district court must examine only the plaintiff's complaint.  The district court must determine if

the complaint alone is sufficient to state a claim; the district court cannot review matters outside

of the complaint."   91 F. App'x at 85.   There are three limited exceptions to this general

principle: (i) documents that the complaint incorporates by reference, <u>see</u> <u>Tellabs, Inc. v. Makor</u>

<u>Issues & Rights, Ltd.</u>, 551 U.S. 308, 322 (2007); (ii) "documents referred to in the complaint if

the documents are central to the plaintiff's claim and the parties do not dispute the documents'

authenticity," <u>Jacobsen v. Deseret Book Co.</u>, 287 F.3d 936, 941 (10th Cir. 2002); and

(iii) "matters of which a court may take judicial notice," <u>Tellabs, Inc. v. Makor Issues & Rights,</u>

<u>Ltd.</u>, 551 U.S. at 322.   In <u>Gee v. Pacheco</u>, 627 F.3d 1178 (10th Cir. 2010), the defendants

"supported their motion with numerous documents, and the district court cited portions of those

motions in granting the [motion to dismiss]."   627 F.3d at 1186.  The Tenth Circuit held that

"[s]uch reliance was improper" and that, even if "the district court did not err initially in

reviewing the materials, the court improperly relied on them to refute Mr. Gee's factual

assertions and effectively convert the motion to one for summary judgment."   <u>Gee v. Pacheco</u>,

627 F.3d at 1186-87.   In other cases, the Tenth Circuit has emphasized that, "[b]ecause the

district court considered facts outside of the complaint, however, it is clear that the district court

dismissed the claim under Rule 56(c) and not Rule 12(b)(6)."   <u>Nard v. City of Okla. City</u>, 153

F. App'x 529, 534 n.4 (10th Cir. 2005)(unpublished).  In <u>Douglas v. Norton</u>, 167 F. App'x 698

---

2010)(unpublished), <u>Roberts v. O'Bannon</u>, 199 F. App'x 711, 714 (10th Cir.
2006)(unpublished), all have persuasive value with respect to a material issue, and will assist the
Court in its disposition of this Memorandum Opinion.

(10th Cir. 2006)(unpublished), the Tenth Circuit addressed an untimely filed charge with the Equal Employment Opportunity Commission, and the Tenth Circuit analogized the deadline to a statute of limitations.   The Tenth Circuit found that, because the requirement was not jurisdictional, the district court should have analyzed the question under rule 12(b)(6), and "because the district court considered evidentiary materials outside of Douglas' complaint, it should have treated Norton's motion as a motion for summary judgment."  167 F. App'x at 704-05.

The Court has previously ruled that, when a plaintiff references and summarizes statements from defendants in a complaint for the purpose of refuting the statements in the complaint, the Court cannot rely on documents the defendants attach to a motion to dismiss which contain their un-redacted statements.  See Mocek v. City of Albuquerque, No. CIV 11-1009 JB/KBM, 2013 WL 312881, at *50-51 (D.N.M. Jan. 14, 2013)(Browning, J.).  The Court in Mocek v. City of Albuquerque reasoned that the statements were neither incorporated by reference nor central to the plaintiff's allegations in the complaint, because the plaintiff cited the statements only to attack their reliability and truthfulness.  See 2013 WL 312881, at *50-51. Additionally, the Court has ruled that, when determining whether a statute of limitations has run in an action alleging fraud and seeking subrogation from a defendant, it may not use interviews and letters attached to a motion to dismiss which evidence that a plaintiff was aware of the defendant's alleged fraud before the statutory period expired.  See Great Am. Ins. Co. v. Crabtree, No. CIV 11-1129 JB/KBM, 2012 WL 3656500, at *3, *22-23 (D.N.M. Aug. 23, 2012)(Browning, J.).  The Court in Great American Insurance Co. v. Crabtree determined that the documents did not fall within any of the Tenth Circuit's exceptions to the general rule that a

complaint must rest on the sufficiency of its contents alone, as the complaint did not incorporate the documents by reference or refer to the documents.  See 2012 WL 3656500, at *22-23.  On the other hand, in a securities class action, the Court has found that a defendant's operating certification, to which plaintiffs refer in their complaint, and which was central to whether the plaintiffs adequately alleged a loss, falls within an exception to the general rule, and the Court may consider the certification when ruling on the defendant's motion to dismiss without converting the motion into one for summary judgment.  See Genesee Cnty. Emps.' Retirement Sys. v. Thornburg Mortg. Sec. Trust, 825 F. Supp. 2d 1082, 1150-51 (D.N.M. 2011)(Browning, J.).

## LAW REGARDING DISMISSING CLAIMS UNDER HECK v. HUMPHREY

In Preiser v. Rodriguez, 411 U.S. 475 (1973), the Supreme Court held "that habeas corpus is the exclusive remedy for a state prisoner who challenges the fact or duration of his confinement and seeks immediate or speedier release, even though such a claim may come within the literal terms of § 1983."  Heck v. Humphrey, 512 U.S. at 481 (citing Preiser v. Rodriguez, 411 U.S. at 488-90).  Justice Scalia[8] stated in Heck v. Humphrey, "We emphasize that Preiser did *not* create an exception to the 'no exhaustion' rule of § 1983; it merely held that certain claims by state prisoners are not *cognizable* under that provision, and must be brought in

---

[8]All nine justices voted to affirm, but split as to the reasoning justifying that decision. Justice Scalia wrote the Supreme Court's majority opinion, in which Chief Justice Rehnquist and Justices Kennedy, Thomas, and Ginsburg joined.  Justice Thomas, although joining the opinion in full, concurred separately to note that, in his view, it is the Supreme Court that "put § 1983 and the habeas statute on what Justice Souter appropriately terms a 'collision course.'"  Heck v. Humphrey, 512 U.S. at 491 (Thomas, J., concurring).  Justice Souter, joined by Justices Blackmun, Stevens, and O'Connor, concurred in the judgment, but disagreed with the majority's reliance on the common-law tort of malicious prosecution "instead of analyzing the statutes to determine which should yield to the other at this intersection."  Heck v. Humphrey, 512 U.S. at 492 (Souter, J., concurring in judgment).

habeas corpus proceedings, which do contain an exhaustion requirement."  Heck v. Humphrey, 512 U.S. at 481 (emphasis in original).  In Heck v. Humphrey, the Supreme Court addressed the issue whether a damages claim that calls into question the lawfulness of conviction or confinement is cognizable under § 1983.  See 512 U.S. at 483 ("The issue with respect to monetary damages challenging conviction is not, it seems to us, exhaustion; but rather, the same as the issue was with respect to injunctive relief challenging conviction in Preiser: whether the claim is cognizable under § 1983 at all.  We conclude that it is not.").

> We hold that, in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254.  A claim for damages bearing that relationship to a conviction or sentence that has *not* been so invalidated is not cognizable under § 1983.  Thus, when a state prisoner seeks damages in a § 1983 suit, the district court must consider whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated.  But if the district court determines that the plaintiff's action, even if successful, will *not* demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to the suit.

Heck v. Humphrey, 512 U.S. at 486-87 (footnotes omitted)(emphasis in original).

The Supreme Court made it clear that § 1983 does not require a § 1983 plaintiff to first exhaust state remedies:

> We do not engraft an exhaustion requirement upon § 1983, but rather deny the existence of a cause of action.  Even a prisoner who has fully exhausted available state remedies has no cause of action under § 1983 unless and until the conviction or sentence is reversed, expunged, invalidated, or impugned by the grant of a writ of habeas corpus.

512 U.S. at 489.  Justice Thomas, in a concurring opinion, explained the benefit of using the

- 56 -

favorable-termination requirement in §1983 cases:

> It is at this point that the malicious-prosecution tort's favorable-termination requirement becomes helpful, not in dictating the elements of a § 1983 cause of action, but in suggesting a relatively simple way to avoid collisions at the intersection of habeas and § 1983. A state prisoner may seek federal-court § 1983 damages for unconstitutional conviction or confinement, but only if he has previously established the unlawfulness of his conviction or confinement, as on appeal or on habeas. This has the effect of requiring a state prisoner challenging the lawfulness of his confinement to follow habeas's rules before seeking § 1983 damages for unlawful confinement in federal court, and it is ultimately the Court's holding today.

512 U.S. at 498 (Thomas, J., concurring). He warned, however, that the holding could cause problems for "individuals not 'in custody' for habeas purposes'":

> If these individuals (people who were merely fined, for example, or who have completed short terms of imprisonment, probation, or parole, or who discover (through no fault of their own) a constitutional violation after full expiration of their sentences), like state prisoners, were required to show the prior invalidation of their convictions or sentences in order to obtain § 1983 damages for unconstitutional conviction or imprisonment, the result would be to deny any federal forum for claiming a deprivation of federal rights to those who cannot first obtain a favorable state ruling. The reason, of course, is that individuals not "in custody" cannot invoke federal habeas jurisdiction, the only statutory mechanism besides § 1983 by which individuals may sue state officials in federal court for violating federal rights. That would be an untoward result.

512 U.S. at 500 (Thomas, J., concurring).

In Wilkinson v. Dotson, 544 U.S. 74 (2005), the Supreme Court reviewed its cases related to when a prisoner in state custody may pursue a § 1983 claim, and when the prisoner must instead seek federal habeas corpus relief or appropriate state relief. 544 U.S. at 78 (citing Preiser v. Rodriguez, 411 U.S. 475 (1973); Wolff v. McDonnell, 418 U.S. 539 (1974); Heck v. Humphrey, 512 U.S. 477 (1994); Edwards v. Balisok, 520 U.S. 641 (1997)).

> Throughout the legal journey from Preiser to Balisok, the Court has focused on the need to ensure that state prisoners use only habeas corpus (or similar state) remedies when they seek to invalidate the duration of their confinement -- either

*directly* through an injunction compelling speedier release or *indirectly* through a judicial determination that necessarily implies the unlawfulness of the State's custody.  Thus, <u>Preiser</u> found an implied exception to § 1983's coverage where the claim seeks -- not where it simply "relates to" -- "core" habeas corpus relief, <u>i.e.</u>, where a state prisoner requests present or future release.  Cf. *post,* at 1253 (Kennedy, J., dissenting)(arguing that <u>Preiser</u> covers challenges that "relate . . . to" the duration of confinement).  <u>Wolff</u> makes clear that § 1983 remains available for procedural challenges where success in the action *would not necessarily* spell immediate or speedier release for the prisoner.  <u>Heck</u> specifies that a prisoner cannot use § 1983 to obtain damages where success *would necessarily* imply the unlawfulness of a (not previously invalidated) conviction or sentence.  And <u>Balisok</u>, like <u>Wolff</u>, demonstrates that habeas remedies do not displace § 1983 actions where success in the civil rights suit would not necessarily vitiate the legality of (not previously invalidated) state confinement.  These cases, taken together, indicate that a state prisoner's § 1983 action is barred (absent prior invalidation) -- no matter the relief sought (damages or equitable relief), no matter the target of the prisoner's suit (state conduct leading to conviction or internal prison proceedings) -- *if* success in that action would necessarily demonstrate the invalidity of confinement or its duration.

544 U.S. at 81-82 (emphasis in original).  The Supreme Court applied these principles in

<u>Wilkinson v. Dotson</u> to conclude that the plaintiffs, who were challenging the state procedures

used to deny parole eligibility and parole suitability, could bring their § 1983 claims, because

"neither prisoner's claim would necessarily spell speedier release," and, thus, "neither lies at 'the

core of habeas corpus.'"  544 U.S. at 82.

> Success for Dotson does not mean immediate release from confinement or a shorter stay in prison; it means at most new eligibility review, which at most will speed *consideration* of a new parole application.  Success for Johnson means at most a new parole hearing at which Ohio parole authorities may, in their discretion, decline to shorten his prison term.

544 U.S. at 82 (emphasis in original).

One question remaining after <u>Heck v. Humphrey</u> is "whether the <u>Heck</u> doctrine pertains

even when the § 1983 claimant cannot pursue federal habeas corpus because she is not in

custody, either because the claimant had never been incarcerated or because a sentence of

- 58 -

incarceration had expired."  Martin A. Schwartz, <u>Section 1983 Litigation Claims and Defenses</u> § 10.06[F] Section 1983 and Federal Habeas Corpus: Solving Preiser-Heck-Edwards Puzzles at 10-68.4 to -68.5 (4th ed. 2012-1 Supp.).  In <u>Cohen v. Longshore</u>, 621 F.3d 1311 (10th Cir. 2010), the Tenth Circuit recognized a circuit split on the issue, but ultimately held that "a petitioner who has no available remedy in habeas, through no lack of diligence on his part, is not barred by <u>Heck</u> from pursuing a § 1983 claim."  621 F.3d at 1317.  In that case, the Tenth Circuit reviewed de novo the district court's denial of the plaintiff's request for leave to amend his complaint to include a false imprisonment claim; the district court had concluded that the claim "lacked merit because Plaintiff had not invalidated his imprisonment and thus could not recover damages under <u>Heck v. Humphrey</u>."  621 F.3d at 1315.  The plaintiff argued "that <u>Heck</u> should not bar this action because Plaintiff has no available habeas remedy," and the Tenth Circuit acknowledged that he had "in fact sought to invalidate his imprisonment through a 28 U.S.C. § 2241 petition but was prevented by his transfer out of Immigration and Customs Enforcement custody, which mooted his habeas claims."  621 F.3d at 1315.  The Tenth Circuit noted that "[t]he circuits have split on the question of whether the <u>Heck</u> favorable-termination requirement applies when the plaintiff lacks an available habeas remedy," 621 F.3d at 1315, based in part on a footnote in <u>Heck v. Humphrey</u>, in which the Supreme Court stated that "'the principle barring collateral attacks -- a longstanding and deeply rooted feature of both the common law and our own jurisprudence -- is not rendered inapplicable by the fortuity that a convicted criminal is no longer incarcerated,'" 621 F.3d at 1315 (quoting <u>Heck v. Humphrey</u>, 512 U.S. at 490 n.10).  "Based on this dicta and the Court's broad language in its holding, several circuits have held that the <u>Heck</u> favorable-termination requirement prevents § 1983 claims for damages even when brought by

- 59 -

petitioners whose release from custody has made habeas relief unavailable."   Cohen v. Longshore, 621 F.3d at 1315 (citing cases from the First, Third, Fifth, and Eighth Circuits).  The Tenth Circuit pointed to other circuits that have "reached the opposite conclusion" based on the Supreme Court's decision in Spencer v. Kemna, 523 U.S. 1 (1998).  Cohen v. Longshore, 621 F.3d at 1316 (citing cases from the Second, Fourth, Sixth, Seventh, Ninth, and Eleventh Circuits).

> In Spencer, a majority of the Court affirmed the dismissal for mootness of a habeas claim brought by a petitioner who was no longer in custody because the petitioner had failed to show that he suffered continuing collateral consequences from his parole revocation following his release.  [523 U.S.] at 14-16 . . . .  In a concurrence, four Justices articulated an additional reason why this result was correct -- "a former prisoner, no longer 'in custody,' may bring a § 1983 action establishing the unconstitutionality of a conviction or confinement without being bound to satisfy a favorable-termination requirement that it would be impossible as a matter of law for him to satisfy," and thus "the answer to Spencer's argument that his habeas claim cannot be moot because Heck bars him from relief under § 1983 is that Heck has no such effect."  Id. at 21 . . . (Souter, J., concurring).  Justice Stevens dissented from the majority opinion, concluding that the case should not be moot based on the petitioner's interest in vindicating his reputation.  Id. at 22-25 . . . (Stevens, J., dissenting).  He agreed with the concurring Justices, however, that a petitioner without a remedy under the habeas statute may bring an action under § 1983.  Id. at 25 n.8 . . . .

> After discussing the Court's statements in Heck and Spencer, the Fourth Circuit explained that its decision to follow the reasoning of the five-Justice plurality in Spencer was informed by equitable concerns and consideration of the purpose of § 1983.  Wilson[ v. Johnson], 535 F.3d [262,] 268[ (4th Cir. 2008)].  The court noted that the purpose of § 1983 is to "provid[e] litigants with 'a uniquely federal remedy against incursions . . . upon rights secured by the Constitution and laws of the Nation,'" and that "[b]arring [the plaintiff's] claim would leave him without access to any judicial forum in which to seek relief for his alleged wrongful imprisonment."  Id. (quoting Wilson v. Garcia, 471 U.S. 261, 272-73 . . . (1985)[, superseded by 28 U.S.C. § 1658 as stated in Jones v. R.R. Donnelley & Sons Co., 541 U.S. 369 (2004)]).  The Fourth Circuit then explained that it simply "d[id] not believe that a habeas ineligible former prisoner seeking redress for denial of his most precious right -- freedom -- should be left without access to a federal court."  Id.  Similarly, the Eleventh Circuit reasoned in Harden[ v. Pataki, 320 F.3d 1289 (11th Cir. 2003),] that, "because federal habeas

- 60 -

corpus is not available to a person extradited in violation of his or her federally protected rights, even where the extradition itself was illegal, § 1983 must be" available to redress an unconstitutional extradition.  Harden, 320 F.3d at 1299.

Cohen v. Longshore, 621 F.3d at 1316.  Noting that the Supreme Court has not settled the issue, see 621 F.3d at 1316 (citing Muhammad v. Close, 540 U.S. 749, 752 n.2 (2004)(stating that "[m]embers of the Court have expressed the view that unavailability of habeas for other reasons may also dispense with the Heck requirement," but that "[t]his case is no occasion to settle the issue")), the Tenth Circuit stated that, "in light of the fact that Heck involved a petitioner who was still incarcerated," it was "not persuaded that Heck must be applied to petitioners without a habeas remedy," 621 F.3d at 1316.  The Tenth Circuit concluded that "a petitioner who has no available remedy in habeas, through no lack of diligence on his part, is not barred by Heck from pursuing a § 1983 claim," and held that the district court "erred in holding that Plaintiff's false imprisonment claim lacked merit where Plaintiff's prior attempt to obtain a favorable termination in habeas was dismissed based on mootness."  621 F.3d at 1317.  See Carbajal v. Hotsenpiller, 524 F. App'x 425, 428 (10th Cir. 2013)(unpublished)("A plaintiff's inability to obtain habeas relief lifts the Heck bar only if that 'inability is not due to the petitioner's own lack of diligence.'").  In Carbajal v. Hotsenpiller, 524 F. App'x 425 (10th Cir. 2013)(unpublished), the Tenth Circuit applied the rule from Cohen v. Longshore and affirmed a district court's application of Heck v. Humphrey to bar the plaintiff's § 1983 claim.  See 524 F. App'x at 428. Even though the plaintiff was not in custody and thus could not pursue a habeas remedy, the Tenth Circuit "agree[d] with the district court that [the plaintiff's] actions evince a lack of diligence," because "the complaint is clear that Carbajal was aware of the claimed defects in the

investigation that led to his convictions in 2000, but only set out to investigate in 2010."  524 F.

App'x at 428.

The Heck v. Humphrey bar also "applies to proceedings that call into question the fact or

duration of parole or probation."   Crow v. Penry, 102 F.3d 1086, 1087 (10th Cir. 1996)(per

curiam).   In Crow v. Penry, the plaintiff brought a suit under Bivens v. Six Unknown Fed.

Narcotics Agents, 403 U.S. 388 (1971)("Bivens"),[9] "against his probation officer, the Probation

Department of the District Court, and the United States Parole Commission," alleging that the

defendants violated "his constitutional rights against unreasonable searches or seizures and due

process of law."  102 F.3d at 1087.  "He sought damages for his arrest as a parole violator and

his subsequent incarceration, the revocation of his parole and the ensuring additional period of

incarceration."  102 F.3d at 1087.  Four months after the district court dismissed the complaint,

the plaintiff filed a motion for leave to file an amended complaint, which the district court

dismissed "as untimely and unjustified."   102 F.3d at 1087.   On appeal, the Tenth Circuit

concluded that the plaintiff's

> § 1983 claim is barred by Heck v. Humphrey, . . . which held that to recover
> damages for an unconstitutional conviction or imprisonment a § 1983 plaintiff
> must prove that the conviction or sentence has been reversed on direct appeal,
> expunged by executive order, declared invalid by an authorized state tribunal, or
> called into question by a federal court's issuance of a writ of habeas corpus.  Heck
> applies to Bivens actions.  Stephenson v. Reno, 28 F.3d 26 (5th Cir. 1994).  It
> applies to proceedings that call into question the fact or duration of parole or

---

[9]The Tenth Circuit stated that the plaintiff "asserted a § 1983 Bivens claim and a pendant
state claim for common law abuse of process."  102 F.3d at 1087.  It is not clear what the Tenth
Circuit meant by "§ 1983 Bivens" claim, because Bivens claims are separate from § 1983 claims,
and, as far as the Court can tell, the plaintiff brought claims against only federal defendants,
meaning that his claims would properly be under Bivens and not under § 1983.  In Bivens, the
Supreme Court held that a violation of the Fourth Amendment "by a federal agent acting under
color of his authority gives rise to a cause of action for damages consequent upon his
unconstitutional conduct."  403 U.S. at 389.

probation.  Jackson v. Vannoy, 49 F.3d 175 (5th Cir.), cert. denied, 516 U.S. 851 . . . (1995).

> Crow's claim necessarily implies the invalidity of his parole revocation. He alleges that the probation officer and others conspired to have the search and arrest warrants issued and that the probation officer falsely testified at his probation revocation hearing.  The civil claim for damages amounts to a collateral attack on his parole revocation and subsequent incarceration.  Heck does not permit this.

Crow v. Penry, 102 F.3d at 1087.

When Heck v. Humphrey bars a claim, "the dismissal should be without prejudice."

Fottler v. United States, 73 F.3d 1064, 1065 (10th Cir. 1996).  See McDow v. Gonzales, CIV 07-

1266 JB/WPL, 2008 WL 5979833 (D.N.M. Sept. 30, 2008)(Browning, J.)("Although a dismissal

under Rule 12(b)(6) for failure to state a claim is generally with prejudice, when a § 1983 claim

is dismissed under Heck, the dismissal is without prejudice." (emphasis in original)), aff'd, 330

F. App'x 765 (10th Cir. 2009).

## LAW REGARDING LIABILITY FOR CONSTITUTIONAL VIOLATIONS UNDER 42 U.S.C. § 1983

Section 1983 of Title 42 of the United States Code provides:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.  For the purposes of this section, any Act of Congress applicable exclusively to the District of Columbia shall be considered to be a statute of the District of Columbia.

42 U.S.C. § 1983.  "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Constitution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law."  West v. Atkins, 487 U.S. 42, 48 (1988).  Individual, non-supervisory defendants may be liable if they knew or reasonably should have known that their conduct would lead to the deprivation of a plaintiff's constitutional rights by others, and an unforeseeable intervening act has not terminated their liability.  See Martinez v. Carson, 697 F.3d 1252, 1255 (10th Cir. 2012)("The requisite causal connection is satisfied if [the defendants] set in motion a series of events that [the defendants] knew or reasonably should have known would cause others to deprive [the plaintiffs] of [their] constitutional rights.")(quoting Trask v. Franco, 446 F.3d 1036, 1046 (10th Cir. 2006)).  The Supreme Court has made clear that there is no respondeat superior liability under 42 U.S.C. § 1983.  See Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)("Because vicarious liability is inapplicable to Bivens[ v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 (1971),] and § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution."); Bd. of Cnty. Comm'rs v. Brown, 520 U.S. 397, 403 (1997).  "An entity cannot be held liable solely on the basis of the existence of an employer-employee relationship with an alleged tortfeasor."  Garcia v. Casuas, No. CIV 11-0011 JB/RHS, 2011 WL 7444745, at *25 (D.N.M. Dec. 8, 2011)(Browning, J.)(citing Monell v. Dep't of Soc. Servs., 436 U.S. 658, 689 (1978)).  Supervisors can be held liable only for their own unconstitutional or illegal policies, and not for the employees' tortious acts.  See Barney v. Pulsipher, 143 F.3d 1299, 1307-08 (10th Cir. 1998).

1.    **Color of State Law.**

"Under Section 1983, liability attaches only to conduct occurring 'under color of law.'"

Gallagher v. Neil Young Freedom Concert, 49 F.3d 1442, 1447 (10th Cir. 1995).  The under-

color-of-state-law requirement is a "jurisdictional requisite for a § 1983 action, which . . .

furthers the fundamental goals of preserving an area of individual freedom by limiting the reach

of federal law . . . and avoiding imposing on the state, its agencies or officials, responsibility for

conduct for which they cannot fairly be blamed."  Jojola v. Chavez, 55 F.3d 488, 492 (10th Cir.

1995).  "The traditional definition of acting under color of state law requires that the defendant in

a § 1983 action have exercised power 'possessed by virtue of state law and made possible only

because the wrongdoer is clothed with the authority of state law.'"  West v. Atkins, 487 U.S. at

49 (quoting United States v. Classic, 313 U.S. 299, 326 (1941)).  "The authority with which the

defendant is allegedly 'clothed' may be either actual or apparent."  Jojola v. Chavez, 55 F.3d at

493.  Accordingly, at a base level, to find that an action was taken under color of state law, the

court must find that "'the conduct allegedly causing the deprivation of a federal right' must be

'fairly attributable to the State.'"  Gallagher v. Neil Young Freedom Concert, 49 F.3d at 1447

(quoting Lugar v. Edmonson Oil Co., 457 U.S. 922, 937 (1982)).

In the context of a public employee, the Tenth Circuit has directed that, while "'state

employment is generally sufficient to render the defendant a state actor . . . . [,]' at the same time,

it is 'well settled that an otherwise private tort is not committed under color of law simply

because the tortfeasor is an employee of the state.'"  Jojola v. Chavez, 55 F.3d at 493 (quoting

Lugar v. Edmonson Oil Co., 457 U.S. at 935-36 n.18; Mark v. Borough of Hatboro, 51 F.3d

1137, 1150 (3d Cir. 1995)).  Thus, "before conduct may be fairly attributed to the state because it

constitutes action 'under color of state law,' there must be 'a real nexus' between the employee's use or misuse of their authority as a public employee, and the violation allegedly committed by the defendant."  Jojola v. Chavez, 55 F.3d at 493.  What constitutes the required real nexus, however, is not completely clear.  As the Tenth Circuit has stated, whether there is a real nexus in a particular case depends on the circumstances:

> The under color of law determination rarely depends on a single, easily identifiable fact, such as the officer's attire, the location of the act, or whether or not the officer acts in accordance with his or her duty. Instead one must examine "the nature and circumstances of the officer's conduct and the relationship of that conduct to the performance of his official duties."

David v. City & Cnty. of Denver, 101 F.3d 1344, 1353 (10th Cir. 1996)(internal citations omitted)(quoting Martinez v. Colon, 54 F.3d 980, 986 (1st Cir. 1995)).

**2.     Individual Liability.**

Government actors may be liable for the constitutional violations that another committed, if the actors "set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of her constitutional rights," thus establishing the "requisite causal connection" between the government actor's conduct and a plaintiff's constitutional deprivations.  Trask v. Franco, 446 F.3d at 1046.  The Tenth Circuit has explained that § 1983 liability should be "'read against the background of tort liability that makes a man responsible for the natural consequences of his actions.'"  Martinez v. Carson, 697 F.3d at 1255 (quoting Monroe v. Pape, 365 U.S. 167, 187 (1961), overruled in part by Monell v. Dep't of Soc. Servs., 436 U.S. 658 (1978)).  "Thus, Defendants are liable for the harm proximately caused by their conduct."  Martinez v. Carson, 697 F.3d at 1255 (citing Trask v. Franco, 446 F.3d at 1046). As the Court has previously concluded: "[A] plaintiff who establishes liability for deprivations of

constitutional rights actionable under 42 U.S.C. § 1983 is entitled to recover compensatory damages for all injuries suffered as a consequence of those deprivations.  The recovery should be guided by common-law tort principles -- including principles of causation . . . ."  Train v. City of Albuquerque, 629 F. Supp. 2d 1243, 1251 (D.N.M. 2009)(Browning, J.).

The Tenth Circuit has found liability for those defendants who proximately caused an injury complained-of under § 1983 and stated that the fact that the "conduct of other people may have concurrently caused the harm does not change the outcome as to [the defendant]," so long as there was not a superseding-intervening cause of a plaintiff's harm.  Lippoldt v. Cole, 468 F.3d 1204, 1220 (10th Cir. 2006).

> Even if a factfinder concludes that the residential search was unlawful, the officers only "would be liable for the harm 'proximately' or 'legally' caused by their tortious conduct."  Bodine v. Warwick, 72 F.3d 393, 400 (3d Cir. 1995). "They would not, however, necessarily be liable for all of the harm caused in the 'philosophic' or but-for sense by the illegal entry."  Id.  In civil rights cases, a superseding cause, as we traditionally understand it in tort law, relieves a defendant of liability.  See, e.g., Warner v. Orange County Dep't of Prob., 115 F.3d 1068, 1071 (2d Cir. 1997); Springer v. Seaman, 821 F.2d 871, 877 (1st Cir. 1987), abrogated on other grounds by Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701 . . . (1989).

Trask v. Franco, 446 F.3d at 1046.  Thus, in the context of a claim under the Fourth Amendment, the Tenth Circuit has held that government actors "may be held liable if the further unlawful detention and arrest would not have occurred but for their conduct and if there were no unforeseeable intervening acts superseding their liability."  Martinez v. Carson, 697 F.3d at 1255.  The Tenth Circuit gave an example of a superseding intervening cause, quoting the Honorable Samuel J. Alito, then-Circuit Judge for the United States Court of Appeals for the Third Circuit, now-Associate Justice for the Supreme Court:

> Suppose that three police officers go to a suspect's house to execute an arrest

> warrant and that they improperly enter without knocking and announcing their presence.  Once inside, they encounter the suspect, identify themselves, show him the warrant, and tell him that they are placing him under arrest. The suspect, however, breaks away, shoots and kills two of the officers, and is preparing to shoot the third officer when that officer disarms the suspect and in the process injures him.  Is the third officer necessarily liable for the harm caused to the suspect on the theory that the illegal entry without knocking and announcing rendered any subsequent use of force unlawful?  The obvious answer is "no." The suspect's conduct would constitute a "superseding" cause, see Restatement (Second) of Torts § 442 (1965), that would limit the officer's liability. See id. § 440.

Trask v. Franco, 446 F.3d at 1046 (quoting Bodine v. Warwick, 72 F.3d at 400).  Additionally, "'[f]oreseeable intervening forces are within the scope of the original risk, and . . . will not supersede the defendant's responsibility.'"  Trask v. Franco, 446 F.3d at 1047 (quoting W. Page Keeton et al., Prosser and Keeton on Torts § 44, at 303-04 (5th ed. 1984)).  If

> the reasonable foreseeability of an intervening act's occurrence is a factor in determining whether the intervening act relieves the actor from liability for his antecedent wrongful act, and under the undisputed facts there is room for reasonable difference of opinion as to whether such act was wrongful or foreseeable, the question should be left for the jury.

Trask v. Franco, 446 F.3d at 1047 (citing Restatement (Second) of Torts § 453 cmt. b (1965)).

### 3.      **Supervisory Liability.**

The Tenth Circuit has held that supervisors are not liable under 42 U.S.C. § 1983 unless there is "'an affirmative link . . . between the constitutional deprivation and either the supervisor's personal participation, [] exercise of control or direction, or [] failure to supervise.'" Gallagher v. Shelton, 587 F.3d 1063, 1069 (10th Cir. 2009)(quoting Green v. Branson, 108 F.3d 1296, 1302 (10th Cir. 1997))(internal alterations omitted).  Because supervisors can be held liable only for their own constitutional or illegal policies, and not for the torts that their employees commit, supervisory liability requires a showing that such policies were a "deliberate

- 68 -

or conscious choice."   Barney v. Pulsipher, 143 F.3d at 1307-08 (citations omitted)(internal

quotation marks omitted).   Cf. Bd. of Cnty. Comm'rs v. Brown, 520 U.S. at 404 ("[I]t is not

enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality.

The plaintiff must also demonstrate that, through its deliberate conduct, the municipality was the

'moving force' behind the injury alleged." (emphasis in original)).

The Tenth Circuit has recognized that Ashcroft v. Iqbal limited, but did not eliminate,

supervisory liability for government officials based on an employee's or subordinate's

constitutional violations.   See Garcia v. Casuas, 2011 WL 7444745, at *25-26 (citing Dodds v.

Richardson, 614 F.3d 1185 (10th Cir. 2010)).   The language that may have altered the landscape

for supervisory liability in Ashcroft v. Iqbal is as follows: "Because vicarious liability is

inapplicable to Bivens and § 1983 suits, a plaintiff must plead that each Government-official

defendant, through the official's own individual actions, has violated the Constitution."   556 U.S.

at 676.   The Tenth Circuit in Dodds v. Richardson held:

> Whatever else can be said about Iqbal, and certainly much can be said, we
> conclude the following basis of § 1983 liability survived it and ultimately resolves
> this case: § 1983 allows a plaintiff to impose liability upon a defendant-supervisor
> who creates, promulgates, implements, or in some other way possesses
> responsibility for the continued operation of a policy the enforcement (by the
> defendant-supervisor or her subordinates) of which "subjects, or causes to be
> subjected" that plaintiff "to the deprivation of any rights . . . secured by the
> Constitution . . . ."

614 F.3d at 1199.   The Tenth Circuit noted that Ashcroft v. Iqbal "does not purport to overrule

existing Supreme Court precedent," but stated that "Iqbal may very well have abrogated § 1983

supervisory liability as we previously understood it in this circuit in ways we do not need to

address to resolve this case."   Dodds v. Richardson, 614 F.3d at 1200.   It concluded that Ashcroft

v. Iqbal did not alter "the Supreme Court's previously enunciated § 1983 causation and personal

involvement analysis." Dodds v. Richardson, 614 F.3d at 1200.  The Tenth Circuit, based on this

conclusion, set forth a test for supervisory liability under § 1983 after Ashcroft v. Iqbal:

> A plaintiff may [] succeed in a § 1983 suit against a defendant-supervisor by
> demonstrating: (1) the defendant promulgated, created, implemented or possessed
> responsibility for the continued operation of a policy that (2) caused the
> complained of constitutional harm, and (3) acted with the state of mind required
> to establish the alleged constitutional deprivation.

Dodds v. Richardson, 614 F.3d at 1199-1200 (citing Summum v. City of Ogden, 297 F.3d 995,

1000 (10th Cir. 2002)).  The Tenth Circuit noted, however: "We do not mean to imply that these

are distinct analytical prongs, never to be intertwined."  614 F.3d at 1200 n.8.  Relying on the

Supreme Court's opinion in Bd. of Cnty. Comm'rs v. Brown, the Tenth Circuit reasoned that two

of the prongs often, if not always, are sufficient proof that the third prong has been met also:

> Where a plaintiff claims that a particular municipal action itself violates federal
> law, or directs an employee to do so, resolving these issues of fault and causation
> is straightforward.  Section 1983 itself contains no state-of-mind requirement
> independent of that necessary to state a violation of the underlying federal right.
> In any § 1983 suit, however, the plaintiff must establish the state of mind required
> to prove the underlying violation.  Accordingly, proof that a municipality's
> legislative body or authorized decisionmaker has intentionally deprived a plaintiff
> of a federally protected right necessarily establishes that the municipality acted
> culpably.  Similarly, the conclusion that the action taken or directed by the
> municipality or its authorized decisionmaker itself violates federal law will also
> determine that the municipal action was the moving force behind the injury of
> which the plaintiff complains.

Dodds v. Richardson, 614 F.3d at 1200 n.8 (quoting Bd. of Cnty. Comm'rs v. Brown, 520 U.S.

at 404-05)(internal quotation marks omitted).  The Tenth Circuit noted that "[w]e think the same

logic applies when the plaintiff sues a defendant-supervisor who promulgated, created,

implemented or possessed responsibility for the continued operation of a policy that itself

violates federal law."  Dodds v. Richardson, 614 F.3d at 1200 n.8.  Thus, the Tenth Circuit

reduced the test to what can be seen as a two-part test for supervisor liability, requiring the

plaintiff to prove "an 'affirmative' link . . . between the unconstitutional acts by their subordinates and their 'adoption of any plan or policy . . . -- express or otherwise -- showing their authorization or approval of such misconduct.'"   Dodds v. Richardson, 614 F.3d at 1200-01 (quoting Rizzo v. Goode, 423 U.S. 362, 371 (1976)).

### 4.    **Municipal Liability.**

A municipality will not be held liable under § 1983 solely because its officers inflicted injury.   See Graves v. Thomas, 450 F.3d 1215, 1218 (10th Cir. 2006).   Rather, to establish municipal liability under § 1983, a plaintiff must demonstrate: (i) that an officer committed an underlying constitutional violation; (ii) that a municipal policy or custom exists; and (iii) that there is a direct causal link between the policy or custom and the injury alleged.   See Graves v. Thomas, 450 F.3d at 1218.   When a claim is brought against a municipality for failing to train its officers adequately, the plaintiff must show that the municipality's inaction was the result of deliberate indifference to the rights of its inhabitants.   See Graves v. Thomas, 450 F.3d at 1218.

### LAW REGARDING ABSOLUTE IMMUNITY

In cases against federal officials for violating the Constitution or of acting outside their federal statutory authority, "the officials 'in general are not absolutely immune . . . *unless* they are performing a narrowly defined judicial, executive, or legislative function.'"   Tripati v. U.S.I.N.S., 784 F.2d at 347 (alterations in original)(quoting Strothman v. Gefreh, 739 F.2d 515, 520 (10th Cir. 1984)).   The Supreme Court takes a "functional approach" to identify the "governmental functions that were historically viewed as so important and vulnerable to interference by means of litigation that some form of absolute immunity from civil liability was needed to ensure that they are performed 'with independence and without fear of

consequences.'"  Rehberg v. Paulk, 132 S. Ct. 1497, 1503 (2012)(quoting Pierson v. Ray, 386

U.S. 547, 554 (1967))(secondary quotation marks omitted).

> Taking this approach, we have identified the following functions that are absolutely immune from liability for damages under § 1983: actions taken by legislators within the legitimate scope of legislative authority; actions taken by judges within the legitimate scope of judicial authority; actions taken by prosecutors in their role as advocates; and the giving of testimony by witnesses at trial.  By contrast, the Court has found no absolute immunity for the acts of the chief executive officer of a State, the senior and subordinate officers of a State's National Guard, the president of a state university, school board members, the superintendent of a state hospital, police officers, prison officials and officers, and private co-conspirators of a judge.

Rehberg v. Paulk, 132 S. Ct. at 1503 (citations omitted).  The Tenth Circuit has also identified

that officials may be absolutely immune for some functions, but only qualifiedly immune for

others:

> Judges are protected by absolute immunity in civil rights actions from liability based on their judicial actions.  At the same time, only qualified immunity protects a judge's decision to fire a probation officer.  Absolute immunity also protects prosecutors from damages arising from the presentation of testimony at a criminal trial.  But prosecutors are only qualifiedly immune when they give legal advice to policemen.  Police officers are absolutely immune from a suit for damages for their testimony at a criminal trial, even if the testimony is perjurious.  However, because of the functional difference in the activities at issue, a police officer seeking an arrest warrant may only claim the protection of qualified immunity.

Mee v. Ortega, 967 F.2d 423, 425 (10th Cir. 1992)(citations omitted).

### 1.      Judicial Immunity for Judges.

"Judges of courts of superior or general jurisdiction are not liable to civil actions for their

judicial acts, even when such acts are in excess of their jurisdiction, and are alleged to have been

done maliciously or corruptly."  Stump v. Sparkman, 435 U.S. 349, 355-56 (1978).  That same

immunity continues even if the judge's "exercise of authority is flawed by the commission of

grave procedural errors." Stump v. Sparkman, 435 U.S. at 359. The Supreme Court has emphasized that a judge's immunity from § 1983 liability "is overcome in only two sets of circumstances. First, a judge is not immune from liability for nonjudicial acts, i.e., actions not taken in the judge's judicial capacity. Second, a judge is not immune for actions, though judicial in nature, taken in the complete absence of all jurisdiction." Mireles v. Waco, 502 U.S. 9, 11-12 (1991)(citations omitted). The Supreme Court has also held that absolute judicial immunity was not affected or abolished "by § 1983, which makes liable 'every person' who under color of law deprives another person of his civil rights." Pierson v. Ray, 386 U.S. 547, 554 (1967), overruled in part on other grounds by Harlow v. Fitzgerald, 457 U.S. 800 (1982).

Absolute judicial immunity is immunity from suit altogether. See Mireles v. Waco, 502 U.S. at 11 (citing Mitchell v. Forsyth, 472 U.S. 511, 526 (1985)). Judges are not entitled to absolute judicial immunity for non-judicial acts, i.e., acts taken that are not in the judge's judicial capacity. See Mireles v. Waco, 502 U.S. at 11 (citing Forrester v. White, 484 U.S. 219, 227-229 (1988); Stump v. Sparkman, 435 U.S. at 360). "[W]hether an act by a judge is a 'judicial' one relates to the nature of the act itself, i.e., whether it is a function normally performed by a judge, and to the expectations of the parties, i.e., whether they dealt with the judge in his judicial capacity." Mireles v. Waco, 502 U.S. at 12 (citations omitted). Judges are, however, entitled to legislative immunity when acting in a legislative capacity. See Supreme Court v. Consumers Union of the United States, Inc., 446 U.S. 719, 734 (1980).

> The rationale of the doctrine of judicial immunity -- "the risk that judges will be harassed and their independence compromised by the threat of having to defend themselves against suits by disgruntled litigants" -- also is equally applicable to [a party's] charge  that in performing their judicial duties the judges of [a] court were engaging in a conspiracy against [a party].

Green v. Seymour, 59 F.3d 1073, 1078 (10th Cir. 1995)(citing Pulliam v. Allen, 466 U.S. 522, 537-38 (1984)).

Judges acting in regards to state disciplinary issues sometimes act in a judicial capacity and sometimes act in a legislative capacity.  A judge acts in a judicial capacity when hearing appeals from disciplinary proceedings.  See Supreme Court v. Consumers Union of United States, Inc., 446 U.S. at 734.  Because "[d]isciplinary rules are rules of general application and are statutory in character," because "[t]hey act not on parties litigant but on all those who practice law in [a state]," and because "[t]hey do not arise out of a controversy which must be adjudicated, but instead out of a need to regulate conduct for the protection of all citizens," a court acts in a legislative capacity when it enacts disciplinary rules.  Id. at 731 (citation and internal quotations omitted).

## 2.    Quasi-Judicial Immunity for Officials who Enforce Judicial Orders.

"Absolute immunity has long been available to protect judges from liability for acts performed in their judicial capacity," and, "[o]ver time the defense has been extended to 'certain others who perform functions closely associated with the judicial process.'"  Dahl v. Charles F. Dahl, M.D., P.C. Defined Ben. Pension Trust, 744 F.3d 623, 630 (10th Cir. 2014)(quoting Cleavinger v. Saxner, 474 U.S. 193, 199, 200 (1985)).  "Just as judges acting in their judicial capacity are absolutely immune from liability under section 1983, 'official[s] charged with the duty of executing a facially valid court order enjoy[] absolute immunity from liability for damages in a suit challenging conduct prescribed by that order.'"  Turney v. O'Toole, 898 F.2d 1470, 1472 (10th Cir. 1990)(alterations in original)(citations omitted)(quoting Valdez v. City & Cnty. of Denver, 878 F.2d at 1286).  See Henriksen v. Bentley, 644 F.2d 852, 855 (10th Cir.

1981)(stating that absolute immunity applies where an official acts "under the command of a court decree or explicit instructions from a judge"). "[I]t is simply unfair to spare the judges who give orders while punishing the officers who obey them." Valdez v. City & Cnty. of Denver, 878 F.2d at 1289. "Enforcing a court order or judgment is intrinsically associated with a judicial proceeding. If losing parties were free to challenge the will of the court by threatening its officers with harassing litigation, the officers might neglect the execution of their sworn duties." Valdez v. City & Cnty. of Denver 878 F.2d at 1288 (citation omitted).

In Valdez v. City and County of Denver, the Tenth Circuit held that "an official charged with the duty of executing a facially valid court order enjoys absolute immunity from liability for damages in a suit challenging conduct prescribed by that order." 878 F.2d at 1286. In that case, the plaintiff Robert Valdez was "present as a spectator in state traffic court," and at some point, the Denver County Court Judge presiding over the proceedings "said something to a defendant with which Valdez disagreed." 878 F.2d at 1286. As a result of his disagreement, the plaintiff exclaimed "bullshit" and had an exchange of words with the judge. 878 F.2d at 1286. The judge held the plaintiff in contempt and ordered one of the defendants, a police officer, to arrest the plaintiff. See 878 F.2d at 1286. The officer complied, and, later the same day, the judge issued a mittimus[10] directing the municipality to retain custody of Valdez. See 878 F.2d at 1286. Pursuant to the judge's order, Valdez was incarcerated for two weeks under the administrative supervision of another defendant. See 878 F.2d at 1286. The Tenth Circuit, in holding that the arresting officer and the defendant who was the administrative supervisor of the jail where the plaintiff was held were entitled to absolute immunity, reasoned:

---

[10]A mittimus is a "court order or warrant directing a jailer to detain a person until ordered otherwise." Black's Law Dictionary 1093 (9th ed. 2009).

> To force officials performing ministerial acts intimately related to the judicial process to answer in court every time a litigant believes the judge acted improperly is unacceptable. Officials must not be called upon to answer for the legality of decisions which they are powerless to control. We explained in [T&W Inv. Co. v. ]Kurtz, 588 F.2d [801,] 802[ (10th Cir. 1978)], that it is simply unfair to spare the judges who give orders while punishing the officers who obey them. Denying these officials absolute immunity for their acts would make them a "lightning rod for harassing litigation aimed at judicial orders." Id.
>
> . . . .
>
> Tension between trial judges and those officials responsible for enforcing their orders inevitably would result were there not absolute immunity for both. Kurtz, 588 F.2d at 802. Officials employed to implement facially valid court orders could choose: They may disregard the judge's orders and face discharge, or worse yet criminal contempt, or they may fulfill their duty and risk being haled into court. . . . Officials such as the defendants must not be required to act as pseudo-appellate courts scrutinizing the orders of judges.

878 F.2d at 1289. Although "absolute immunity always comes at a price," such that an individual "wrongly deprived of liberty or property by a judge's decision will be unable to pursue a remedy under the civil rights statute," the aggrieved party is not without recourse. 878 F.2d at 1289. "In most cases, the defendant should appeal: The proper procedure for a party who wishes to contest the legality of a court order enforcing a judgment is to appeal that order and the underlying judgment, not to sue the official responsible for its execution." 878 F.2d at 1289-90 (internal quotation marks omitted).

There are limits, however, to "how unlawful an order can be and still immunize the officer executing it." Moss v. Kopp, 559 F.3d 1155, 1163 (10th Cir. 2009)(citing Turney v. O'Toole, 898 F.2d at 1474). For the state official to be entitled to quasi-judicial immunity, "the judge issuing the disputed order must be immune from liability in his or her own right, the officials executing the order must act within the scope of their own jurisdiction, and the officials must only act as prescribed by the order in question." Moss v. Kopp, 559 F.3d at 1163 (citing

Turney v. O'Toole, 898 F.2d at 1472, 1474).  The order must also be facially valid.  See Moss v. Kopp, 559 F.3d at 1164.  "[E]ven assuming that an order is infirm as a matter of state law, it may be facially valid, as 'facially valid' does not mean 'lawful,' and erroneous orders can be valid."  Moss v. Kopp, 559 F.3d at 1165 (quoting Turney v. O'Toole, 898 F.2d at 1473).

When an official, in bad faith, obtains the order under which he or she claims immunity, that order does not provide the same quasi-judicial immunity as an order which the official played no part in procuring.  See Moss .v Kopp, 559 F.3d at 1163 n.10; Turney v. O'Toole, 898 F.2d at 1473 n.3 (citing Guerro v. Mulhearn, 498 F.2d 1249, 1256 (1st Cir. 1974)(refusing to extend absolute immunity to police officers who acted pursuant to a wiretap court order when the officers allegedly obtained the wiretap order "in bad faith and on the basis of perjured testimony").

### 3.   **Officials in Administrative Hearings.**

The Tenth Circuit has recognized that "officials in administrative hearings can claim the absolute immunity that flows to judicial officers if they are acting in a quasi-judicial fashion."  Guttman v. Khalsa, 446 F.3d 1027, 1033 (10th Cir. 2006)(citing Butz v. Economou, 438 U.S. 478, 514 (1978)).  For an official at an administrative hearing to enjoy absolute immunity, "(a) the officials' functions must be similar to those involved in the judicial process, (b) the officials' actions must be likely to result in damages lawsuits by disappointed parties, and (c) there must exist sufficient safeguards in the regulatory framework to control unconstitutional conduct."   Guttman v. Khalsa, 446 F.3d at 1033 (quoting Horwitz v. State Bd. of Med. Examiners of State of Colo., 822 F.2d 1508, 1513 (10th Cir. 1987))(internal quotation marks omitted).

In Guttman v. Khalsa, a doctor who suffered from depression and post-traumatic stress disorder had appeared before the Impaired Physicians Committee of the New Mexico Board of Medical Examiners to respond to a series of complaints about his professional conduct.  See 446 F.3d at 1030.  The Committee in Guttman v. Khalsa issued a "Notice of Contemplated Action and Order of Summary Suspension" of the doctor's medical license based on alleged mental illness and lying to the Committee.  446 F.3d at 1030.  The New Mexico Board of Medical Examiners then held a hearing, during which one of the defendants acted as Administrative Prosecutor.  See 446 F.3d at 1030.  The New Mexico Board of Medical Examiners in Guttman v. Khalsa revoked the doctor's medical license pursuant to its statutory authority to do so.  See 446 F.3d at 1030.

The doctor in Guttman v. Khalsa appealed the decision to the Seventh Judicial District of New Mexico.  See 446 F.3d at 1030.  The Seventh Judicial District of New Mexico denied the appeal, and the doctor then appealed to the Court of Appeals of New Mexico.  See 446 F.3d at 1030.  After the Court of Appeals of New Mexico affirmed, the doctor filed a petition for certiorari with the Supreme Court of New Mexico.  See 446 F.3d at 1030.  Before the Supreme Court of New Mexico could act on the petition, the doctor filed a lawsuit in federal court, alleging, among other things, violations of his constitutional rights.  See 446 F.3d at 1030.

The Tenth Circuit in Guttman v. Khalsa held that the Rooker-Feldman doctrine[7] did not bar the doctor's federal lawsuit, because the state-court lawsuit was not final.  See 446 F.3d at

---

[7]The Rooker-Feldman doctrine derives from two Supreme Court cases, Rooker v. Fidelity Trust Co., 263 U.S. 413 (1923), and District of Columbia Court of Appeals v. Feldman, 460 U.S. 462 (1983).  The Tenth Circuit has recognized that the "Rooker-Feldman doctrine prohibits federal suits that amount to appeals of state-court judgments."  Bolden v. City of Topeka, Kan., 441 F.3d 1129, 1142-43 (10th Cir. 2006)(citations omitted).

1032.  The Tenth Circuit found, however, that the Administrative Prosecutor and the individual who presided over the three-day hearing in front of the New Mexico Board of Medical Examiners enjoyed absolute immunity.  See 446 F.3d at 1032.  The basis for the hearing officer's immunity in Guttman v. Khalsa was that he had served a quasi-judicial function.  See 446 F.3d at 1032.

The Tenth Circuit in Guttman v. Khalsa also relied on an earlier case: Horwitz v. State Board of Medical Examiners of State of Colorado, 822 F.2d 1508 (10th Cir. 1987).  In Horwitz v. State Board of Medical Examiners of State of Colorado, the Tenth Circuit concluded that members of the State Board of Medical Examiners for the State of Colorado enjoyed absolute immunity for actions it took in filing a formal complaint against a doctor, and in temporarily suspending his right to practice medicine pending investigations and hearings.  See 822 F.2d at 1510, 1515.  The Tenth Circuit in Horwitz v. State Board of Medical Examiners of State of Colorado reasoned that the defendant Board members were performing adjudicatory and prosecutorial functions.  See 822 F.2d at 1515.  The Tenth Circuit in Horwitz v. State Board of Medical Examiners of State of Colorado also noted:

> There exists a strong need to insure that individual Board members perform their functions for the public good without harassment or intimidation. There exist adequate due process safeguards under Colorado law to protect against unconstitutional conduct without reliance upon private damages lawsuits. It is important to insulate Board members from political influences in meeting their adjudicatory responsibilities in the adversarial setting involving licensure to practice medicine.  Public policy requires that officials serving in such capacities be exempt from personal liability.

822 F.2d at 1515.  Finally, the Tenth Circuit pointed out the Board members' functions, observing that Board members

> serve in the prosecutorial role in that they, among other things, initiate

complaints, start hearings, make investigations, take evidence, and issue subpoenas. They also serve in the adjudicative role, as judges. Thus, the Board duties are "functionally comparable" to a court of law. And we are reminded that, with respect to immunity, we must include all acts of the official performing statutory duties as having "[m]ore or less connection with the general matters committed by law" to his station.

822 F.2d at 1515.

### 4. **Court Reporters.**

Although certain officers enjoy immunity from suit for acts taken in a quasi-judicial setting, the Supreme Court has held that court reporters do not enjoy such immunity. Rejecting a court reporter's claim of absolute immunity, the Supreme Court stated: "We are also unpersuaded by the contention that our functional approach to immunity . . . requires that absolute immunity be extended to court reporters because they are part of the judicial function." Antoine v. Byers & Anderson, Inc., 508 U.S. 429, 435 (1993). Rather, in the Supreme Court's view:

> The doctrine of judicial immunity is supported by a long-settled understanding that the independent and impartial exercise of judgment vital to the judiciary might be impaired by exposure to potential damages liability. Accordingly, the "touchstone" for the doctrine's applicability has been "performance of the function of resolving disputes between parties, or of authoritatively adjudicating private rights." [Burns v. Reed,] 500 U.S. [478,] 500 [(1991)](Scalia, J., concurring in judgment in part and dissenting in part). When judicial immunity is extended to officials other than judges, it is because their judgments are "functional[ly] comparab[le]" to those of judges -- that is, because they, too, "exercise a discretionary judgment" as a part of their function. Imbler v. Pachtman, 424 U.S. [409,] 423, n.20 [(1976)].

Antoine v. Byers & Anderson, Inc., 508 U.S. at 435-36 (footnote omitted).

In light of this understanding of judicial immunity, the Supreme Court found that the function that court reporters perform is not one that would lead to a grant of immunity. See Antoine v. Byers & Anderson, Inc., 508 U.S. at 436. The Supreme Court reasoned that court

reporters "are afforded no discretion" in carrying out their duty and that they are "not absolutely immune because their duties are ministerial, not discretionary in nature."  Antoine v. Byers & Anderson, Inc., 508 U.S. at 436 (citations omitted)(internal quotation marks omitted).

The Court has also drawn distinctions between when a person is acting in a judicial role, such that they are entitled to quasi-judicial immunity, and when a person in a quasi-judicial setting plays a merely ministerial role.  See Duprey v. Twelfth Judicial Dist. Court, 760 F. Supp. 2d 1180, 1204 (D.N.M. 2009)(Browning, J.).  In Duprey v. Twelfth Judicial District Court, the Court found that the state defendant who acted as chairperson of the judicial grievance board was entitled to absolute immunity, because his function was similar to that of an administrative law judge in a quasi-judicial setting.  See 760 F. Supp. 2d at 1204.  The Court found that the director of human resources for the New Mexico Administrative Office of the Courts was not entitled to absolute immunity, because her role was ministerial and mechanical. See 760 F. Supp. 2d at 1204.  In analyzing each defendant's function, the Court focused on participation in the deliberative process and the exercise of independent judgment.   See 760 F. Supp. 2d at 1205.  The Court determined that, because the human resources director played a ministerial role and did not act at the direction of a judge, she was not entitled to judicial immunity.  See 760 F. Supp. 2d at 1208 ("An individual whose job at a judicial proceeding is to run a tape recorder is not one who needs to be able to act according to her own convictions."). See also Braverman v. New Mexico, No. 11-0829, 2011 WL 6013587, at *20 (D.N.M. Oct. 19, 2011)(Browning, J.)(finding that judicial immunity probably protected a state judge and special master from suit when denying a motion for a temporary restraining order).

   5.   **Probation Officers.**

Whether a probation or parole officer is entitled to absolute immunity or qualified immunity depends on whether the officer is performing a function that is quasi-judicial in nature. See Russ v. Uppah, 972 F.2d 300, 303 (10th Cir. 1992).  In Tripati v. U.S.I.N.S., the Tenth Circuit held that, when "the challenged activities of a federal probation officer are intimately associated with the judicial phase of the criminal process, he or she is absolutely immune from a civil suit for damages."  784 F.2d at 348.  In that case, the plaintiff alleged that "two probation officers made false statements in a pretrial bond report and a presentence report."  784 F.2d at 347.  The Tenth Circuit explained that "[t]here can be no doubt that both the decision whether to order the pretrial release of a criminal defendant and the selection of an appropriate sentence after his conviction are important parts of the judicial process in criminal cases," and that "[p]robation officers who assist in these determinations perform critical roles."  784 F.2d at 348. The Tenth Circuit emphasized that the probation officers were acting as "an arm of the court," rather than as "an investigative arm for the prosecution," and that the presentence report and pretrial release report were "prepared exclusively at the discretion of and for the benefit of the court."  784 F.2d at 348.  On the other hand, "decisions involving the revocation of probation or parole by a probation or parole officer warrant only qualified, not absolute, immunity because such decisions are farther removed from the judicial process and are not initiated by courts." Snell v. Tunnell, 920 F.2d 673, 692 n.18 (10th Cir. 1990).

## LAW REGARDING QUALIFIED IMMUNITY

Qualified immunity recognizes the "need to protect officials who are required to exercise their discretion and the related public interest in encouraging the vigorous exercise of official authority."  Harlow v. Fitzgerald, 457 U.S. 800, 807 (1982).  "Qualified immunity protects

federal and state officials from liability for discretionary functions, and from 'the unwarranted demands customarily imposed upon those defending a long drawn-out lawsuit.'"  Roybal v. City of Albuquerque, No. CIV 08-0181, 2009 WL 1329834, at *10 (D.N.M. Apr. 28, 2009)(Browning, J.)(quoting Siegert v. Gilley, 500 U.S. 226, 232 (1991)).  The Supreme Court deems it "untenable to draw a distinction for purposes of immunity law between suits brought against state officials under § 1983 and suits brought directly under the Constitution against federal officials."  Butz v. Economou, 438 U.S. 478, 504 (1978).  "The qualified immunity analysis is the same whether the claims are brought under Bivens or pursuant to the post-Civil War Civil Rights Acts."  Breidenbach v. Bolish, 126 F.3d 1288, 1291 (10th Cir. 1997), overruled on other grounds as recognized in Currier v. Doran, 242 F.3d 905 (10th Cir. 2001).

> Under § 1983 (invoked in this case) and Bivens v. Six Unknown Fed. Narcotics Agents, 403 U.S. 388 . . . (1971), a plaintiff may seek money damages from government officials who have violated her constitutional or statutory rights.  But to ensure that fear of liability will not "unduly inhibit officials in the discharge of their duties," Anderson v. Creighton, 483 U.S. 635, 638 . . . (1987), the officials may claim qualified immunity; so long as they have not violated a "clearly established" right, they are shielded from personal liability, Harlow v. Fitzgerald, 457 U.S. 800, 818 . . . (1982).  That means a court can often avoid ruling on the plaintiff's claim that a particular right exists.  If prior case law has not clearly settled the right, and so given officials fair notice of it, the court can simply dismiss the claim for money damages.  The court need never decide whether the plaintiff's claim, even though novel or otherwise unsettled, in fact has merit.

Camreta v. Green, 131 S. Ct. 2020, 2030-31 (2011).

Issues of qualified immunity are best resolved at the "earliest possible stage in litigation."  Pearson v. Callahan, 555 U.S. 223, 232 (2009)(quoting Hunter v. Bryant, 502 U.S. 224, 227 (1991)(per curiam)).  "If qualified immunity is to mean anything, it must mean that public employees who are just doing their jobs are generally immune from suit."  Lewis v. Tripp, 604 F.3d 1221, 1230 (10th Cir. 2010).

Qualified immunity shields government officials from liability where "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Pearson v. Callahan, 555 U.S. at 231 (quoting Harlow v. Fitzgerald, 457 U.S. at 818). Qualified immunity also shields officers who have "reasonable, but mistaken beliefs" and operates to protect officers from the sometimes "hazy border[s]" of the law. Saucier v. Katz, 533 U.S. 194, 205 (2001), receded from by Pearson v. Callahan, 129 S. Ct. 808 (2009). When a defendant asserts qualified immunity, the plaintiff must demonstrate: (i) that the defendant's actions violated his or her constitutional or statutory rights; and (ii) that the right was clearly established at the time of the alleged misconduct. See Riggins v. Goodman, 572 F.3d 1101, 1107 (10th Cir. 2009).

## 1.      Procedural Approach to Qualified Immunity.

The Supreme Court recently revisited the proper procedure for lower courts to evaluate a qualified immunity defense. In Pearson v. Callahan, the Supreme Court held that lower courts "should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." 555 U.S. at 236. The Supreme Court also noted that, while no longer mandatory, the protocol outlined in Saucier v. Katz -- by which a court first decides if the defendant's actions violated the constitution, and then the court determines if the right violated was clearly established -- will often be beneficial. See Pearson v. Callahan 555 U.S. at 241. In rejecting the prior mandatory approach, the Supreme Court recognized that "[t]here are cases in which it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right," and that such an approach burdens district court and courts of

appeals with "what may seem to be an essentially academic exercise."  555 U.S. at 237.  The
Supreme Court also recognized that the prior mandatory approach "departs from the general rule
of constitutional avoidance and runs counter to the older, wiser judicial counsel not to pass on
questions of constitutionality unless such adjudication is unavoidable."   555 U.S. at 241
(alterations omitted)(internal quotation marks omitted).   See Reichle v. Howards, 132 S. Ct.
2088, 2093 (2012)(affirming Pearson v. Callahan's procedure and noting that deciding qualified
immunity issues on the basis of a right being not "clearly established" by prior case law
"comports with our usual reluctance to decide constitutional questions unnecessarily").   Once the
plaintiff establishes an inference that the defendant's conduct violated a clearly established
constitutional right, a qualified immunity defense generally fails.   See Cannon v. City & Cnty. of
Denver, 998 F.2d 867, 870-71 (10th Cir. 1993).

        The Supreme Court recognizes seven circumstances where district courts should proceed
directly to and "should address only" the clearly established prong of the qualified immunity
analysis: when (i) the first, constitutional violation question "is so factbound that the decision
provides little guidance for future cases"; (ii) "it appears that the question will soon be decided
by a higher court"; (iii) deciding the constitutional question requires "an uncertain interpretation
of state law"; (iv) "qualified immunity is asserted at the pleading stage" and "the precise factual
basis for the . . . claim . . . may be hard to identify"; (v) tackling the first element "may create a
risk of bad decisionmaking" because of inadequate briefing; (vi) discussing both elements risks
"bad decisionmaking," because the court is firmly convinced the law is not clearly established
and is thus inclined to give little thought to the existence of the constitutional right; or (vii) the
doctrine of "constitutional avoidance" suggests the wisdom of passing on the first constitutional

question when "it is plain that a constitutional right is not clearly established but far from obvious whether in fact there is such a right."  Kerns v. Bader, 663 F.3d 1173, 1180-81 (10th Cir. 2011)(quoting Pearson v. Callahan, 555 U.S. at 236-42).  Regarding the last of these seven circumstances, the Supreme Court has clarified that courts may "avoid avoidance" and address the first prong before the second prong in cases involving a recurring fact pattern, where guidance on the constitutionality of the challenged conduct is necessary and the conduct is likely only to face challenges in the qualified immunity context.  Camreta v. Greene, 131 S. Ct. at 2031-32.  See Kerns v. Bader, 663 F.3d at 1181.[11]  "Courts should think carefully before

---

[11]In Kerns v. Bader, the Tenth Circuit reversed the Court's decision that an officer was not entitled to qualified immunity, noting that the Court "analyzed both aspects of the qualified immunity test before agreeing" with the plaintiff that the qualified immunity defense did not protect the officer.  663 F.3d at 1183.  In reversing, the Tenth Circuit stated:

> Because we agree with Sheriff White on the latter (clearly established law) question, we reverse without addressing the former (constitutional violation) question.  And we pursue this course because doing so allows us to avoid rendering a decision on important and contentious questions of constitutional law with the attendant needless (entirely avoidable) risk of reaching an improvident decision on these vital questions.

663 F.3d at 1183-84.  The Tenth Circuit did not analyze whether the officer violated the plaintiff's constitutional rights and stated that guidance on the particular constitutional issue would be more appropriate in a case not involving qualified immunity: "Neither do we doubt that the scope of the Constitution's protection for a patient's hospital records can be adequately decided in future cases where the qualified immunity overlay isn't in play (e.g., through motions to suppress wrongly seized records or claims for injunctive or declaratory relief)."  663 F.3d at 1187 n.5.  On remand, the Court stated:

> While the Court must faithfully follow the Tenth Circuit's decisions and opinions, the Court is troubled by this statement and the recent trend of the Supreme Court's hesitancy in § 1983 actions to address constitutional violations.  A Reconstruction Congress, after the Civil War, passed § 1983 to provide a civil remedy for constitutional violations.  See Mitchum v. Foster, 407 U.S. 225, 238-39 (1972).  In Mitchum v. Foster, the Supreme Court explained:

 

          Section 1983 was originally § 1 of the Civil Rights Act of 1871 . . . and was enacted for the express purpose of "enforc(ing) the Provisions of the Fourteenth Amendment." . . . The predecessor of § 1983 was thus an important part of the basic alteration in our federal system wrought in the Reconstruction era through federal legislation and constitutional amendment.

407 U.S. at 238-39.  Congress did not say it would remedy only violations of "clearly established" law, but that

          [e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to <u>the deprivation of any rights, privileges, or immunities secured by the Constitution and laws</u>, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress, except that in any action brought against a judicial officer for an act or omission taken in such officer's judicial capacity, injunctive relief shall not be granted unless a declaratory decree was violated or declaratory relief was unavailable.

42 U.S.C. § 1983 (emphasis added).  The Supreme Court established the qualified immunity defense in <u>Pierson v. Ray</u>, 386 U.S. 547 (1967), and held that officials were not liable for constitutional violations where they reasonably believed that their conduct was constitutional.  <u>See</u> E. Clarke, Safford Unified Sch. Dist. No. 1 v. Redding: <u>Why Qualified Immunity is a Poor Fit in Fourth Amendment School Search Cases</u>, 24 B.Y.U. J. Pub. L. 313, 329 (2010).  The Supreme Court first introduced the "clearly established" prong in reference to an officer's good faith and held that a compensatory award would only be appropriate if an officer "acted with such an impermissible motivation or with such disregard of the [individual's] clearly established constitutional rights that his action cannot reasonably be characterized as being in good faith."  <u>Wood v. Strickland</u>, 420 U.S. 308, 322 (1975).  In <u>Harlow v. Fitzgerald</u>, when the Supreme Court moved to an objective test, the clearly-established prong became a part of the qualified immunity test. <u>See</u> 457 U.S. at 818 ("We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights.").  It seems ironic that the federal courts would restrict a congressionally mandated remedy for constitutional violations -- presumably the rights of innocent people -- and discourage case law development on the civil side -- and restrict case law development to motions to suppress, which reward only

expending 'scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'"   Ashcroft v. al-Kidd, 131 S. Ct. 2074, 2080 (2011)(quoting Pearson v. Callahan, 555 U.S. 223, 236-37 (2009)). See Camreta v. Greene, 131 S. Ct. at 2032 ("In general, courts should think hard, and then think

---

the guilty and is a judicially created, rather than legislatively created, remedy. Commentators have noted that, "[o]ver the past three decades, the Supreme Court has drastically limited the availability of remedies for constitutional violations in" exclusionary rule litigation in a criminal case, habeas corpus challenges, and civil litigation under § 1983. J. Marceau, The Fourth Amendment at a Three-Way Stop, 62 Ala. L. Rev. 687, 687 (2011). Some commentators have also encouraged the courts to drop the suppression remedy and the legislature to provide more -- not less -- civil remedies for constitutional violations. See Christopher Slobogin, Why Liberals Should Chuck the Exclusionary Rule, 1999 U. Ill. L. Rev. 363, 390-91 (1999)("Behavioral theory suggests that the exclusionary rule is not very effective in scaring police into behaving. . . . These theories also suggest that a judicially administered damages regime . . . would fare significantly better at changing behavior at an officer level."); Hon. Malcolm R. Wilkey, Constitutional Alternatives to the Exclusionary Rule, 23 S. Tex. L.J. 531, 539 (1982)(criticizing the exclusionary rule and recommending alternatives). In Hudson v. Michigan, 547 U.S. 586 (2006), the Supreme Court noted that civil remedies were a viable alternative to a motion to suppress when it held that the exclusionary rule was inapplicable to cases in which police officers violate the Fourth Amendment when they fail to knock and announce their presence before entering. See 547 U.S. at 596-97. Rather than being a poor or discouraged means of developing constitutional law, § 1983 seems the better and preferable alternative to a motion to suppress. It is interesting that the current Supreme Court and Tenth Circuit appear more willing to suppress evidence and let criminal defendants go free, than have police pay damages for violations of innocent citizens' civil rights. It is odd that the Supreme Court has not adopted a clearly established prong for suppression claims; it seems strange to punish society for police violating unclear law in criminal cases, but protect municipalities from damages in § 1983 cases.

Kerns v. Bd. of Comm'rs, 888 F. Supp. 2d 1176, 1224 n.36 (D.N.M. 2012)(Browning, J.), abrogated on other grounds as recognized in Ysasi v. Brown, No. CIV 13-0183 JB/CG, 2014 WL 936835, at *9 n.24 (D.N.M. Feb. 28, 2014)(Browning, J.).

hard again, before turning small cases into large ones.").[12]   The Tenth Circuit will remand a case

---

[12]In Kerns v. Board of Commissioners, the Court expressed concern with Justice Elena Kagan's comments about "large" and "small" cases:

      While the Court is, of course, obligated to follow faithfully the Supreme Court's decisions and opinions, the Court has always been unenlightened and even troubled by Justice Elena Kagan's comments in Camreta v. Greene about "large" and "small" cases.  131 S. Ct. at 2032.  As a trial judge, the Court has tried assiduously to avoid thinking about or categorizing some cases as "large" and some as "small."  It usually is not mentally healthy for a judge to put all his or her energy into "large" cases and slight "small cases"; to the litigants, their case is the most important case on the Court's docket, and it is usually wise for the judge to treat each case on which he or she is working -- at that moment -- as the most important case at that moment.  Getting the decision "right," i.e. getting the law and facts correct and accurate, is obviously important, but getting it right is only one-half of a judge's task, particularly a trial judge's job.  The other half of dispensing justice is the appearance of justice -- did the Court listen to the litigant's arguments, wrestle with those arguments, and deal with them in an intellectually honest way.  Americans are pretty good about accepting a judicial decision -- even an adverse one -- and cease obsessing over an issue, if they are convinced that an authority figure has dressed up, taken them seriously, listened patiently and politely, wrestled with the arguments, addressed them, and accurately stated the facts.  The Court believes that, if it starts looking at some cases before it as "large" and some as "small," it begins a slippery slope that does not accomplish both halves of the task of dispensing justice.  The justice system depends so much on the nation respecting and accepting the courts' proceedings and decisions, because courts have very little "power" that does not depend on that acceptance.  Thus, Justice Kagan's comments are not only not self-defining, but they are disturbing.

      If, perhaps, a "large" case is a Supreme Court case or one that comes from the East Coast or California, rather than one in a district court in New Mexico, then it helps to look at what cases the Supreme Court has decided for the plaintiff. The three most recent qualified immunity cases, the Supreme Court dealt with are: (i) Reichle v. Howards, 132 S. Ct. 2088 (2012); (ii) Filarksy v. Delia, 132 S. Ct. 1657 (2012); and (iii) Messerschmidt v. Millender, 132 S. Ct. 1235 (2012).  In Reichle v. Howards, the Supreme Court determined that secret service agents were entitled to qualified immunity for arresting a protestor who touched the Vice President and held that it was not clearly established that an arrest supported by probable cause could give rise to a First Amendment violation.  See 132 S. Ct. at 2092, 2097.  In Filarsky v. Delia, the Supreme Court held that a private individual that the government hires to do its work, an internal affairs review, is entitled to

to the district court for further consideration when the district court has given cursory treatment to the clearly established prong of the qualified immunity analysis.  See Kerns v. Bader, 663 F.3d at 1182.

> **2.** **Clearly Established Rights in the Qualified Immunity Analysis.**

In evaluating whether the right was clearly established, a district court considers whether the right was sufficiently clear that a reasonable government employee in the defendant's shoes would understand that what he or she did violated that right.  See Casey v. W. Las Vegas Indep. Sch. Dist., 473 F.3d 1323, 1327 (10th Cir. 2007).  "A clearly established right is generally defined as a right so thoroughly developed and consistently recognized under the law of the jurisdiction as to be 'indisputable' and 'unquestioned.'"  Lobozzo v. Colo. Dep't of Corr., 429 F. App'x 707, 710 (10th Cir. 2011)(unpublished)(quoting Zweibon v. Mitchell, 720 F.2d 162, 172-

---

seek qualified immunity for Fourth and Fourteenth Amendment violations. See 132 at 1660, 1668.  In Messerschmidt v. Millender, the Supreme Court held that police officers in Los Angeles, California were entitled to qualified immunity when they relied on an invalid warrant to search a home, because a reasonable officer would not have realized the error.  See 132 at 1241, 1250.  The Supreme Court has not denied qualified immunity since 2004 in Groh v. Ramirez, 540 U.S. 551 (2004), where it held that an officer unreasonably relied on a deficient warrant.  See 540 U.S. at 565. The Court does not think those presumably "large" cases (they are Supreme Court cases, after all) are any different -- substantively, legally, or factually -- than this case involving the search of a citizen's home after someone shot down a police helicopter and then detained that suspect for nine months until the United States realized that J. Kerns could not have shot down the helicopter.

   On the flip side, treating large cases like they are large cases can create an appearance problem to the public and to the litigants -- that only big cases deserve the Court's attention.  A trial judge can overwork a "large" case.  It is better to treat even "large" cases like every other case; large cases and their litigants need to know and appreciate that they are not the only case on the court's docket, and realize that the scarcity of judicial resources applies to them too.

888 F. Supp. 2d at 1222 n.35.

73 (D.C. Cir. 1983)).

"Ordinarily, in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains." Currier v. Doran, 242 F.3d 905, 923 (10th Cir. 2001). On the other hand, the Supreme Court has observed that it is generally not necessary to find a controlling decision declaring the "very action in question . . . unlawful." Anderson v. Creighton, 483 U.S. 635, 640 (1987). "In determining whether the right was 'clearly established,' the court assesses the objective legal reasonableness of the action at the time of the alleged violation and asks whether 'the contours of the right [were] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" Holland ex rel. Overdorff v. Harrington, 268 F.3d 1179, 1186 (10th Cir. 2001)(alteration in original)(quoting Saucier v. Katz, 533 U.S. at 202). A court should inquire "whether the law put officials on fair notice that the described conduct was unconstitutional" rather than engage in "a scavenger hunt for cases with precisely the same facts." Pierce v. Gilchrist, 359 F.3d 1279, 1298 (10th Cir. 2004).

The Supreme Court has clarified that the clearly established prong of the qualified immunity test is a very high burden for the plaintiff: "A Government official's conduct violates clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." Ashcroft v. al-Kidd, 131 S. Ct. at 2083. "In other words, 'existing precedent must have placed the statutory or constitutional question beyond debate.'" Reichle v. Howards, 132 S. Ct. at 2093 (quoting Ashcroft v. al-Kidd, 131 S. Ct. at 2083). While a case directly on

point is not required, the Supreme Court has held that "existing precedent must have placed the statutory or constitutional question beyond debate."  Ashcroft v. al-Kidd, 131 S. Ct. at 2083. "The operation of this standard, however, depends substantially upon the level of generality at which the relevant 'legal rule' is to be identified."  Anderson v. Creighton, 483 U.S. at 639. "The general proposition, for example, that an unreasonable search or seizure violates the Fourth Amendment is of little help in determining whether the violative nature of particular conduct is clearly established."  Ashcroft v. al-Kidd, 131 S. Ct. at 2084.  The level of generality at which the legal rule is defined is important, because qualified immunity shields officers who have "reasonable, but mistaken beliefs" as to the application of law to facts and operates to protect officers from the sometimes "hazy border[s]" of the law.  Saucier v. Katz, 533 U.S. at 205.

The Tenth Circuit held in Kerns v. Bader that, although "a case on point isn't required if the impropriety of the defendant's conduct is clear from existing case law," the law is not clearly established where "a distinction might make a constitutional difference."  663 F.3d at 1188 (emphasis in original).  In Kerns v. Bader, dealing with the search of a home, the Tenth Circuit explained that the relevant question "wasn't whether we all have some general privacy interest in our home," but "whether it was beyond debate in 2005 that the officers' entry and search lacked legal justification."  663 F.3d at 1183 (emphasis added).  Earlier Tenth Circuit cases, clarifying the level of generality at which a legal rule must be defined, applied a sliding scale to determine when the law is clearly established.  See Casey v. City of Fed. Heights, 509 F.3d 1278, 1284 (10th Cir. 2007)("The more obviously egregious the conduct in light of prevailing constitutional principles, the less specificity is required from prior case law to clearly establish the violation."). "[W]hen an officer's violation . . . is particularly clear . . . , [the Tenth Circuit] does not require a

second decision with greater specificity to clearly establish the law." Casey v. City of Fed. Heights, 509 F.3d at 1284.   Furthermore, "general statements of the law are not inherently incapable of giving fair and clear warning . . . ." Hope v. Pelzer, 536 U.S. 730, 741 (2002).

## LAW REGARDING PLEADING ALLEGATIONS IN THE CONTEXT OF QUALIFIED IMMUNITY

A plaintiff must plead "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The "degree of specificity necessary to establish plausibility and fair notice, and therefore the need to include sufficient factual allegations, depends on context: . . . . Fair notice under Rule 8(a)(2) depends on the type of case." Robbins v. Oklahoma, 519 F.3d 1242, 1248 (10th Cir. 2008)(citing Phillips v. County of Allegheny, 515 F.3d 224, 231-232 (3d Cir. 2008). Although the same standard applies "in evaluating dismissals in qualified immunity cases as to dismissals generally, complaints in § 1983 cases against individual government actors pose a greater likelihood of failures in notice and plausibility because they typically include complex claims against multiple defendants." Robbins v. Oklahoma, 519 F.3d at 1249 (quoting Shero v. City of Grove, 510 F.3d 1196, 1200 (10th Cir. 1997))(internal quotations omitted). The Tenth Circuit has articulated the standard required to give adequate notice to government actors sued in their individual capacities under § 1983:

> In § 1983 cases, defendants often include the government agency and a number of government actors sued in their individual capacities. Therefore, it is particularly important in such circumstances that the complaint make clear exactly who is alleged to have done what to whom, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against the state.

Robbins v. Oklahoma, 519 F.3d at 1249-1250 (emphasis in original).

**LAW REGARDING PROCEDURAL DUE PROCESS**

The Fourteenth Amendment states: "No State shall . . . deprive any person of life, liberty, or property, without due process of law."  U.S. Const. amend. XIV.  The Due Process Clause encompasses two distinct forms of protection: (i) procedural due process, which requires a state to employ fair procedures when depriving a person of a protected interest; and (ii) substantive due process, which guarantees that a state cannot deprive a person of a protected interest for certain reasons.  See, e.g., Cnty. of Sacramento v. Lewis, 523 U.S. 833, 845-46 (1998).  "Under either form of protection, however, a person must have a protected interest in either life, liberty, or property."  Chavez-Rodriguez v. City of Santa Fe, No. CIV 07-0633, 2008 WL 5992271, at *6 (D.N.M. Oct. 9, 2008)(Browning, J.).  The Tenth Circuit prescribes a two-step inquiry in determining whether an individual's procedural due-process rights were violated: (i) "'Did the individual possess a protected property interest to which due process protection was applicable?'"; and (ii) "'Was the individual afforded an appropriate level of process?'"  Camuglia v. City of Albuquerque, 448 F.3d 1214, 1219 (10th Cir. 2006)(quoting Clark v. City of Draper, 168 F.3d 1185, 1189 (10th Cir. 1999)).

"The Constitution does not create or define the contours of 'liberty' or 'property,' the 'broad and majestic terms' enshrined in the Fourteenth Amendment."  Farthing v. City of Shawnee, Kan., 39 F.3d 1131, 1135 (10th Cir. 1994)(quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 571 (1972)).  "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it."  Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577.  "Such an interest arises not from the Due Process Clause of the

Constitution itself, but is 'created by independent sources such as a state or federal statute, a municipal charter or ordinance, or an implied or express contract.'"   Teigen v. Renfrow, 511 F.3d 1072, 1079 (10th Cir. 2007).   See Paul v. Davis, 424 U.S. 693, 710 (1976)("[Liberty and property] interests attain . . . constitutional status by virtue of the fact that they have been initially recognized and protected by state law.").

> Property interests, of course, are not created by the Constitution. Rather they are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law -- rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.

Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577.   See Farthing v. City of Shawnee, Kan., 39 F.3d at 1135 ("Rather, property interests, which are the subject of the present litigation, 'are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law.'" (quoting Bd. of Regents of State Colls. v. Roth, 408 U.S. at 577)).

"[O]nce it is determined that the Due Process Clause applies, 'the question remains what process is due.'"   Cleveland Bd. of Educ. v. Loudermill, 470 U.S. 532, 541 (1985)(citing Morrissey v. Brewer, 408 U.S. 471, 481 (1972)).   "An essential principle of due process is that a deprivation of life, liberty, or property 'be preceded by notice and opportunity for hearing appropriate to the nature of the case.'"   Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 542 (citing Mullane v. Cent. Hanover Bank & Trust Co., 339 U.S. 306, 313 (1950)).   "[D]ue process is flexible and calls [only] for such procedural protections as the particular situation demands."   Mathews v. Eldridge, 424 U.S. 319, 334 (1976)(internal quotation marks and brackets omitted). The Supreme Court has described that

> the root requirement of the Due Process Clause as being that an individual be

given an opportunity for a hearing before he is deprived of any significant property interest.  This principle requires some kind of a hearing prior to the discharge of an employee who has a constitutionally protected property interest in his employment.

. . . .

[T]he pretermination hearing, though necessary, need not be elaborate.  We have pointed out that [t]he formality and procedural requisites for the hearing can vary, depending upon the importance of the interests involved and the nature of the subsequent proceedings.  In general, something less than a full evidentiary hearing is sufficient prior to adverse administrative action.

Cleveland Bd. of Educ. v. Loudermill, 470 U.S. at 542, 545 (footnote omitted)(citations and internal quotation marks omitted).  The United States Court of Appeals for the Second Circuit has stated:

The Supreme Court . . . explained that procedural due process is a flexible standard that can vary in different circumstances depending on "'the private interest that will be affected by the official action'" as compared to "the Government's asserted interest, 'including the function involved' and the burdens the Government would face in providing greater process."  Hamdi v. Rumsfeld, 542 U.S. 507, ----, 124 S. Ct. 2633, 2646 . . . (2004)(quoting Mathews v. Eldridge, 424 U.S. at 335 . . . ).   A court must carefully balance these competing concerns, analyzing "'the risk of an erroneous deprivation' of the private interest if the process were reduced and the 'probable value, if any, of additional or substitute safeguards.'"  Id. (quoting Mathews v. Eldridge, 424 U.S. at 335 . . .).

United States v. Abuhamra, 389 F.3d 309, 318 (2d Cir. 2004).  The hearing required depends on: (i) the nature of the private interest at stake; (ii) the risk of erroneous deprivation given the procedures already guaranteed, and whether additional procedural safeguards would prove valuable; and (iii) the government's interest and the burdens that additional procedures might impose.  See Mathews v. Eldridge, 424 U.S. at 335.  For example, "[w]here . . . the state must act quickly, a meaningful postdeprivation hearing is adequate."   Clark v. City of Draper, 168 F.3d at 1189.  See Spielman v. Hildebrand, 873 F.2d 1377, 1385 (10th Cir. 1989)(removal of a child

- 96 -

from parents' custody requires predeprivation hearing "except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event." (internal quotation marks omitted)).

## LAW REGARDING FOURTH AMENDMENT SEARCHES

The Fourth Amendment protects "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV. It also commands that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. In determining whether a Fourth Amendment violation has occurred, courts must "assur[e] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted." United States v. Jones, 132 S. Ct. 945, 950 (2012)(Scalia, J.)(alteration in original)(quoting Kyllo v. United States, 533 U.S. 27, 31 (2001)(Scalia, J.)).

"Not all searches require a warrant. The hallmark of the Fourth Amendment is reasonableness." United States v. Harmon, 785 F. Supp. 2d 1146, 1157 (D.N.M. 2011)(Browning, J.). See United States v. McHugh, 639 F.3d 1250, 1260 (10th Cir. 2011)("[T]he ultimate touchstone of the Fourth Amendment is 'reasonableness.'")(quoting Brigham City, Utah v. Stuart, 547 U.S. 398 (1978)). "In the criminal context, reasonableness usually requires a showing of probable cause." Herrera v. Santa Fe Pub. Sch., 792 F. Supp. 2d 1174, 1184 (D.N.M. 2011)(Browning, J.)(quoting Bd. of Educ. of Indep. Sch. Dist. No. 92 of Pottawatomie Cnty. v. Earls, 536 U.S. 822, 828 (2002)). The Supreme Court has stated in the law enforcement context that "searches conducted outside the judicial process, without prior

approval by judge or magistrate, are per se unreasonable under the Fourth Amendment -- subject only to a few specifically established and well-delineated exceptions." Katz v. United States, 389 U.S. 347, 357 (1967)(footnotes omitted).

1. *United States v. Jones*.

The defendant in United States v. Jones was suspected of drug trafficking, and a joint Federal Bureau of Investigation and District of Columbia Metropolitan Police Department task force obtained a warrant authorizing installation in Washington, D.C., within ten days, of a Global Positioning System device to the defendant's car. See 132 S. Ct. at 948. On the eleventh day, task force agents attached the GPS device to the bottom of the defendant's car while the car was in Maryland. The agents then used the GPS device to track the defendant's movements over the next twenty-eight days, replacing the battery once, and collecting over two-thousand pages of data sent from the device. See 132 S. Ct. at 948.

The Honorable Antonin G. Scalia, Associate Justice of the Supreme Court, writing for the majority, in which Chief Justice Roberts and Justices Kennedy, Thomas, and Sotomayor joined, held that "the Government's installation of a GPS device on a target's vehicle, and its use of that device to monitor the vehicle's movements, constitutes a 'search.'" 132 S. Ct. at 949. Justice Scalia reasoned that the United States' conduct was a Fourth Amendment search, because the United States trespassed on a constitutionally protected area. See 132 S. Ct. at 949 ("The Fourth Amendment provides . . . that '[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated.' It is beyond dispute that a vehicle is an 'effect' as that term is used in the Amendment."). Such a physical intrusion, Justice Scalia opined, would have come within the Framers' intended

- 98 -

definition of a "search": "It is important to be clear about what occurred in this case: The Government physically occupied private property for the purpose of obtaining information.  We have no doubt that such a physical intrusion would have been considered a 'search' within the meaning of the Fourth Amendment when it was adopted."  132 S. Ct. at 949.  Justice Scalia reconciled the Supreme Court's conclusion that attaching a GPS device to track a Jeep in plain view was a Fourth Amendment search with New York v. Class, 475 U.S. 106 (1986), in which the Supreme Court concluded that a visual examination of the outside of a vehicle while in plain view does not constitute a search, by noting that "[i]n Class itself we suggested that this [physical invasion] would make a difference, for we concluded that an officer's momentary reaching into the interior of a vehicle did constitute a search."  United States v. Jones, 132 S. Ct. at 952.

Justice Scalia reasoned that the Fourth Amendment's text supports taking a property law based approach to determine whether there is a search, but did not shy away from the fact that, in recent history, the Supreme Court had deviated from this approach:

> The text of the Fourth Amendment reflects its close connection to property, since otherwise it would have referred simply to "the right of the people to be secure against unreasonable searches and seizures"; the phrase "in their persons, houses, papers, and effects" would have been superfluous.
>
> Consistent with this understanding, our Fourth Amendment jurisprudence was tied to common-law trespass, at least until the latter half of the 20th century. Kyllo v. United States, 533 U.S. [at] 31 . . . .  Our later cases, of course, have deviated from that exclusively property-based approach. . . . [and] have applied the analysis of Justice Harlan's concurrence in [Katz v. United States], which said that a violation occurs when government officers violate a person's "reasonable expectation of privacy," id., at 464 . . . .

132 S. Ct. at 949-50.

The United States had contended that, under the "Harlan standard" -- i.e., the Katz v.

United States reasonable-expectation-of-privacy approach -- "no search occurred here, since Jones had 'no reasonable expectation of privacy' in the area of the Jeep accessed by the Government agents (its underbody) and in the locations of the Jeep on the public roads, which were visible to all."  132 S. Ct. at 950.  Justice Scalia concluded, however, that the Supreme Court "need not address the Government's contentions" in relation to the Katz v. United States reasonable-expectation-of-privacy test analysis, because the trespass-based search approach, which existed at the time of the Fourth Amendment's adoption, disposed of the issue:

> Jones's Fourth Amendment rights do not rise or fall with the Katz formulation.  At bottom, we must "assur[e] preservation of that degree of privacy against government that existed when the Fourth Amendment was adopted."  Kyllo[ v. United States, 533 U.S. at 34].  As explained, for most of our history the Fourth Amendment was understood to embody a particular concern for government trespass upon the areas ("persons, houses, papers, and effects") it enumerates.  Katz did not repudiate that understanding.  Less than two years later the Court upheld defendants' contention that the Government could not introduce against them conversations between other people obtained by warrantless placement of electronic surveillance devices in their homes.  The opinion rejected the dissent's contention that there was no Fourth Amendment violation "unless the conversational privacy of the homeowner himself is invaded."  Alderman v. United States, 394 U.S. 165, 176 . . . (1969).  "[W]e [do not] believe that Katz, by holding that the Fourth Amendment protects persons and their private conversations, was intended to withdraw any of the protection which the Amendment extends to the home . . . ."  Id., at 180.

132 S. Ct. at 950-51 (some alteration in original)(footnotes omitted).

In her concurrence, Justice Sotomayor agreed that "the trespassory test applied in the majority's opinion reflects an irreducible constitutional minimum: When the Government physically invades personal property to gather information, a search occurs.  The reaffirmation of that principle suffices to decide this case."  132 S. Ct. at 955 (Sotomayor, J., concurring).  She continued:

> Of course, the Fourth Amendment is not concerned only with trespassory intrusions on property.  See, e.g., Kyllo v. United States, 533 U.S. [at] 31-33 . . . .  Rather, even in the absence of a trespass, "a Fourth Amendment search occurs when the government violates a subjective expectation of privacy that society recognizes as reasonable." Id., at 33; see also Smith v. Maryland, 442 U.S. 735, 740-741 . . . (1979); Katz v. United States, 389 U.S. [at] 361 . . . (Harlan, J., concurring).

132 S. Ct. at 954-55 (Sotomayor, J., concurring).  Justice Sotomayor's concurrence focused on the reality, in her view, that,

> physical intrusion is now unnecessary to many forms of surveillance. . . .   In cases of electronic or other novel modes of surveillance that do not depend upon a physical invasion on property, the majority opinion's trespassory test may provide little guidance. But "[s]ituations involving merely the transmission of electronic signals without trespass would remain subject to Katz analysis."

132 S. Ct. at 955 (Sotomayor, J., concurring)(alteration in original)(quoting the majority opinion, 132 S. Ct. at 953).

Justice Alito, joined by Justices Ginsburg, Breyer, and Kagan, concurred in the judgment only, reasoning that, although he agreed with the result, given the use of twenty-first century technology, he would have analyzed whether the government's long-term monitoring of the defendant violated the Katz v. United States reasonable-expectation-of-privacy test:

> This case requires us to apply the Fourth Amendment's prohibition of unreasonable searches and seizures to a 21st-century surveillance technique, the use of a Global Positioning System (GPS)[13] device to monitor a vehicle's movements for an extended period of time.  Ironically, the Court has chosen to decide this case based on 18th-century tort law.  By attaching a small GPS device to the underside of the vehicle that respondent drove, the law enforcement officers in this case engaged in conduct that might have provided grounds in 1791 for a suit for trespass to chattels.  And for this reason, the Court concludes, the

---

[13]"The Global Positioning System (GPS) is a satellite-based navigation system made up of a network of 24 satellites placed into orbit by the U.S. Department of Defense.  GPS was originally intended for military applications, but in the 1980s, the government made the system available for civilian use."  What is GPS?, Garmin, www.garmin.com/aboutGPS (last visited June 7, 2014).

installation and use of the GPS device constituted a search.  [132 S. Ct.] at 948-949.

This holding, in my judgment, is unwise.  It strains the language of the Fourth Amendment; it has little if any support in current Fourth Amendment case law; and it is highly artificial.

I would analyze the question presented in this case by asking whether respondent's reasonable expectations of privacy were violated by the long-term monitoring of the movements of the vehicle he drove.

132 S. Ct. at 957-58 (Alito, J., concurring in the judgment).  Justice Alito first took issue with what he called the majority's "questionable proposition that the[] two procedures [of attaching and using a GPS device] cannot be separated for Fourth amendment purposes."  132 S. Ct. at 958.  Justice Alito submitted that, "[i]f these two procedures are analyzed separately, it is not at all clear from the Court's opinion why either should be regarded as a search."  132 S. Ct. at 958.

Justice Alito contended that the majority's opinion suggests that "the concept of a search, as originally understood, comprehended any technical trespass that led to the gathering of evidence," but disagreed with the majority, stating: "[W]e know this is incorrect."  132 S. Ct at 958.  Justice Alito pointed out that the open-fields doctrine grew out of the distinction between a physical intrusion of any private property and property that is part of a home: "At common law, any unauthorized intrusion on private property was actionable, but a trespass on open fields . . . does not fall within the scope of the Fourth Amendment because private property outside the curtilage is not part of a 'hous[e]' within the meaning of the Fourth Amendment."  132 S. Ct. at 958-959 (Alito, J., concurring in the judgment)(quoting Oliver v. United States, 466 U.S. 170 (1984)).

Justice Alito asserted that the trespass-based approach that the majority used was "repeatedly criticized" and ultimately "repudiated," based largely on its incompatibility with

cases involving wiretapping and eavesdropping surveillance.  United States v. Jones, 132 S. Ct. at 959, 960 (Alito, J., concurring in the judgment).  Justice Alito contended that "the majority is hard pressed to find support in post-Katz cases for its trespass-based" decision that, when the United States attached the GPS device to Jones' Jeep, it trespassed on his effects and performed a Fourth Amendment search.  132 S. Ct. at 960-61.  Justice Alito pointed to multiple problems that he believes the majority's trespass-based approach creates.  First, he asserted that the majority's analysis is irreconcilable with the element of the United States' conduct that he contends society would find offensive -- the GPS-monitoring and not the attachment of the device.  If the United States could follow a car without physically trespassing on a person, home, paper, or effect, such as remotely monitoring a car via an internal GPS device, this monitoring would not constitute a Fourth Amendment search under the majority's analysis.  See 132 S. Ct. at 961.  Second, along the same lines, Justice Alito pointed out an "incongruous result[]" from the majority's opinion that a short-term tracking of a vehicle with a GPS device, merely tracking a vehicle down a single street, is a Fourth Amendment search, while, "if the police follow the same car for a much longer period using unmarked cars and aerial assistance, this tracking is not subject to any Fourth Amendment constraints."  132 S. Ct. at 961.  Justice Alito also asserted that, by tying Fourth Amendment searches to property law and trespass concepts, the Fourth Amendment's protections "may vary from State to State," based on different property and contract laws in the various states.  132 S. Ct. at 961-62.

## 2. *Florida v. Jardines*.

In Florida v. Jardines, 133 S. Ct. 1409 (2013), Justice Scalia, writing for the majority once again, held that using a drug-sniffing dog to sniff a person's "home and its immediate

surroundings" is a Fourth Amendment search.   133 S. Ct. at 1417-18.   Justices Thomas, Ginsburg, Sotomayor, and Kagan joined Justice Scalia's majority opinion in <u>Florida v. Jardines</u>. The Honorable Elena Kagan, Associate Justice, filed a separate concurring opinion, in which Justices Ginsburg and Sotomayor joined, adding "further thoughts, suggesting that a focus on Jardines' privacy interests would make 'an easy cas[e] easy' twice over," but "join[ing] the Court's opinion in full."  133 S. Ct. at 1420 (Kagan, J., concurring).  Justice Alito dissented, and Chief Justice Roberts, Justice Kennedy, and Justice Breyer joined his opinion.

In <u>Florida v. Jardines</u>, based on a tip that the defendant, Jardines, was growing marijuana in his home, the Miami-Dade, Florida, police department and the Drug Enforcement Administration sent a surveillance team to Jardines' home.  <u>See</u> 133 S. Ct. at 1413.  Observing nothing of note in the first fifteen minutes watching the home, two detectives approached the home accompanied by a dog trained to detect marijuana, cocaine, heroin, and several other drugs by alerting the detectives with behavioral changes.  <u>See</u> 133 S. Ct. at 1413.  As the dog approached Jardines' front porch, the dog "apparently sensed one of the odors he had been trained to detect," and after tracking back and forth, sat at the base of the front door, "which is the trained behavior upon discovering the odor's strongest point."  133 S. Ct. at 1413.  The dog's handler then immediately left the porch, and told the other agents and officers at the scene that there had been a positive alert for drugs, at which time the officers applied for and received a search warrant for the residence, the execution of which revealed marijuana plants.  <u>See</u> 133 S. Ct. at 1413.  Jardines was arrested for trafficking in marijuana and moved to suppress the evidence based on an illegal search.  <u>See</u> 133 S. Ct. at 1413.

Justice Scalia held that the use of a drug-sniffing dog that required physical intrusion of

officers onto the defendant's curtilage was a Fourth Amendment search, reasoning:

> [T]his case [is] a straightforward one.  The officers were gathering information in an area belonging to Jardines and immediately surrounding his house -- in the curtilage of the house, which we have held enjoys protection as part of the home itself. And they gathered that information by physically entering and occupying the area to engage in conduct not explicitly or implicitly permitted by the homeowner.

133 S. Ct. at 1414.  Justice Scalia noted that "[t]he Fourth Amendment 'indicates with some precision the places and things encompassed by its protections': persons, houses, papers, and effects." 133 S. Ct. at 1414 (quoting Oliver v. United States, 466 U.S. at 176).  Thus, the Fourth Amendment does not cover every "investigation[] on private property; for example, an officer may (subject to Katz) gather information in what we have called 'open fields' -- even if those fields are privately owned -- because such fields are not enumerated in the Amendment's text." 133 S. Ct. at 1414.

Justice Scalia held that "the officers' investigation took place in a constitutionally protected area," the home, as the front porch is the home's curtilage.  See 133 S. Ct. at 1414-15. Justice Scalia then "turn[ed] to the question of whether it was accomplished through an unlicensed physical intrusion," 133 S. Ct. at 1415, and reasoned that it was:

> While law enforcement officers need not "shield their eyes" when passing by the home "on public thoroughfares," [California v. Ciraolo, 476 U.S. 207, 213 (1986)], an officer's leave to gather information is sharply circumscribed when he steps off those thoroughfares and enters the Fourth Amendment's protected areas. In permitting, for example, visual observation of the home from "public navigable airspace," we were careful to note that it was done "in a physically nonintrusive manner."  Ibid.  Entick v. Carrington, 2 Wils. K.B. 275, 95 Eng. Rep. 807 (K.B. 1765), a case "undoubtedly familiar" to "every American statesman" at the time of the Founding, Boyd v. United States, 116 U.S. 616, 626 . . . (1886)[, abrogated by Warden, Md. Penitentiary v. Hayden, 387 U.S. 294 (1967)], states the general rule clearly: "[O]ur law holds the property of every man so sacred, that no man can set his foot upon his neighbour's close without his leave."  2 Wils. K.B., at 291.  As it is undisputed that the detectives had all four of their feet and all four of

their companion's firmly planted on the constitutionally protected extension of Jardines' home, the only question is whether he had given his leave (even implicitly) for them to do so.  He had not.

133 S. Ct. at 1415.  Justice Scalia noted that, while society recognizes an implicit license which "typically permits the visitor to approach the home by the front path, knock promptly, wait briefly to be received, and then (absent invitation to linger longer) leave," he concluded that "introducing a trained police dog to explore the area around the home in hopes of discovering incriminating evidence is something else. There is no customary invitation to do that."  133 S. Ct. at 1415-16 (emphasis in original).  Justice Scalia explained:

> An invitation to engage in canine forensic investigation assuredly does not inhere in the very act of hanging a knocker.  To find a visitor knocking on the door is routine (even if sometimes unwelcome); to spot that same visitor exploring the front path with a metal detector, or marching his bloodhound into the garden before saying hello and asking permission, would inspire most of us to -- well, call the police.  The scope of a license -- express or implied -- is limited not only to a particular area but also to a specific purpose.  Consent at a traffic stop to an officer's checking out an anonymous tip that there is a body in the trunk does not permit the officer to rummage through the trunk for narcotics.  Here, the background social norms that invite a visitor to the front door do not invite him there to conduct a search.

133 S. Ct. at 1416.

The State of Florida argued "that investigation by a forensic narcotics dog by definition cannot implicate any legitimate privacy interest."  133 S. Ct. at 1417.  The State of Florida cited to United States v. Place, 462 U.S. 696 (1983), United States v. Jacobsen, 466 U.S. 109 (1984), and Illinois v. Caballes, 543 U.S. 405 (2005), "which held, respectively, that canine inspection of luggage in an airport, chemical testing of a substance that had fallen from a parcel in transit, and canine inspection of an automobile during a lawful traffic stop, do not violate the 'reasonable expectation of privacy' described in Katz."  133 S. Ct. at 1417.  Justice Scalia pointed out that, in

United States v. Jones, the Supreme Court had already concluded that "[t]he Katz reasonable-expectations test 'has been added to, not substituted for,' the traditional property-based understanding of the Fourth Amendment, and so it is unnecessary to consider [the test under Katz v. United States] when the government gains evidence by physically intruding on constitutionally protected areas." 133 S. Ct. at 1417 (emphasis in original)(quoting United States v. Jones, 132 S. Ct. at 951-52). Because the Supreme Court had already concluded that the conduct was a Fourth Amendment search under the trespass-based analysis, therefore, it held that it was unnecessary to consider whether the conduct amounted to a search under the Katz v. United States reasonable-expectation-of-privacy analysis:

> Thus, we need not decide whether the officers' investigation of Jardines' home violated his expectation of privacy under Katz. One virtue of the Fourth Amendment's property-rights baseline is that it keeps easy cases easy. That the officers learned what they learned only by physically intruding on Jardines' property to gather evidence is enough to establish that a search occurred.

133 S. Ct. at 1417.

Justice Kagan wrote a concurring opinion, noting: "The Court today treats this case under a property rubric; I write separately to note that I could just as happily have decided it by looking to Jardines' privacy interests." 133 S. Ct. at 1418 (Kagan, J., concurring). Justice Kagan analogized the government's conduct in using a drug sniffing dog on Jardines' porch to a stranger coming to the front door, who "doesn't knock or say hello," but instead, peers through the windows "into your home's furthest corners" with "super-high-powered binoculars," and "in just a couple of minutes, his uncommon behavior allows him to learn details of your life you disclose to no one." 133 S. Ct. at 1418 (Kagan, J., concurring). This conduct, she posited, is a trespass which exceeds any implied license and is also an invasion of reasonable expectations of

privacy; she argued that, like her analogy, the facts in <u>Florida v. Jardines</u> likewise involved a

trespass and a violation of privacy expectations:

> That case is this case in every way that matters.  Here, police officers came to
> Joelis Jardines' door with a super-sensitive instrument, which they deployed to
> detect things inside that they could not perceive unassisted.  The equipment they
> used was animal, not mineral.  But contra the dissent, <u>see</u> [133 S. Ct.] at 1420
> (opinion of Alito, J.)(noting the ubiquity of dogs in American households), that is
> of no significance in determining whether a search occurred.

133 S. Ct. at 1418 (Kagan, J., concurring).  According to Justice Kagan, had she written the

majority opinion based on the <u>Katz v. United States</u> reasonable-expectations-of-privacy search

test,

> [a] decision along those lines would have looked . . . well, much like this one.  It
> would have talked about "'the right of a man to retreat into his own home and
> there be free from unreasonable governmental intrusion.'"  [133 S. Ct.] at 1414
> (quoting <u>Silverman v. United States</u>, 365 U.S. 505, 511 . . . (1961)).  It would
> have insisted on maintaining the "practical value" of that right by preventing
> police officers from standing in an adjacent space and "trawl[ing] for evidence
> with impunity."  [133 S. Ct.] at 1414.  It would have explained that "'privacy
> expectations are most heightened'" in the home and the surrounding area.  [133 S.
> Ct.] at 1414-15 (quoting <u>California v. Ciraolo</u>, 476 U.S. [at] 213 . . . ).  And it
> would have determined that police officers invade those shared expectations when
> they use trained canine assistants to reveal within the confines of a home what
> they could not otherwise have found there.  <u>See</u> [133 S. Ct.] at 1415-16, and
> n.2-3.

133 S. Ct. 1409, 1418-19 (Kagan, J., concurring).

Justice Alito's dissenting opinion, in which Chief Justice Roberts, and Justices Kennedy

and Breyer, joined, submitted that "[t]he Court's decision in this important Fourth Amendment

case is based on a putative rule of trespass law that is nowhere to be found in the annals of

Anglo-American jurisprudence."  133 S. Ct. at 1420 (Alito, J., dissenting).  Justice Alito noted

that general trespass law permits a license to public members to use a walkway to approach a

house's door, including strangers such as mailmen and solicitors, and the majority's conclusion

that "the police officer in this case, Detective Bartelt, committed a trespass because he was accompanied during his otherwise lawful visit to the front door of respondent's house by his dog, Franky," is without a sound basis in trespass law.  133 S. Ct. at 1420-21 (Alito, J., dissenting). Justice Alito also asserted that decision is inconsistent with the Katz v. United States' reasonable-expectations-of-privacy test: "A reasonable person understands that odors emanating from a house may be detected from locations that are open to the public, and a reasonable person will not count on the strength of those odors remaining within the range that, while detectible by a dog, cannot be smelled by a human." Florida v. Jardines, 133 S. Ct. at 1421 (Alito, J., dissenting).

Justice Alito contended that the majority's opinion, that the detective "exceeded the boundaries of the license to approach the house that is recognized by the law of trespass," is "unfounded."  133 S. Ct. at 1421 (Alito, J., dissenting).  Justice Alito pointed out that the law of trespass does not distinguish between visitors or reasons for the visit in granting an implied license to approach a house's front door. See 133 S. Ct. at 1421-22 (Alito, J., dissenting).  He also asserted: "As I understand the law of trespass and the scope of the implied license, a visitor who adheres to these limitations is not necessarily required to ring the doorbell, knock on the door, or attempt to speak with an occupant," and uses mail carriers as an example of such a visitor.  133 S. Ct. at 1423 (Alito, J., dissenting).  Justice Alito pointed out that the implied license also applies to law enforcement and cited to Kentucky v. King, 131 S. Ct. 1849 (2011), in which the Supreme Court held that law enforcement officers approaching the front door of a residence to conduct a "knock and talk" is not a Fourth Amendment search. Florida v. Jardines, 133 S. Ct. at 1423 (Alito, J., concurring).  Given that "Detective Bartelt did not exceed the scope

of the license to approach respondent's front door," Justice Alito took issue with the majority's conclusion "that Detective Bartelt went too far because he had the 'objectiv[e] . . . purpose to conduct a search.'"  133 S. Ct. at 1423 (Alito, J., dissenting)(emphasis in original).  According to Justice Alito, because approaching a house to conduct a knock and talk is not a search,

> [w]hat the Court must fall back on, then, is the particular instrument that Detective Bartelt used to detect the odor of marijuana, namely, his dog. But in the entire body of common-law decisions, the Court has not found a single case holding that a visitor to the front door of a home commits a trespass if the visitor is accompanied by a dog on a leash.  On the contrary, the common law allowed even unleashed dogs to wander on private property without committing a trespass.
>
> The Court responds that "[i]t is not the dog that is the problem, but the behavior that here involved use of the dog."  But where is the support in the law of trespass for this proposition? Dogs' keen sense of smell has been used in law enforcement for centuries. The antiquity of this practice is evidenced by a Scottish law from 1318 that made it a crime to "disturb a tracking dog or the men coming with it for pursuing thieves or seizing malefactors."  If bringing a tracking dog to the front door of a home constituted a trespass, one would expect at least one case to have arisen during the past 800 years.  But the Court has found none.

133 S. Ct. at 1424 (Alito, J., dissenting)(emphasis in original)(internal citations omitted).  Justice Alito thus concluded: "For these reasons, the real law of trespass provides no support for the Court's holding today.  While the Court claims that its reasoning has 'ancient and durable roots,' its trespass rule is really a newly struck counterfeit."   133 S. Ct. at 1424 (Alito, J., dissenting)(internal citations omitted).

Justice Alito did not look any more favorably upon Justice Kagan's conclusion that Detective Bartelt's conduct violated Jardines' reasonable privacy expectations, asserting:

> [W]e have already rejected a very similar, if not identical argument, see Illinois v. Caballes, 543 U.S. 405, 409-410 . . . (2005), and in any event I see no basis for concluding that the occupants of a dwelling have a reasonable expectation of privacy in odors that emanate from the dwelling and reach spots where members of the public may lawfully stand.

- 110 -

133 S. Ct. at 1424 (Alito, J., dissenting).  Justice Kagan asserted that Bartelt's use of Franky, the drug-sniffing dog, was an invasion of Jardines' privacy in his home, because the government's conduct was similar to the conduct in Kyllo v. United States, in which the Supreme Court held that using a thermal imaging device to monitor movements in a home was a Fourth Amendment search.  Justice Alito pointed out that "[t]his Court . . . has already rejected the argument that the use of a drug-sniffing dog is the same as the use of a thermal imaging device.  The very argument now advanced by the concurrence appears in Justice Souter's Caballes dissent.  But the Court was not persuaded."   133 S. Ct. at 1425 (Alito, J., dissenting)(internal citations omitted)(citing Illinois v. Caballes, 543 U.S. at 409-10 and 413 n.3).  Justice Alito contended that "Kyllo is best understood as a decision about the use of new technology. . . .  A dog, however, is not a new form of 'technology' or a 'device.'  And, as noted, the use of dogs' acute sense of smell in law enforcement dates back many centuries."  133 S. Ct. at 1425 (Alito, J., dissenting).   Justice Alito therefore concluded that the government's conduct in Florida v. Jardines "did not constitute a trespass and did not violate respondent's reasonable expectations of privacy.  I would hold that this conduct was not a search, and I therefore respectfully dissent." 133 S. Ct. at 1426.

   **3.**   **Standing.**

   The Tenth Circuit has referred to the test whether a particular search implicates a defendant's Fourth Amendment interests -- whether the search violates the defendant's reasonable privacy expectation -- as one of "standing."  E.g., United States v. Creighton, 639 F.3d 1281, 1286 (10th Cir. 2011)("The Defendant has the burden of establishing . . . standing, or, in other words, a subjective expectation of privacy in the [item searched] that society is prepared

to recognize as reasonable."); United States v. Poe, 556 F.3d 1113, 1121 (10th Cir. 2009)("[A] defendant raising a Fourth Amendment challenge must first demonstrate that he has standing to object to the search.")(citing United States v. Rubio-Rivera, 917 F.2d 1271, 1274 (10th Cir. 1990)); United States v. Shareef, 100 F.3d 1491, 1499 (10th Cir. 1996)("A Defendant has standing to challenge a search only if he or she has a reasonable expectation of privacy in the area being searched."). Accordingly, the Court, tracing the Tenth Circuit's language has also referred to this test as one of standing. See, e.g., United States v. Harmon, 785 F. Supp. 2d at 1157 ("Standing requires the defendant to show 'that he had a subjective expectation of privacy in the premises searched and that society is prepared to recognize that expectation as reasonable.'")(quoting United States v. Poe, 556 F.3d at 1121). The Supreme Court's decisions in United States v. Jones and Florida v. Jardines, however, suggest that this test has now expressly been designated a substantive Fourth Amendment analysis alongside the trespass-based Fourth Amendment analysis, rather than a distinct analysis under the rubric entitled standing.

In Rakas v. Illinois, 439 U.S. 128 (1978), the Supreme Court disapproved of labeling the inquiry whether a search implicates a defendant's personal Fourth Amendment interests "as one of standing, rather than simply recognizing it as one involving the substantive question of whether or not the proponent of the motion to suppress had his own Fourth Amendment rights infringed by the search and seizure which he seeks to challenge." 439 U.S. at 133. Dispensing with this label, the Supreme Court noted:

> Had we accepted petitioners' request to allow persons other than those whose own Fourth Amendment rights were violated by a challenged search and seizure to suppress evidence obtained in the course of such police activity, it would be appropriate to retain Jones[ v. United States, 362 U.S. 257 (1960,

overruled by United States v. Salvucci, 448 U.S. 83 (1980)]' use of standing in Fourth Amendment analysis. Under petitioners' target theory, a court could determine that a defendant had standing to invoke the exclusionary rule without having to inquire into the substantive question of whether the challenged search or seizure violated the Fourth Amendment rights of that particular defendant. However, having rejected petitioners' target theory and reaffirmed the principle that the "rights assured by the Fourth Amendment are personal rights, [which] . . . may be enforced by exclusion of evidence only at the instance of one whose own protection was infringed by the search and seizure," Simmons v. United States, 390 U.S. [377,] 389 . . . [(1968)], the question necessarily arises whether it serves any useful analytical purpose to consider this principle a matter of standing, distinct from the merits of a defendant's Fourth Amendment claim. We can think of no decided cases of this Court that would have come out differently had we concluded, as we do now, that the type of standing requirement discussed in Jones and reaffirmed today is more properly subsumed under substantive Fourth Amendment doctrine. Rigorous application of the principle that the rights secured by this Amendment are personal, in place of a notion of "standing," will produce no additional situations in which evidence must be excluded. The inquiry under either approach is the same. But we think the better analysis forthrightly focuses on the extent of a particular defendant's rights under the Fourth Amendment, rather than on any theoretically separate, but invariably intertwined concept of standing. The Court in Jones also may have been aware that there was a certain artificiality in analyzing this question in terms of standing because in at least three separate places in its opinion the Court placed that term within quotation marks. 362 U.S., at 261, 263, 265 . . . .

439 U.S. at 138-39. The Supreme Court emphasized:

[N]othing we say here casts the least doubt on cases which recognize . . . as a general proposition, the issue of standing [generally.] . . . But this Court's long history of insistence that Fourth Amendment rights are personal in nature has already answered many of these traditional standing inquiries, and we think that definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing.

439 U.S. at 139-40. In Minnesota v. Carter, 525 U.S. 83 (1998), the Supreme Court recognized

that Rakas v. Illinois put an end to the Fourth Amendment standing analysis as separate from the

substantive Fourth Amendment search analysis:

The Minnesota courts analyzed whether respondents had a legitimate expectation of privacy under the rubric of "standing" doctrine, an analysis that this Court expressly rejected 20 years ago in Rakas . . . . Central to our analysis [in Rakas v.

> Illinois] was the idea that in determining whether a defendant is able to show the violation of his (and not someone else's) Fourth Amendment rights, the "definition of those rights is more properly placed within the purview of substantive Fourth Amendment law than within that of standing." Id., at 140 . . . .

525 U.S. at 87-88.  The Supreme Court has thus noted that the analysis under either approach -- the substantive Fourth Amendment doctrine that the rights that the Amendment secures are personal versus the separate notion of "standing" -- is the same and that Katz v. United States' reasonable-expectation-of-privacy analysis has now been classified as a substantive Fourth Amendment test, as opposed to a standing test.  Rakas v. Illinois, 439 U.S. at 139.

> Rigorous application of the principle that the rights secured by this Amendment are personal, in place of a notion of "standing," will produce no additional situations in which evidence must be excluded.  But we think the better analysis forthrightly focuses on the extent of a particular defendant's rights under the Fourth Amendment, rather than on any theoretically separate, but invariably intertwined concept of standing.

Rakas v. Illinois, 439 U.S. at 139 (footnote omitted).  This development is in line with the Supreme Court's guidance that the analysis "is more properly subsumed under substantive Fourth Amendment doctrine."  Rakas v. Illinois, 439 U.S. at 139.

### 4.      Whether a Fourth Amendment Search Occurred.

A Fourth Amendment search occurs either where the government, to obtain information, trespasses on a person's property or where the government, to collect information, violates a person's subjective expectation of privacy that society recognizes as reasonable.  See United States v. Jones, 132 S. Ct. at 947.  "[T]he Katz reasonable-expectation-of-privacy test has been added to, not substituted for, the common-law trespassory test."  United States v. Jones, 132 S. Ct. at 947 (emphasis in original)(citing Alderman v. United States, 394 U.S. 165, 176 (1969); Soldal v. Cook Cnty., 506 U.S. 56, 64 (1992)).  "When 'the Government obtains information by

physically intruding' on persons, houses, papers, or effects, 'a 'search' within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.'" Florida v. Jardines, 133 S. Ct. at 1414 (quoting United States v. Jones, 132 S. Ct. at 950 n.3).

a.       **Trespass-Based Analysis.**

The Fourth Amendment "establishes a simple baseline, one that for much of our history formed the exclusive basis for its protections: When 'the Government obtains information by physically intruding' on persons, houses, papers, or effects, 'a 'search' within the original meaning of the Fourth Amendment' has 'undoubtedly occurred.'" Florida v. Jardines, 133 S. Ct. at 1414 (quoting United States v. Jones, 132 S. Ct. at 950 n.3 ("[A] 'search' within the original meaning of the Fourth Amendment" occurs "[w]here . . . the Government obtains information by physically intruding on a constitutionally protected area.")).  "[A]n actual trespass," however, "is neither necessary nor sufficient to establish a constitutional violation." United States v. Jones, 132 S. Ct. at 951 n.5 (Scalia, J.)(emphasis omitted)(quoting United States v. Karo, 468 U.S. 705, 713 (1984)).

In determining whether a search has occurred, "[t]resspass alone does not qualify, but there must be conjoined with that . . . an attempt to find something or to obtain information." United States v. Jones, 132 S. Ct. at 951 n.5.  The Supreme Court has also noted that "[p]hysically invasive inspection is simply more intrusive than purely visual inspection." Bond v. United States, 529 U.S. 334, 337 (2000).  Moreover, the Supreme Court in Florida v. Jardines suggested that the trespass-based analysis applies only when the trespass occurs in one of the four places or things listed in the Fourth Amendment:

> The Fourth Amendment "indicates with some precision the places and things encompassed by its protections": persons, houses, papers, and effects.  Oliver v.

> United States, 466 U.S. [at] 176 . . . .  The Fourth Amendment does not, therefore,
> prevent all investigations conducted on private property; for example, an officer
> may (subject to Katz) gather information in what we have called "open fields" --
> even if those fields are privately owned -- because such fields are not enumerated
> in the Amendment's text.  Hester v. United States, 265 U.S. 57 . . . (1924).  But
> when it comes to the Fourth Amendment, the home is first among equals.

133 S. Ct. at 1414.

In United States v. Alabi, 943 F. Supp. 2d 1201 (D.N.M. 2013)(Browning, J.), the Court

analyzed whether the Secret Service's digital scan of electronic information contained in the

defendants' credit and debit cards' magnetic strips was a Fourth Amendment search under a

trespass-based analysis, concluding that it was not, because the Secret Service properly

possessed the credit and debit cards, and the additional act of scanning the cards to read the

virtual data contained on the strips did not involve a physical intrusion or physical penetration of

space.  See 943 F. Supp. 2d at 1264-65.  The Court noted that, "[e]ven if the Supreme Court were

to extend the trespass-based analysis for Fourth Amendment searches to virtual invasions, the

Secret Service's conduct scanning the thirty-one credit and debit cards still would not amount to

a Fourth Amendment search," because the magnetic strip, as opposed to the credit or debit card

separately, is not a constitutionally protected area.  943 F. Supp. 2d at 1267-68.

> When a law enforcement officer sees only the exterior of a credit or debit card,
> however, given that the financial institution which issues the card places the same
> information on the magnetic strip as embossed on the card's exterior, the only
> instances in which the information inside the credit or debit card is not
> information already seen by and known to the officer is when the information has
> been reencoded for unlawful purposes.  In these instances, not only does the
> person asserting his or her Fourth Amendment right not own or otherwise
> lawfully possess the information contained inside the card on the magnetic strip,
> but the person has stolen the information with the intent to use that information to
> steal further from the person whose information is on the magnetic strip.
> Protecting this area from law enforcement search and seizure would thus not
> further the Fourth Amendment's express purpose of protecting "[t]he right of the
> people to be secure in their persons, houses, papers, and effects . . . ."  U.S. Const.

amend IV.

943 F. Supp. 2d at 1273 (alteration in original).

> **b.** ***Katz v. United States*' Reasonable-Expectations-of-Privacy Search Test Remains Good Law.**

The Court has noted that, in light of the Supreme Court's recent decisions in <u>Florida v. Jardines</u> and <u>United States v. Jones</u>, both of which Justice Scalia wrote for the majority, and both of which analyze whether government conduct constituted a Fourth Amendment search using the trespass-based approach, "the question arises whether the <u>Katz v. United States</u> reasonable-expectation-of-privacy test is still good law." <u>United States v. Alabi</u>, 943 F. Supp. 2d at 1242 (citing <u>Minnesota v. Carter</u>, 525 U.S. at 97-98 (Scalia, J. concurring)). Justice Scalia has consistently criticized this "notoriously unhelpful test":

> In my view, the only thing the past three decades have established about the <u>Katz</u> test (which has come to mean the test enunciated by Justice Harlan's separate concurrence in <u>Katz</u> . . .) is that, unsurprisingly, those "actual (subjective) expectation[s] of privacy" "that society is prepared to recognize as 'reasonable,'" bear an uncanny resemblance to those expectations of privacy that this Court considers reasonable. When that self-indulgent test is employed (as the dissent would employ it here) to determine whether a "search or seizure" within the meaning of the Constitution has <u>occurred</u> (as opposed to whether that "search or seizure" is an "unreasonable" one), it has no plausible foundation in the text of the Fourth Amendment. That provision did not guarantee some generalized "right of privacy" and leave it to this Court to determine which particular manifestations of the value of privacy "society is prepared to recognize as 'reasonable.'" Rather, it enumerated ("persons, houses, papers, and effects") the objects of privacy protection to which the <u>Constitution</u> would extend, leaving further expansion to the good judgment, not of this Court, but of the people through their representatives in the legislature.

<u>Minnesota v. Carter</u>, 525 U.S. at 97-98 (Scalia, J., concurring)(emphasis in original)(internal citations omitted).[14] In both <u>United States v. Jones</u> and <u>Florida v. Jardines</u>, however, Justice

---

[14]The Honorable Clarence Thomas, Associate Justice, was the only other Justice to join

Scalia, writing for the majority, never stated that the Supreme Court was substituting the trespass-based analysis for <u>Katz v. United States</u>' reasonable-expectation-of-privacy analysis. Rather, his majority opinions asserted that the <u>Katz v. United States</u> reasonable-expectation-of-privacy analysis added to the trespass-based analysis.  <u>See</u> <u>Florida v. Jardines</u>, 133 S. Ct. at 1417 ("The <u>Katz</u> reasonable-expectations test 'has been <u>added to</u>, not <u>substituted for</u>,' the traditional property-based understanding of the Fourth Amendment." (emphasis in original))(quoting <u>United States v. Jones</u>, 132 S. Ct. at 952).  The Court concluded in <u>United States v. Alabi</u> that, "as the Supreme Court now stands, Justices Alito, Breyer, Kagan, Ginsburg, and Sotomayor still adhere to application of the <u>Katz v. United States</u> reasonable-expectation-of-privacy Fourth Amendment analysis, at least as a possible approach alongside of the trespass-based approach."  2013 WL 1876791, at *35.

In June, 2013, Justice Scalia dissented from the Supreme Court's decision in <u>Maryland v. King</u>, 133 S. Ct. 1958 (2013), in which the Supreme Court held that "DNA identification of arrestees is a reasonable search that can be considered part of a routine booking procedure," 133 S. Ct. at 1980.  Justice Scalia criticized the majority's opinion for analogizing DNA testing to taking an arrestee's photograph by citing to <u>Katz v. United States</u> and pointing out that "we have never held that merely taking a person's photograph invades any recognized 'expectation of privacy.'"  <u>Maryland v. King</u>, 133 S. Ct. at 1986 (Scalia, J., dissenting).  Justice Scalia also pointed out that a person's "privacy-related concerns" in his or her body are weighty:

> We are told that the "privacy-related concerns" in the search of a home "are weighty enough that the search may require a warrant, notwithstanding the diminished expectations of privacy of the arrestee." But why are the "privacy-related concerns" not also "weighty" when an intrusion into the <u>body</u> is at stake?

Justice Scalia's <u>Minnesota v. Carter</u> concurrence.

> (The Fourth Amendment lists "persons" <u>first</u> among the entities protected against unreasonable searches and seizures.)

<u>Maryland v. King</u>, 133 S. Ct. at 1982 (Scalia J., dissenting)(emphasis in original).  Justice Scalia also suggested that the Founders would have shared these privacy-related concerns:

> Today's judgment will, to be sure, have the beneficial effect of solving more crimes; then again, so would the taking of DNA samples from anyone who flies on an airplane (surely the Transportation Security Administration needs to know the "identity" of the flying public), applies for a driver's license, or attends a public school.  Perhaps the construction of such a genetic panopticon is wise.  But I doubt that the proud men who wrote the charter of our liberties would have been so eager to open their mouths for royal inspection.

<u>Maryland v. King</u>, 133 S. Ct. at 1989 (Scalia J., dissenting).  The Court therefore concludes that Justice Scalia and the Supreme Court may still rely on a person's privacy expectation when determining whether a search is reasonable for Fourth Amendment purposes, although Justice Scalia may not turn to the expectations prong until he runs the facts through the trespass prong.  <u>See</u> <u>Apodaca v. New Mexico Adult Probation and Parole</u>, No. CIV 13-0113 JB/SMV, 2014 WL 712588, at *14 (D.N.M. Feb. 13, 2014)(Browning, J.)(reaching this conclusion).

### c.    *Katz v. United States*<u>' Reasonable-Expectations-of-Privacy Analysis</u>.

"'Fourth Amendment rights are personal rights which, like some other constitutional rights, may not be vicariously asserted.'"  <u>Rakas v. Illinois</u>, 439 U.S. at 133-34 (quoting <u>Alderman v. United States</u>, 394 U.S. at 174).  "A district court cannot suppress evidence unless the movant proves that a search implicates <u>personal</u> Fourth Amendment interests."  <u>United States v. Jones</u>, 44 F.3d 860, 871 (10th Cir. 1995)(emphasis in original).  "'[N]o interest legitimately protected by the Fourth Amendment' is implicated by governmental investigative activities unless there is an intrusion into a zone of privacy, into 'the security a man relies upon when he places himself or his property within a constitutionally protected area.'"  <u>United States v. Miller</u>,

- 119 -

425 U.S. 435, 440 (1976)(Hoffa v. United States, 385 U.S. 293, 301-02 (1966)).[15]   The Tenth

Circuit has thus noted that "[a]n illegal search or seizure only harms those with legitimate

_____

[15]The Court has previously stated: "[T]he Supreme Court has vigorously asserted that the proper analysis under the Fourth Amendment is not whether the place searched is a 'constitutionally protected area.'"   Kerns v. Bd. of Comm'rs of Bernalillo Cnty., 888 F. Supp. 2d 1176, 1219 (D.N.M. 2012)(Browning, J.)(quoting Katz. V. United States, 389 U.S. at 351).   In support for this proposition, the Court relied on the majority's decision in Katz v. United States, where the Supreme Court stated that focusing on whether the area is a "constitutionally protected area . . . . deflects attention from the problem," as it focuses attention on the place, rather than the person:

> Because of the misleading way the issues have been formulated, the parties have attached great significance to the characterization of the telephone booth from which the petitioner placed his calls.   The petitioner has strenuously argued that the booth was a "constitutionally protected area."   The Government has maintained with equal vigor that it was not.   But this effort to decide whether or not a given "area," viewed in the abstract, is "constitutionally protected" deflects attention from the problem presented by this case.   For the Fourth Amendment protects people, not places.   What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.   See Lewis v. United States, 385 U.S. 206, 210 [1966]; United States v. Lee, 274 U.S. 559, 563 . . . (1927).   But what he seeks to preserve as private, even in an area accessible to the public, may be constitutionally protected.   See Rios v. United States, 364 U.S. 253 . . . [1960]; Ex parte Jackson, 96 U.S. 727, 733 . . . [1877].

Katz v. United States, 389 U.S. at 351-52.   The Supreme Court appears to have changed course in its two most recent opinions on Fourth Amendment searches.   In Florida v. Jardines, the particular place at which the search occurred weighs heavily on the Supreme Court's holding, reasoning that "[t]he [Fourth] Amendment establishes [as] a simple baseline . . . . protections 'when the Government does engage in a physical intrusion of a constitutionally protected area.'" 133 S. Ct. at 1414 (original alterations and original emphasis omitted)(emphasis added)(quoting United States v. Knotts, 460 U.S. 276, 286 (1983)(Brennan, J., concurring)).   See United States v. Jones, 132 S. Ct. at 951 ("Katz did not erode the principle 'that, when the Government does engage in physical intrusion of a constitutionally protected area in order to obtain information, that intrusion may constitute a violation of the Fourth Amendment. . . .   Katz did not narrow the Fourth Amendment's scope.'" (emphasis added)).   The Court thus concludes that, while it may be true that the analysis does not turn on the place searched, the Court's prior statement -- "the Supreme Court has vigorously asserted that the proper analysis under the Fourth Amendment is not whether the place searched is a 'constitutionally protected area,'" Kerns v. Bd. of Comm'rs of Bernalillo Cnty., 888 F. Supp. 2d at 1219 -- may no longer accurately reflect the Supreme Court's recent reversion to property-based analysis as a Fourth Amendment analysis baseline.

- 120 -

expectations of privacy in the premises searched." United States v. Jones, 44 F.3d at 871 (citing

United States v. Roper, 918 F.2d 885, 886-87 (10th Cir. 1990)).  Thus, "[t]he proper inquiry" to

determine whether a search implicates a defendant's Fourth Amendment interests still depends,

after conducting a trespass-based analysis, on "whether the defendant had an expectation of

privacy in the place searched and whether that expectation was objectively reasonable." Kerns v.

Bd. of Comm'rs, 888 F. Supp. 2d 1176, 1219 (D.N.M. 2012)(Browning, J.), abrogated on other

grounds as recognized in Ysasi v. Brown, No. CIV 13-0183 JB/CG, 2014 WL 936835, at *9 n.24

(D.N.M. Feb. 28, 2014)(Browning, J.)

"Official conduct that does not 'compromise any legitimate interest in privacy' is not a

search subject to the Fourth Amendment." Illinois v. Caballes, 543 U.S. at 409 (quoting United

States v. Jacobsen, 466 U.S. at 123).  The Supreme Court has thus recognized that, rather than

determining whether law enforcement conduct was a search, it sometimes proves easier to

"assess[] when a search is not a search." Kyllo v. United States, 533 U.S. at 32.

> In assessing when a search is not a search, we have applied somewhat in reverse
> the principle first enunciated in Katz v. United States.  Katz involved
> eavesdropping by means of an electronic listening device placed on the outside of
> a telephone booth -- a location not within the catalog ("persons, houses, papers,
> and effects") that the Fourth Amendment protects against unreasonable searches.
> We held that the Fourth Amendment nonetheless protected Katz from the
> warrantless eavesdropping because he "justifiably relied" upon the privacy of the
> telephone booth.  As Justice Harlan's oft-quoted concurrence described it, a
> Fourth Amendment search occurs when the government violates a subjective
> expectation of privacy that society recognizes as reasonable.

Kyllo v. United States, 533 U.S. at 32-33.  The Supreme Court thus articulated the Katz v.

United States rule -- which Professor Wayne R. LaFave has noted is "somewhat inaccurately

stated as the 'reasonable expectation of privacy' test," Wayne R. LaFave, Search and Seizure: A

Treatise on the Fourth Amendment § 2.1(b), at 435 (4th ed. 2004)(citing Anthony G.

Amsterdam, <u>Perspectives on the Fourth Amendment</u>, 58 Minn. L. Rev. 349, 383-388 (1974)(criticizing this formulation of the standard and explaining that "the common formula for <u>Katz</u> fails to capture <u>Katz</u> at any point because the <u>Katz</u> decision was written to resist captivation in any formula") -- which posits: "[A] Fourth Amendment search does <u>not</u> occur . . . unless 'the individual manifested a subjective expectation of privacy in the object of the challenged search,' and 'society [is] willing to recognize that expectation as reasonable.'" <u>Kyllo v. United States</u>, 533 U.S. at 33 (emphasis in original)(quoting <u>California v. Ciraolo</u>, 476 U.S. at 211).

A "reasonable expectation of privacy" is "said to be an expectation 'that has a source outside of the Fourth Amendment, either by reference to concepts of real or personal property law or to understandings that are recognized and permitted by society.'" <u>United States v. Jones</u>, 132 S. Ct. at 951. <u>See</u> <u>United States v. Harmon</u>, 785 F. Supp. 2d at 1157 ("To decide whether a reasonable expectation of privacy exists, courts consider concepts of real or personal property law . . . ."). In analyzing whether an expectation of privacy is reasonable in the Fourth Amendment context based on property law, "arcane distinctions developed in property and tort law between guests, licensees, invitees, and the like, ought not to control." <u>Rakas v. Illinois</u>, 439 U.S. at 143 & n.12. While ownership or lawful possession is not determinative under the <u>Katz v. United States</u> reasonable-expectation-of-privacy test, it is often a dispositive factor; because the Fourth Amendment is a personal right, a defendant bears the burden of demonstrating "that he gained possession [of the area searched] from the owner or someone with the authority to grant possession." <u>United States v. Arango</u>, 912 F.2d 441, 445-46 (10th Cir. 1990).

i.        **Subjective Expectation of Privacy.**

A defendant maintains a subjective expectation of privacy when the defendant "has shown that 'he sought to preserve something as private.'"  Bond v. United States, 529 U.S. at 338 (internal alterations omitted)(quoting Smith v. Maryland, 442 U.S. 735, 740 (1979)).  Thus, there is no reasonable expectation of privacy in otherwise private information disclosed to a third party.  Under the Katz v. United States expectation-of-privacy test -- although perhaps not under United States v. Jones and Florida v. Jardines -- "[t]he Fourth Amendment protects people, not places.  What a person knowingly exposes to the public . . . is not a subject of Fourth Amendment protection."  Katz v. United States, 389 U.S. at 351.  The Supreme Court has noted:

> This Court has held repeatedly that the Fourth Amendment does not prohibit the obtaining of information revealed to a third party and conveyed by him to Government authorities, even if the information is revealed on the assumption that it will be used only for a limited purpose and the confidence placed in the third party will not be betrayed.

United States v. Miller, 425 U.S. at 443.

The Supreme Court has recognized, however, that subjective expectations of privacy do not always coincide with the interests that the Fourth Amendment is universally thought to protect.  In Smith v. Maryland, for instance, the Supreme Court identified situations in which it would not follow the subjective approach:

> Situations can be imagined, of course, in which Katz' two-pronged inquiry would provide an inadequate index of Fourth Amendment protection.  For example, if the Government were suddenly to announce on nationwide television that all homes henceforth would be subject to warrantless entry, individuals thereafter might not in fact entertain any actual expectation or [sic] privacy regarding their homes, papers, and effects.  Similarly, if a refugee from a totalitarian country, unaware of this Nation's traditions, erroneously assumed that police were continuously monitoring his telephone conversations, a subjective expectation of privacy regarding the contents of his calls might be lacking as well. In such circumstances, where an individual's subjective expectations had been

> "conditioned" by influences alien to well-recognized Fourth Amendment freedoms, those subjective expectations obviously could play no meaningful role in ascertaining what the scope of Fourth Amendment protection was.   In determining whether a "legitimate expectation of privacy" existed in such cases, a normative inquiry would be proper.

442 U.S. at 740 n.5.  Most recently, in Jones v. United States, Justice Sotomayor commented that, given the reality of technology in the twenty-first century, it may no longer be sound to universally hold to the third-party disclosure rule to determine whether a subjective expectation of privacy exists:

> [I]t may be necessary to reconsider the premise that an individual has no reasonable expectation of privacy in information voluntarily disclosed to third parties.  This approach is ill suited to the digital age, in which people reveal a great deal of information about themselves to third parties in the course of carrying out mundane tasks.  People disclose the phone numbers that they dial or text to their cellular providers; the URLs that they visit and the e-mail addresses with which they correspond to their Internet service providers; and the books, groceries, and medications they purchase to online retailers.[16]  Perhaps, as Justice Alito notes, some people may find the "tradeoff" of privacy for convenience "worthwhile," or come to accept this "diminution of privacy" as "inevitable," and perhaps not.  I for one doubt that people would accept without complaint the warrantless disclosure to the Government of a list of every Web site they had visited in the last week, or month, or year. But whatever the societal expectations, they can attain constitutionally protected status only if our Fourth Amendment jurisprudence ceases to treat secrecy as a prerequisite for privacy.  I would not assume that all information voluntarily disclosed to some member of the public for a limited purpose is, for that reason alone, disentitled to Fourth Amendment protection.

132 S. Ct. at 957 (Sotomayor, J., concurring)(internal citations omitted).  Regardless what the Supreme Court decides to do with social media on the internet, only the most ignorant or gullible think what they post on the internet is or remains private.  See United States v. Meregildo, 883 F.

---

[16]URL is the abbreviation for a "uniform resource locator, . . . also known as web address, [which] is a specific character string that constitutes a reference to a[n internet] resource."   Uniform Resource Locator, Wikipedia.org,   http://en.wikipedia.org/wiki/ Uniform_resource_locator (last visited Apr. 23, 2013).

Supp. 2d 523, 526 (S.D.N.Y. 2012)(Pauley, J.)(holding that a person posting to his Facebook profile had "no justifiable expectation that his 'friends' would keep his profile private").

ii.     **Privacy Expectation that Society is Prepared to Recognize as Reasonable.**

Under the second step of Katz v. United States' reasonable-expectation-of-privacy approach, courts must determine "whether society is prepared to recognize that [subjective privacy] expectation as objectively reasonable." United States v. Ruiz, 664 F.3d at 838. The Supreme Court has cautioned: "The concept of an interest in privacy that society is prepared to recognize as reasonable is, by its very nature, critically different from the mere expectation, however well justified, that certain facts will not come to the attention of the authorities." United States v. Jacobsen, 466 U.S. 109, 122 (1984). Determining whether society would view the expectation as objectively reasonable turns on whether the government's intrusion infringes on a legitimate interest, based on the values which the Fourth Amendment protects. See California v. Ciraolo, 476 U.S. at 212 (explaining that "[t]he test of legitimacy is not whether the individual chooses to conceal assertedly 'private' activity," but instead "whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment")(quoting Oliver v. United States, 466 U.S. at 181-83). This second factor of the Katz v. United States reasonable-expectation-of-privacy analysis developed from Justice Harlan's "attempt to give content to the word 'justifiably' in the majority's assertion that eavesdropping on Katz was a search because it 'violated the privacy upon which he justifiably relied while using the telephone booth.'" LaFave, supra §2.1(d), at 439 (quoting Katz v. United States, 389 U.S. at 353). Thus, whether society will recognize a certain expectation of privacy does not turn on whether the hypothetical reasonable person would hold the same expectation of privacy, but rather whether

- 125 -

the expectation of privacy is justified or legitimate.  The Supreme Court has provided that, while no single factor determines legitimacy, whether society recognizes a privacy interest as reasonable is determined based on our societal understanding regarding what deserves protection from government invasion:

> No single factor determines whether an individual legitimately may claim under the Fourth Amendment that a place should be free of government intrusion not authorized by warrant.  In assessing the degree to which a search infringes upon individual privacy, the Court has given weight to such factors as the intention of the Framers of the Fourth Amendment, the uses to which the individual has put a location, and our societal understanding that certain areas deserve the most scrupulous protection from government invasion.

Oliver v. United States, 466 U.S. at 177-78 (internal citations omitted).

The Supreme Court has held that "[o]fficial conduct that does not 'compromise any legitimate interest in privacy' is not a search subject to the Fourth Amendment."  Illinois v. Caballes, 543 U.S. at 409 (quoting United States v. Jacobsen, 466 U.S. at 123).  In United States v. Place, the Supreme Court held that the "canine sniff" of a drug-sniffing dog does "not constitute a 'search' within the meaning of the Fourth Amendment."  United States v. Place, 462 U.S. at 707.  The case arose when law enforcement seized the luggage of an airline passenger and transported it to another location, where a drug-sniffing dog could sniff it.  See 462 U.S. at 699.  The drug sniffing dog alerted the officers that drugs were in the luggage, the officers obtained a search warrant, and, upon opening the bags, the officers found over one-thousand grams of cocaine.  See 462 U.S. at 699.  While recognizing that a person has a reasonable expectation of privacy in the contents of his or her luggage, the Supreme Court held that the dog's sniff test was not a Fourth Amendment search and emphasized the unique nature of the investigative technique, which could disclose only criminal activity:

> We have affirmed that a person possesses a privacy interest in the contents of personal luggage that is protected by the Fourth Amendment. A "canine sniff" by a well-trained narcotics detection dog, however, does not require opening the luggage. It does not expose noncontraband items that otherwise would remain hidden from public view, as does, for example, an officer's rummaging through the contents of the luggage. Thus, the manner in which information is obtained through this investigative technique is much less intrusive than a typical search. Moreover, the sniff discloses only the presence or absence of narcotics, a contraband item. Thus, despite the fact that the sniff tells the authorities something about the contents of the luggage, the information obtained is limited. This limited disclosure also ensures that the owner of the property is not subjected to the embarrassment and inconvenience entailed in less discriminate and more intrusive investigative methods.

> In these respects, the canine sniff is *sui generis*. We are aware of no other investigative procedure that is so limited both in the manner in which the information is obtained and in the content of the information revealed by the procedure. Therefore, we conclude that the particular course of investigation that the agents intended to pursue here -- exposure of respondent's luggage, which was located in a public place, to a trained canine -- did not constitute a "search" within the meaning of the Fourth Amendment.

462 U.S. at 707.

In United States v. Jacobsen, the Supreme Court extended this holding to the chemical field test of a white powdery substance to reveal that the substance was cocaine. See 466 U.S. at 122-24. A Federal Express employee and supervisor had opened a damaged package, and exposed four zip-lock plastic bags containing six and one-half ounces of white powder. See 466 U.S. at 111. They then called the DEA and repacked the contents in the original packaging, before they provided the package to the DEA officers. See 466 U.S. at 111. When the agents arrived, the agents removed the exposed plastic bags from the broken package, opened each of the four bags, and field-tested the white powder, identifying the powder as cocaine. See 466 U.S. at 111-12. The Supreme Court first held that removal of the plastic bags from the tubes and the agent's visual inspection were not Fourth Amendment searches:

- 127 -

> The removal of the plastic bags from the tube and the agent's visual inspection of their contents enabled the agent to learn nothing that had not previously been learned during the private search.  It infringed no legitimate expectation of privacy and hence was not a "search" within the meaning of the Fourth Amendment.

466 U.S. at 120 (footnote omitted).  The Supreme Court noted: "The question remains whether the additional intrusion occasioned by the field test, which had not been conducted by the Federal Express agents and therefore exceeded the scope of the private search, was an unlawful 'search' or 'seizure' within the meaning of the Fourth Amendment."  466 U.S. at 122.  The Supreme Court, relying on United States v. Place, held that the additional digital scan of the white substance was not a Fourth Amendment search, because the test discloses only whether the substance is cocaine and "nothing [else] of special interest":

> The field test at issue could disclose only one fact previously unknown to the agent -- whether or not a suspicious white powder was cocaine.  It could tell him nothing more, not even whether the substance was sugar or talcum powder.  We must first determine whether this can be considered a "search" subject to the Fourth Amendment -- did it infringe an expectation of privacy that society is prepared to consider reasonable?
>
> . . . .
>
> A chemical test that merely discloses whether or not a particular substance is cocaine does not compromise any legitimate interest in privacy.  This conclusion is not dependent on the result of any particular test.  It is probably safe to assume that virtually all of the tests conducted under circumstances comparable to those disclosed by this record would result in a positive finding; in such cases, no legitimate interest has been compromised.  But even if the results are negative -- merely disclosing that the substance is something other than cocaine -- such a result reveals nothing of special interest.  Congress has decided -- and there is no question about its power to do so -- to treat the interest in "privately" possessing cocaine as illegitimate; thus governmental conduct that can reveal whether a substance is cocaine, and no other arguably "private" fact, compromises no legitimate privacy interest.
>
> . . . .

> Here, as in Place, the likelihood that official conduct of the kind disclosed by the record will actually compromise any legitimate interest in privacy seems much too remote to characterize the testing as a search subject to the Fourth Amendment.

United States v. Jacobsen, 466 U.S. at 122-24.

Most recently, where a "dog sniff was performed on the exterior of respondent's car while he was lawfully seized for a traffic violation," the Supreme Court, again relying on United States v. Place and also on United States v. Jacobsen, held that "[a]ny intrusion on respondent's privacy expectations does not rise to the level of a constitutionally cognizable infringement." Illinois v. Caballes, 543 U.S. at 409.[17]  The Supreme Court reasoned that the dog sniff in Illinois v. Caballes fell squarely in line with the cases holding "that any interest in possessing contraband cannot be deemed 'legitimate,' and th[at] governmental conduct that only reveals the possession of contraband 'compromises no legitimate privacy interests.'"  Illinois v. Caballes, 543 U.S. at 408 (quoting United States v. Jacobsen, 466 U.S. at 123)(emphasis in original).  The Supreme Court explained: "This is because the expectation 'that certain facts will not come to the attention of the authorities' is not the same as an interest in 'privacy that society is prepared to consider reasonable.'"  Illinois v. Caballes, 543 U.S. at 408-09 (quoting United States v. Jacobsen, 466 U.S. at 122).  The Supreme Court in Illinois v. Caballes noted that its decision was consistent with Kyllo v. United States, as the thermal imaging device in Kyllo v. United States could detect lawful, "intimate details" in a home:

> This conclusion is entirely consistent with our recent decision that the use of a thermal-imaging device to detect the growth of marijuana in a home constituted

---

[17]The Honorable John Paul Stevens, former Associate Justice of the Supreme Court, penned the majority's opinion in Illinois v. Caballes.  Out of the current Supreme Court Justices, Justices Scalia, Kennedy, Thomas, and Breyer joined Justice Stevens' majority opinion, while Justice Ginsburg dissented.  See 543 U.S. at 405.

an unlawful search.  Kyllo v. United States, 533 U.S. 27 . . . .  Critical to that decision was the fact that the device was capable of detecting lawful activity -- in that case, intimate details in a home, such as "at what hour each night the lady of the house takes her daily sauna and bath."  Id., at 38 . . . .  The legitimate expectation that information about perfectly lawful activity will remain private is categorically distinguishable from respondent's hopes or expectations concerning the nondetection of contraband in the trunk of his car.  A dog sniff conducted during a concededly lawful traffic stop that reveals no information other than the location of a substance that no individual has any right to possess does not violate the Fourth Amendment.

Illinois v. Caballes, 543 U.S. at 409-10.

In United States v. Alabi, the defendants possessed thirty-one credit and debit cards, "many of them in their own names, several of which had information on the magnetic strips that related to persons other than the Defendants."  943 F. Supp. 2d at 1275.  The Court reluctantly accepted the defendants' assertion that they "subjectively intended not to disclose this information to a third party -- i.e., intended not to use the cards," 943 F. Supp. 2d at 1275, but determined that "a privacy expectation in the account information stored on credit and debit cards' magnetic strips -- separate and beyond the credit and debit cards themselves -- is not objectively reasonable," 943 F. Supp. 2d at 1280.  The Court explained that the Secret Service's scan of the cards' magnetic strips "reveals only the same information revealed in a private search when the card is used as intended," and, further, that, even if the cards had never been used, the scan "discloses only information known by viewing the outside of the card, or information that the cards and account information are possessed unlawfully . . . ."  943 F. Supp. 2d at 1281.  Noting the Supreme Court's decision in Rakas v. Illinois, in which the Supreme Court "reasoned that society is not prepared to recognize as reasonable an expectation of privacy in a burglar robbing a summer cabin during the offseason," the Court concluded that society would not

- 130 -

recognize "as reasonable a privacy expectation which, at least in contemporary society, would benefit only criminals." 943 F. Supp. 2d at 1287.

5.    **Reasonable Government Searches.**

"[B]ecause 'the ultimate touchstone of the Fourth Amendment is reasonableness,'" when a search implicating the Fourth Amendment has occurred, the district court must determine whether the search is reasonable. Kentucky v. King, 131 S. Ct. at 1856 (quoting Brigham City v. Stuart, 547 U.S. 398, 403 (2006)).    See Samson v. California, 547 U.S. 843, 848 (2006)("'[U]nder our general Fourth Amendment approach' we 'examin[e] the totality of the circumstances' to determine whether a search is reasonable within the meaning of the Fourth Amendment.")(quoting United States v. Knights, 534 U.S. 112, 118 (2001)).   "Although the Fourth Amendment ordinarily requires the degree of probability embodied in the term 'probable cause,' a lesser degree satisfies the Constitution when the balance of governmental and private interests makes such a standard reasonable." United States v. Knights, 534 U.S. at 121 (citing e.g. Terry v. Ohio, 392 U.S. 1 (1968)).  The Supreme Court has justified this balancing test with the recognition that "[t]he Fourth Amendment does not protect all subjective expectations of privacy, but only those that society recognizes as 'legitimate.'"   Vernonia Sch. Dist. 47J v. Acton, 515 U.S. 646, 654 (1995)(quoting New Jersey v. T.L.O., 649 U.S. 325, 338 (1985)).

"Whether a search is reasonable 'is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy and, on the other, the degree to which it is needed for the promotion of legitimate governmental interests.'"  Samson v. California, 547 U.S. at 848 (quoting United States v. Knights, 534 U.S. at 118).  See Banks v. United States, 490 F.3d 1178, 1184 (10th Cir. 2007)(stating that the Supreme Court "described the totality-of-the-

circumstances test as one where 'the reasonableness of a search is determined by assessing, on the one hand, the degree to which it intrudes upon an individual's privacy, and on the other, the degree to which it is needed for the promotion of legitimate governmental interests'" (quoting United States v. Knights, 534 U.S. at 119-20).

> As the text of the Fourth Amendment indicates, the ultimate measure of the constitutionality of a governmental search is "reasonableness."   At least in a case . . . where there was no clear practice, either approving or disapproving the type of search at issue, at the time the constitutional provision was enacted, whether a particular search meets the reasonableness standard "'is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate governmental interests.'"

Vernonia Sch. Dist. 47J v. Acton, 515 U.S. at 652-53 (1995)(quoting Skinner v. Ry. Labor Executives' Ass'n, 489 U.S. 602, 617 (1989)).   The Supreme Court has held that the test of reasonableness under the Fourth Amendment is not a concrete test:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application.   In each case [determining reasonableness] requires a balancing of the need for the particular search against the invasion of personal rights that the search entails.   Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

Bell v. Wolfish, 441 U.S. 520, 559 (1979).

In analyzing the first factor -- the intrusion on the individual's privacy -- courts and the Tenth Circuit look to the individual's privacy expectations.   See, e.g., United States v. Knights, 534 U.S. 112, 119-120 (2001)(noting that the petitioner had a "significantly diminished . . . reasonable expectation of privacy," because a condition of his probation was to consent to search of his apartment without notice or probable cause, and because he was clearly notified and informed of the provision); Banks v. United States, 490 F.3d at 1186-87 (noting that the plaintiffs, convicted felons on probation, have a more limited expectation of privacy than the

ordinary citizen, noting: "Those who have never been convicted of a felony are the last distinct category. What is 'reasonable' under the fourth amendment for a person on conditional release, or a felon, may be unreasonable for the general population."); Boling v. Romer, 101 F.3d 1336, 1340 (10th Cir. 1999)("[W]hile obtaining and analyzing the DNA or saliva of an inmate convicted of a sex offense is a search and seizure implicating Fourth Amendment concerns, it is a reasonable search and seizure.   This is so in light of an inmate's diminished privacy rights . . . .")

As Justice Kagan has noted, property law informs society's expectations about what government intrusions are reasonable: "It is not surprising that in a case involving a search of a home, property concepts and privacy concepts should so align.  The law of property 'naturally enough influence[s]' our 'shared social expectations' of what places should be free from governmental incursions."     Florida v. Jardines, 133 S. Ct. at 1419 (Kagan, J., concurring)(quoting Georgia v. Randolph, 547 U.S. 103, 111 (2006)).  Similarly, in Vernonia Sch. Dist. 47J v. Acton, Justice Scalia writing for the majority noted: "What expectations are legitimate varies, of course, with context, depending, for example, upon whether the individual asserting the privacy interest is at home, at work, in a car, or in a public park."  515 U.S. at 654 (internal citations omitted).

**6.     Consensual Searches.**

Searches conducted pursuant to consent constitute one exception to the Fourth Amendment's search-warrant and probable-cause requirements.  See Schneckloth v. Bustamonte, 412 U.S. 218, 219 (1973).  When an individual consents to a police search, and the consent is "freely and voluntarily given," the search does not implicate the Fourth Amendment.  United

States v. Peña, 143 F.3d 1363, 1366 (10th Cir. 1998)(quoting Schneckloth v. Bustamonte, 412

U.S. at 219). The Tenth Circuit has provided a two-part test for determining voluntariness,

which requires that the government (i) "'proffer clear and positive testimony that consent was

unequivocal and specific and intelligently given,'" and (ii) "the officers must have used no

'implied or express duress or coercion.'" United States v. Sanchez, 608 F.3d 685, 690 (10th Cir.

2010)(quoting United States v. Taverna, 348 F.3d 873, 878 (10th Cir. 2003)).

Determining whether a party's consent was free and voluntary is a question of fact to be

determined from the totality of the circumstances. See United States v. Peña, 143 F.3d at 1366.

The Supreme Court and the Tenth Circuit have developed a non-exhaustive list of factors that

courts should consider when trying to determine whether a defendant's consent was voluntarily

given:

> (i) the "threatening presence of several officers;" (ii) the "use of aggressive
> language or tone of voice indicating that compliance with an officer's request is
> compulsory," or, conversely, the "officer's pleasant manner and [] tone of voice;"
> (iii) the "prolonged retention of a person's personal effects such as identification,"
> or, conversely, "the prompt return of the defendant's identification and papers;"
> (iv) the "absence of other members of the public," or, conversely, whether the
> stop occurs in "a public location such as 'the shoulder of an interstate highway, in
> public view;'" (v) the "officer's failure to advise the defendant that [he or] she is
> free to leave." United States v. Ledesma, 447 F.3d [1307,] 1314 [10th Cir.
> 1997)](citing and quoting numerous sources). Other factors include: (vi) "the
> display of a weapon, [and (vii)] physical touching by the officer." United States
> v. Anderson, 114 F.3d 1059, 1064 (10th Cir. 1997).

United States v. Sedillo, No. CR 08-1419 JB, 2010 WL 965743, at *12 (D.N.M. Feb. 19,

2010)(Browning, J)(some alterations in original). See United States v. Fox, 600 F.3d 1253, 1258

(10th Cir. 2010).

Because courts are required to look at the totality of the circumstances in determining

whether an individual's consent was voluntary, see United States v. Peña, 143 F.3d at 1366, no

one factor is dispositive in a court's inquiry into the circumstances.  For example, although an officer's failure to advise a defendant that he or she is free to leave might suggest that coercive law enforcement conduct caused the defendant's consent to search, the Supreme Court has ruled that officers do not need to advise an individual of his or her right to refuse to consent to a search for that individual's consent to be voluntary.  See Schneckloth v. Bustamonte, 412 U.S. at 232.  Moreover, the mere presence of officers by exits to a building, threatening no more than to question individuals if they seek to leave, "should not [result] in any reasonable apprehension by any [individual] that they would be seized or detained in any meaningful way."  United States v. Drayton, 536 U.S. 194, 205 (2002)(internal citations omitted).  Additionally, an officer's display of a weapon may contribute to the coercive nature of a situation, but "[t]he presence of a holstered firearm . . . is unlikely to contribute to the coerciveness of the encounter absent active brandishing of the weapon."  United States v. Drayton, 536 U.S. at 205.  As such, "it is only by analyzing all the circumstances of an individual consent that it can be ascertained whether in fact it was voluntary or coerced.  It is this careful sifting of the unique facts and circumstances of each case that is evidenced in our prior decisions involving consent searches."  Schneckloth v. Bustamonte, 412 U.S. at 232.

In United States v. Harmon, the Court concluded that the defendant, Michael Harmon, voluntarily consented to an officer searching the vehicle he was driving.  See 785 F. Supp. 2d at 1171-74.  The Court noted that "'[t]his Circuit follows the bright-line rule that an encounter initiated by a traffic stop may not be deemed consensual unless the driver's documents have been returned to him.'" 785 F. Supp. 2d at 1171 (quoting United States v. Gonzalez-Lerma, 14 F.3d 1479, 1483 (10th Cir.1994), overruled on other grounds by United States v. Botero-Ospina, 71

F.3d 783 (10th Cir. 1994)).  After the officer, Hermilo Lucero, issued Harmon a warning, "he returned all Harmon's paperwork[,] . . . made sure that Harmon had everything, gave him a warning and told him to be careful."  United States v. Harmon, 785 F. Supp. 2d at 1171.  "As Harmon turned around and started to walk back to his vehicle, Lucero, intending to initiate a consensual encounter, called out to Harmon, and . . . asked him whether there was anything illegal in the vehicle, to which Harmon responded no."  785 F. Supp. 2d at 1172.  The Court concluded that this question initiated a consensual encounter, as "[a] reasonable person in Harmon's situation would not have an objective reason to believe he was not free to end his conversation with Lucero," and Harmon's subsequent signing of the consent-to-search form provided the officer with the necessary consent to search the vehicle without infringing Harmon's Fourth Amendment rights.  785 F. Supp. 2d at 1172-73.

### 7.    Legal Standard for Probable Cause in an Affidavit in Support of a Warrant.

Probable cause must support a search warrant, which requires "more than mere suspicion but less evidence than is necessary to convict."  United States v. Burns, 624 F.2d 95, 99 (10th Cir. 1980).  To establish probable cause to justify a search of a home, an affidavit in support of a search warrant "must contain facts sufficient to lead a prudent person to believe that a search would uncover contraband or evidence of criminal activity."  United States v. Danhauer, 229 F.3d 1002, 1006 (10th Cir. 2000).  "Probable cause undoubtedly requires a nexus between suspected criminal activity and the place to be searched."  United States v. Corral-Corral, 899 F.2d 927, 937 (10th Cir. 1990).  The task of the magistrate judge issuing the search warrant

> is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular

place.

United States v. Reed, 195 F. App'x 815, 821 (10th Cir. 2006)(unpublished)(quoting Illinois v. Gates, 462 U.S.213, 238 (1983)).   See United States v. Glover, 104 F.3d 1570, 1578 (10th Cir. 1997)(finding that, in determining whether an affidavit supports a finding of probable cause, the court must review the affidavit as a whole and look to the totality of the information contained therein), abrogated on other grounds by Corley v. United States, 556 U.S. 303 (2009). In making his or her determination, the magistrate judge "may draw reasonable inferences from the material provided in the warrant application."   United States v. Rowland, 145 F.3d 1194, 1205 (10th Cir. 1998).

"A reviewing court should accord great deference to a magistrate's determination of probable cause." United States v. Reed, 195 F. App'x at 822.  The court's duty is "simply to ensure that the magistrate had a substantial basis for . . . conclud[ing] that probable cause existed." Illinois v. Gates, 462 U.S. at 236, 238-39.  This deference is appropriate to further the Fourth Amendment's strong preference for warrants.  See Massachusetts v. Upton, 466 U.S. 727, 733 (1984); United States v. Ventresca, 380 U.S. 102, 105-06 (1965)("An evaluation of the constitutionality of a search warrant should begin with the rule that the informed and deliberate determinations of magistrates empowered to issue warrants . . . are to be preferred over the hurried action of office[r]s . . . .").  Because of the strong preference for warrants, "in a doubtful or marginal case a search under a warrant may be sustainable where without one it would fall." United States v. Ventresca, 380 U.S. at 106.  See United States v. Christy, 785 F. Supp. 2d 1004, 1051 (D.N.M. 2011)(Browning, J.)(discussing the great deference due a magistrate's finding of probable cause and that the Court reviews only whether there was a substantial basis for

concluding that probable cause existed given the facts set forth in the affidavit); Garcia v. Casuas, No. CIV 11-0011 JB/RHS, 2011 WL 7444745, at *45 (D.N.M. Dec. 8, 2011)(Browning, J.)("Additionally, before arresting Garcia, the Defendants obtained a determination that probable cause existed and an arrest warrant from a state court judge. . . . That probable cause determination is entitled to great deference in this Court.")

The deference accorded a magistrate judge's probable cause determination, however, is not boundless. See United States v. Leon, 468 U.S. 897, 914 (1984). The Court should not defer to a magistrate judge's probable-cause determination where there is no substantial basis for concluding that the affidavit in support of the warrant established probable cause. See United States v. Danhauer, 229 F.3d at 1006. Specifically, the Court should not defer to a magistrate judge's probable-cause determination if it "is a mere ratification of the bare conclusions or 'hunches' of others or where it involves an improper analysis of the totality of the circumstances." United States v. Reed, 195 F. App'x at 822 (citing United States v. Leon, 468 U.S. at 915; Massachusetts v. Upton, 466 U.S. 727, 734 (1984); Illinois v. Gates, 462 U.S. 239).

### 8.    The Particularity Requirement for Search Warrants.

The Supreme Court has stated that "those searches deemed necessary should be as limited as possible." Coolidge v. New Hampshire, 403 U.S. 443, 467 (1971). The Tenth Circuit has explained that "the Fourth Amendment requires that the government describe the items to be seized with as much specificity as the government's knowledge and circumstances allow, and warrants are conclusively invalidated by their substantial failure to specify as nearly as possible the distinguishing characteristics of the goods to be seized." Cassady v. Goering, 567 F.3d 628,

635 (10th Cir. 2009)(quoting <u>United States v. Leary</u>, 846 F.2d 592, 600 (10th Cir. 1988)).  The particularity requirement prevents general searches and strictly limits the discretion of the officer executing the warrant.  <u>See</u> <u>Voss v. Bergsgaard</u>, 774 F.2d 402, 404 (10th Cir. 1985)("The particularity requirement ensures that a search is confined in scope to particularly described evidence relating to a specific crime for which there is demonstrated probable cause."); <u>United States v. Janus Indus.</u>, 48 F.3d 1548, 1553 (10th Cir. 1995)("'As to what is to be taken, nothing is left to the discretion of the officer executing the warrant.'")(quoting <u>Stanford v. Texas</u>, 379 U.S. 476, 485 (1965)).  "A description is sufficiently particular when it enables the searcher to reasonably ascertain and identify the things authorized to be seized."  <u>United States v. Janus Indus.</u>, 48 F.3d at 1553 ("The test applied to the description of the items to be seized is a practical one.").

In <u>Cassady v. Goering</u>, the search warrant authorized the search of the plaintiff's entire farm, including his house, and the seizure of "[a]ny & all narcotics," "[a]ny and all illegal contraband," and various specific items mostly related to a narcotics operation, as well as the search and seizure of "all other evidence of criminal activity" and all personal property that was stolen, embezzled, or otherwise illegal.  567 F.3d at 635.  The Tenth Circuit found that the warrant violated the plaintiff's Fourth Amendment rights, because "[t]he warrant[] allowed precisely the kind of rummaging through a person's belongings, in search of evidence of even previously unsuspected crimes or of no crime at all, that the Fourth Amendment proscribes." 567 F.3d at 635 (quoting <u>Voss v. Bergsgaard</u>, 774 F.2d at 405).  The Tenth Circuit in <u>Cassady v. Goering</u> explained that it had previously "applied a blanket suppression where officers *conducted a general search for evidence* of crimes not specifically listed in the warrant," 567 F.3d at 643

(emphasis in original)(citing United States v. Foster, 100 F.3d 846, 851-52 (10th Cir. 1996);

United States v. Medlin, 842 F.2d 1194, 1199-1200 (10th Cir. 1988)); given that line of cases,

the Tenth Circuit said "it would be an odd result not to suppress *warrants that expressly*

*authorize* a general search and seizure," Cassady v. Goering, 567 F.3d at 643 (emphasis in

original).

### 9.    **Warrantless Searches of Homes.**

"[T]he warrantless entry of the home is 'the chief evil against which . . . the Fourth

Amendment is directed.'"   United States v. Lowe, 999 F.2d 448, 451 (10th Cir. 1993)(quoting

United States v. United States District Court, 407 U.S. 297, 313 (1972)).  "A warrantless search

of a defendant's home is unreasonable absent exigent circumstances or consent."  United States

v. Pikyavit, 527 F.3d 1126, 1130 (10th Cir. 2008).  The Fourth Amendment's protection of the

home against warrantless searches extends to a home's curtilage.  See United States v. Dunn, 480

U.S. 294 (1987); Oliver v. United States, 466 U.S. 170 (1984).

### a.    **Curtilage.**

In United States v. Dunn, the Supreme Court articulated four factors that should be used

when determining whether an area is within the curtilage of a house for Fourth Amendment

purposes.  These factors are

> the proximity of the area claimed to be curtilage to the home, whether the area is
> included within an enclosure surrounding the home, the nature of the uses to
> which the area is put, and the steps taken by the resident to protect the area from
> observation by people passing by.

480 U.S. at 301.  See United States v. Christy, 810 F. Supp. 2d 1219, 1252-57 (D.N.M.

2011)(Browning, J.)(analyzing the United States v. Dunn factors to determine if a driveway,

where an officer was standing when he looked through the window of the defendant's house, was

part of the house's curtilage, concluding that "the area from which [the officer] looked into the window 'did not fall within the curtilage' of Christy's residence," and, thus, did not violate the Fourth Amendment, but concluding that the "act of peering into a small crack in the blinds constituted a search").   Backyards that are enclosed and adjacent to a house are generally considered to be part of the curtilage.  See United States v. Hatfield, 333 F.3d 1189, 1196 (10th Cir. 2003); United States v. Jenkins, 124 F.3d 768, 772-73 (6th Cir. 1997).   Even partially enclosed backyards have been found to be part of a home's curtilage.  See, e.g., United States v. Swepston, 987 F.2d 1510, 1515 (10th Cir. 1993)(holding partial enclosure consistent with area being curtilage), overruled in part on other grounds by United States v. Cousins, 455 F.3d 1116 (10th Cir. 2006); United States v. Jenkins, 124 F.3d at 773 (same); Ysasi v. Brown, No. CIV 13-0183 JB/CG, 2014 WL 936835, at *48-49 (D.N.M. Feb. 28, 2014)(Browning, J.)(concluding that the area inside the plaintiff's six-foot high chain-linked fence was part of the mobile home's curtilage, when the fence enclosed the entire property and was about one-hundred yards from the mobile home, the gates on the fence were locked, and the dumpster was located outside the fence).

   **b.**  **Consent.**

   A warrantless search is constitutional if consent is given for the search.  Consent to a search must be unequivocal, specific, and freely given.  See United States v. Guerrero, 472 F.3d 784, 789 (10th Cir. 2007); United States v. Davis, 197 F.3d 1048, 1052 (10th Cir. 1999); United States v. Butler, 966 F.2d 559, 562 (10th Cir. 1992).  Consent does not need to be spoken, but "may instead be granted through gestures or other indications of acquiescence, so long as they are sufficiently comprehensible to a reasonable officer."  United States v. Guerrero, 472 F.3d at

789-90.  "Non-verbal conduct, considered with other factors, can constitute voluntary consent to search."  United States v. Gordon, 173 F.3d 761, 766 (10th Cir. 1999).  In United States v. Gordon, for example, the Tenth Circuit found implied consent when, in response to an officer's question whether the defendant could open a locked bag, the defendant handed the officer the key.  See 173 F.3d at 766.

One strategy to gain consent to a search is a knock and talk, and the knock and talk itself is not a search.  "[P]olice officers do not engage in a search when they approach the front door of a residence and seek to engage in what is termed a 'knock and talk,' i.e., knocking on the door and seeking to speak to an occupant for the purpose of gathering evidence."  Florida v. Jardines, 133 S. Ct. at 1423 (Alito, J., dissenting).

> When law enforcement officers who are not armed with a warrant knock on a
> door, they do no more than any private citizen might do.  And whether the person
> who knocks on the door and requests the opportunity to speak is a police officer
> or a private citizen, the occupant has no obligation to open the door or to speak.

Kentucky v. King, 131 S. Ct. at 1862.  The Tenth Circuit has explained that reasonable suspicion is unnecessary for a knock-and-talk investigation, because, "[a]s commonly understood, a 'knock and talk' is a consensual encounter and therefore does not contravene the Fourth Amendment, even absent reasonable suspicion."  United States v. Cruz-Mendez, 467 F.3d 1260, 1264 (10th Cir. 2006).  Police officers may approach a home, entering the curtilage surrounding that home that would be the normal route of access to the home, and knock, "precisely because that is 'no more than any private citizen might do.'"  United States v. Shuck, 713 F.3d 563, 568 (10th Cir. 2013)(quoting Florida v. Jardines, 133 S. Ct. at 1416)).  See Ysasi v. Brown, 2014 WL 936835, at *54 (concluding that, when the plaintiff told the defendant officers that he did not want them

on his property, the officers could not rely on the knock-and-talk investigation strategy to enter the curtilage around his mobile home).

### c.   **Exigent Circumstances.**

A warrantless search of a home can also be constitutional when there are exigent circumstances.  For exigent circumstances regarding safety to justify a warrantless search of a home: "(1) the officers [must have] had an objectively reasonable basis to believe that there was an immediate need to enter to protect the safety of themselves or others, and (2) the conduct of the entry [must have been] reasonable."  United States v. Reeves, 524 F.3d 1161, 1169 (10th Cir. 2008).  See United States v. Smith, 797 F.2d 836, 840 (10th Cir. 1986).  While officers do not need probable cause to establish that exigent circumstances exists, "there must be some reasonable basis, approaching probable cause," supporting the search of the area.  United States v. Smith, 797 F.2d at 840 (internal quotation marks omitted).  See James v. Chavez, 830 F. Supp. 2d 1208, 1260 (D.N.M. 2011)(Browning, J.)(concluding that exigent circumstances justified an officer's decision to order a SWAT team to enter the decedent's house when the officers "had a variety of corroborating circumstances to indicate that Murphy Sr. could harm someone, including their own personal observations," including that a neighbor called 911 when the decedent had been standing outside the neighbor's door with a knife, "threatened to harm" the officers, "brandished a knife at them," "would not allow his daughter to leave" the house, and refused to negotiate with officers or relinquish the knife), aff'd, 511 F. App'x 742 (10th Cir. 2013).

## LAW REGARDING FOURTH AMENDMENT SEIZURES

For purposes of analyzing Fourth Amendment seizures, the Tenth Circuit has divided interactions between police and citizens into three categories: (i) consensual encounters; (ii) investigative stops; and (iii) arrests.  See Oliver v. Woods, 209 F.3d 1179, 1186 (10th Cir. 2000).   A consensual encounter occurs when a police officer approaches a person to ask questions under circumstances where a reasonable person would feel free to refuse to answer and to end the encounter.  See Oliver v. Woods, 209 F.3d at 1186.  For example, officers generally may "go to a person's home to interview him," United States v. Daoust, 916 F.2d 757, 758 (1st Cir. 1990), because "[i]t is not improper for a police officer to call at a particular house and seek admission for the purpose of investigating a complaint or conducting other official business." 1 W. LaFave, Search and Seizure: A Treatise on the Fourth Amendment § 2.3(b), at 475 (3d ed. 1996).   Such encounters generally "are not seizures within the meaning of the Fourth Amendment, and need not be supported by suspicion of criminal wrongdoing."   Oliver v. Woods, 209 F.3d at 1186.

### 1.    Investigative Detentions and Reasonable Suspicion.

An encounter that is not consensual may nevertheless be justified as an investigative detention.  An investigative detention occurs when an officer stops and briefly detains a person "in order to determine his identity or to maintain the status quo momentarily while obtaining more information."  Oliver v. Woods, 209 F.3d at 1186 (quoting Adams v. Williams, 407 U.S. 143, 146 (1972)).   Inasmuch as such brief investigative detentions are not consensual, they constitute a seizure and must meet two distinct requirements to be "reasonable" under the Fourth Amendment.  First, the officer "must have a particularized and objective basis for suspecting the

particular person stopped of criminal activity."   Oliver v. Woods, 209 F.3d at 1186 (quoting United States v. Cortez, 449 U.S. 411, 417-18 (1981)).  Second, the investigative detention that follows the stop must be "reasonably related in scope to the circumstances" which justified the stop in the first place, Terry v. Ohio, 392 U.S. 1, 20 (1968), because the Fourth Amendment imposes "limitations on both the length of the detention and the manner in which it is carried out," United States v. Holt, 264 F.3d 1215, 1229 (10th Cir. 2001)(en banc), overruling on other grounds recognized in United States v. Stewart, 473 F.3d 1265 (10th Cir. 2007).

"For reasonable suspicion to exist, an officer 'need not rule out the possibility of innocent conduct;' he or she simply must possess 'some minimal level of objective justification' for making the stop."   United States v. Winder, 557 F.3d 1129, 1134 (10th Cir. 2009)(quoting United States v. Vercher, 358 F.3d 1257, 1261 (10th Cir. 2004)).   This standard is met by information "falling 'considerably short' of a preponderance standard."   United States v. Winder, 557 F.3d at 1134.   See Illinois v. Wardlow, 528 U.S. 119, 123 (2000)(noting that "'reasonable suspicion' is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence . . .").   A police/citizen encounter that goes beyond the limits of a stop under Terry v. Ohio is an arrest which probable cause or consent must support to be valid.   See United States v. Perdue, 8 F.3d 1455, 1462 (10th Cir. 1993)("An encounter between police and an individual which goes beyond the limits of a Terry stop, however, may be constitutionally justified only by probable cause or consent.").

An officer may "stop and frisk" an individual under the Fourth Amendment if a reasonably prudent person "in the circumstances would be warranted in the belief that his safety or that of others was in danger."   Terry v. Ohio, 392 U.S. at 27.   "The officer need not be

absolutely certain that the individual is armed; the issue is whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger." Terry v. Ohio, 392 U.S. at 27. A frisk "must . . . be confined in scope to an intrusion reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer." Terry v. Ohio, 392 U.S. at 29. In evaluating the validity of the stop-and-frisk, the totality of the circumstances must be considered. See Florida v. Bostick, 501 U.S. 429, 436 (1991).

The Tenth Circuit has recognized the doctrine in Terry v. Ohio of an investigative detention -- "stop" -- and of a protective search -- "frisk."

> Terry has come to stand for two distinct propositions -- an investigative detention ("stop") in which a police officer, for the purpose of investigation, may briefly detain a person on less than probable cause, . . . and a protective search ("frisk") which permits an officer, in the course of an investigative detention, to conduct a limited search for weapons for his or her own protection.

United States v. King, 990 F.2d 1552, 1557 (10th Cir. 1997)(citations omitted)). The legal standard is whether a "stop and frisk" is reasonable under the Fourth Amendment. United States v. King, 990 F.2d at 1557.

In United States v. Johnson, 364 F.3d 1185 (10th Cir. 2004), the Tenth Circuit held that an officer had reasonable suspicion to continue questioning and to frisk a suspect after: (i) the officer had responded to a call from a citizen who gave his telephone number, and gave a detailed and accurate description of possible criminal activity and of the suspect; (ii) the contact occurred in Albuquerque's highest-crime area; and (iii) the suspect displayed nervous behavior. See 364 F.3d at 1194. The Tenth Circuit noted that the officer's experience and training allowed him to make inferences, based on a combination of the surrounding circumstances, that criminal

activity was afoot.  See 364 F.3d at 1194 ("His suspicions were particularized to [the suspect], and were based on how his training and experience taught him to interpret a number of objectively reasonable details.").  While many of the factors that the Tenth Circuit considered did not, without more, give rise to reasonable suspicion, the combination of circumstances was sufficient.  See 364 F.3d at 1193 (noting that the district court had erred, because "[a]ll of these factors, mitigating and aggravating, should have been analyzed as part of the totality of the circumstances faced by [the officer] at the inception of the detention").

In United States v. Ceballos, 355 F. App'x 226 (10th Cir. 2009)(unpublished), the police officer observed a young girl walking down the street at night.  See 355 F. App'x at 227-28.  A truck pulled up alongside the girl, the driver of the truck and the girl spoke briefly, then the truck drove ahead, and the girl continued on her walk.  See 355 F. App'x at 228.  Rather than leave, however, the truck drove ahead and parked with its lights off at a dark spot on the road by which the girl would have to walk.  See id.  The officer spoke to the girl, who seemed unconcerned and told him that the man in the truck had asked only if she needed a ride; she had refused.  See id.  Not investigating any particular crime or suspected-crime, and admittedly acting on a "hunch," the officer turned on his emergency lights and pulled up behind the truck.  355 F. App'x at 228, 229.  Upon talking to the truck's driver, Ceballos, the officer discovered that Ceballos' breath smelled of alcohol, he did not have a driver's license, and he had a gun and other items in his vehicle.  See 355 F. App'x at 227-29.  The Tenth Circuit found that the facts available to the officer would have led a reasonable officer to conclude that reasonable suspicion existed and that the officer's "subjective characterization of his actions is irrelevant."  355 F. App'x at 229.  The Tenth Circuit, in an opinion written by the Honorable Michael R. Murphy, United States Circuit

Judge for the Tenth Circuit, and joined by the Honorable Mary Beck Briscoe, Chief Judge, and

Robert H. McWilliams, Jr., Senior Judge, explained:

> A review of the totality of the circumstances shows Gallegos was not acting on an unparticularized hunch; during his testimony he articulated specific facts that caused him to suspect Ceballos intended to assault or abduct the teenage pedestrian.  Specifically, at the time Gallegos initiated the traffic stop, he had observed Ceballos slow his vehicle as he passed a teenage girl walking alone late at night.  He then observed Ceballos alter his route by making a U-turn and following the girl down a narrow, nearly deserted residential street.  Ceballos pulled alongside the girl, who he did not know, and asked her if she wanted a ride. She refused, telling him she lived up the street.  Ceballos then drove further down the road, pulled into a driveway as if to turn around and return to the main road, but instead backed out and drove a few feet further east, in the same direction the girl was walking.  He parked in a dark location and turned off his lights.
>
> . . . .
>
> We agree with the Government that Officer Gallegos had reasonable suspicion to stop and detain Ceballos.  Ceballos showed an interest in a teenage girl he did not know, to the point that he changed his route to follow her down a dark street, offered her a ride, and then parked where the girl would be required to walk past him as she continued to her home.  The facts found by the district court, viewed in totality, amply support the constitutionality of the investigative detention.

355 F. App'x at 229.  The Tenth Circuit did not require the officer to identify the particular crime

of which the officer had reasonable suspicion or even to acknowledge having reasonable

suspicion.  The Tenth Circuit was content to find that a reasonable officer would have reasonable

suspicion that "Ceballos intended to assault or abduct the teenage pedestrian."  355 F. App'x at

229.  The Tenth Circuit demanded only that an officer have facts from which a reasonable officer

could form a reasonable suspicion that criminal conduct was occurring or was about to occur.

See 355 F. App'x at 229.

In United States v. Aragones, 483 F. App'x 415 (10th Cir. May 18, 2012)(unpublished),

the Tenth Circuit found reasonable suspicion based upon an officer's knowledge of the

defendant's:

> (1) gang tattoo; (2) presence in a high crime area; (3) abrupt move away from the officer as soon as [the defendant] saw [the officer]; (4) glancing about in a manner consistent with an attempt to find a route to flee; and, (5) approach to [a private] home's back door without conversing with the residents visible inside.

483 F. App'x at 417.   At the district court level, in ruling on the motion to suppress, the Honorable Martha Vazquez, United States District Court Judge, had concluded that, because the defendant's conduct in standing outside a private residence and looking in "was consistent with the most benign of conduct, including a visit to a friend's house or calling upon a neighbor for assistance," the officer did not have reasonable suspicion at the time of the stop and should have waited longer to rule out innocent conduct.   483 F. App'x at 418 (quoting District Court Opinion at 19).   The Tenth Circuit disagreed, however, stating: "The problem is that conduct giving rise to reasonable suspicion sufficient to support an investigative detention can be -- and often is -- consistent with innocent behavior."   483 F. App'x at 418.   The Tenth Circuit noted that, moreover, the defendant's conduct was not necessarily innocent, because an Albuquerque public ordinance prohibits "[e]ntering upon any private property and looking into any occupied dwelling without the consent of the occupant or owner of the dwelling."   483 F. App'x at 417 (quoting Albuquerque Ord. § 12-2-21(B)).   The Tenth Circuit thus reversed Judge Vazquez' judgment, disagreeing with her finding that the officer lacked reasonable suspicion of unlawful activity, and concluded that "a reasonable officer could have suspected that [the defendant] wasn't a welcome guest and did not have consent to look into the home."   483 F. App'x at 417.

## 2.   **Arrests**.

A seizure that exceeds the investigative detention's limited scope or duration may nevertheless be justified as an arrest.   An arrest is a seizure that is "characterized by highly

intrusive or lengthy search or detention." Oliver v. Woods, 209 F.3d at 1186 (quoting United States v. Cooper, 733 F.2d 1360, 1363 (10th Cir. 1984)). The general rule is that "the use of firearms, handcuffs, and other forceful techniques" is sufficiently intrusive to signal that a person has been placed under arrest. United States v. Melendez-Garcia, 28 F.3d 1046, 1052-53 (10th Cir. 1994). See Florida v. Royer, 460 U.S. 491, 499 (1983). The use of handcuffs, however, does not always elevate a detention into an arrest. See United States v. Albert, 579 F.3d 1188, 1195 (10th Cir. 2009)("[W]e have approved the use of handcuffs in the context of a Terry stop."); United States v. Reyes-Vencomo, 866 F. Supp. 2d 1304, 1330 (D.N.M. 2012)(Browning J.)("The use of handcuffs . . . does not always elevate a detention into an arrest."); Pierre-Louis v. Schake, No. CIV 12-0527 JB/RHS, 2014 WL 1954783 (D.N.M. April 30, 2014)(Browning, J.)(concluding that the defendant police officer acted reasonably in handcuffing the plaintiff, whom he suspected had recently assaulted a person on the side of the road by threatening him with a gun). "Inasmuch as an arrest exceeds an investigative stop's limited scope or duration, it must be supported by probable cause." United States v. Rodriguez, 836 F. Supp. 2d 1258, 1288 (D.N.M. 2011)(Browning, J.). See Wilson v. Jara, 866 F. Supp. 2d 1270, 1292 (D.N.M. 2011)(Browning, J.)("Probable cause must support an arrest, 'characterized by highly intrusive or lengthy search or detention.'" (quoting Oliver v. Woods, 209 F.3d at 1185)), aff'd, 512 F. App'x 841 (10th Cir. 2013).

    "Probable cause to arrest exists only when the 'facts and circumstances within the officers' knowledge, and of which they have reasonably trustworthy information, are sufficient in themselves to warrant a man of reasonable caution in the belief that an offense has been or is being committed.'" United States v. Valenzuela, 365 F.3d 892, 896-97 (10th Cir. 2004)(quoting

United States v. Edwards, 242 F.3d 928, 934 (10th Cir. 2001))(citing Draper v. United States, 358 U.S. 307, 313 (1959)).  Although "[p]robable cause does not require facts sufficient for a finding of guilt . . . , it does require more than mere suspicion."  United States v. Morris, 247 F.3d 1080, 1088 (10th Cir. 2001)(internal quotation marks omitted).  The Supreme Court has made the following distinction between reasonable suspicion, which is sufficient for an investigatory stop under Terry v. Ohio, and probable cause, which is required before an arrest can be made:

> Reasonable suspicion is a less demanding standard than probable cause not only in the sense that reasonable suspicion can be established with information that is different in quantity or content than that required to establish probable cause, but also in the sense that reasonable suspicion can arise from information that is less reliable than that required to show probable cause.

Alabama v. White, 496 U.S. 325, 330 (1990).

Probable cause is measured against an objective standard.  See Beck v. Ohio, 379 U.S. 89, 96 (1964).  "The subjective belief of an individual officer as to whether there was probable cause for making an arrest is not dispositive."  United States v. Valenzuela, 365 F.3d at 896-97 (citing Florida v. Royer, 460 U.S. 491, 507 (1983); United States. v. Treto-Haro, 287 F.3d 1000, 1006 (10th Cir. 2002)).  Thus, the primary consideration is "whether a reasonable officer would have believed that probable cause existed to arrest the defendant based on the information possessed by the arresting officer." Olsen v. Layton Hills Mall, 312 F.3d 1304, 1312 (10th Cir. 2002)(alterations omitted)(internal quotation marks omitted).

The Supreme Court has directed that, in analyzing whether information received from an informant establishes probable cause, courts must look to the totality of the circumstances, and "make a practical, common-sense decision whether, given all the circumstances," including the

informant's "'veracity' and basis of knowledge,'" there is a "substantial basis" for determining "a fair probability that contraband or evidence of a crime will be found in a particular place." Illinois v. Gates, 462 U.S. at 239 (citations omitted).  The Tenth Circuit has recognized that the probable-cause determination using the totality of the circumstances test balances indicia of reliability and that, when there is sufficient independent evidence of corroboration, the informant's veracity need not be established:

> The Court explained that an informant's "veracity, reliability, and basis of knowledge are all highly relevant in determining the value of his report." However, "a deficiency in one [factor] may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability."  Specifically, "[w]hen there is sufficient independent corroboration of an informant's information, there is no need to establish the veracity of the informant."

United States v. Artez, 389 F.3d 1106, 1111 (10th Cir. 2004)(internal citations omitted).  Thus, the Court has recognized that, "[i]n testing the sufficiency of probable cause, courts may look at information received from a [confidential informant] so long as other matters contained in the warrant corroborate the informant's statement."  United States v. Quezada-Enriquez, No. CR 06-2262 JB, 2007 WL 709047, at *5 (D.N.M. Feb. 5, 2007)(Browning, J), aff'd, 567 F.3d 1228 (10th Cir. 2009).  "Corroboration of apparently innocent details of an informant's report tends to indicate that other aspects of the report are also correct, because an informant who is right about some details is probably also right about others."  United States v. Lundy, 164 F. App'x 332, 334 (4th Cir. 2006)(internal quotations omitted).  See United States v. Gary, 24 F. App'x 862, 864-65 (10th Cir. 2001)(unpublished)(finding probable cause existed where an independent investigation corroborated the "innocent information" an informant provided); 79 C.J.S. § 67, Searches and Seizures (stating that an informant's information may establish probable cause where it is

corroborated by independent police work, an additional informant, or other personal knowledge

of an officer; "[e]ven corroboration of portions of the information which do not in and of

themselves involve criminal activity may be sufficient").

The Tenth Circuit has held that "[a] tip from an anonymous or confidential informant that

narcotics are being distributed at a particular location may be corroborated through the

arrangement of a controlled purchase at the suspect location."  United States v. Artez, 389 F.3d

at 1111.  The Tenth Circuit has noted:

> The common formalities observed by police officers when conducting such
> controlled purchases are as follows: the police search the informant (and his
> vehicle, if appropriate) for money and contraband prior to the buy; give the
> informant money with which to purchase the narcotics; transport the informant to
> the suspect residence (or follow the informant to the residence); watch the
> informant enter the suspect residence, disappear while inside the suspect
> residence, and emerge from the suspect residence; search the informant upon
> exiting the suspect residence; and receive the narcotics from the informant.

United States v. Artez, 389 F.3d at 1111-12 (internal footnote omitted).  "[T]he absence of

constant visual contact with the informant conducting the transaction does not render a

controlled purchase insufficient, nor does the absence of an audio-recording of the transaction."

United States v. Artez, 389 F.3d at 1112.

In United States v. Richardson, 86 F.3d 1537 (10th Cir. 1996)(cited with approval in

United States v. Artez, 389 F.3d at 1112), abrogation on other grounds recognized by United

States v. Pearce, 146 F.3d 771, 774 (10th Cir. 1998), the Tenth Circuit held that probable cause

existed based on a controlled purchase in which the officers had not before used the unwitting

informant, Stone, and did not see the defendant, Richardson, provide the drugs to Stone, which

the confidential informant ("CI") then provided to the officers once the CI left Stone's presence.

86 F.3d at 1545.  The CI, who had "numerous prior cocaine transactions with Mr. Richardson

and Mr. Stone," called the police officers and told them "that he could arrange a large cocaine transaction involving Mr. Richardson and Mr. Stone." 86 F.3d at 1545. The officer in charge verified the participants' identities and then coordinated a controlled purchase, which progressed as follows:

> After Officer Cash verified the alleged participants' identities, a meeting was arranged. Officer Cash observed the informant enter Mr. Stone's vehicle to make a cocaine purchase. The informant returned from Mr. Stone's vehicle and informed Officer Cash that he had given Mr. Stone cash and that Mr. Stone was going to Mr. Richardson's residence to acquire the cocaine. Other officers observed Mr. Stone enter the driveway of Mr. Richardson's residence, exit his vehicle, disappear from sight for twenty minutes, return to his vehicle and depart. Officer Cash then observed Mr. Stone's return from Mr. Richardson's residence. The informant again entered Mr. Stone's vehicle and returned with cocaine.

86 F.3d at 1545. The Tenth Circuit concluded that these facts provided sufficient probable cause to search Richardson's home, because the informant's tip to officers that Stone could obtain drugs from the defendant "was corroborated by a controlled narcotics purchase and the observation of [the defendant's] residence." 86 F.3d at 1545.

**3.     When a Detention Becomes an Arrest.**

The Tenth Circuit has held that a police/citizen encounter which goes beyond the limits of an investigative stop is an arrest which probable cause or consent must support to be valid. See United States v. Perdue, 8 F.3d 1455, 1462 (10th Cir. 1993)("An encounter between police and an individual which goes beyond the limits of a Terry stop, however, may be constitutionally justified only by probable cause or consent."). "Terry stops must be limited in scope to the justification for the stop . . . [and] the intrusiveness of a search or seizure will be upheld if it was reasonable under the totality of the circumstances." United States v. Perdue, 8 F.3d at 1462. "The government has the burden of demonstrating 'that the seizure it seeks to justify on the basis

of a reasonable suspicion was sufficiently limited in scope and duration to satisfy the conditions

of an investigative seizure.'"   United States v. Perdue, 8 F.3d at 1462 (quoting Florida v. Royer,

460 U.S. 491 (1983)).

   This Court has also engaged in the balancing act of deciding when a detention becomes

an arrest.  In United States v. Perea, 374 F. Supp. 2d 961 (D.N.M. 2005)(Browning, J.), aff'd sub

nom United States v. Burciaga-Burciaga, 147 F. App'x 725 (10th Cir. 2005)(unpublished), the

Court had to determine whether the police involved transformed the investigative detention into

an arrest by drawing their weapons on the suspect, handcuffing him, and placing him in the back

of a police car.  See United States v. Perea, 374 F. Supp. 2d at 976.  In that case, the Court

determined that such measures were appropriate and did not elevate the investigative detention to

the level of an arrest.  See 374 F. Supp. 2d at 976.  The Court recognized that, "[i]n 'most

scenarios,' when officers effectuate what would otherwise be considered a Terry stop by pointing

guns at a suspect, that stop is elevated to an arrest, which requires probable cause."  374 F. Supp.

2d at 974.  See United States v. Burciaga-Burciaga, 147 F. App'x at 730 (affirming the Court's

determination in United States v. Perea that the officers had reasonable suspicion to believe that

the suspect might be armed and dangerous, justifying the officers' use of firearms and not

transforming the vehicle stop into a formal arrest requiring probable cause); United States v.

Gama-Bastidas, 142 F.3d 1233, 1240 (10th Cir. 1998)("[T]he use of firearms, handcuffs, and

other forceful techniques are justified only by probable cause or when 'the circumstances

reasonably warrant such measures.'").

   There "exist[s], however, a limited set of circumstances in which officers may draw their

guns at a suspect without transforming the stop into an arrest.  'The use of guns in connection

with a stop is permissible where the police reasonably believe the weapons are necessary for their protection.'" United States v. Perea, 374 F. Supp. 2d at 974. See United States v. Merkley, 988 F.2d 1062, 1064 (10th Cir. 1993)(upholding reasonableness of stop when officers detained the defendant at gunpoint and placed him in handcuffs where suspect had threatened to kill someone and was pounding interior of truck with his fists); United States v. Lechuga, 925 F.2d 1035, 1040 (7th Cir. 1991)(holding that the officer's "drawing his gun but keeping it pointed to the street" was not "unreasonably intrusive"); United States v. Alexander, 907 F.2d 269, 272-73 (2d Cir. 1990)(holding that the law enforcement officers did not convert the stop into an arrest by "upholstering their guns and frisking" the defendant when they suspected that the defendant had "just completed a narcotics purchase," there were a number of "innocent bystanders on the crowded city street," and stopping a vehicle "is especially hazardous and supports the need for added safeguards"). Similarly, there are circumstances in which a seizure is not an arrest merely because the subject of the detention is placed in handcuffs. See United States v. Merkley, 988 F.2d at 1064; United States v. Miller, 974 F.2d 953, 957 (8th Cir. 1992)("Numerous cases have held that a police officer's use of handcuffs can be a reasonable precaution during a Terry stop."); United States v. Hastamorir, 881 F.2d 1551, 1557 (11th Cir. 1989)("The handcuffing of Hastamorir constituted a Terry stop, and was a reasonable action designed to provide for the safety of the agents."). United States v. Perea was one of those unique cases, because the police had reasonable cause to believe that the person whom they were detaining was, in fact, the suspect whom they sought to arrest -- a man wanted for murder whom, it was believed, might be armed and dangerous. See 374 F. Supp. 2d at 976. The Tenth Circuit affirmed the Court's determination that the stop was not an arrest:

> The officers' conduct during the felony stop was appropriate in relation to the perceived threat.  The measures taken during a <u>Terry</u> stop must be reasonably related in scope to the circumstances which justified the interference in the first place and may not go beyond what is necessary for officer safety.  The felony stop was justified by suspicion that someone in the Escalade might have a gun, or at least was dangerous.  The officers displayed their weapons only as long as necessary to ensure that the vehicle and its occupants posed no threat.  The officers put their guns away as soon as they handcuffed Mr. Burciaga, placed him in the back of a police car, and confirmed that no one else was in the car.

<u>United States v. Burciaga-Burciaga</u>, 147 F. App'x at 730 (citations omitted)(internal quotation marks omitted).

### 4.    <u>Relevant Law on Excessive Force.</u>

"Excessive force claims, like most other Fourth Amendment issues, are evaluated for objective reasonableness based upon the information the officers had when the conduct occurred." <u>Saucier v. Katz</u>, 533 U.S. 194, 207 (2001).  <u>See</u> <u>Cordova v. Aragon</u>, 569 F.3d 1183, 1188 (10th Cir. 2009)("A Fourth Amendment claim of excessive force is analyzed under the 'objective reasonableness' standard that governs other Fourth Amendment inquiries.").  Hence, "the 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." <u>Graham v. Connor</u>, 490 U.S. 386, 396 (1989).  The Tenth Circuit has explained:

> Reasonableness is evaluated under a totality of the circumstances approach which requires that we consider the following factors:  the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight.

<u>Weigel v. Broad</u>, 544 F.3d 1143, 1151-52 (10th Cir. 2008)(quoting <u>Graham v. Connor</u>, 490 U.S. at 396)(internal quotation marks and citations omitted).  Additionally, a court must judge the reasonableness of a particular use of force from the "perspective . . . of the information possessed

by the [officers]."  Weigel v. Broad, 544 F.3d at 1152 (quoting Anderson v. Creighton, 483 U.S. 635, 641 (1987))(citations and internal quotes omitted).

When analyzing a § 1983 claim for both excessive force and unlawful arrest, a court must look first at whether the arrest was lawful and then at whether the officers' use of force was reasonable in light of the lawfulness of the arrest.  The Tenth Circuit has explained:

> [I]n cases involving claims of both unlawful arrest and excessive force arising from a single encounter, it is necessary to consider both the justification the officers had for the arrest and the degree of force they used to effect it.  If the plaintiff can prove that the officers lacked probable cause, he is entitled to damages for the unlawful arrest, which includes damages resulting from any force reasonably employed in effecting the arrest.  If the plaintiff can prove that the officers used greater force than would have been reasonably necessary to effect a lawful arrest, he is entitled to damages resulting from that excessive force.  These two inquiries are separate and independent, though the evidence may overlap.  The plaintiff might succeed in proving the unlawful arrest claim, the excessive force claim, both, or neither.

Cortez v. McCauley, 478 F.3d 1108, 1127 (10th Cir. 2007)(emphasis added).  Moreover,

> in a case where police effect an arrest without probable cause or a detention without reasonable suspicion, but use no more force than would have been reasonably necessary if the arrest or the detention were warranted, the plaintiff has a claim for unlawful arrest or detention but not an additional claim for excessive force.

Cortez v. McCauley, 478 F.3d at 1126.  See Smith v. Kenny, 678 F. Supp. 2d 1124, 1161 (D.N.M. 2009)(Browning, J.)(noting that the finding whether the officers' use of force is "commensurate with the circumstances" depends upon whether the arrest was lawful).  Thus, if it is clear that the amount of force used would have been reasonable if the detention or arrest had been appropriate, then the plaintiff can recover damages only for the unlawful arrest -- including any damages that flow from the officers' use of force during the arrest -- but there will be no separate excessive-use-of-force claim.  See Cortez v. McCauley, 478 F.3d at 1127 (holding that a

plaintiff must present evidence that the force used was more than that which would be required in effectuating a lawful arrest for the plaintiff to prevail in obtaining damages for both an unlawful arrest and the use of excessive force).

## ANALYSIS

Reid brings three claims against the Defendants -- a claim for violation of his right to procedural due process, a claim for violation of his Fourth Amendment right to be free from unreasonable searches, and a claim for violation of his Fourth Amendment right to be free from an unreasonable seizure.   Although Reid alleges only one procedural due-process count, he asserts that the Defendants subjected him to an additional term of probation and seven days of incarceration; the Court will thus analyze these two portions of the procedural due-process claim separately.   The Court will analyze the claims under absolute immunity, then under Heck v. Humphrey, followed by qualified immunity.   The Court will dismiss most of the claims with prejudice under absolute or qualified immunity, and will dismiss the remaining claims under Heck v. Humphrey without prejudice.   See Crabtree v. Oklahoma, No. 13-CV-688-JED-TLW, 2013 WL 6633019, at *5 (N.D. Okla. Dec. 17, 2013)(dismissing the claims against the district attorney with prejudice, because the state prosecutor was entitled to absolute immunity, and dismissing the remaining claims without prejudice under Heck v. Humphrey), aff'd, No. 13-5153, 2014 WL 1647114 (10th Cir. April 25, 2014).

The Court will: (i) dismiss with prejudice the procedural due-process claim against Ross for Reid's seven days of incarceration, because Ross was involved only with obtaining the Order of Probation and subjecting Reid to an additional term of probation, but she was not involved in denying any procedures related to his seven days of incarceration; (ii) dismiss without prejudice

the procedural due-process claim against Ross for Reid's additional term of probation, because Heck v. Humphrey bars Reid's procedural due process-claims based on his additional term of probation; (iii) dismiss with prejudice the Fourth Amendment search and Fourth Amendment seizure claims against Ross, because, although her conduct related to obtaining the Order of Probation led to other Defendants violating Reid's Fourth Amendment rights, the law was not clearly established; (iv) dismiss with prejudice the procedural due-process claims related to Reid's additional term of probation against Garcia, Hatley, Pautler, and Muller, because these Defendants were not involved in obtaining the Order of Probation, are absolutely immune for enforcing a facially valid court order, and did not have an independent duty to provide additional process for a court order they were enforcing; (v) dismiss with prejudice the procedural due-process claims related to Reid's seven days of incarceration against Garcia, Hatley, Pautler, and Muller, because Reid cannot demonstrate that the seven-day delay between his arrest and a hearing prejudiced him; (vi) dismiss with prejudice the Fourth Amendment search claim against Garcia, Hatley, and Pautler, because these Defendants are absolutely immune for enforcing a facially valid court order, or, alternatively, qualifiedly immune for relying on a facially valid court order; (vii) dismiss with prejudice the Fourth Amendment seizure claim against Garcia, Hatley, and Pautler, because, although Reid has alleged that they falsely stated that Reid repeatedly violated the probation conditions and was a risk to himself, there was an independent basis for arresting Reid pursuant to a facially valid court order and for his violation of state law in consuming marijuana; and (viii) dismiss with prejudice the procedural due-process, Fourth Amendment search, and Fourth Amendment seizure claims against Muller, because Reid has not sufficiently alleged that Muller was involved in these purported violations.  Because the Court is

dismissing all of Reid's claims against all of the Defendants, the Court will grant the MTD. Futher, the Court concludes that <u>Heck v. Humphrey</u> would bar Reid's proposed additional claims; the Court will thus deny the Motion to Amend.

## I.   THE COURT WILL GRANT THE MTD IN PART AND DENY IT IN PART ON THE DEFENDANTS' ABSOLUTE IMMUNITY DEFENSE.

Although the Defendants were state, rather than federal, probation officers, the relevant inquiry focuses on whether they were acting in a quasi-judicial function, that is, whether their activities were "intimately associated with the judicial phase of the criminal process." <u>Tripati v. U.S.I.N.S.</u>, 784 F.2d at 348.  The Honorable James R. Carrigan, United States District Judge for the District of Colorado, has stated that "[t]here is no logical reason that federal probation officers should have immunity but state parole or probation officers should not.  Their quasi-judicial functions are not legally distinguishable." <u>Mee v. Jefferson Cnty. Sheriff's Dep't</u>, 744 F. Supp. 252, 253-54 (D. Colo. 1990), <u>affirmed in part, reversed in part by</u> <u>Mee v. Ortega</u>, 967 F.2d 423 (10th Cir. 1992).  On appeal, the Tenth Circuit did not comment on the fact that the defendants were state, rather than federal, officers, but rather analyzed whether the parole officers performed judicial or prosecutorial functions.  <u>See</u> <u>Mee v. Ortega</u>, 967 F.2d 423, 425-26 (10th Cir. 1992).  The Court will, likewise, analyze the Defendants' actions to determine whether they were acting in a quasi-judicial capacity.

### A.   ROSS WAS NOT ACTING IN A JUDICIAL CAPACITY WHEN SHE FILLED OUT A NEW ORDER OF PROBATION, SUBMITTED IT TO JUDGE PURCELL, AND PRESENTED IT TO REID, AND THUS, SHE IS NOT ENTITLED TO ABSOLUTE IMMUNITY.

According to the FAC, in June, 2007, Ross "questioned why [Reid] was no longer on probation," and,

> [e]ven though the file and documentation contained therein clearly showed that
> [Reid's] probation had ended on March 13, 2007 and that he could not be placed
> on any additional probation, Defendant Ross nonetheless filled out a new Order of
> Probation for the Plaintiff and submitted it to the district court for its signature.

FAC ¶ 10, at 3.   Further, "[a]fter Defendant Ross was successful in obtaining the court's

signature, she presented [Reid] with the new Order of Probation in CR-139, which purported to

extend his probation from March 14, 2007 until March 13, 2012."  FAC ¶ 11, at 3.  "Although

[Reid] questioned the validity of extending his probation any further, he was assured by

Defendant Ross that he had an additional five (5) years of probation to serve under his April 19,

2001 convictions."  FAC ¶ 11, at 3.  The FAC's version of events is slightly different than what

Reid argued at the hearing, when he asserted that Ross presented the Order of Probation to Reid

before submitting it to Judge Purcell:

> I think we can demonstrate that [Reid] signed [the Order of Probation] prior to the
> judge signing it . . . .  I think [the Defendants were] representing to the Court that
> [Reid] agrees with th[e Order of Probation], but they didn't actually have a
> hearing where he could express his disagreement with the Court.

Tr. at 56:25-57:5 (Frost).  Nothing in the Order of Probation indicates whether Reid or Judge

Purcell was the first to sign; the Order of Probation lists sixteen probation conditions, with

Reid's initials by each condition, three signatures on the bottom of the last page, including Judge

Purcell's, Reid's, and Ross' signatures, and below the signatures is the handwritten date "6-12-

7."  Order of Probation at 1-2.  Because the Order of Probation does not provide any insight, the

Court must take the facts as Reid alleged them in the FAC.  See Smith v. United States, 561 F.3d

1090, 1098 (10th Cir. 2009)("[F]or purposes of resolving a Rule 12(b)(6) motion, we accept as

true all well-pled factual allegations in a complaint and view these allegations in the light most

favorable to the plaintiff."  (citing Moore v. Guthrie, 438 F.3d 1036, 1039 (10th Cir. 2006))).

The issue is whether Ross was acting in a judicial capacity when she (i) "questioned why [Reid] was no longer on probation," (ii) "filled out a new Order of Probation for [Reid]," (iii) "submitted it to the district court for its signature," (iv) "presented [Reid] with the new Order of Probation," and (v) assured Reid that he had an additional five years of probation. FAC ¶¶ 10-11, at 3.

The Tenth Circuit's analysis in <u>Mee v. Ortega</u> is particularly useful in determining whether Ross was performing a judicial or prosecutorial function that absolute immunity protects, or whether she was performing a law enforcement function such that qualified immunity is more appropriate. In <u>Mee v. Ortega</u>, the defendant, Jose Ortega, a Colorado state parole officer, heard a report from the sheriff's department that the plaintiff, Stephen Mee, had threatened a person who had filed charges of harassment against him; Ortega filed a complaint that led to Mee's arrest for violating parole conditions, and, while Mee was in jail, Ortega initiated parole revocation proceedings against him. <u>See</u> 967 F.2d at 424. Despite the advice from two lawyers in the county district attorney's office that the complaint could not serve as the basis for revocation of parole, Ortega kept Mee in custody pending the revocation hearing, and when Mee sought a writ of habeas corpus, the court "denied the writ on the basis of Mr. Ortega's testimony that a district attorney, whom he could not name, was planning to pursue revocation at the parole hearing." 967 F.2d at 424-25. At the revocation hearing, the district attorney's office recommended against revocation; the parole board agreed and released Mee. <u>See</u> 967 F.2d at 425. Mee sued Ortega and Ortega's supervisor for holding him in custody pending the parole revocation hearing, alleging that they violated his due-process rights. <u>See</u> 967 F.2d at 424. The district court relied heavily on <u>Tripati v. U.S.I.N.S.</u>, and concluded that Ortega and his supervisor

"played an integral role in the judicial process and therefore were shielded from section 1983

liability by the doctrine of quasi-judicial immunity," but the Tenth Circuit disagreed.  967 F.2d at

425.  Starting with the presumption that "qualified rather than absolute immunity is sufficient to

protect government officials in the exercise of their duties," 967 F.2d at 425, the Tenth Circuit

explained that cases "involving officials who perform functions connected to, but outside of, the

traditional criminal proceeding demand that we pay close attention to the role the official plays,"

967 F.2d at 426.  The Tenth Circuit pointed to several factors to help "determine the contours of

the line between absolute and qualified immunity":

> (a) the need to assure that the individual can perform his functions without
> harassment or intimidation; (b) the presence of safeguards that reduce the need for
> private damages actions as a means of controlling unconstitutional conduct;
> (c) insulation from political influence; (d) the importance of precedent; (e) the
> adversary nature of the process; and (f) the correctability of error on appeal.

967 F.2d at 426 (quoting Cleavinger v. Saxner, 474 U.S. 193, 202 (1985)).  These factors are

"characteristic of the judicial process" and should be "considered in determining absolute as

contrasted with qualified immunity."  Cleavinger v. Saxner, 474 U.S. at 202.  The Tenth Circuit

admitted that "this is a battle about characterization," and noted that it had previously "focused

on the distance between the challenged functions and those benchmark functions to which

absolute immunity has been extended":

> "In contrast to the preparation of pretrial bond or presentence reports [at issue in
> Tripati], *other decisions involving the revocation of probation or parole by a
> probation or parole officer warrant only qualified, not absolute, immunity*
> because such decisions are farther removed from the judicial process and are not
> initiated by courts."

Mee v. Ortega, 967 F.2d at 427 (alteration and emphasis in original)(quoting Snell v. Tunnell,

9210 F.2d at 969).  Based on Mee's allegations that Ortega held him in jail pending the parole

revocation hearing and that Ortega committed perjury at the habeas proceeding, the Tenth Circuit determined that Ortega acted more like a police officer deciding whether probable cause exists to make an arrest than like a prosecutor presenting a case.  See 967 F.2d at 426.  In making that determination, the Tenth Circuit reviewed several previous Tenth Circuit decisions, including Tripati v. U.S.I.N.S., 784 F.2d at 348 (holding that probation officers who had falsified a pretrial bond report and a presentence report were absolutely immune from suit, because they worked directly for the court and assisted it in reaching decisions regarding pretrial release and sentencing); Snell v. Tunnell, 920 F.2d at 686-96 & n.18 (stating, as an example in dicta, that, unlike the pretrial bond or presentence reports involved in Tripati v. U.S.I.N.S., a probation or parole officer's decision to revoke probation or parole warrants only qualified, and not absolute, immunity, because the latter decisions are "farther removed from the judicial process and are not initiated by courts"); Valdez v. City and County of Denver, 878 F.2d 1289 (extending absolute immunity to officials charged with directly enforcing court orders); and Miller v. Glanz, 948 F.2d 1562, 1570-72 (10th Cir. 1991)(extending absolute immunity to witnesses who conspire to present perjured testimony in a criminal proceeding).  Three factors influenced the Tenth Circuit's analysis in finding that qualified immunity, rather than absolute immunity, applied: (i) "few if any safeguards exist to check against parole officers who impermissibly infringe a parolee's constitutionally protected liberty interest," because the state statutory scheme did not require a district attorney's input into the decision; (ii) the state statutes created the risk that "precedent will not control decisionmaking" by "insulating the parole officer from any direct legal supervision"; and (iii) "lost time free from the constraints of incarceration cannot be recovered through the appellate process."  967 F.2d at 428-29.

Ross' activities in determining that Reid should be subject to further probation, filling out a new Order of Probation, and submitting it to Judge Purcell are more analogous to a police officer submitting a warrant application to a court than to a prosecutor presenting a case.  See Malley v. Briggs, 475 U.S. 335, 341-42 (1986)(holding that a police officer who allegedly caused plaintiffs to be unconstitutionally arrested by presenting a judge with a complaint and supporting affidavit which failed to establish probable cause was entitled to qualified, but not absolute, immunity from liability for damages).  Unlike presentence reports, which are "prepared exclusively at the discretion of and for the benefit of the court," Tripati v. U.S.I.N.S., 784 F.2d at 348, there is no indication in the FAC that Ross prepared the Order of Probation at Judge Purcell's direction, and the Court cannot find any authority under New Mexico state law that there is any "standing order" analogous to the federal probation officers' duties to prepare presentence reports in federal court.

Further, many of the six factors that are characteristic of the judicial process weigh in favor of finding that Ross was not performing a judicial function.  Those six factors are:

> (a) the need to assure that the individual can perform his functions without harassment or intimidation; (b) the presence of safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct; (c) insulation from political influence; (d) the importance of precedent; (e) the adversary nature of the process; and (f) the correctability of error on appeal.

Cleavinger v. Saxner, 474 U.S.at 202.  Several of these factors weigh against finding that Ross was performing a judicial function.  First, qualified immunity adequately assures that a probation officer who reviews a probationer's file, determines that the person should be subject to further probation, and submits an order to a court for its signature can perform these functions without harassment or intimidation; although the Court wants to ensure that probation officers are not

chilled from vigorously doing their jobs, qualified immunity is adequate to protect an analogous role for police officers who submit warrant applications to a court. As the Tenth Circuit said, "[a]ny potential chilling effect is minimized by the very real protection against suit afforded by qualified immunity." Mee v. Ortega, 967 F.2d at 428. Next, probation officers in the state system, being part of the executive branch at the New Mexico Corrections Department, are not similarly protected from political influence like judges, although elected state judges are also not as protected from political influence as appointed federal judges. Further, it does not appear that Ross consulted with a lawyer or required Reid to consult with an attorney before submitting the Order of Probation to Judge Purcell, and insulating a probation officer from any direct legal supervision may create a risk that precedent will not control decisionmaking. See Mee v. Ortega, 967 F.2d at 429 ("[B]y insulating the parole officer from any direct legal supervision, the Colorado statutes create the risk that precedent will not control decisionmaking."). Requiring some legal supervision is a safeguard that may check probation and parole officers "who impermissibly infringe a parolee's constitutionally protected liberty interest." Mee v. Ortega, 967 F.2d at 428-29. It appears from the FAC that, when Ross submitted the Order of Probation to Judge Purcell, Reid was not present, meaning that the hearing was not adversarial in nature, further weighing against finding that Ross was performing a judicial function.

On the other hand, some of the factors weigh in favor of finding that Ross was performing a judicial function. First, the factor regarding the "safeguards that reduce the need for private damages actions as a means of controlling unconstitutional conduct" cuts in both directions, because there are some, but perhaps not adequate, safeguards available. The FAC does not indicate whether Ross needed to get a supervisor to review the Order of Probation

before she submitted it to Judge Purcell, and there is no supervisor's signature on the Order of Probation.  The fact that Judge Purcell had to sign the Order of Probation before it took effect is not a sufficient safeguard, because the same is true about a judge signing a warrant application, in which case the officer receives only qualified immunity.  On the other hand, there are several avenues for a probationer to challenge an order of probation after it issues, such as by filing a motion to correct or modify the sentence, see NMRA 5-801, or by appealing the order of probation, see N.M. Stat. Ann. § 39-3-3.  Because placing someone on probation limits their liberty, but is not as serious as incarceration, the safeguards available to challenge an order of probation after it has issued may be sufficient, reducing the need for separate damages suits.  The last factor -- "the correctability of the error on appeal" -- counsels slightly in favor of finding that Ross was performing a judicial function, because Reid could have challenged the Order of Probation and avoided the additional four-and-one-half years' probation; unlike Mee v. Ortega, where Mee's "lost free time from the constraints of incarceration" could not "be recovered through the appellate process," 967 F.2d at 429, Reid was not incarcerated.

Although there are factors that weigh for and against finding that Ross was performing a judicial function, the Court concludes that, as a whole, her conduct in preparing a new Order of Probation and presenting it to Judge Purcell is more akin to a law enforcement function -- such as submitting an application for a warrant to a court -- than to a judicial function, and thus, qualified immunity is more appropriate.  Further, the Court is influenced by the Supreme Court's caution that absolute immunity for judicial functions should be "extended no further than its justification would warrant."  Harlow v. Fitzgerald, 457 U.S. at 811.

The Defendants' supplemental authority, McAllister v. District of Columbia, does not

dictate a different result.  In that case, the District of Columbia Court of Appeals extended absolute immunity to a courtroom clerk who made a mistaken entry on a Judgment and Commitment Order, which the sentencing judge then signed and which resulted in the plaintiff being imprisoned "for a period of time far in excess of the maximum term permitted for that offense." 653 A.2d at 850.  The District of Columbia Court of Appeals extended quasi-judicial immunity to the courtroom clerk based on the United States Court of Appeals for the District of Columbia Circuit's decision to grant a courtroom clerk absolute immunity, reasoning that, if "'immunity were not extended to clerks, courts would face the danger that disappointed litigants, blocked by the doctrine of absolute immunity from suing the judge directly would vent their wrath on clerks, court reporters, and other judicial adjuncts.'"  653 A.2d at 851 (quoting Sindram v. Suda, 986 F.2d 1459, 1461 (D.C. Cir. 1993)).  The District of Columbia Court of Appeals did not, however, discuss how the clerk's conduct in preparing an order and presenting it to the judge was integrally related to the judicial process, even though it acknowledged that absolute immunity "'is justified . . . by the functions it protects and serves, not by the person to whom it attaches.'"  McAllister v. District of Columbia, 653 A.2d at 851 (quoting Forrester v. White, 484 U.S. 219, 227 (1988)).

There are situations in which a court clerk performs quasi-judicial functions.  For example, the Tenth Circuit held that

> [c]ourt clerks, entrusted with the entry of default judgments pursuant to Fed. R. Civ. P. 55, fall within that category of judicial officers who, through the performance of 'judicial acts,' 'authoritatively adjudicate private rights.'  The entry of a default judgment unquestionably constitutes a judicial act; indeed, little could be thought a more quintessential judicial act than the entry of a legal judgment.

Lundahl v. Zimmer, 296 F.3d 936, 939 (10th Cir. 2002)(citations omitted).  It may also be true

that the clerk in <u>McAllister v. District of Columbia</u> performed a judicial function when he or she prepared the Judgment and Commitment Order, but the Court does not think that every person who prepares an order and submits it to a court for its signature is necessarily performing a judicial function.   The District of Columbia Court of Appeals' cursory analysis does not convince the Court that Ross is entitled to absolute immunity in this case.

Ross is also not entitled to quasi-judicial immunity for her conduct in presenting the Order of Probation to Reid or assuring him that he had five additional years of probation to serve for his April 19, 2001, convictions.   Officials who enforce or execute facially valid court orders are entitled to absolute immunity, but when the official played a role in obtaining an illegal court order, the Tenth Circuit has said that the official is not entitled to the same level of immunity. <u>Moss v. Kopp</u>, 559 F.3d at 1163 n.10 ("We have also indicated that where the defendants themselves, in bad faith, obtain the order under which they claim immunity, that order will not provide the same quasi-judicial immunity as an order which the defendant played no part in procuring.").   Because Ross took part in obtaining the Order of Probation "[e]ven though the file and documentation contained therein clearly showed that the Plaintiff's probation had ended on March 13, 2007 and that he could not be placed on any additional probation," Ross was not simply enforcing a facially valid court order when she presented the Order of Probation to Reid and assured him that he had an additional five years of probation.

**B.   HATLEY AND PAUTLER WERE ACTING IN A QUASI-JUDICIAL CAPACITY WHEN THEY ENFORCED THE FACIALLY VALID COURT ORDER BY REQUIRING REID TO SUBMIT TO URINE DRUG TESTS, BUT GARCIA, HATLEY, AND PAUTLER WERE NOT ACTING IN A QUASI-JUDICIAL CAPACITY WHEN THEY FALSELY STATED THAT HE WAS A RISK TO HIMSELF ON THE ARREST ORDER.**

The Court first notes that the FAC does not sufficiently allege who conducted the search at Reid's house: he alleges that, at least one time during his extended probation, "a PO appeared at the Plaintiff's home in Logan, New Mexico and searched the premises." FAC ¶ 13, at 3. Although Garcia was supervising Reid at some point during the probation period, see FAC ¶ 14, at 4 ("[A]t some point prior to September of 2011, the Plaintiff was being directly supervised by Defendant Gregory Garcia, who in turn was subject to the supervision of the Defendant Kristy Muller."), the FAC does not allege that Garcia was Reid's PO at the time a PO searched Reid's house, nor does it allege that Garcia was the PO that searched Reid's house. Because Reid failed to plead who searched his house or which Defendant was responsible for that conduct, the Court will dismiss the Fourth Amendment search claim against the Defendants for searching Reid's house. See Robbins v. Oklahoma, 519 F.3d at 1249-50 (stating that, when a plaintiff sues "the government agency and a number of government actors sued in their individual capacities," it is "particularly important . . . that the complaint make clear exactly who is alleged to have done what to whom, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations against the state" (emphasis in original)).

Reid alleges in the FAC that Hatley and Pautler "demanded that the Plaintiff take a urine test and he complied," FAC ¶ 14, at 4, and that they violated the Fourth Amendment by "forc[ing] the Plaintiff to submit to a urine test . . . without a warrant, absent exigent circumstances," FAC ¶ 26, at 6. The Defendants contend that Hatley and Pautler were enforcing

a facially valid Order of Probation and that they are entitled to absolute quasi-judicial immunity.

For Hatley and Pautler to be entitled to quasi-judicial immunity, the order must be facially valid,

"the judge issuing the disputed order must be immune from liability in his or her own right, the

officials executing the order must act within the scope of their own jurisdiction, and the officials

must only act as prescribed by the order in question."  Moss v. Kopp, 559 F.3d at 1163 (citing

Turney v. O'Toole, 898 F.2d at 1472, 1474).

The Order of Probation was facially valid, although it was erroneous under New Mexico

law.[18]  "[E]ven assuming that an order is infirm as a matter of state law, it may be facially valid,

as 'facially valid' does not mean 'lawful,' and erroneous orders can be valid."  Moss v. Kopp,

559 F.3d at 1165 (quoting Turney v. O'Toole, 898 F.2d at 1473).  Taking the facts as alleged in

the FAC, Reid was on probation for CR-139 from March 14, 2002, until March 13, 2007, a

period of five years.  See FAC ¶ 8, at 2.  Three months after he finished probation for CR-139,

Ross submitted the new Order of Probation in CR-139 for an additional five years of probation,

even though Reid had already been on probation for five years for the same offense.  See FAC

¶ 10, at 3.  As Reid correctly points out, a district court may not order more than five years'

probation for an offense.  See FAC ¶ 7, at 2 (citing N.M. Stat. Ann. § 31-20-5(A); State v.

Devigne, 1981-NMCA-088)("Under New Mexico law, the total period of probation a defendant

can be sentenced in district courts may not exceed five (5) years.").  N.M. Stat. Ann. § 31-20-

_____

[18]Because this issue comes before the Court at the motion-to-dismiss stage, the Court
must take the facts as Reid alleges them, together with evidence that the Court may properly
consider, including the documents to which Reid refers in the FAC.  Reid asserts that he had
completed his probation three months before Judge Purcell signed the June 2007 Order of
Probation.  Without a separate conviction, there was no basis for the Order of Probation, and,
thus, the Court must conclude, at this stage, that the Order of Probation was issued erroneously.
The CR-139 J&S and the Order of Probation do not contradict this conclusion.

5(A) states:

> When a person has been convicted of a crime for which a sentence of imprisonment is authorized and when the magistrate, metropolitan or district court has deferred or suspended sentence, it shall order the defendant to be placed on probation for all or some portion of the period of deferment or suspension if the defendant is in need of supervision, guidance or direction that is feasible for the corrections department to furnish.  Except for sex offenders as provided in Section 31-20-5.2 NMSA 1978, the total period of probation for district court shall not exceed five years and the total period of probation for the magistrate or metropolitan courts shall be no longer than the maximum allowable incarceration time for the offense or as otherwise provided by law.

N.M. Stat. Ann. § 31-20-5.  The Court of Appeals of New Mexico explained that § 31-20-5 "states two limitations upon the length of probation.  First, the probation cannot exceed the period of suspension. . . .  Second, the proviso to § 31-20-5 states 'the total period of probation shall not exceed five years.'"  State v. Devigne, 1981-NMCA-088, ¶ 26.  When the defendant in State v. Devigne was convicted, at one trial, for five counts of burglary, the district court sentenced the defendant to three years imprisonment on each of the five counts, with two of the sentences to be served consecutively for a total of six years.  See 981-NMCA-088, ¶ 22.  The Court of Appeals of New Mexico concluded that, "[o]n the basis of the internal wording of § 31-20-5, and the legislative history, . . . the proviso of § 31-20-5 means that the maximum probation for the five sentences imposed upon defendant, for convictions that occurred at one trial, was five years."  1981-NMCA-088, ¶ 33.  Although the Defendants contend that a district court may order more than five years of probation in different cases, see MTD Memo. at 29-30, this argument misses the problem that, at least according to the FAC, Reid served five years of probation for CR-139 before the new Order of Probation required him to serve an additional five years of probation for the same offense.  Further, while the CR-139 J&S -- which was filed in state court April, 2001 -- states that Reid's sentence for CR-139 "shall be consecutive to the

sentence imposed in" CR-137 and CR-139, CR-139 J&S ¶ 4, at 2, the FAC alleges that, in February of 2006, an "Amended Order of Probation was filed" in CR-138 and CR-139, "which required the Plaintiff to serve probation in those cause numbers form March 14, 2002 until March 13, 2007," FAC ¶ 8, at 2.  Taking the facts as Reid alleges them, and noting that none of the documents that the parties attached for the Court's consideration reveal otherwise, Reid served the maximum amount of time for CR-139 by the time Ross submitted the new Order of Probation, meaning that the Order of Probation violated New Mexico law.

This conclusion, that the Order of Probation was erroneous under New Mexico law, does not mean, however, that the Order of Probation was not facially valid.  As the Tenth Circuit explained in Moss v. Kopp,

> [e]ven assuming that an order is infirm as a matter of state law, it may be facially valid, as 'facially valid' does not mean 'lawful,' and erroneous orders can be valid.  [Turney v. O'Toole, 898 F.2d] at 1473.  We explained: "State officials 'must not be required to act as pseudo-appellate courts scrutinizing the orders of judges,' but subjecting them to liability for executing an order because the order did not measure up to statutory standards would have just that effect."  Id. (quoting Valdez, 878 F.2d at 1289).  Further, "[t]o allow plaintiffs to bring suit any time a state agent executes a judicial order which does not fulfill every legal requirement would make the agent 'a lightning rod for harassing litigation aimed at judicial orders.'"  Id. (quoting Valdez, 878 F.2d at 1289).  "Simple fairness requires that state officers 'not be called upon to answer for the legality of decisions which they are powerless to control.'"  Id. (quoting Valdez, 878 F.2d at 1289).

559 F.3d at 1165.  In this case, the Order of Probation is facially valid; although it extended Reid's probation for CR-139 without legal authority, there are a number of scenarios in which the Order of Probation would have been proper under New Mexico law, and the face of it does not eliminate those possibilities.  For example, it appears from the FAC that Reid served probation for CR-138 and CR-139 concurrently, rather than consecutively, based on the

February, 2006, amended order of probation; had Reid served his probation sentences in CR-137, CR-138, and CR-139 consecutively, then he could have started serving probation for CR-139 in 2007.  Further, the Order of Probation does not indicate whether he was incarcerated for any period of time before being placed on probation, nor does it rule out the possibility that he violated probation conditions and was subject to additional probation.  See State v. Baca, 2005-NMCA-001, ¶ 18, 136 N.M. 667, 104 P.3d 533 (noting that the maximum period of probation that a district court may impose at sentencing is a total of five years, based on N.M. Stat. Ann. § 31-20-5(A) and State v. Devigne, but concluding that five years is not the total amount of time a person can serve on probation when the person has repeatedly violated probation conditions, because N.M. Stat. Ann. § 31-21-15(B) gives the sentencing court the authority to continue the original probation, revoke the probation, or order a new probation or impose a sentence).  Although Reid's counsel worked with the Tenth Judicial District Attorney's office after Reid was arrested to determine that his probation ended in March, 2007, and to obtain an order discharging Reid from probation, see FAC ¶ 19, at 5, these subsequent actions do not indicate that the Order of Probation was facially invalid when Hatley and Pautler were enforcing it, even if it was erroneous.  The Court concludes that the Order of Probation was valid on its face.

Regarding Hatley's and Pautler's actions in requiring Reid to submit urine drug tests, the other three requirements for quasi-judicial immunity when enforcing a facially valid court order are easily met: "the judge issuing the disputed order must be immune from liability in his or her own right, the officials executing the order must act within the scope of their own jurisdiction, and the officials must only act as prescribed by the order in question."  Moss v. Kopp, 559 F.3d at 1163 (citing Turney v. O'Toole, 898 F.2d at 1472, 1474).  First, Judge Purcell, who issued the

disputed order, would be immune from liability in his own right, because he performed a judicial function and did not act in complete absence of all jurisdiction.  See Mireles v. Waco, 502 U.S. at 11-12 (explaining that a judge's immunity from § 1983 liability "is overcome in only two sets of circumstances": (i) "a judge is not immune from liability for nonjudicial acts, i.e., actions not taken in the judge's judicial capacity," and (ii) "a judge is not immune for actions, though judicial in nature, taken in the complete absence of all jurisdiction").  Judge Purcell performed a judicial action in signing the Order of Probation, and in granting Reid's probation officers authority to order Reid to "provide urine or breath test specimens for laboratory analysis."  Order of Probation at 2.  Ordering a probationer to submit to drug tests as a probation condition is within a judge's judicial purview.  See United States v. Walser, 275 F.3d 981, 987 (10th Cir. 2001)("Courts are given broad discretion in the imposition of conditions of supervised release"). Further, Judge Purcell was not acting in "complete absence of all jurisdiction" when he issued the Order of Probation, because district judges have authority to set probation conditions.  See N.M. Stat. Ann. § 31-20-5A (providing the authority for a district court to place a defendant on probation).  As the Supreme Court has explained, "the scope of the judge's jurisdiction must be construed broadly where the issue is the immunity of the judge," and "the necessary inquiry in determining whether a defendant judge is immune from suit is whether at the time he took the challenged action he had jurisdiction over the subject matter before him."  Stump v. Sparkman, 435 U.S. at 356.  "A judge may act in excess of his subject matter jurisdiction and still retain absolute judicial immunity; only in the unusual circumstances of complete and clear absence of all jurisdiction is absolute immunity inappropriate."  Snell v. Tunnell, 920 F.2d at 694.  Although Reid has alleged that he completed the five years' probation for CR-139 three months before

Judge Purcell signed the Order of Probation, he has not indicated in the FAC that a court discharged him from any further obligations on CR-139, and, thus, Judge Purcell at least arguably still retained jurisdiction over Reid.  See N.M. Stat. Ann. § 31-20-9 ("Whenever the period of deferment expires, the defendant is relieved of any obligations imposed on him by the order of the court and has satisfied his criminal liability for the crime, the court shall enter a dismissal of the criminal charges.").  The Court does not think that Judge Purcell acted in complete and clear absence of all jurisdiction.

Next, Hatley and Pautler were acting in the scope of their own jurisdiction as probation officers to supervise Reid, and, when they ordered Reid to submit to urine drug tests, were acting "as prescribed by the order in question," Moss v. Kopp, 559 F.3d at 1163, which required Reid to "provide urine or breath test specimens for laboratory analysis upon request of the Probation and Parole division," Order of Probation ¶ 9, at 2.  Although Hatley and Pautler were not normally supervising Reid, Reid did not allege in the FAC that they did not have authority to supervise him on September 7, 2011, when Reid went to the Tucumcari probation office.  See FAC ¶ 13, at 3-4.  Nor did Reid allege that Hatley and Pautler acted in a manner that exceeded the Order of Probation's scope.  The Court concludes that Hatley and Pautler were enforcing a facially valid court order when they required Reid to submit to a urine drug test on September 7, 2011, and, thus, are entitled to absolute quasi-judicial immunity for that conduct.  The Court will grant the MTD in part on the Defendants' absolute-immunity defense, and dismiss the Fourth Amendment search claims against Garcia, Muller,[19] Pautler, Hatley.  To the extent that Reid's procedural due-

---

[19]The Court is including Garcia and Muller, because Reid did not allege facts to show that Garcia or Muller participated in any searches of Reid, either of his home or in requiring Reid to submit to urine drug tests.

process claim extends to Garcia, Hatley, Pautler, or Muller for enforcing the Order of Probation and carrying out the conditions of Reid's additional probation term rather than providing additional process, the Court concludes that these Defendants are entitled to absolute immunity and will dismiss the procedural due-process claim related to the additional term of probation term.

On the other hand, Garcia, Pautler, and Hatley are not entitled to absolute immunity for their conduct in filling out the Arrest Order, including that they "falsely stated that the Plaintiff was a [risk] to himself and that he was guilty of repeated violations of supervised conditions" while filling out the Arrest Order.  FAC ¶ 15, at 4.  See Arrest Order at 1 (stating "risk" rather than "danger").  Their conduct in filling out the Arrest Order is similar to Ross' conduct in obtaining the Order of Probation, in that it is more analogous to a police officer seeking a warrant than to a judicial act.  Instead of absolute quasi-judicial immunity, the Court will consider whether qualified immunity protects Garcia, Hatley, and Pautler for arresting Reid, and falsely stating that he was a risk to himself and repeatedly violated his supervised conditions.

## II. HECK v. HUMPHREY BARS THE CLAIMS THAT CHALLENGE REID'S ADDITIONAL TERM OF PROBATION.

Although the parties dedicated the bulk of the briefing and argument to the Defendants' absolute and qualified immunity defenses, the Defendants raised an issue in response to the Court's minute orders -- whether Heck v. Humphrey bars Reid's § 1983 claims.  In the Defendants' Supp., the Defendants explain that they did not raise Heck v. Humphrey and Wilkinson v. Dotson arguments in the MTD, "because of the arguably sufficient 'favorable termination' allegation" in the FAC, and "because defendants did not want to detract from the immunity arguments."  Defendants' Supp. at 4.  In response to the Court's second minute order,

the Defendants briefed the issue.  They contend that "success on plaintiff's § 1983 claims would necessarily call into question the validity of Judge Purcell's June 2007 order of probation," and that the Order of Probation has not been "reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus."  Defendants' Second Supp. at 3.  Reid maintains that the Stipulated Order and the Court Log demonstrate that "there was no basis for him to be on probation any longer than five (5) years," which "satisfies the Heck standard."  Reid's Second Supp. at 6-7.

The Supreme Court has stated that

a state prisoner's § 1983 action is barred (absent prior invalidation) -- no matter the relief sought (damages or equitable relief), no matter the target of the prisoner's suit (state conduct leading to conviction or internal prison proceedings) -- *if* success in that action would necessarily demonstrate the invalidity of confinement or its duration.

Wilkinson v. Dotson, 544 U.S. at 82 (emphasis in original).

The first question is whether any of Reid's claims in this § 1983 action would necessarily demonstrate the invalidity of his confinement or sentence.  Reid has brought three claims -- procedural due process, Fourth Amendment search, and Fourth Amendment seizure.  On Reid's procedural due-process claim, he asserts that "[a]t no time prior to June of 2007 was the Plaintiff charged with any crime or provided with any due process that would justify the imposition of an additional five (5) years of probation and his arrest in September of 2011 for violating the conditions of his release."  FAC ¶ 20, at 5.  On the Fourth Amendment search claim, Reid alleges that the Defendants "forced the Plaintiff to submit to a urine test and searched his home, without a warrant, absent exigent circumstances."  FAC ¶ 26, at 6.  Regarding the Fourth Amendment

seizure claim, Reid asserts that "[a]t all times material hereto it was a clearly established law that a law enforcement officer could not arrest an individual without probable cause and/or an arrest warrant," and, that, "under New Mexico law a probation officer has no independent law enforcement authority, but may only enforce the terms of valid probation order." FAC ¶ 30, at 7. He alleges that the Defendants "arrested the Plaintiff on September 7, 2011 without probable cause and without a warrant." FAC ¶ 31, at 7. On each of these claims, success would necessarily demonstrate the invalidity of the June 2007 Order of Probation.

In Reid's procedural due-process claim, he is not just asserting that he did not receive adequate process that might lead to a different result; he is asserting that there was no basis for the Order of Probation. If he were still subject to the Order of Probation, he would be challenging the fact and duration of his "confinement," that is, his time on probation, which would be the proper subject for habeas relief rather than a § 1983 action.

> Because allowing a state prisoner to proceed directly with a federal-court § 1983 attack on his conviction or sentence "would wholly frustrate explicit congressional intent" as declared in the habeas exhaustion requirement, Preiser, 411 U.S., at 489, . . . the statutory scheme must be read as precluding such attacks. This conclusion flows not from a preference about how the habeas and § 1983 statutes ought to have been written, but from a recognition that "Congress has determined that habeas corpus is the appropriate remedy for state prisoners attacking the validity of the fact or length of their confinement, [a] specific determination [that] must override the general terms of § 1983." Id., at 490 . . . .

Heck v. Humphrey, 512 U.S. at 498. Reid's proper federal remedy, if he were still on probation, would be to petition for habeas relief:

> A prisoner need not be incarcerated to satisfy the custody requirement. Thus, in Jones v. Cunningham, the Supreme Court concluded that a habeas petitioner who had been placed on parole was still "in custody" under an unexpired sentence because of the restraints and conditions set forth in the parole order. 371 U.S. 236, 241-43 . . . (1963). The Court reasoned that despite his release from prison, the petitioner was still required to report regularly to a parole officer, remain in a

- 180 -

> particular community, residence, and job, and refrain from certain activities.  Id.
> at 242 . . . .  Similarly, suspended or stayed sentences may satisfy the custody
> requirement; see, e.g., McVeigh v. Smith, 872 F.2d 725, 727 (6th Cir. 1989);
> Sammons v. Rodgers, 785 F.2d 1343, 1345 (5th Cir. 1986)(per curiam); as may
> commitment to a mental institution, and incarceration as the result of a civil
> contempt order.  See Duncan v. Walker, 533 U.S. 167, 176 . . . (2001).  In
> contrast, "[t]he payment of restitution or a fine, absent more, is not the sort of
> significant restraint on liberty contemplated in the custody requirement of the
> federal habeas statutes."  Erlandson[ v. Northglenn Municipal Court], 528 F.3d
> [785,] 788 [(10th Cir. 2008)](internal quotation marks and citation omitted).

Mays v. Dinwiddie, 580 F.3d 1136, 1139 (10th Cir. 2009).  Similarly, Reid's additional probation term, with its restraints on his liberty, would form the proper basis for habeas relief. Stated differently, Reid is alleging that he was placed on probation without first being convicted of a crime and given the process attendant to being convicted of a crime.  Success on the due-process claim would mean showing that he was not convicted of a crime or otherwise given process that would justify a probation term, and would show that the Order of Probation was invalid.

On the Fourth Amendment search claim, Reid is alleging that the probation officers did not have any legal basis for searching his home or making him submit to drug tests; because the legal basis is the June 2007 Order of Probation, success on the Fourth Amendment search claim would necessarily demonstrate the invalidity of the Order of Probation.  Although the Supreme Court in Heck v. Humphrey gave an example of a situation in which an unreasonable search claim would not necessarily invalidate the conviction, the example it provided does not resolve the question before the Court.  In context, the Supreme Court explained that, when "the plaintiff's action, even if successful, will *not* demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed, in the absence of some other bar to the suit."  Heck v. Humphrey, 512 U.S. at 487 (emphasis in original).

> For example, a suit for damages attributable to an allegedly unreasonable search
> may lie even if the challenged search produced evidence that was introduced in a
> state criminal trial resulting in the § 1983 plaintiff's still-outstanding conviction.
> Because of doctrines like independent source and inevitable discovery, and
> especially harmless error, such a § 1983 action, even if successful, would not
> *necessarily* imply that the plaintiff's conviction was unlawful.

Heck v. Humphrey, 512 U.S. at 487 n.7 (emphasis in original)(citations omitted).  Unlike the

unreasonable search example that the Supreme Court provided, Reid's Fourth Amendment

search claim will, if successful, depend on Reid proving that the Order or Probation was invalid,

because the Order of Probation would otherwise have given the Defendants authority to perform

the searches.  To win on the Fourth Amendment seizure claim, it will be necessary, although not

sufficient, for Reid to show that the Order of Probation was invalid; he will have to go on to

show that there was no other basis, such as consent or exigent circumstances, justifying the

searches.

Similarly, Reid asserts that the probation officers had no independent basis to arrest him,

other than allegedly violating the Order of Probation.  Again, success on this claim would

necessarily demonstrate the invalidity of the Order of Probation, because there is no other basis

allowing the probation officers to arrest him.  To succeed, Reid will have to establish that the

Order of Probation was invalid, because, otherwise, it gives the probation officers authority to

arrest Reid.  Although the Tenth Circuit has explained that "false arrest claims generally do not

implicate Heck, because improprieties in arrest typically do not undermine the validity of an

ensuing conviction," Jackson v. Loftis, 189 F. App'x 775, 779 (10th Cir.

2006)(unpublished)(citing Beck v. City of Muskogee Police Dep't, 195 F.3d 553, 558 (10th

Cir. 1999); Price v. Philpot, 420 F.3d 1158, 1163 n.3 (10th Cir. 2005)), it has also recognized

that some false arrest claims would implicate the validity of the conviction or sentence; in

Jackson v. Loftis, the Tenth Circuit said that, "given the particular nature of plaintiff's claim --
that his arrest was improper *because he had not committed the alleged offenses* -- this may be the
exceptional false arrest case that satisfies the 'necessarily called into doubt' condition for
invoking Heck." Jackson v. Loftis, 189 F. App'x at 779 (emphasis in original). Reid's Fourth
Amendment seizure claim again depends on proving that the Order of Probation was invalid,
because it provided the basis for the Defendants to arrest him. The Court concludes that all three
of Reid's claims, if successful, would necessarily demonstrate the invalidity of the Order of
Probation. Reid did not argue otherwise; in responding to the Court's minute order regarding
Heck v. Humphrey, Reid asserted only that he met the favorable-termination requirement, but he
did not argue that his claims do not implicate Heck v. Humphrey on other grounds. See Reid's
Second Supp. at 6-7.

Because Reid's challenge implicates the validity of his sentence, that is, the June 2007
Order of Probation, he must show that "the conviction or sentence has been reversed on direct
appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such
determination, or called into question by a federal court's issuance of a writ of habeas corpus."
Heck v. Humphrey, 512 U.S. at 487. To satisfy this requirement, Reid points to the Stipulated
Order, which states:

> THIS MATTER having come before the Court this 17th day of October,
> 2011, upon the motion of the Defendant, by and through his attorney, Randal M.
> Harris, and the concurrence of the State of New Mexico, represented by Tim
> Rose, Deputy District Attorney, regarding the same, and the Court being fully
> appraised in the premises orders the following:
>
> 1. The Court has jurisdiction over the parties and subject matter herein;
>
> 2. That the Defendant received a suspended sentence on the 19th day of
> April, 2001, for the charge of Burglary of Vehicle/Crafts/Structure - Non

Residential, Criminal Damage to Property Under $1,000 and was to be on probation for a period of five (5) years, zero (0) months, zero (0) days, and it further appearing to the Court that the Defendant is, satisfactorily discharged from Supervised Probation.

IT IS THEREFORE ORDERED.

Stipulated Order at 1.  Reid also points to the Court Log, which includes this interaction:

CT:     IN SESSION

STYLE-CR-00139 (137 & 138)

APPEARANCES – TIM ROSE FOR STATE RANDAL HARRIS FOR DEFT AND DEFT IS PRESENT IN COURT

RT:     WITH PERMISSION JUST FAXED STIP ORD SAT DISCHARGE FROM PROBATION
CAPTION INCLUDED 138&139&137
SAT DISCHARGE FROM ANYMORE PROBATION

CT:     138 & 137 ALREADY HAVE ORDERS DISCHARG[ING] HIM IN THOSE MATTER[S]

RH:     YOU CAN MARK OUT OTHER NUMBERS

TR:     NO OBJECTION REVIEWED FILE THIS MORNING DIDN'T NOTICE THE PREVIOUS ORDERS ON THE OTHER 2 CHARGES COULDN'T SEE WHY STILL ON PROBATION ON 139
10-11 YEARS OLD HE HAS DONE HIS TIME

CT:     NOTE MR REID[] CLEARLY SAT DISCHARGE IN 137 & 138
COURT AGREES NO GROUNDS TO KEEP ON PROBATION

RH:     SPOKE WITH WADE CARTER HIS POSITION WAS THE SAME THERE WAS A GLITCH OR OVERSIGHT

CT:     MR REID ANY PROBLEM

RR:     NO SIR

CT:     RECEIVED STIP ORD MR ROSE DO YOU APPROVE BY PHONE

RH:     PLEASE FILE IN OPEN COURT

- 184 -

CT:     EASIER IF I FILE IT IN CLERK'S OFFICE JUST WORKS BETTTER
        TAKING OFF 127 & 138
        SIGNED THE ORDER
        MR REID TAKE THIS TO CLERK'S OFFICE HAVE THEM FILE IT
        AND GET A CERT COPY
        ANYTHING FUTHER

RH:     MY REID PLEASE CALL MY OFFICE TO MAKE AN PPT

CT:     ADJOURNED

Court Log at 2.  Neither the Stipulated Order nor the Court Log specifically invalidates the June

2007 Order of Probation.  At most, the Stipulated Order may imply that the Order of Probation

was improper based on the dates: the Stipulated Order states that, on April 19, 2001, Reid

received a suspended sentence and was put on five years of probation, and that, on October 17,

2011, he was "satisfactorily discharged" from probation.  This statement may imply that any

probation past 2006, five years after the 2001 conviction, was improper, but it does not

necessarily so imply, because there may be probation violations that extended the probation

term.  The Honorable Albert J. Mitchell, Jr., District Judge for the Tenth Judicial District Court

in New Mexico, who signed the Stipulated Order, did not make any findings in the Stipulated

Order, or, as far as the Court can tell, during the proceeding in which he signed the Stipulated

Order, specifically invalidating the June 2007 Order of Probation.  It appears that he accepted the

parties' stipulations that Reid had completed the required probation, but did not necessarily do

anything more.

   In Garey v. Marshall, 361 F. App'x 91 (10th Cir. 2010)(unpublished), the plaintiff, Jacob

Garey, Jr., brought a § 1983 action alleging that his convictions and sentences in state court

constituted false imprisonment and violated the double jeopardy clause, and seeking money

damages for his allegedly unlawful incarceration, but the Tenth Circuit held that his "§ 1983 complaint cannot succeed on its merits because there has been no termination on the challenged criminal proceedings in Mr. Garey's favor." 361 F. App'x at 917. During the state criminal proceedings, Garey had filed a motion "styled as a 'Motion to Amend Judgment and Sentence of Probation Commitment to Penitentiary,'" but the state court dismissed the motion as moot, because the state and Garey "stipulated that Mr. Garey had been released from custody on those convictions and had completed his terms of probation and parole." 361 F. App'x at 916-17. Although the Tenth Circuit did not cite Heck v. Humphrey, the conclusion that the parties' stipulation that Garey had completed his probation and parole terms was not a favorable termination would seem to apply with equal force in this case, where the parties stipulated that Reid "is satisfactorily discharged from Supervised Probation," but the Stipulated Order does not say that the June 2007 Order of Probation was invalid. The Order of Probation has not been "declared invalid by a state tribunal authorized to make such determination." Heck v. Humphrey, 512 U.S. at 487. See Morris v. McAllester, 702 F.3d 187, 191 (5th Cir. 2012)("Morris's order does not include express language dismissing his indictment, nor does it state that his guilty plea is withdrawn, that the verdict is set aside, or that his civil liberties are restored. Accordingly, we hold that the district judge properly concluded that Morris's claims were barred by Heck."), cert. denied, 134 S. Ct. 80 (2013).

Because Reid is no longer on probation and is not in jail on the alleged probation violation, he is no longer in "custody" for habeas relief, and any appeal from the June 2007 Order of Probation would be moot. When a § 1983 plaintiff is no longer in custody and does not have the opportunity to invalidate the conviction or sentence, the Tenth Circuit has explained

that the plaintiff may still be able to maintain the § 1983 action: "[A] petitioner who has no available remedy in habeas, through no lack of diligence on his part, is not barred by Heck from pursuing a § 1983 claim."  Cohen v. Longshore, 621 F.3d at 1317 (emphasis added).  The Tenth Circuit has affirmed dismissal of plaintiffs' § 1983 claims when they do not exercise diligence to invalidate their convictions.  For example, in Carbajal v. Hotsenpiller, the Tenth Circuit "agree[d] with the district court that [the plaintiff's] actions evince a lack of diligence," because "the complaint is clear that Carbajal was aware of the claimed defects in the investigation that led to his convictions in 2000, but only set out to investigate in 2010."  524 F. App'x at 428.  Similarly, here, Reid "questioned the validity of extending his probation any further," FAC ¶ 11, at 3, but he did not do anything for four-and-a-half years to confirm his suspicions.  In response to the Court's second minute order, in which the Court asked whether Reid had to exhaust his state remedies, Reid responded that the question

> presupposes that the Plaintiff knew that under New Mexico law he could only be placed on probation for five (5) years and that he knew that the 2007 Order of Probation that he was being asked to sign was invalid under New Mexico law and unconstitutional.  That is not correct.  There is no question that had the Plaintiff been aware of his rights under the law, he could have done a lot of things to prevent being placed on an additional five (5) years of probation.  He could have refused to sign the Order of Probation.  He could have demanded to see the judge or ask for a hearing in association with the Order of Probation.  If the judge rejected his argument, he could have appealed the additional Order of Probation to the New Mexico Court of Appeals and, ultimately, to the New Mexico Supreme Court.  But, he did not know.

> In fact, at the point that the Plaintiff hired an attorney in 2011 it was not because he was aware that he had been on probation for four (4) years longer than he was supposed to, but because he had been thrown in jail and he was trying to get out. . . .  At the point the Plaintiff discovered that he had been on probation for an extra (4) years, there was no administrative remedy available to him.  He had been discharged from probation.  He was free.  He could not very well at that point pursue an appeal which would be moot.  He was not in a position to file a declaratory judgment with the district court or pursue other legal remedies,

> because the State agreed that he had been improperly placed on an extra four (4)
> years of probation.

Reid's Second Supp. at 3-4.  Reid tries to excuse his lack of action by pointing to his lack of

knowledge, but this failure to act demonstrates his lack of diligence.   There was nothing

preventing him from investigating his suspicions regarding the Order of Probation, even after he

signed it.  He did not refuse to sign the order.  He did not appeal it.  He did not write a letter to

the court.  He "questioned the validity of extending his probation any further," FAC ¶ 10, at 3,

yet did nothing to protect his claims.  The Court concludes that Reid has not met the diligence

requirement from Cohen v. Longshore regarding his additional term of probation.  In contrast,

Reid was incarcerated for seven days after the alleged probation violation, and he quickly

attempted to be released.  Regarding this short period of incarceration, the Court finds that Reid

was diligent, and, although there is nothing invalidating his incarceration or a reversal on appeal,

he acted diligently in seeking to be released; thus, Cohen v. Longshore permits him to pursue the

procedural due-process claim for the seven days of incarceration.   The Court will dismiss

without prejudice Reid's procedural due-process claim and Fourth Amendment search claim

related to his additional term of probation, because, through his own lack of diligence, the

probation term was not "reversed on direct appeal, expunged by executive order, declared invalid

by a state tribunal authorized to make such determinations, or called into question by a federal

court's issuance of a writ of habeas corpus."  Heck v. Humphrey, 512 U.S. at 486-87.  The Court

concludes that Heck v. Humphrey does not bar Reid's procedural due-process claim aimed at the

seven days he was incarcerated or to Reid's Fourth Amendment seizure claim.

## III.   THE COURT WILL GRANT IN PART AND DENY IN PART THE DEFENDANTS' QUALIFIED IMMUNITY DEFENSE.

Because the Court has granted the MTD on the Defendants' absolute-immunity defense only for the Fourth Amendment search claim against Garcia, Pautler, Hatley, and Muller, and the procedural due-process claim against Garcia, Pautler, and Hatley regarding the additional term of probation but not the seven days of incarceration, the Court must next analyze the Defendants' qualified-immunity defense for the remaining claims, which include: (i) procedural due process, Fourth Amendment search, and Fourth Amendment seizure claims against Ross; and (ii) procedural due process for the seven days of incarceration and Fourth Amendment seizure claims against Garcia, Hatley, and Pautler.  To survive the MTD, Reid must have alleged "facts sufficient to show (assuming they are true) that the defendants plausibly violated their constitutional rights, and that those rights were clearly established at the time.  This requires enough allegations to give the defendants notice of the theory under which their claim is made."

Robbins v. Oklahoma, 519 F.3d at 1249.  The Tenth Circuit has explained that,

> [a]lthough we apply "the same standard in evaluating dismissals in qualified immunity cases as to dismissals generally," complaints in § 1983 cases against individual government actors pose a greater likelihood of failures in notice and plausibility because they typically include complex claims against multiple defendants.  The Twombly standard may have greater bite in such contexts, appropriately reflecting the special interest in resolving the affirmative defense of qualified immunity "at the earliest possible stage of a litigation."  Without allegations sufficient to make clear the "grounds" on which the plaintiff is entitled to relief, it would be impossible for the court to perform its function of determining, at an early stage in the litigation, whether the asserted claim is clearly established.

Robbins v. Oklahoma, 519 F.3d at 1249 (citations omitted)(footnote omitted).

**A.   REID HAS SUFFICIENTLY ALLEGED THAT ROSS VIOLATED REID'S CLEARLY ESTABLISHED PROCEDURAL DUE-PROCESS RIGHTS.**

Taking as true the FAC's factual allegations, three months after Reid completed five years of probation in CR-139, Ross filled out a new Order of Probation and submitted it to Judge Purcell to sign.  See FAC ¶ 10, at 3.  Ross then presented the signed Order of Probation to Reid and assured him that he had an additional five years of probation to serve under his April 19, 2001, convictions.  See FAC ¶ 11, at 3.  Reid contends that "[a]t no time prior to June of 2007 was the Plaintiff charged with any crime or provided with any due process that would justify the imposition of an additional five (5) years of probation and his arrest in September of 2011 for violating the conditions of his release," and that "[t]he Defendants" deprived him of his liberty interest without due process of law by requiring the Plaintiff to submit to an additional four and one-half (4½) years of supervised probation and a period of seven (7) days of incarceration." FAC ¶¶ 20-21, at 5-6.  Further, he asserts that "[a]t all times material hereto it was a clearly established law that an individual cannot be placed on probation and required to adhere to the terms of probation and arrested for allegedly violating those terms, without first being charged with a crime and being provided with due process prior to a conviction."  FAC ¶ 19, at 5.  The Court understands Reid's allegation against Ross to be that she initiated an additional term of probation without providing him any process, such as notice or a hearing.  The Court has previously indicated that it will analyze the procedural due-process claim in two parts; first, for the additional term of probation, and second, for the seven days of incarceration.  Because Reid does not allege that Ross was involved in denying him any process related to the seven days of incarceration, the Court will dismiss that portion of the due-process claim against Ross with prejudice.  The remainder of the analysis regarding the procedural due-process claim against

Ross relates only to Reid's additional term of probation.

As an initial note, the Court thinks that Reid has met his pleading obligations regarding Ross' state-of-mind for the procedural due-process claim.  In <u>Brown v. Montoya</u>, the Tenth Circuit noted that "[a]ccording to the Supreme Court, a plaintiff must show that the defendant was more than simply negligent to make out a procedural due process claim," that "[t]he circuit courts have responded accordingly in requiring a state of mind element such as recklessness or gross negligence," but that the Tenth Circuit had "not resolved th[e] issue" and did not need to "decide the appropriate state of mind test to resolve" <u>Brown v. Montoya</u>, because the plaintiff's complaint "alleges conduct that was 'intentional, malicious, sadistic, willful, wanton, obdurate, and in gross and reckless disregard" of the plaintiff's constitutional rights.  662 F.3d at 1170. Similarly, Reid alleges in the due process count that "[t]he conduct of the Defendants was intentional, willful, wanton, and in reckless disregard of the rights of the Plaintiff."  FAC ¶ 23, at 6.  The Court does not think that these allegations are conclusory, because Reid also alleges facts that support a finding of this state of mind, and which particularly identify Ross:

> In June of 2007, three (3) months after the Plaintiff had completed his five (5) years of maximum probation in CR-139, the Defendant Flyshia Ross questioned why the Plaintiff was no longer on probation.  Even though the file and documentation contained therein clearly showed that the Plaintiff's probation had ended on March 13, 2007 and that he could not be placed on any additional probation, Defendant Ross nonetheless filled out a new Order of Probation for the Plaintiff and submitted it to the district court for its signature.

FAC ¶ 10, at 3.  Although it is not entirely clear what mental state Reid had to allege to maintain the procedural due-process claim, Reid's allegations against Ross are very similar to the plaintiff's allegations in <u>Brown v. Montoya</u>, and, because the Tenth Circuit held that the plaintiff had sufficiently pled scienter in <u>Brown v. Montoya</u>, the Court reaches the same conclusion here.

<u>See</u> Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally.").

To maintain a procedural due-process claim, Reid must have a protected property or liberty interest to which due process applies, and he must not have been afforded an appropriate level of process.  <u>See</u> <u>Camuglia v. City of Albuquerque</u>, 448 F.3d at 1219.

> As for the second step, ordinarily one who has a protected property interest is entitled to some sort of hearing before the government acts to impair that interest, although the hearing need not necessarily provide all, or even most, of the protections afforded by a trial.  <u>See</u> <u>Mathews v. Eldridge,</u> 424 U.S. 319, 335 . . . (1976)(the type of hearing required depends on (1) the nature of the private interest at stake; (2) the risk of erroneous deprivation given the procedures already guaranteed, and whether additional procedural safeguards would prove valuable; and (3) the government's interest, and the burdens that additional procedures might impose).  But "due process is flexible and calls [only] for such procedural protections as the particular situation demands."  <u>Id.</u> at 334 . . . (internal quotation marks and brackets omitted).  For example, "[w]here . . . the state must act quickly, a meaningful postdeprivation hearing is adequate."  <u>Clark[ v. City of Draper]</u>, 168 F.3d [1185,] 1189[ (10th Cir. 1999)]; <u>see</u> <u>also</u> <u>Spielman v. Hildebrand</u>, 873 F.2d 1377, 1385 (10th Cir. 1989)(removal of child from parents' custody requires predeprivation hearing "except for extraordinary situations where some valid governmental interest is at stake that justifies postponing the hearing until after the event." (internal quotation marks omitted)).

<u>Camuglia v. The City of Albuquerque</u>, 448 F.3d at 1220.

Reid had a protected liberty interest in not being placed on probation without first being convicted of a crime.  As Reid alleged in the FAC and which the Order of Probation bears out, being on probation for him meant that

> he was required to report to his Probation Officer ("PO") once a month; get permission from his PO before leaving Quay County, changing jobs or changing residences; he was prohibited from associating with persons identified by his PO as being detrimental to his supervision; he was required to authorize his PO to visit his home and to allow them to conduct warrantless searches on his person, residence, automobiles or property; he was required to provide urine or breath

tests at the PO's request; and was required to pay monthly probation costs as well as pay Crime Stoppers, DNA and other fees.

FAC ¶ 12, at 3.  Although the Third Circuit in Skipworth v. United States noted that extending probation is "clearly not as 'grievous' a 'loss' as revocation," it nonetheless noted that "probation entails significant restrictions on an individual."  508 F.2d at 601.  The Third Circuit distinguished between extending probation, and revoking probation, when it determined how much process was due and when, not whether process was due.  See 508 F.2d at 601-02. Further, although "probationers 'do not enjoy the absolute liberty to which every citizen is entitled, but only . . . conditional liberty properly dependent on observance of special [probation] restrictions,'" Trask v. Franco, 446 F.3d at 1044-45 (alterations in original)(quoting Griffin v. Wisconsin, 483 U.S. 868, 874 (1987)), Reid was not a probationer when Ross submitted the new Order of Probation for Judge Purcell to sign: according to the FAC, Reid had finished his probation three months earlier, see FAC ¶ 10, at 3.  Reid had a protected liberty interest in being free from probation restrictions.

The harder question is determining whether Reid had the appropriate level of process available to him through the post-deprivation remedies that the Defendants listed in the Defendants' Supp., including (i) filing a motion to correct or modify the sentence pursuant to rule 5-801 NMRA; (ii) appealing the terms and conditions of probation; (iii) filing a petition for writ of habeas corpus pursuant to N.M. Stat. Ann. § 44-1-1; or (iv) filing a petition for writ of habeas relief under 28 U.S.C. § 2241, see Defendants' Supp. at 2-4, or whether due process required that Reid be given a pre-deprivation hearing.  Reid maintains that he had a right to a hearing before Judge Purcell signed the Order of Probation, especially because the effect of the Order of Probation, in his view, was to increase the severity of his sentence.  See Reid Supp. at

1-2.  The Defendants, on the other hand, maintain that this situation is analogous to extending a person's probation period, which, at least according to the five circuits that have so held, does not require a hearing before the extension.  <u>See</u> Defendants' Supp. at 5.

As supporting authority, Reid points to New Mexico statutes and cases to demonstrate that he should have been given a hearing before Judge Purcell signed the Order of Probation. For example, rule 5-612 of the New Mexico State Court Rules provides that, "[e]xcept as otherwise provided by these rules, the defendant shall be present at all proceedings, including the arraignment, all hearings and conferences, argument, the jury trial and during all communications between the court and the trial jury."  NMRA 5-612(A).  A defendant may waive the right to be personally present, <u>see</u> NMRA 5-612(B), and a defendant does not need to be present in the following situations:

> (1) a defendant other than a person may appear by counsel for all purposes;
>
> (2) when the offense is punishable by fine or by imprisonment for a term of less than one (1) year, or both, the court, with the written consent of the defendant, permits arraignment, plea, trial and imposition of sentence in the defendant's absence;
>
> (3) when the proceeding involves only a conference or hearing upon a question of law.

NMRA 5-612(D).  The Court of Appeals of New Mexico has indicated that a defendant does not need to be present at post-conviction hearings where a sentence is not imposed.  <u>See</u> <u>State v. Sommer</u>, 1994-NMCA-070, ¶ 6.  When the post-conviction hearing is to reconsider a sentence, the defendant does not need to be present unless the "hearing results in the terms of the sentence being made more onerous."  1994-NMCA-070, ¶ 8.  As far as the Court can tell, Reid is correct that there is no statutory authority in New Mexico for a court to extend a probation sentence.

There is statutory authority for a court to extend a probation period for juveniles:

> Prior to the expiration of a judgment of probation, the court may extend the judgment for an additional period of one year until the child reaches the age of twenty-one if the court finds that the extension is necessary to protect the community or to safeguard the welfare of the child.

N.M. Stat. Ann. § 32A-2-23.  There is not, however, a similar extension provision that would allow a court to extend probation for adults.  Reid has also pointed to two New Mexico cases that support his argument.  In State v. Crespin, 1981-NMCA-095, 96 N.M. 640, 633 P.2d 1238, the Court of Appeals of New Mexico stated that "the trial court correctly ruled that it could not extend the length of the probation term; the trial court's authority as to length of probation was the authority conferred by our statutes."  1981-NMCA-095, ¶ 9.  The Court of Appeals of New Mexico explained that a trial court may not modify probation conditions to increase the penalty after it has set the probation conditions:

> Section 31-20-5, N.M.S.A.1978, authorizes the trial court to place a defendant on probation when sentence is suspended.  If there are probation conditions, they are to be attached to the order suspending sentence.  Section 31-20-6, supra.  When a violation of probation is established, "the court may continue or revoke the probation and may require the probationer to serve the balance of the sentence imposed or any lesser sentence."  Section 31-21-15(B), N.M.S.A.1978.  Under this authority, the trial court may relieve a defendant of the conditions of probation, or continue the existing conditions; however, these statutes do not authorize the trial court to change any probation condition so that the penalty is increased.

State v. Crespin, 1981-NMCA-095, ¶ 11.  The defendant in that case violated his probation conditions and requested that the trial court extend his probation period rather than impose incarceration.  See 1981-NMCA-095, ¶ 12.  The Court of Appeals of New Mexico explained that, "[a]fter imposition of a valid sentence, a court may not increase the penalty."  1981-NMCA-095, ¶ 13.  "The statutes cited in this opinion have not authorized a trial court to extend the

length of probation or change the conditions of probation so as to increase the penalty even if a defendant is agreeable to such changes." State v. Crespin, 1981-NMCA-095, ¶ 15.  In State v. Castillo, 1980-NMCA-020, 94 N.M. 352, 610 P.2d 756, the trial court extended the defendant's probation period from one to five years, and after the defendant had served her first year of probation, she violated one of the conditions, leading to the court revoking her probation and ordering her to serve the balance of her sentence in jail.  See 1980-NMCA-020, ¶ 2.  The defendant argued on appeal that the "the court could not validly extend her probationary period, and thus the subsequent revocation, as well as her reincarceration, were invalid."  1980-NMCA-020, ¶ 8.  The Court of Appeals of New Mexico agreed with the defendant, stating that, "[o]nce a court has issued a valid original judgment and imposed sentence on a defendant, it cannot enlarge the sentence by increasing the penalty at a later date."  1980-NMCA-020, ¶ 9.  While these authorities are interesting, New Mexico law does not define the contours of the Due Process Clause; it may be that there is overlap between what New Mexico requires and what the Constitution requires, but it may also be that New Mexico requires more than what the Constitution requires.

The Defendants' authority is more on point than Reid's in that the cases they cite discuss constitutional limitations, including whether a pre- or post-deprivation hearing is sufficient under the due process clause, but, while this authority is helpful, the Court notes that it also does not answer the precise question before the Court.  In Skipworth v. United States, for example, the issue was whether a one-year ex parte extension of probation was valid.  See 508 F.2d at 600.  The defendant argued that rule 43 of the Federal Rules of Criminal Procedure "required his presence at the time the trial judge granted the extension," but the Third Circuit explained that

neither placing a defendant on probation nor extending probation constitute an "imposition of

sentence" as defined in rule 43, and thus, the fact that the court had extended his probation ex

parte did not violate rule 43.  508 F.2d at 600.  The Third Circuit then addressed the "much more

troublesome question . . . whether the due process clause requires that a probationer be given

notice and a right to a hearing before any order granting an extension of probation is entered."

508 F.2d at 600.   After reviewing Morrissey v. Brewer, 408 U.S. 471 (1972), in which the

Supreme Court "had established a constitutional right to a hearing before revocation of parole,"

and Gagnon v. Scarpelli, 411 U.S. 778 (1973), in which the Supreme Court held that due process

requires that a probationer be given notice and the right to a hearing before revocation of

probation, the Third Circuit concluded that due process did not require notice and a hearing

before extending probation.  508 F.2d at 601.

> While we acknowledge that probation entails significant restrictions on an
> individual, an extension of probation is clearly not as "grievous" a "loss" as
> revocation, and here it entailed no greater restrictions than those which existed
> previously.  In fact, the primary "loss" suffered by an individual whose probation
> has been extended lies not in the continuing restrictions themselves, but in the
> possibility of future revocation.  While such a loss is indeed serious, it is merely
> potential at the time of extension, and the due process clause clearly provides the
> protection of a hearing in the event that revocation proceedings should
> subsequently occur.

508 F.2d at 601-02.  The Third Circuit reasoned that, unlike a revocation hearing at which a

judge must find that the probationer violated a condition of probation or broke a law, a

determination to extend probation does not require a judge to find any probation violation has

occurred.  See 508 F.2d at 602 (explaining that "the trial judge is given greater latitude" when

granting probation extensions, and citing United States v. Squillante, 144 F. Supp. 494, 497

(S.D.N.Y. 1956), in which the Southern District of New York refused to terminate the probation

which it had previously extended, because it found that the best interest of society warranted the continuing supervision over the probationer).  The Third Circuit stated that, beyond the judge's latitude in extending probation, "[a]dditional circumstances . . . similarly undercut any claim of prejudice," including that the probationer "was clearly on notice of the trial judge's power to extend the term of his probation, since the probation order he signed explicitly stated that the court had such power," that the "extension did not entail any new or more onerous restrictions, since the conditions of probation were not changed in any way," and that the probationer "was given prompt notification of the extension and of the reasons it had been granted, and thus he was clearly on notice that he was still subject to its conditions and restrictions."  508 F.2d at 602. Although the Third Circuit concluded that "the ex parte extension of [the probationer's] probation was not so prejudicial as to constitute a violation of due process," it stated that, "because of the potential for prejudice in such extensions,  . . . they are inadvisable," and thus, indicated that it would "hereafter require the district courts in this Circuit before extending probation to provide notice to the probationer of the proposed extension and advise him that he has a right to a hearing should he so desire, together with the assistance of counsel."  508 F.2d at 602-03.

In United States v. Silver, the Ninth Circuit addressed the constitutionality of extending probation without a hearing.  The Ninth Circuit first reviewed the applicable law, noting that the Sentencing Reform Act of 1984, Pub. L. No. 98-473, § 212(a)(2), 98 Stat. 1837, as amended by Sentencing Act of 1987, Pub. L. No. 100-182, § 2, 101 Stat. 1266, explicitly stated that a "'court may, after a hearing, extend a term of probation . . . at any time prior to the expiration or termination of the term of probation,'" 83 F.3d at 291 (quoting 18 U.S.C. § 3653), but that,

before the Sentencing Reform Act went into effect, a "court could discharge the probationer from further supervision or extend the probation 'as shall seem advisable,'" but that "[t]here was no provision for a hearing, 83 F.3d at 291 (quoting 18 U.S.C. § 3653 (repealed October 12, 1984)). The Ninth Circuit applied the pre-Sentencing Reform Act law, because the act was not effective at the time the defendant committed the offenses. See 83 F.3d at 291. The Ninth Circuit noted that "[t]he four Courts of Appeals that have decided the issue of whether due process requires notice and a hearing before the extension of probation have all held that a hearing is not necessary under the law in existence before the Sentencing Reform Act became effective." 83 F.3d 289, 291 (9th Cir. 1996)(citing Forgues v. United States, 636 F.2d 1125 (6th Cir. 1980); United States v. Cornwell, 625 F.2d 686 (5th Cir. 1980); United States v. Carey, 565 F.2d 545 (8th Cir. 1977); Skipworth v. United States, 508 F.2d 598 (3d Cir. 1975)).

> These courts believed that the extension of probation is not as "grievous" a "loss" as revocation and did not implicate a liberty interest sufficient to require additional procedural protections. These courts reasoned that the loss of liberty in an extension proceeding is only a potential one and that the judge in an extension proceeding need not make a detailed factual inquiry into whether the probationer committed a violation, but only must determine what is in the best interest of society.

United States v. Silver, 83 F.3d at 292 (citations omitted). The Ninth Circuit concurred with the Third, Fifth, Sixth, and Eighth Circuits, and held "that due process does not require the district court to hold a hearing as to an extension of probation for offenses committed before the Sentencing Reform Act went into effect on November 1, 1987." 83 F.3d at 292.

Although the Tenth Circuit has not addressed the probation extension issue, it cited Skipworth v. United States favorably in United States v. Ortiz, 733 F.2d 1416, 1417-18 (10th Cir. 1984). United States v. Ortiz involved an equal protection challenge, but the Tenth Circuit

looked to <u>United States v. Skipworth</u> to explain that extending a probation period is a "milder loss" than "the grievous loss of liberty implicated in a revocation of probation." <u>United States v. Ortiz</u>, 733 F.2d at 1418.  The Tenth Circuit concluded that extending an indigent's probation period after he failed to pay the fine imposed as a probation condition did not violate fundamental fairness.  <u>See</u> 733 F.2d at 1418.

The Court recognizes that the Defendants cited only probation extension cases by way of analogy, but it has concerns about relying too heavily on those cases, primarily because Reid's probation was not simply extended; according to the FAC, he had completed his probation three months before Ross submitted the new Order of Probation to Judge Purcell to sign.  The Tenth Circuit explained that, at least when it comes to the Fourth Amendment "right to be free from warrantless searches" of the home, a person who has "already been discharged" from probation enjoys the "absolute liberty to which every citizen is entitled," rather than the "conditional liberty properly dependent on observance of special probation restrictions." <u>Trask v. Franco</u>, 446 F.3d at 1043-44.  Although <u>Trask v. Franco</u> involved a Fourth Amendment search claim rather than a procedural due-process claim, the Court thinks that it stands for the broader proposition that, after a person's probation period has ended, he or she has the same liberty to which every citizen is entitled.  Thus, once Reid ended his probation period for CR-139 on March 13, 2007, he regained the absolute liberty to which every citizen is entitled under the Constitution, including his right to due process before being subjected to a term of probation.  When Ross submitted the Order of Probation to Judge Purcell without providing notice and a hearing, he did not receive the appropriate amount of process, even though he had available -- and apparently did not take -- the post-deprivation remedies such as filing a motion for correction or

modification of his sentence or appealing the Order of Probation.

The Court also concludes that a person's right to a hearing before a sentence of probation is imposed was clearly established in 2007 when Ross submitted the new Order of Probation to Judge Purcell.  "It is fundamental that the state cannot hold and physically punish an individual except in accordance with due process of law."  Ingraham v. Wright, 430 U.S. 651, 674 (1977). As John Marshall Harlan II, Associate Justice for the Supreme Court, said in a concurring opinion,

> the requirements of criminal justice . . . leave no doubt of [the defendant's] right to be present when a final determination of sentence is made.  The elementary right of a defendant to be present at the imposition of sentence and to speak in his own behalf . . . is not satisfied by allowing him to be present and speak at a prior stage of the proceedings . . . .  Even if he has spoken earlier, a defendant has no assurance that when the time comes for final sentence the district judge will remember the defendant's words in his absence and give them due weight. Moreover, only at the final sentencing can the defendant respond to a definitive decision of the judge.

United States v. Behrens, 375 U.S. 162, 167-68 (1963)(Harlan, J., concurring in the result).  The Court concludes that Ross violated clearly established law when she submitted the Order of Probation to Judge Purcell to sign when Reid had completed his probation period for CR-139. Before imposing a new term of probation, Reid was entitled to notice and a hearing, which he did not receive.  The Court will, however, dismiss without prejudice the procedural due-process claim against Ross for the additional term of probation, because, as the Court previously discussed, Heck v. Humphrey bars that portion of the due-process claim.

As a final note regarding the due-process claim against Ross, the Defendants assert that, although Ross may be liable as an individual under a procedural due-process claim, they stress that "Judge Purcell's signing of the subject order of probation scribed by Ross constituted an

- 201 -

intervening cause of any harm suffered by plaintiff" and that the "theory of superseding cause applies in § 1983 cases." Defendants' Supp. at 8. Based on that theory, they contend that "Ross, as an individual, would not have violated Reid's procedural due process rights by scribing the probation order and submitting it to Judge Purcell for signature after his review." Defendant's Supp. at 8. The Defendants are correct that, to hold a defendant personally liable under § 1983, the defendant must have "caused the deprivation of a federal right." Hafer v. Melo, 502 U.S. 21, 25 (1991). They incorrectly label, however, Judge Purcell's conduct in signing the Order of Probation as a superseding intervening cause that cuts off Ross' liability. While Judge Purcell's conduct in signing the Order of Probation was an intervening cause, it was not superseding, because it was a foreseeable result after Ross submitted the Order of Probation to Judge Purcell. The situation is analogous to a police officer submitting a warrant affidavit to a magistrate judge when the affidavit lacks probable cause; in Malley v. Briggs, the Supreme Court rejected the argument that the magistrate judge's "decision to issue the warrant breaks the causal chain between the application for the warrant and the improvident arrest." 475 U.S. at 344 n.7.

> As we stated in Monroe v. Pape, 365 U.S. 167 . . . (1961),[ overruled in part by Monell v. Dep't of Social Servs., 436 U.S. 658 (1978)], § 1983 "should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions." Since the common law recognized the causal link between the submission of a complaint and an ensuing arrest, we read § 1983 as recognizing the same causal link.

Malley v. Briggs, 475 U.S. at 345 n.7. Similarly, the Court concludes that the natural consequences of Ross' conduct in submitting a new Order of Probation for Judge Purcell to sign was that Judge Purcell would sign it, and, thus, his conduct is not a superseding cause that cuts off Ross' liability. Although Reid did not challenge the Order of Probation by filing a motion to modify or correct his sentence, or by appealing it, the Court also does not think that Reid's

- 202 -

conduct constitutes a superseding intervening cause to cut off Ross' liability, because she assured Reid that he had five years of probation yet to serve; a natural consequence of her assurances is that Reid would not press the issue further.

**B.   ALTHOUGH ROSS VIOLATED REID'S FOURTH AMENDMENT RIGHT TO BE FREE FROM UNREASONABLE SEARCHES BY CAUSING OTHER PROBATION OFFICERS TO COMPLETE ILLEGAL SEARCHES, THE LAW WAS NOT CLEARLY ESTABLISHED.**

Reid asserted at the hearing that he was asserting the Fourth Amendment search claim against all of the Defendants, including Ross.  In this count, Reid alleges that "[t]he Defendants, while acting under color of state law, forced the Plaintiff to submit to a urine test and searched his home, without a warrant, absent exigent circumstances, in violation of the Fourth Amendment to the United States Constitution."  FAC ¶ 26, at 6.  Based on Reid's conduct in submitting the Order of Probation to Judge Purcell for his signature, and then assuring Reid that he had an additional five years of probation to serve, the Court thinks that, although Ross did not personally participate in the alleged illegal searches, she caused them.  "'The requisite causal connection is satisfied if the defendant set in motion a series of events that the defendant knew or reasonably should have known would cause others to deprive the plaintiff of [his] constitutional rights.'"  Snell v. Tunnell, 920 F.2d at 700 (quoting Conner v. Reinhard, 847 F.2d 384, 396-97 (7th Cir. 1988)).  The foreseeable and expected result of the Order of Probation was that other probation officers would supervise Reid pursuant to the Order of Probation's conditions, which included searches of his house and his person, including drug tests.

In the Order of Probation, Reid wrote his signature next to each probation condition, including the two provisions related to the alleged illegal searches:

I will permit any Probation/Parole Officer to visit me at my home or place of

> employment at any time.  I will permit a warrant-less search by the Officer of my person, automobile, residence, property and/or living quarters if he/she has reasonable cause to believe the search will produce evidence of a violation of my conditions of probation.
>
>  . . . .
>
> I will not buy, sell, consume, possess or distribute any controlled substances except those legally prescribed for my use by a State Certified Medical Doctor.  I will also provide urine or breath test specimens for laboratory analysis upon request of the Probation and Parole division.

Order of Probation at 1, 2.  Although Reid signed the Order of Probation, the Court does not think that his signature absolves Ross' liability for the searches, because it seems that Reid is alleging that he did not voluntarily consent to the probation conditions.  See FAC ¶ 11, at 3 ("Although the Plaintiff questioned the validity of extending his probation any further, he was assured by Defendant Ross that he had an additional five (5) years of probation to serve under his April 19, 2001 convictions."); FAC ¶ 12, at 3 (discussing "the terms of the standard probation order that Plaintiff was required to sign by Defendant Ross in June of 2007 . . . ." (emphasis added)).

The Court concludes that the situation of Ross submitting the erroneous Order of Probation to Judge Purcell is similar to a situation in which a police officer submits an application for a warrant to a magistrate judge when the application does not support a finding of probable cause.  In Malley v. Briggs, the Supreme Court rejected the argument that, when an officer seeks an arrest warrant by submitting a complaint and supporting affidavit to a judge, a magistrate judge who issues the arrest warrant breaks the causal chain between the officer's conduct and the plaintiff's arrest.  See 475 U.S. at 339.  The Supreme Court concluded that, when "a reasonably well-trained officer in petitioner's position would have known that his

- 204 -

affidavit failed to establish probable cause and that he should not have applied for the warrant," "the officer's application for a warrant was not objectively reasonable, because it created the unnecessary danger of an unlawful arrest." 475 U.S. at 345.

> It is true that in an ideal system an unreasonable request for a warrant would be harmless, because no judge would approve it. But ours is not an ideal system, and it is possible that a magistrate, working under docket pressures, will fail to perform as a magistrate should. We find it reasonable to require the officer applying for the warrant to minimize this danger by exercising reasonable professional judgment.

475 U.S. at 345-46. The Supreme Court cautioned that it was not requiring a police officer to assume a role more skilled than the magistrate judge:

> It is a sound presumption that "the magistrate is more qualified than the police officer to make a probable cause determination," and it goes without saying that where a magistrate acts mistakenly in issuing a warrant but within the range of professional competence of a magistrate, the officer who requested the warrant cannot be held liable. But it is different if no officer of reasonable competence would have requested the warrant, *i.e.,* his request is outside the range of the professional competence expected of an officer. If the magistrate issues the warrant in such a case, his action is not just a reasonable mistake, but an unacceptable error indicating gross incompetence or neglect of duty. The officer then cannot excuse his own default by pointing to the greater incompetence of the magistrate.

Malley v. Briggs, 475 U.S. at 346 n.9 (citation omitted). The Supreme Court also noted that, "[a]lthough the case before us only concerns a damages action for an officer's part in obtaining an allegedly unconstitutional arrest warrant, the distinction between a search warrant and an arrest warrant would not make a difference in the degree of immunity accorded the officer who applied for the warrant." 475 U.S. at 344 n.6.

The Tenth Circuit dealt with a similar issue in Salmon v. Schwarz, 948 F.2d 1131 (10th Cir. 1991), although the issue came before it during a motion for summary judgment. The Tenth Circuit agreed with the district court that had denied qualified immunity to a Federal Bureau of

Investigation agent who obtained an arrest warrant but did not participate in the arrest, because there was "a genuine issue of material fact whether an 'officer of reasonable competence would have requested the warrant' for [the plaintiff's] arrest with [the agent's] information."  948 F.2d at 1140 (quoting <u>Malley v. Briggs</u>, 475 U.S. at 346 n.9).

Likewise, Ross' conduct in submitting the Order of Probation to Judge Purcell, when "the file and documentation contained therein clearly showed that the Plaintiff's probation had ended on March 13, 2007 and that he could not be placed on any additional probation," FAC ¶ 10, at 3, violated Reid's Fourth Amendment right to be free from unreasonable searches, because there was no basis for the Order of Probation that would cause probation officers to subject Reid to many searches over a period of five years.  The problem, however, is that the law was not clearly established that Ross' conduct would violate the Constitution, because the Tenth Circuit held in <u>Kerns v. Bader</u> that, although "a case on point isn't required if the impropriety of the defendant's conduct is clear from existing case law," the law is not clearly established where "a distinction <u>might</u> make a constitutional difference."  663 F.3d at 1188 (emphasis in original).  There are several differences between Ross' conduct and a police officer's conduct in submitting an affidavit that lacks probable cause.  A police officer must swear to certain facts that he or she believes establish probable cause, and a person subject to the warrant does not have any way to challenge the warrant application until after the warrant has been issued and executed.  Here, Ross did not swear to any facts in the draft Order of Probation that she submitted to Judge Purcell, but merely determined, although apparently inaccurately, that Reid had not served his entire probation term.  Further, Reid could challenge the Order of Probation before any alleged unconstitutional searches or seizures took place, through appealing the Order of Probation.

There may also be a difference between a police officer who primarily will perform law enforcement functions, and a probation officer, who may sometimes perform law enforcement functions and at other times may perform judicial functions.  These differences convince the Court that the law was not clearly established; thus, the Court will grant the MTD regarding the Fourth Amendment search claim against Ross.

###   C.   THE COURT WILL DISMISS REID'S FOURTH AMENDMENT SEIZURE CLAIM AGINST ROSS, BECAUSE THE LAW WAS NOT CLEARLY ESTABLISHED.

Just as the Fourth Amendment search claim against Ross fails, because the law was not clearly established, so too the Fourth Amendment seizure claim must also fail.  The differences between a police officer submitting a warrant application and Ross submitting the Order of Probation might make a constitutional difference and convince the Court that the law was not clearly established.

The Court makes two additional observations regarding the Fourth Amendment seizure claim.  First, although Reid admitted to using marijuana in violation of the Order of Probation, his conduct does not cut off Ross' liability.  Whether Reid's conduct was foreseeable is a matter for a jury to determine, and the Court cannot conclude, as a matter of law, that Ross could not foresee a probationer violating a probation condition.  Because the issue comes before the Court on a motion to dismiss, the Court will not consider some of the exhibits that Reid submitted, because he did not mention them in the FAC and they are not central to his allegations.  For example, the Court will not consider the CR-01-051 J&S, PPD Substance Abuse Testing, or the Huebner Article.  Even without considering these exhibits as evidence, however, the Court concludes that Reid's use of marijuana was not a superseding, intervening cause cutting off

Ross' liability for the Fourth Amendment seizure claim.  On the other hand, it was not foreseeable to Ross that Garcia, Pautler, and Hatley would falsely state that Reid repeatedly violated his probation conditions.  Ultimately, however, these observations do not impact the Court's conclusion that Reid is entitled to qualified immunity for the Fourth Amendment seizure claim, because the law was not clearly established.  The Court will grant the MTD and dismiss the Fourth Amendment seizure claim against Ross.

### D.    THE COURT WILL DISMISS REID'S PROCEDURAL DUE-PROCESS CLAIMS AGAINST GARCIA, PAUTLER, AND HATLEY, BECAUSE REID CANNOT ESTABLISH ANY PREJUDICE FROM THE DELAY FOR A PRELIMINARY HEARING.

Although Reid alleged at the hearing that he is bringing a procedural due-process claim against all the Defendants, it is not clear what he is alleging Garcia, Pautler, and Hatley did to deny him procedural due process.  They were not involved in obtaining the additional term of probation, and, although they enforced it, Reid has not pointed to any authority that they were required to independently investigate the Order of Probation before enforcing it.  It seems that the part of the due process count against them is that they, "while acting under the color of state law, deprived the Plaintiff of his liberty interest without due process of law, in violation of the Fourteenth Amendment to the United States Constitution by requiring the Plaintiff to submit to . . . a period of seven (7) days of incarceration."  FAC ¶ 21, at 5-6.  To support this count, Reid alleges that, after he had a positive drug test and admitted to using marijuana,

> "[t]he consensus of Defendants Hatley, Garcia and Pautler was that the Plaintiff should be immediately arrested.  They proceeded to fill out an Arrest Order, which specifically stated that the Plaintiff was not to be given bond.  As a justification for the arrest, Defendants Pautler, Garcia and Hatley falsely stated that the Plaintiff was a [risk] to himself and that he was guilty of repeated violations of supervised conditions.  Defendant Pautler signed the Arrest Order on behalf of Defendant Garcia and Defendant Hatley signed the order on behalf of

Defendant Muller.  The Plaintiff was immediately taken into custody at the Quay County Detention Center.

16. As part of the Arrest Order signed by the Defendants, the Defendants were required to identify the current convictions which formed the basis of the probationer's probation.  Each of the convictions identified by the Defendants, show that they were over ten (10) years prior to the date of the Arrest Order.

17. SCRA 5-805(B) requires the Defendants to file with the district attorney's office within one (1) day of a probationer's arrest, a notice of the arrest and a copy is to be given to the probationer and the district court.  Upon filing of the notice, the court has five (5) days to review the conditions of release of the probationer who is incarcerated.  At no time did any of the Defendants file a notice of arrest as required by SCRA-5-805.

FAC ¶¶ 15-17, at 4-5.

Essentially, Hatley, Garcia, and Pautler initiated probation revocation proceedings against Reid.  "Probation revocation, like parole revocation, is not a stage of a criminal prosecution, but does result in a loss of liberty."  Gagnon v. Scarpelli, 411 U.S. at 782.  The Supreme Court has held that "a probationer, like a parolee, is entitled to a preliminary and a final revocation hearing, under the conditions specified in Morrissey v. Brewer."  Gagnon v. Scarpelli, 411 U.S. at 782. In Morrissey v. Brewer, the Supreme Court explained that

> a parolee is entitled to two hearings, one a preliminary hearing at the time of his arrest and detention to determine whether there is probable cause to believe that he has committed a violation of his parole, and the other a somewhat more comprehensive hearing prior to the making of the final revocation decision.

Gagnon v. Scarpelli, 411 U.S. at 781-82.  The Supreme Court detailed what must happen at both of these hearings:

> We now turn to the nature of the process that is due, bearing in mind that the interest of both State and parolee will be furthered by an effective but informal hearing.  In analyzing what is due, we see two important stages in the typical process of parole revocation.

(a) Arrest of Parolee and Preliminary Hearing.  The first stage occurs when the parolee is arrested and detained, usually at the direction of his parole officer.  The second occurs when parole is formally revoked.  There is typically a substantial time lag between the arrest and the eventual determination by the parole board whether parole should be revoked.  Additionally, it may be that the parolee is arrested at a place distant from the state institution, to which he may be returned before the final decision is made concerning revocation.  Given these factors, due process would seem to require that some minimal inquiry be conducted at or reasonably near the place of the alleged parole violation or arrest and as promptly as convenient after arrest while information is fresh and sources are available.  Such an inquiry should be seen as in the nature of a 'preliminary hearing' to determine whether there is probable cause or reasonable ground to believe that the arrested parolee has committed acts that would constitute a violation of parole conditions.

In our view, due process requires that after the arrest, the determination that reasonable ground exists for revocation of parole should be made by someone not directly involved in the case.  It would be unfair to assume that the supervising parole officer does not conduct an interview with the parolee to confront him with the reasons for revocation before he recommends an arrest.  It would also be unfair to assume that the parole officer bears hostility against the parolee that destroys his neutrality; realistically the failure of the parolee is in a sense a failure for his supervising officer.  However, we need make no assumptions one way or the other to conclude that there should be an uninvolved person to make this preliminary evaluation of the basis for believing the conditions of parole have been violated.  The officer directly involved in making recommendations cannot always have complete objectivity in evaluating them.  Goldberg v. Kelly found it unnecessary to impugn the motives of the case-worker to find a need for an independent decisionmaker to examine the initial decision.

This independent officer need not be a judicial officer.   The granting and revocation of parole are matters traditionally handled by administrative officers.  In Goldberg, the Court pointedly did not require that the hearing on termination of benefits be conducted by a judicial officer or even before the traditional 'neutral and detached' officer; it required only that the hearing be conducted by some person other than one initially dealing with the case.   It will be sufficient, therefore, in the parole revocation context, if an evaluation of whether reasonable cause exists to believe that conditions of parole have been violated is made by someone such as a parole officer other than the one who has made the report of parole violations or has recommended revocation.  A State could certainly choose some other independent decisionmaker to perform this preliminary function.

With respect to the preliminary hearing before this officer, the parolee should be given notice that the hearing will take place and that its purpose is to determine

whether there is probable cause to believe he has committed a parole violation. The notice should state what parole violations have been alleged.  At the hearing the parolee may appear and speak in his own behalf; he may bring letters, documents, or individuals who can give relevant information to the hearing officer.  On request of the parolee, [a] person who has given adverse information on which parole revocation is to be based is to be made available for questioning in his presence. However, if the hearing officer determines that an informant would be subjected to risk of harm if his identity were disclosed, he need not be subjected to confrontation and cross-examination.

The hearing officer shall have the duty of making a summary, or digest, of what occurs at the hearing in terms of the responses of the parolee and the substance of the documents or evidence given in support of parole revocation and of the parolee's position.  Based on the information before him, the officer should determine whether there is probable cause to hold the parolee for the final decision of the parole board on revocation.  Such a determination would be sufficient to warrant the parolee's continued detention and return to the state correctional institution pending the final decision.  As in <u>Goldberg</u>, 'the decision maker should state the reasons for his determination and indicate the evidence he relied on . . .' but it should be remembered that this is not a final determination calling for 'formal findings of fact and conclusions of law.'  No interest would be served by formalism in this process; informality will not lessen the utility of this inquiry in reducing the risk of error.

(b) The Revocation Hearing.  There must also be an opportunity for a hearing, if it is desired by the parolee, prior to the final decision on revocation by the parole authority.  This hearing must be the basis for more than determining probable cause; it must lead to a final evaluation of any contested relevant facts and consideration of whether the facts as determined warrant revocation.  The parolee must have an opportunity to be heard and to show, if he can, that he did not violate the conditions, or, if he did, that circumstances in mitigation suggest that the violation does not warrant revocation.  The revocation hearing must be tendered within a reasonable time after the parolee is taken into custody.  A lapse of two months, as respondents suggest occurs in some cases, would not appear to be unreasonable.

We cannot write a code of procedure; that is the responsibility of each State. Most States have done so by legislation, others by judicial decision usually on due process grounds.  Our task is limited to deciding the minimum requirements of due process.  They include (a) written notice of the claimed violations of parole; (b) disclosure to the parolee of evidence against him; (c) opportunity to be heard in person and to present witnesses and documentary evidence; (d) the right to confront and cross-examine adverse witnesses (unless the hearing officer specifically finds good cause for not allowing confrontation); (e) a 'neutral and

detached' hearing body such as a traditional parole board, members of which need not be judicial officers or lawyers; and (f) a written statement by the factfinders as to the evidence relied on and reasons for revoking parole.  We emphasize there is no thought to equate this second stage of parole revocation to a criminal prosecution in any sense.  It is a narrow inquiry; the process should be flexible enough to consider evidence including letters, affidavits, and other material that would not be admissible in an adversary criminal trial.

We do not reach or decide the question whether the parolee is entitled to the assistance of retained counsel or to appointed counsel if he is indigent.

Morrissey v. Brewer, 408 U.S. at 484-90 (citations omitted)(footnotes omitted).  See Gagnon v. Scarpelli, 411 U.S. at 782 (stating that a probationer is entitled to the same process as a parolee before probation is revoked).

Both Reid and the Defendants acknowledge that a seven-day delay before the September 14, 2011, hearing does not necessarily give rise to a due-process claim; as Reid states, "to establish a due-process violation for failure to timely provide a preliminary hearing, the Plaintiff must demonstrate that the delay was both unreasonable and prejudicial."  Reid's Second Supp. at 5.  Both parties cite to Paul v. McFadin, 117 F.3d 1428, 1997 WL 407843 (10th Cir. 1997)(unpublished table decision), in which the Tenth Circuit noted that, in the context of revoking parole, "due process requires a preliminary revocation hearing 'as promptly as convenient after arrest,' and a final revocation hearing 'within a reasonable time after the parolee is taken into custody.'"  1997 WL 407843, at *2 (quoting Morrissey v. Brewer, 408 U.S. at 485, 488).  "However, delay in providing these hearings does not, per se, constitute a violation of due process entitling an accused parole violator to immediate release.  Instead, 'to establish a legal right to habeas relief, the delay, taking into consideration all the circumstances, must also be prejudicial.'"  1997 WL 407843, at *2 (citations omitted).  In that case, a three-month delay between arrest and the preliminary hearing did not violate due process, because the plaintiff

failed to demonstrate any prejudice.  See 1997 WL 407843, at *3.

Reid states that "[i]t is clear that under no circumstances could the Plaintiff argue that a seven (7) day delay amounts to a due process violation unless he can also demonstrate prejudice."  Reid's Second Supp. at 6.  To support his argument that the delay prejudiced him, Reid asserts that,

> [h]ad there been a court review of the Arrest Order leading to his arrest within a couple of days following the arrest, he could have avoided spending four (4) or five (5) days in jail.  As a result of the Defendants' conduct in not notifying the district attorney's office according to the statute or in some other way ensuring that the issue of his continued incarceration was brought before the court, the Plaintiff spent several additional days incarcerated.

Reid's Second Supp. at 6.  Reid did not cite any cases to support his argument that the additional four or five days of incarceration in and of itself demonstrates prejudice.  If Reid could explain how the additional few days in jail led to a loss of evidence or hindered his defense, that would be one thing, but his argument that he was prejudiced simply on the basis of the additional days of incarceration would mean that any probationer who was incarcerated following an alleged probation violation, and then subsequently released after a preliminary or final hearing, would have suffered prejudice.

The Defendants make several additional arguments why they did not violate due process.  First, they assert that the September 14, 2011, hearing "could be considered the 'preliminary hearing' or a combined preliminary/final hearing."  Defendants' Second Supp. at 8.  They point to a number of cases holding that a preliminary hearing may be combined with a final hearing and that the final hearing may itself satisfy due process without a preliminary hearing.  See Defendants' Second Supp. at 8-10.  Although the Defendants did not point to any Tenth Circuit cases on point, the Court agrees that the Supreme Court has not foreclosed the possibility for the

preliminary hearing and final hearing to be combined.  See Ellis v. District of Columbia, 84 F.3d 1413, 1424 (D.C. Cir. 1996)("Consolidating the preliminary and final revocation hearings into a single proceeding is constitutionally permissible." (citing Gagnon v. Scarpelli, 411 U.S. at 783 n.5; Pierre v. Wash. State Bd. of Prison Terms & Paroles, 699 F.2d 471, 473 (9th Cir. 1983)).  In this situation, whether the September 14, 2011, hearing is considered a combined hearing or even simply the final hearing, Reid cannot demonstrate any prejudice, as that term is defined in the case law, resulting from the seven-day delay.

The Defendants also argue that Reid was, "in effect, given an immediate 'preliminary hearing' when Pautler and Hatley, after administering the urine test that came back positive and after having been told by plaintiff that he had consumed marijuana, contacted Garcia on the telephone, and discussed the situation with him."  Defendants' Second Supp. at 10-11.  The Defendants assert that Garcia "independently evaluated whether probable cause existed for the arrest pending a court hearing" and that Reid did not allege that he "did not have an opportunity to present his side of the story to Garcia."  Defendants' Second Supp. at 11.  The Court notes that, in some circumstances, Garcia could fulfill the role of independently evaluating probable cause, because the "independent officer need not be a judicial officer."  Morrissey v. Brewer, 408 U.S. at 486.  While Garcia was not directly involved with discovering the alleged violation, the Court does not agree with the Defendants that Garcia could fulfill the requirement that "the determination that reasonable ground exists for revocation or parole should be made by someone not directly involved in the case."  Morrissey v. Brewer, 408 U.S. at 485.  That Garcia had, up until that point, been supervising Reid indicates to the Court that Garcia was not a proper person to conduct a preliminary hearing.  Because Reid has not demonstrated that the seven-day delay

prejudiced him, however, the Court's conclusion that Garcia did not perform a satisfactory preliminary hearing when Hatley and Pautler called him does not impact the Court's holding.

An additional issue related to the procedural due-process claim is Reid's allegation that the Defendants violated rule 5-805(B) of the New Mexico Rules. Rule 5-805(B) NMRA states:

> If the probationer is arrested by the probation office without a warrant the probation office shall provide the district with a written notice within one (1) day of the arrest. The notice shall contain a brief description of each alleged probation violation. A copy of the notice shall be given to the probationer and filed with the court.

NMRA 5-805(B). The Defendants contend that any failure on the part of the Defendants to file a notice pursuant to rule 5-805(B) did not harm Reid, because a district judge entered an order modifying his conditions of release within the required time period in rule 5-805(D). See MTD Memo. at 15. Because rule 5-805(D) requires the sentencing judge to review the notice of arrest or warrant and consider conditions of release pending adjudication of the probation violation within five days of the arrest, see 5-805(D) NMRA, and because Saturdays, Sundays, and legal holidays are excluded in computing days when the time prescribed is less than eleven, see 5-104(A) NMRA, Reid was released from custody within the five days that the rules contemplate. He was arrested on September 7, 2011, and the judge had until September 14, 2011, to review the notice; as the FAC alleges, Reid was released on September 14, 2011. See FAC ¶ 18, at 5; MTD Memo. at 15-16. Although the Defendants may not have strictly complied with New Mexico's rule, their failure to provide written notice did not impact that a judge reviewed Reid's case within the time that the New Mexico rules required. Further, a violation of New Mexico's rules does not independently demonstrate a constitutional due-process violation. Because Reid cannot demonstrate that the seven days between his arrest and the hearing prejudiced him, the

Court will dismiss the procedural due-process claim against Garcia, Hatley, and Pautler related to Reid's seven days of incarceration.

> ### E.   EVEN IF HATLEY, PAUTLER, AND GARCIA ARE NOT ABSOLUTELY IMMUNE FOR THE SEARCHES THEY PERFORMED PURSUANT TO THE ORDER OF PROBATION, THEY ARE QUALIFIEDLY IMMUNE.

Although the Court has concluded that Garcia, Hatley, and Pautler are absolutely immune for any searches they performed, because they were enforcing a facially valid court order, the Court also concludes that, even if absolute immunity does not apply, they are qualifiedly immune, because their reliance on the facially valid Order of Probation was objectively reasonable.  Although Reid cited Pitchford v. Borough of Munhall at the hearing for the principle that negligence may be actionable under § 1983 for Fourth Amendment claims, see Tr. at 34:3-21 (Frost), the Court thinks the case demonstrates why Hatley, Pautler, and Garcia are not liable under a qualified immunity analysis for the alleged unconstitutional searches.

In Pitchford v. Borough of Munhall, a magistrate judge issued a warrant for the plaintiff's arrest based on a defendant citizen's private criminal complaint that the plaintiff had violated a Protection From Abuse ("PFA") order; contrary to the citizen's complaint, however, there was not any PFA order entered against the plaintiff.  631 F. Supp. 2d at 647.  Nonetheless, the magistrate judge issued the warrant for the plaintiff's arrest.  See 631 F. Supp. 2d at 648.  The Honorable Terrence F. McVerry, United States District Judge for the Western District of Pennsylvania, noted that, for the three officers who arrested the plaintiff, "[s]ince the *only* basis for this arrest was an arrest warrant that was not supported by probable cause, the arrest was unconstitutional," but said that, "[f]or the purpose of the qualified immunity inquiry, the dispositive question is whether 'a reasonable officer [in the defendants' position] could have

believed that his or her conduct was lawful, in light of the clearly established law and the

information in the officer's possession.'"  631 F. Supp. 2d at 654 (emphasis in original)(quoting

Sharrar v. Felsing, 128 F.3d 810, 826 (3d Cir. 1997), abrogated on other grounds in Curley v.

Klem, 499 U.S. 199 (3d Cir. 2007)).  "The governing precedents recognize that this inquiry is an

objective one, and that [the plaintiff] cannot defeat the officers' qualified immunity defense

unless she can establish that a 'reasonably well trained officer would have known that the [arrest]

was illegal despite the magistrate's authorization.'"  631 F. Supp. 2d at 654 (quoting United

States v. Leon, 468 U.S. at 922-23, n.23)).  Judge McVerry acknowledged that an "'apparently

valid warrant does not render an officer immune from suit if his reliance on it is unreasonable in

light of the relevant circumstances,'" 631 F. Supp. 2d at 654-55 (quoting Berg v. Cnty. of

Allegheny, 219 F.3d 261, 273 (3d Cir. 2000)), but concluded that the officers did not act

unreasonably in relying on the arrest warrant, even though they had the ability to "check the PFA

registry for the purpose of verifying that a PFA order had been entered against her,"  631 F.

Supp. 2d at 655.  He compared the situation to Berg v. County of Allegany, in which

> a constable arrested someone for a parole violation who had been mistakenly
> named in an arrest warrant because of a clerical error.  The individual who was
> arrested was no longer on parole.  The constable initially traveled to the last
> known address of the individual who was supposed to have been named in the
> warrant, only to find an abandoned house.  After speaking with the person who he
> would eventually arrest over the telephone, the constable traveled for more than
> an hour for the purpose of locating him.  When the constable arrived at the
> person's residence, he encountered evidence indicating that the person named in
> the warrant was no longer on parole and, hence, could not have violated the
> conditions of his parole.  The constable nevertheless executed the arrest warrant,
> apparently motivated by a desire for the fee that he received for each person
> arrested.  Although the warrant had been generated on August 3, 1994, it was not
> executed until December 30, 1994.  Given the age of the warrant, the discrepancy
> concerning the address, the evidence that the individual had already completed his
> parole, and the fact that the individual did not seek to evade the constable's efforts

to locate him, the Court of Appeals determined that there were "valid questions" concerning the reasonableness of the constable's conduct.

Pitchford v. Borough of Munhall, 631 F. Supp. 2d at 655 (citations omitted).   Unlike the

circumstances in Berg v. County of Allegany, Judge McVerry determined that the officers did

not act unreasonably in relying on the warrant:

> This case is clearly distinguishable from Berg.  The arrest warrant executed by Garcia, Curtain and Chereb had just been issued approximately sixteen hours before their arrival at Pitchford's residence.  The age of the warrant gave the officers no reason to hesitate.  The arresting officers did not encounter a discrepancy concerning the address of the person named in the warrant akin to that which had been encountered by the arresting constable in Berg.  After checking Pitchford's driver's license to verify her identity, Garcia arrested Pitchford.  Pitchford's only basis for contending that the officers acted in an objectively unreasonable manner was their failure to check the PFA registry for the purpose of verifying that a PFA order had been entered against her.  The Court is not convinced that Berg requires the denial of the officers' motion to dismiss.  Garcia, Curtain and Chereb did nothing that could be characterized as objectively unreasonable.  They executed a facially valid (though genuinely invalid) arrest warrant that had recently been issued by a magistrate.  They encountered no direct evidence that a PFA order could not have been in effect (unlike the constable in Berg, who encountered direct evidence indicating that the person named in the warrant was no longer on parole), nor did they have any other reason to question the validity of the arrest warrant.  The objectively reasonable nature of the officers' conduct, of course, does not negate the illegality of the arrest itself.  It does, however, entitle Garcia, Curtain and Chereb to the defense of qualified immunity.

Pitchford v. Borough of Munhall, 631 F. Supp. 2d at 655-56 (citations omitted).

Although the case is from the Western District of Pennsylvania, the Court concludes that

it provides a helpful framework with which to analyze Reid's claims against Hatley and Pautler,

the officers who required him to take a urine drug test.  First, requiring Reid to submit to a urine

drug test was a search under the Fourth Amendment.  See Skinner v. Ry. Execs. Ass'n, 489 U.S.

at 617 ("Because it is clear that the collection and testing of urine intrudes upon expectations of

privacy that society has long recognized as reasonable, the Federal Courts of Appeals have

- 218 -

concluded unanimously, and we agree, that these intrusions must be deemed searches under the Fourth Amendment.").   Although Hatley and Pautler were enforcing a facially valid Order of Probation, the Order of Probation was not valid, because Reid had served his maximum probation term for CR-139.  Further, taking the facts as Reid alleges them, Hatley and Pautler did not have any independent justification for the search, because, although Reid's initials appear on the Order of Probation, he did not consent to the searches, nor were there any exigent circumstances or independent probable cause for the search.  He merely acknowledged by his initials that he had been told of the specific conditions; initialing is an attempt to keep violations to a minimum and not as an attempt to secure consent.  The search may have violated the Fourth Amendment, but Hatley and Pautler acted on an objectively reasonable belief that the facially valid Order of Probation allowed them to require Reid to submit to urine drug tests.  Put another way, Hatley and Pautler did not need to look past the facially valid Order of Probation to ensure that it was free from error.

The Court also looks, as it must, to Tenth Circuit precedent in reaching this conclusion. In Salmon v. Schwarz, 948 F.2d 1131 (10th Cir. 1991), the Tenth Circuit granted qualified immunity to defendant FBI agent Martin Schwartz, who executed a facially valid arrest warrant, even though the Tenth Circuit denied qualified immunity to defendant Arturo Gonzalez, the agent who obtained the arrest warrant.  See 948 F.2d at 1133, 1140-41.  The Tenth Circuit noted that, for qualified immunity, "the inquiry is confined to the objectively ascertainable question whether a reasonably well-trained official would have known that the search was illegal despite the magistrate's authorization."  948 F.2d at 1136 (citing United States v. Leon, 468 U.S. 897, at 911 n. 23).   "In Anderson[ v. Creighton, 438 U.S. 635 (1987),] the Court noted that a

determination whether an arrest or search was "objectively legally reasonable . . . will often require examination of the information possessed by the [arresting or] searching officials."  948 F.2d at 1136 (citing Anderson v. Creighton, 483 U.S. at 641, 643).  Although the Tenth Circuit determined that there were factual questions regarding how Gonzalez obtained the arrest warrant, "Schwarz did not participate with Gonzalez in the application for the arrest and search warrants," and the Tenth Circuit said that "he bears no liability for any lack of adequate probable cause to apply for the arrest warrant."  948 F.2d at 1136-37.  Schwarz argued that, "because he had no role in preparing the affidavit, and because the warrant issued by the magistrate was facially valid, his execution of the warrant is protected by the doctrine of qualified immunity," and the Tenth Circuit agreed.  948 F.2d at 1140.

> The Supreme Court held in Anderson that: "it is inevitable that law enforcement officials will in some case reasonably but mistakenly conclude that probable cause is present, and we have indicated that in such case those officials -- like other officials who act in ways they reasonably believe to be lawful -- should not be held personally liable." . . . .  We feel that an objectively reasonable officer clearly could have believed that Schwarz' execution of the facially valid arrest warrant was proper here so that his conduct was protected by the defense of qualified immunity.

948 F.2d at 1140-41 (citations omitted).  The Court concludes that, although the Order of Probation was erroneous, and although Hatley and Pautler did not have an independent basis for subjecting Reid to a urine drug test, an objectively reasonable officer could have believed that the Order of Probation was proper and that it provided the authority needed to conduct the search.  Reid has not pointed to any cases that demonstrate that Hatley and Pautler had a duty to look beyond the Order of Probation to determine if it was valid, and, by way of analogy to arrest warrants, the weight of authority counsels that the officers may rely on a facially valid court order unless they have other information to indicate that it is invalid.  See Hill v. Bogans, 735

F.2d 391, 393 (10th Cir. 1984)("Unless a warrant is facially invalid an officer has no constitutional duty to independently determine its validity.").  Reid has not alleged any facts that would indicate that Garcia, Pautler, or Hatley had any reason to doubt the Order of Probation. To the extent absolute immunity does not apply to the searches that Garcia, Pautler, and Hatley performed, the Court will grant the MTD for the Fourth Amendment search claim against them based on their qualified immunity defense.

###       F.      THE COURT WILL DISMISS REID'S FOURTH AMENDMENT SEIZURE CLAIMS AGAINST GARCIA, PAUTLER, AND HATLEY, BECAUSE THEY ARE QUALIFIEDLY IMMUNE.

Regarding the Fourth Amendment seizure claims against Garcia, Pautler, and Hatley, the Court notes that Reid has alleged that Garcia, Pautler, and Hatley falsely stated on the Arrest Order that Reid was a risk to himself and guilty of repeated violations of supervised conditions. Although the Defendants argue that Reid's admission to using marijuana establishes that he was a risk to himself, the Court is not convinced.

In State v. Ponce, 2004-NMCA-137, 136 N.M. 614, 103 P.3d 54, the defendant was arrested for violating the probation condition that he could not consume alcohol.  See 2004-NMCA-137, at ¶ 2.  The probation order also "provided that a warrant could be issued for Defendant's arrest for any probation violation and that '[w]hen acting in accordance with official policy and New Mexico law, your Probation Officer has the authority to have you arrested without a warrant.'"  2004-NMCA-137, at ¶ 13.

> When Defendant reported to the PPD office on February 8, 2001, he was arrested because a urinalysis performed three days earlier, on February 5, 2001, and received by the probation office on February 7 or 8, 2001, was positive for alcohol.  The arrest was pursuant to an "arrest order" prepared by Probation Officer Garnand on which Officer Garnand checked off boxes indicating that

Defendant was arrested both because he was a risk to himself and a risk to the public.

2004-NMCA-137, ¶ 2.  The probation officer conducted a patdown search of the defendant and found vehicle keys "which then ultimately led to a search of Defendant's vehicle where cocaine was found."  2004-NMCA-137, at ¶ 1.  The defendant sought to suppress the evidence from his vehicle, because he asserted, in part, that he was "arrested in violation of New Mexico Probation and Parole Division (PPD) Administrative Regulation PPD-215 which sets out PPD policy and procedure regarding arrests of petitioners."  2004-NMCA-137, at ¶ 4.  After the district court denied the motion to suppress, the defendant appealed, and argued that "the arrest and searches were unconstitutional because they violated standards in the probation division regulations."  2004-NMCA-137, at ¶ 5.

The Court of Appeals of New Mexico, in an opinion written by the Honorable Jonathan B. Sutin, Judge for the Court of Appeals of New Mexico, and in which the Honorable James J. Wechsler, Chief Judge, concurred, and from which the Honorable Michael E. Vigil dissented, discussed N.M. Stat. Ann. § 31-21-15(A)(3), which provides that authorized probation officers may arrest without a warrant probationers who violate probation conditions, see 2004-NMCA-137, ¶ 9, and PPD Regulation 215, which

states a policy that PPD arrest orders "are authorized when there is sufficient evidence to indicate a possible serious or repeated pattern of violation of conditions of probation or parole and there is a compelling need for detaining the offender, or the offender is a risk to public or individual safety."  PPD Regulation 215 procedures are contained in PPD Regulation 215.1 and 215.2.  The pertinent part of PPD Regulation 215.1 provides that officers who are authorized to arrest offenders may do so "in an emergency" when certain conditions exist, including:

3.       Instances in which a serious violation of parole or probation is evident and circumstances preclude the arrest being carried out by a law enforcement officer.

> 4.    The offender is an immediate threat of causing injury to himself or others.
>
> The pertinent part of PPD Regulation 215.2 states that arrest orders are for use to detain "an offender for a serious or continued probation . . . violation [], or when investigating such violation[]."  This regulation also provides that arrest orders "should not be used for any other purpose except as otherwise stated in Department policy and/or approved by the Director."

2004-NMCA-137, at ¶ 11 (alterations in original).

When the probation officer filled out the arrest order, he checked both "risk to self and risk to public."  2004-NMCA-137, at ¶ 17.  Although the defendant did not contest "the fact that his urine tested positive for alcohol" or "that the probation order together with the ISP agreement forbade him from consuming alcohol," he argued that,

> [w]hile "a probationer may be arrested for violating some condition of his probation by an act that would not constitute a crime in an ordinary situation," such an arrest is reasonable only if "it can be shown that the person presents a danger to himself or the public, or that his conduct represented a serious or repeated pattern of violations danger," as stated in PPD Regulation 215.

2004-NMCA-137, at ¶ 18.  The Court of Appeals of New Mexico noted that, "[e]ven in intensive supervision circumstances, the official policy in PPD Regulation 215 requiring a possible serious or repeated pattern of probation violations or a risk to public or individual safety must be proven by the State in order to justify an arrest."  2004-NMCA-137, at ¶ 18.  The Court of Appeals of New Mexico concluded that "[t]he State failed to establish these required grounds for his arrest." 2004-NMCA-137, at ¶ 18.  Because the state could not meet the requirements of PPD Regulation 215, the defendant argued that his arrest violated the Fourth Amendment and the New Mexico Constitution.  See 2004-NMCA-137, at ¶ 19.  The Court of Appeals of New Mexico disagreed:

> In our view, the determinative constitutional point is that Defendant's arrest was based on sufficient cause to pass muster under federal and State constitutional

reasonableness standards.  The arrest was by no means arbitrary or otherwise without reasonable basis.  The probation officer knew that Defendant's urine had three days earlier tested positive for alcohol and knew that Defendant was prohibited under his probation conditions from consuming alcohol.  The arrest having been based on this knowledge, we hold that the warrantless arrest was reasonable and constitutionally sufficient whether or not it was handled according to a more stringent administrative policy.

2004-NMCA-137, at ¶ 20.  Judge Vigil dissented from the majority on the issue whether the

vehicle searches were reasonable, but did not disagree with the majority's analysis of the arrest.

See 2004-NMCA-137, at ¶ 41 (Vigil, J., dissenting).

Just as the Court of Appeals of New Mexico concluded that the defendant's use of

alcohol did not mean that the defendant was a risk to himself, the use of marijuana, although

illegal, does not demonstrate that Reid was a "risk" to himself as the arrest order required.  On

the other hand, there is an independent basis on which Garcia, Pautler, and Hatley could rely to

justify arresting Reid, without relying on a finding that Reid was a "risk to self" or that he

repeatedly violated his probation conditions.  The first condition of the Order of Probation states:

"I will not violate any of the laws or ordinances of the State of NM, or any other jurisdiction."

Order of Probation at 1.  Another condition states: "I will not buy, sell, consume, possess or

distribute any controlled substances except those legally prescribed for my use by a State

Certified Medical Doctor."  Order of Probation at 2.  After listing all of the conditions, the Order

of Probation states:

You are hereby advised that under the law of the Court, it may at any time during the probation term issue a warrant for your arrest and your probation may be revoked if you violate any one of the conditions of this Order during the time of your probation.  When acting in accordance with official policy and New Mexico law, your Probation Officer has the authority to have you arrested without a warrant.

- 224 -

Order of Probation at 2.  Thus, under the Order of Probation, Garcia, Pautler, and Hatley had the authority to arrest Reid for violating at least state law when he consumed marijuana and for violating the term prohibiting him from consuming controlled substances.  The requirement that a probation officer find that a probationer is a risk to himself or has repeatedly violated probation conditions is not the constitutional standard for whether an arrest is reasonable; violation of state laws are not, standing alone, adequate to form the basis for a § 1983 claim.  When an officer has probable cause to believe that someone has violated the law, an arrest is reasonable.

The complicating fact here is that the Order of Probation, which gave the probation officers authority to arrest Reid for violating probation conditions, was erroneous, meaning that Garcia, Hatley, and Pautler did not have authority to arrest Reid.  The question on qualified immunity is whether a reasonable probation officer would have known that his actions would violate the Constitution.  Here, Garcia, Pautler, and Hatley reasonably relied on the Order of Probation to conclude that they had authority to arrest Reid for violating his probation conditions.  The Court concludes that, similar to the Fourth Amendment search claims against Garcia, Hatley, and Pautler, the Fourth Amendment seizure claims fail, because the officers could rely on the Order of Probation to arrest Reid for violating his probation conditions, which stated that he would not violate New Mexico law and he would not consume controlled substances.

## III. REID HAS NOT ALLEGED THAT MULLER WAS PERSONALLY INVOLVED IN ANY OF THE ALLEGED CONSTITUTIONAL VIOLATIONS, NOR HAS HE ALLEGED FACTS THAT WOULD SUPPORT SUPERVISORY LIABILITY.

Reid included very little information in the FAC regarding Muller; he alleges only that, (i) "[b]eginning at some point prior to September of 2011, the Plaintiff was being directly

- 225 -

supervised by Defendant Gregory Garcia, who in turn was subject to the supervision of the Defendant Kristy Muller," FAC ¶ 14, at 4; and (ii) that, on the Arrest Order, "Defendant Hatley signed the order on behalf of Defendant Muller," FAC ¶ 15, at 4.  As the FAC alludes, the Arrest Order includes a typed line indicating where Muller would sign it, but the signature is not hers. See Arrest Order at 1.  Because Reid has not alleged that Muller was personally involved in any of the conduct, the Court understands Reid to be asserting supervisory liability against Muller.

"Supervisory liability 'allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, [or] implements . . . a policy . . . which subjects, or causes to be subjected that plaintiff to the deprivation of any rights . . . secured by the Constitution." Brown v. Montoya, 662 F.3d at 1163-64 (alterations in original)(quoting Dodds v. Richardson, 614 F.3d 1185, 1199 (10th Cir. 2010)).  To establish supervisory liability, "a plaintiff must show that '(1) the defendant promulgated, created, implemented or possessed responsibility for the continued operation of a policy that (2) caused the complained of constitutional harm, and (3) acted with the state of mind required to establish the alleged constitutional deprivation.'" Brown v. Montoya, 662 F.3d at 1164 (quoting Dodds v. Richardson, 614 F.3d at 1199).  Reid has not alleged that any of the Defendants acted pursuant to a policy, or that Muller promulgated, created, implemented, or possessed responsibility for a policy that caused the alleged constitutional harms.  To the extent Reid's claim against Muller is for supervisory liability, the Court will grant the MTD and dismiss the claims against her, because he has not alleged any facts that support supervisory liability.

Reid has also not alleged facts sufficient to implicate Muller for personal liability, because none of the facts show that she was personally involved in the alleged constitutional

violations.  The closest allegation of personal involvement is that her typed name was on the Arrest Warrant, but Reid did not allege that she gave Hatley permission to sign for her; rather, Reid alleged that "Defendant Hatley signed the order on behalf of Defendant Muller."  FAC ¶ 15, at 4.  This scintilla of an allegation is insufficient to implicate Muller in the alleged constitutional violations.  See Robbins v. Oklahoma, 519 F.3d at 1249-50 (stating that "it is particularly important" in § 1983 cases, when defendants sue "a number of government actors," that "the complaint make clear exactly who is alleged to have done what to whom, to provide each individual with fair notice as to the basis of the claims against him or her").

## IV.   BECAUSE HECK v. HUMPHREY WOULD BAR REID'S PROPOSED ADDITIONAL CLAIMS, THE COURT WILL NOT PERMIT REID TO AMEND THE COMPLAINT.

In the Motion to Amend, Reid moves to amend the FAC to include a Fifth Amendment violation -- that Ross deprived him of his right to be free from double jeopardy -- and a Sixth Amendment violation -- that Ross deprived him of his right to be represented by counsel when she obtained Judge Purcell's signature on the Order of Probation without providing him with an attorney.  See Second Amended Complaint for Violation of Civil Rights ¶¶ 37, 42, at 8-9, attached as Exhibit 1 to the Motion to Amend, filed May 30, 2014 (Doc. 48-1).

Regarding the Sixth Amendment claim, Reid explains:

> The United States Supreme Court has long held that the Sixth Amendment guarantees a defendant the right to have counsel present at all critical stages of the pr[o]ce[e]ding.  Montejo v. Louisiana, 556 U.S. 778 . . . (2009).  That includes the right to be represented by an attorney at sentencing.  Gardner v. Florida, 430 U.S. 349 . . . (1977).

> In this instance Defendant Ross should have been aware that the Plaintiff Rick Reid was entitled to be represented by an attorney.  Yet she proceeded to obtain the Plaintiff's signature on the 2007 Order of Probation without providing Reid with an attorney and giving counsel the opportunity to determine the

appropriateness of the new order.  The Plaintiff believes this gives rise to a Section 1983 claim based upon the Sixth Amendment violation.

Motion to Amend at 2.  Regarding the Fifth Amendment double jeopardy claim, Reid asserts:

> The double jeopardy clause of the Fifth Amendment to the United States Constitution prohibits imposing multiple punishments on an individual defendant for the same offense.  Warnick v. Booher, 425 F.3d 842, 847 (10th Cir. 2005). The multiple punishment prohibition includes prohibitions against greater punishment than the legislature intended and against sentence modifications that are contrary to the defendant's legitimate expectation of the finality of his sentence.  Id.

> In this instance, the 2007 Order of Probation violated both of those prohibitions.  First, the Order of Probation imposed an additional five (5) years of supervised probation on the Plaintiff when, in fact, New Mexico statutes and case law clearly limit the length of time a person can spend on probation to five (5) years.  State v. Devigne, 1981-NMCA-088, 96 N.M. 561, 632 P.2d 1199 (App. Ct. 1981); N.M.S.A 1978 § 31-20-5(A).

> Second, the 2007 Order of Probation unquestionably deprived the Plaintiff of his legitimate expectation that he was only going to be on probation for five (5) years.  That expectation is best reflected by the court orders as well as his questioning of Defendant Ross when she made him sign the 2007 Order of Probation.  The conduct of Defendant Ross violated the Plaintiff's right to be free of double jeopardy.  See State v. Allen, 1971-NMSC-021, 82 N.M. 373, 482 P.2d 237 (S. Ct. 1971).

Motion to Amend at 2-3.

In response, the Defendants reiterate arguments from the MTD that they are entitled to absolute and qualified immunity, and, thus, that an amended complaint would be futile.  See Defendants' Response to Plaintiff's Opposed Motion to Amend Complaint and Memorandum Brief in Support Thereof at 3, filed June 13, 2014 (Doc. 52)("Response to Motion to Amend").  Further, the Defendants argue that Heck v. Humphrey also bars the two proposed additional claims.  See Response to Motion to Amend at 7.

The Court agrees with the Defendants that allowing Reid to amend the FAC to include a Fifth Amendment double jeopardy claim and a Sixth Amendment right to counsel claim would be futile, because <u>Heck v. Humphrey</u> bars both claims.  The Court must consider "whether a judgment in favor of the plaintiff would necessarily imply the invalidity of his conviction or sentence; if it would, the complaint must be dismissed unless the plaintiff can demonstrate that the conviction or sentence has already been invalidated."  <u>Heck v. Humphrey</u>, 512 U.S. at 486-87.

Reid challenges the constitutionality of the Order of Probation, including the fact that he did not have an attorney; succeeding on the Sixth Amendment claim would "necessarily imply the invalidity of his conviction or sentence," <u>Heck v. Humphrey</u>, 512 U.S. at 487, that is, his sentence of probation.  If the Court were to find merit to his claim that the Constitution required that he have an attorney present when Judge Purcell signed the Order of Probation or when Ross presented it to Reid, that finding would necessarily imply that the Order of Probation was invalid.  Because the Court has elsewhere concluded that Reid has not shown that his Order of Probation was overturned or otherwise invalidated, and that Reid was not diligent in seeking to overturn or invalidate the Order of Probation, <u>Heck v. Humphrey</u> bars his claim.

Similarly, Reid challenges that the Order of Probation amounts to a harsher sentence and violates the constitutional guarantee against double jeopardy.  Success on this claim would necessarily imply the invalidity of the Order of Probation.  <u>See</u> <u>Roberts v. O'Bannon</u>, 199 F. App'x 711, 714 (10th Cir. 2006)(unpublished)(dismissing the plaintiff's § 1983 claim that his indictment violated the double jeopardy clause under <u>Heck v. Humphrey</u>, because judgment in favor of the plaintiff would necessarily imply the invalidity of his convictions and the plaintiff

failed to show he had been exonerated on the charges).  Because the Court concludes that <u>Heck</u> <u>v. Humphrey</u> would bar both of Reid's proposed additional claims, amendment would be futile. The Court will deny the Motion to Amend.

     **IT IS ORDERED** that: (i) the Defendants' Opposed Motion to Dismiss First Amended Complaint for Violation of Civil Rights, filed August 16, 2013 (Doc. 26), is granted; and (ii) the Plaintiff's Opposed Motion to Amend Complaint and Memorandum Brief in Support Thereof, filed May 30, 2014 (Doc. 48), is denied.

 

_____
UNITED STATES DISTRICT JUDGE

*Counsel*:

Warren F. Frost
Warren F. Frost, P.C.
Logan, New Mexico

     *Attorney for the Plaintiff*

Raul A. Carrillo, Jr.
Daniel D. James
Carrillo Law Firm, P.C.
Las Cruces, New Mexico

     *Attorneys for the Defendants*